UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

RUBEN NARRO, Plaintiff,

VS.

SINGH SUKHWINDER, et al., Defendants.

CAUSE NO. 5:24-CV-045-H

---

TRANSCRIPT OF TRIAL
VOLUME 1 OF 2
BEFORE THE HONORABLE JAMES WESLEY HENDRIX,
UNITED STATES DISTRICT JUDGE, and A JURY

OCTOBER 20, 2025
LUBBOCK, TEXAS

---

FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

A P P E A R A N C E S

FOR THE PLAINTIFF:
ANDERSON ALEXANDER
ATTORNEYS AT LAW
101 N SHORELINE BOULEVARD, SUITE 610
CORPUS CHRISTI, TEXAS 78401
BY: STEPHEN F. BECHTOL

BENJAMIN H. DAVIDSON
ATTORNEY AT LAW
5010 UNIVERSITY AVENUE, SUITE 500
LUBBOCK, TEXAS 79413

FOR THE DEFENDANTS:
MEHAFFY WEBER
ATTORNEYS AT LAW
ONE ALLEN CENTER
500 DALLAS STREET, SUITE 2800
HOUSTON, TEXAS 77002
BY: WARREN B. WISE
GRANT CARPER

* * * * *

INDEX
VOLUME 1

VOIR DIRE EXAMINATION BY THE PLAINTIFF................. 34

VOIR DIRE EXAMINATION BY THE DEFENDANTS................ 51

JURY SEATED............................................ 76

PRELIMINARY INSTRUCTIONS TO THE JURY................... 79

OPENING STATEMENT BY THE PLAINTIFF..................... 85

OPENING STATEMENT BY THE DEFENDANTS.................... 94

WITNESSES FOR THE PLAINTIFF:

SUKHWINDER SINGH (VIA VIDEOTAPED DEPOSITION)........... 103

DAVID BALAT
DIRECT EXAMINATION BY MR. BECHTOL................ 105
CROSS-EXAMINATION BY MR. CARPER.................. 119
REDIRECT EXAMINATION BY MR. BECHTOL.............. 131

MARK VALENTE, D.O. (VIA VIDEOTAPED DEPOSITION)......... 132

EMRI NARRO
DIRECT EXAMINATION BY MR. BECHTOL................ 136

RUBEN NARRO
DIRECT EXAMINATION BY MR. BECHTOL................ 169
(CONTINUES IN VOLUME 2)

WITNESSES FOR THE DEFENDANTS:
(None)

(continued)

INDEX (CONTINUED)
VOLUME 1

PLAINTIFF'S EXHIBITS


| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| NO. 1 | SINGH DEPOSITION EXCERPT | | 201 |
| NO. 2 | VALENTE DEPOSITION EXCERPT | | 201 |


DEFENDANTS' EXHIBITS


| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| (None) | | | |

REPORTER'S CERTIFICATE.................................. 204


* * * * *

P R O C E E D I N G S

THE COURT: Good morning, everyone.

PANEL MEMBERS: (In unison) Good morning.

THE COURT: My name is Wes Hendrix, and I am the United States District Court Judge for the Northern District of Texas's Lubbock Division. I'm also the federal judge that covers our Abilene Division and our San Angelo Division. This is a Lubbock Division case. So welcome. Welcome to court. It's the people's court, and I appreciate you being here. Every month, I throw these parties, and it's like sending invitations to a party that no one wants to attend. So I want to talk about that for just a few minutes.

I've sat where you sat. I've been a juror. I know and I'm certain that all of you are mothers and fathers and daughters and sons and sisters and brothers and employers and employees and friends and neighbors and have a lot of things going on in your life. It's incredibly rare that someone gets a jury service summons and says, that's perfect timing. You know, I'm so glad I got it right now. This is perfect.

Sometimes we get those people, and we sometimes get people that are just--they just love jury service. Most, understandably, view it as what it is. And, in one respect, it is an interruption. And so I recognize that; both sides in this case recognize that; and we genuinely appreciate your presence despite it.

09:11 We had a few people not show up. I want you to know that-- It's just two. I'll be talking to those two people. I will be sending them an order that will be handed to them by our United States Marshal's Service, and they're not off the hook. So they will come. They will have to take time out to explain why they couldn't be here. Sometimes there's good reasons. There's an emergency or whatever. But I have the power to fine. I even have the power to put someone in jail for three days. I have not done that before. That seems excessive. But for those that didn't show, please know I'm not going to just overlook that.

09:11 And there's a reason. And the reason is, what you are here to do today is incredibly important. So it's an interruption, but it is government by the people. Our founders, decades and centuries ago, made a decision, and that decision was, we are going to have government by the consent, the consent of the governed, and that's the people.

09:12 I have been nominated by the President to be a federal district court judge, and confirmed by the Senate, and with that comes a lot of power. I can do a lot of things. But even with all of that, there are some things that I cannot do. In our founders' wisdom, they decided that only the people could make certain decisions. And that's a good thing.

09:12 One of the things that only the people can do is help parties resolve their factual disputes. I can't do that.

Unless the parties agree to give me that power, only the people can decide what happened, what are the facts and, as a result, are the elements of whatever cause of action we're dealing with met.

09:13 That's what you're here to do today. That is in the best tradition of our government and the consent of the governed, and you should be proud of your service today despite the interruption. So in all seriousness, on behalf of the Court and the parties, thank you.

09:13 Now, as inspired as I'm sure you all are and now so excited to be here because of my little speech about American history, I also know what's in probably 95 percent of your heads. Let me see if I can guess. How long is this going to take? All right. I see some smiles. Maybe I didn't get 95 percent, but many of you.

09:13 I can tell you that I ask the parties for their best estimates as to how long a trial is going to take, because we want to be respectful of your time and help you plan your week, as well. And they tell me that their best estimate is that the case will take roughly three days. Usually, we can beat those estimates, but you should plan for three days.

09:14 Now, let me be clear. That's for the entire trial. That's for those that are going to be chosen to sit in this box over here and to hear this case. This morning, for this part of trial, which is called voir dire, this will be done by

lunch, if not sooner. So for those of you that are not selected, you're going to be free to go before lunch. You can go on about your day.

We're going to seat eight jurors in this case, because it's a civil trial. It's not a criminal trial. So I don't have to choose eight jurors. So only eight of you will be selected. The rest of you will be free to go and dismissed from this trial before lunch. So if that helps, kind of, you just get a sense of what you're facing, I'm glad to provide that.

Okay. I've introduced myself, but let me introduce you to the Court's team.

My assigned law clerk is to my right. His name is Ben Buell. He is a young lawyer. Clerked on the Circuit Court last year and is now with me. He's the brains of the operation.

My courtroom deputy is right in front of me. Her name is Criss Flock. She makes sure all the trains run on time. She'll be doing 17 things at once. If you see her juggling chainsaws, it's totally normal. It's a job requirement.

And then our fantastic court reporter, Mechelle Daniel, is to my left. She is required to take down everything that is said. She's probably the most powerful person in the room because she has license, if anyone is talking too fast--

usually it's me--or if we're talking at the same time--again, usually it's me--she has a green light to throw things at my head.

09:15 All right. People will be coming in and out of the courtroom during trial. I want you to know that's perfectly normal. This is an open courtroom to the public. We have hundreds and hundreds of cases that never stop, and so work continues even during trial. Don't view that as unusual. It is not.

09:16 The first official order of business is to give you an oath. So if you are here in response to a jury summons, if you would please rise as you are able and raise your right hand.

09:16 (THE PANEL MEMBERS ARE SWORN)

09:16 THE COURT: All right. Thank you very much. You have been sworn. Please be seated.

09:16 All right. First, I need to confirm that each of you are qualified to serve as jurors in this district. Every person is deemed qualified to serve in this district if:

09:17 You're a citizen of the United States;

09:17 You're at least eighteen years old;

09:17 You have resided for a period of at least one year within the Northern District of Texas and you currently live in any of the following counties: Bailey, Borden, Cochran, Crosby, Dawson, Dickens, Floyd, Gaines, Garza, Hale, Hockley, Kent,

Lamb, Lubbock, Lynn, Motley, Scurry, Terry, or Yoakum counties;

09:17 Next, you're qualified if you're able to read, write, and understand the English language with a degree of proficiency sufficient to fill out the juror qualification form satisfactorily;

09:17 Next, if you're able to speak the English language;

09:17 Next, if you're capable, both mentally and physically, to render satisfactory jury service; and

09:18 Finally, if you have neither a charge pending against you for the commission of, nor have you been convicted in a state or federal court of record of, a crime punishable by imprisonment for more than one year and your civil rights have not been restored by pardon or amnesty.

09:18 If there is anyone here who believes they are not qualified to serve based on those list of qualifications, would you please raise your hand.

09:18 Seeing no hands, I find that you are all qualified.

09:18 Now, even though you're qualified, there are certain members of our community who are exempt from jury service, so please listen carefully. The following members are exempt:

09:18 First, members in the active service in the Armed Forces of the United States;

09:18 Second, members of the fire or police departments of any state, district, territory, possession, or subdivision

thereof; and

Finally, any public officers in the executive, legislative, or judicial branches of the government of the United States or any state, district, territory, possession, or subdivision thereof, who are actively engaged in the performance of official duties.

Is there anyone here who believes they are exempt based on those three categories? If so, would you please raise your hand.

Seeing no hands, I find that no one is exempt.

Now, even though you are qualified and not exempt, certain members of the community may seek to be excused from jury service if you fall within any of the following categories. It is within my discretion, however, to grant any excuses. The following groups might be excused from service:

First, persons who are licensed to and who are actively practicing medicine in the State of Texas;

Second, persons having active care of a child or children under ten years of age whose service on a jury would require leaving the child or children without adequate supervision;

Third, persons essential to the care of the aged or infirm persons;

Fourth, persons over seventy years of age;

Fifth, persons who are full-time students of a

public or private secondary school or an accredited college or university;

09:20 Sixth, persons who are volunteer safety personnel, that is, those serving in an official capacity without compensation as firefighters or members of a rescue squad or ambulance crew; and

09:21 Seventh, persons who have, within the past two years, served on a federal grand jury or trial jury panel for more than 30 days.

09:21 Based on those categories, is there anyone here who would seek to be excused from jury service? If so, would you please raise your hand.

09:21 Seeing no hands, I find that no one seeks to be excused. Just did I--I didn't miss anyone, did I? Okay. All right. No one is seeking to be excused.

09:21 My very first law clerk, these young lawyers that help the Court for a year, was from Boston, went to school in Chicago, and was always just shocked and impressed that the people of West Texas don't really seek to be excused from jury service. Apparently, in Boston, people will show up in costume and be speaking in tongues to try to get out, doing whatever they can. But we know our duties in West Texas, so even if it is an interruption, I do appreciate your willingness to serve.

09:21 All right. Let me give you a case overview and an explanation of this portion of trial, voir dire. We're going

to begin trial this morning in Case Number 5:24-CV-045. The case is called Ruben Narro vs. Singh Sukhwinder, et al.

09:22 This is a civil case, so not a criminal case, brought by the plaintiff, Ruben Narro, against the defendants, Sukhwinder Singh and S. Chahal Trucking, Incorporated. You're going to hear more details soon, but, in short, the plaintiff alleges that he was injured when a tractor-trailer driven by the defendant collided with the plaintiff's vehicle. As I've noted previously, I anticipate the case will take about three days to try.

09:22 The first stage of the proceedings is called voir dire. The purpose of voir dire is to select jurors that we believe are best situated to try this particular case and to help the parties resolve this particular dispute.

09:23 So in order to do that, we need to ask you some questions. We're not trying to pry when we ask these questions. We're just trying to get enough information to determine whether anyone might not be well suited to hear this case. For example, if this were a bank robbery trial, which I have in this courtroom, and you are a bank teller who was robbed on Friday, probably not the best juror to sit in a bank robbery trial. That's just one example of questions we might be asking and why we are asking them.

09:23 So my first question is to see if anyone is familiar or knows the parties in this case. Here this morning,

the plaintiff, Ruben Narro, is represented by Stephen Bechtol and co-counsel.

09:24 Mr. Bechtol, would you please rise, introduce yourself, your co-counsel, and your client.

09:24 MR. BECHTOL: Good morning, everybody. This is my client, Mr. Ruben Narro.

09:24 THE COURT: Mr. Narro, would you please rise--

09:24 MR. NARRO: Yes, sir.

09:24 THE COURT: --just so everybody can see you. Thank you.

09:24 MR. BECHTOL: I'm Stephen Bechtol. I'm his attorney, along with my co-counsel, Ben Davidson.

09:24 THE COURT: All right. Thank you, Mr. Bechtol.

09:24 Is there anyone here who knows or has any familiarity with Mr. Bechtol; his client, Mr. Narro; or his co-counsel, Mr. Davidson? If so, would you please raise your hand.

09:24 All right. Seeing no hands, I find that no one does.

09:24 All right. The defendants, Mr. Singh and S. Chahal Trucking, Incorporated, are represented by Mr. Wise. Mr. Wise, if you would please rise and introduce yourself, your co-counsel, and your team.

09:24 MR. WISE: Yes, Your Honor.

09:24 Good morning, everybody. My name is Warren Wise.

My assistant to my left here is Michelle Stutes. And my associate attorney Grant Carper is further to my left.

09:25 THE COURT: Thank you, sir.

09:25 Is there anyone here who is familiar with defense counsel and the defense team? If so, would you please raise your hand.

09:25 Seeing no hands, I find that no one is.

09:25 All right. So I have confirmed that you don't know any folks at these tables or their parties, their clients. But what about the Court? Is there anyone here who knows or has any familiarity with my team, the Court's team, court staff, or me? Obviously, I have a lot of cases. Sometimes I'm in the news, whether I like it or not. I'm doing my best. Whatever it was, I'm sorry. Is there anyone here who has knowledge of the Court and court staff? If so, please raise your hand.

09:25 Excellent. Seeing no hands, I find that no one does. Occasionally, to my great terror, someone raises their hand and says, I went to elementary school with you here in Lubbock. And it's just, like, oh, no, this is not going to go well. So excellent.

09:26 Let me give you a little bit more of an overview of the case. I'm not going to detail each side's party--each side's view of the case, because obviously, there are two sides to every story. I just want you to understand the basics of what happened, because I'm going to ask if you're familiar with

the case at all.

09:26 This lawsuit arises from a vehicle collision that occurred at an intersection in Lubbock, Texas. The plaintiff alleges that he was injured by the defendant's negligence in failing to prevent the collision.

09:26 The defendants allege that the collision was not the cause of the plaintiff's injuries and that the plaintiff's requested damages are not reasonable or necessary.

09:26 Again, that's just a quick overview, but based on that, is there anyone here who happens to have any familiarity with the case? If so, would you please raise your hand.

09:27 Seeing no hands, I find that no one does.

09:27 Next, is there anyone here who has heard any comments or statements or pretrial publicity, social media posts from anyone involved or anything about this case? If so, would you please raise your hand.

09:27 Seeing no hands, I find that no one has.

09:27 All right. Next, I'm going to ask if any of you know any of the potential witnesses that might be called by both sides.

09:27 So, Mr. Bechtol, if you would please rise and tell the jury what witnesses you expect to call. Go ahead.

09:27 MR. BECHTOL: All right. In this case, obviously, you're going to hear from my client, Mr. Narro. You will also hear from his wife, Emri Narro. She's in the back of the

courtroom. And then you will also hear from his treating orthopedic surgeon. His name is Dr. Mark Valente. And then you will hear from a billing expert. His name is David Balat.

And that is the total of plaintiff's witnesses.

THE COURT: All right. Thank you.

Is there anyone here who knows or has any familiarity with those witnesses from the plaintiff? If so, please raise your hand.

All right. Seeing no hands, I find that no one does.

All right. Mr. Wise, if you would please tell the jurors of your potential witnesses.

MR. WISE: Yes. We expect to call two witnesses in this case. One, his name is Dr. Ernest Chiodo. The other is a billing expert by the name of Jana Schieber.

THE COURT: Thank you very much.

Is there anyone here who knows or has any familiarity with those two witnesses? Please raise your hand if so.

All right. Seeing no hands, I find that no one does.

Okay. The next question is about prior jury service. If you have previously served as a juror in a civil or criminal case, would you please raise your hand. Let me start with the front row, the row that's closest to me. If you

09:29 have previously served as a juror in a civil or criminal case at any point, please raise your hand.

09:29 All right. Just one hand in the first row. We've got a lot of rookies. Welcome to the club. Let us get a microphone to you. All right. That is Juror Number 6; is that right?

09:29 PANEL MEMBER NO. 6: Yes, sir.

09:29 THE COURT: All right. Juror Number 6, if you would please rise just so my courtroom--or court reporter can see you better. Tell us about that.

09:29 PANEL MEMBER NO. 6: It was a couple of years ago, a divorce, custody for children.

09:29 THE COURT: Was it here in Lubbock?

09:29 PANEL MEMBER NO. 6: Yes.

09:29 THE COURT: Did you reach a verdict in that case?

09:29 PANEL MEMBER NO. 6: They settled.

09:29 THE COURT: All right. So you started to hear evidence in the case?

09:29 PANEL MEMBER NO. 6: Yeah, we probably had one day, and then--one and a half. We came back from lunch and then they dismissed us.

09:30 THE COURT: Understood. And is that the only time you've previously served as a jury?

09:30 PANEL MEMBER NO. 6: Yes, sir.

09:30 THE COURT: All right. Would anything about that

experience affect your ability to be fair and impartial in this case?

PANEL MEMBER NO. 6: No, sir.

THE COURT: Thank you very much.

All right. Anyone else on the front row that I missed? Okay. Second row, prior jury service? Man, lots of-- Oh, there's one. Okay. Yeah, we'll--if there's a doubt, like maybe this counts, maybe it doesn't-- Let me get you a microphone, sir. Go ahead. Tell me about it.

PANEL MEMBER NO. 18: Yes. I was previous--I served the last six months on grand jury in Brownfield, in Terry County.

THE COURT: All right.

PANEL MEMBER NO. 18: So I don't know if that qualifies.

THE COURT: Absolutely. Are you Juror Number 18?

PANEL MEMBER NO. 18: Juror Number 18, sir.

THE COURT: All right. Thank you very much. So you said you've served as a grand juror?

PANEL MEMBER NO. 18: Yes, the last six months of this year in Terry County, yes, sir.

THE COURT: Is that grand jury still going?

PANEL MEMBER NO. 18: I believe we are concluded, sir.

THE COURT: Okay. All right. Did you return true

bills and not true bills--

PANEL MEMBER NO. 18: Yes, sir, we--

THE COURT: --as a grand jury?

PANEL MEMBER NO. 18: Yes, sir, we did during that time.

THE COURT: Both true and not true?

PANEL MEMBER NO. 18: Yes, sir.

THE COURT: Understood. Would anything about that experience affect your ability to be fair and impartial here?

PANEL MEMBER NO. 18: No, sir, they would not.

THE COURT: Okay. Thank you very much.

PANEL MEMBER NO. 18: You're welcome.

THE COURT: Juror Number 18 has been busy. Welcome back. We should have, like, a frequent juror card. Get a free sandwich or something.

PANEL MEMBER NO. 18: An award or something.

THE COURT: Yeah. I'll punch your ticket before you leave. It's good for about the ink it's painted--or ink it's printed on.

Okay. What about the last row? Any prior jury service? All right. I see one hand. All right. Is that Juror Number 32?

PANEL MEMBER NO. 32: Yes.

THE COURT: All right. Tell us about that, madam.

PANEL MEMBER NO. 32: It was about 15 years ago,

and it was a lady that was running a meth lab.

THE COURT: Okay. So criminal case?

PANEL MEMBER NO. 32: Yes.

THE COURT: Was it here in Lubbock?

PANEL MEMBER NO. 32: Yes.

THE COURT: Was it in this courtroom or across the street?

PANEL MEMBER NO. 32: I think across the street.

THE COURT: Were you able to reach a verdict in that case?

PANEL MEMBER NO. 32: Yes.

THE COURT: Was it for the State or for the defendant; do you remember?

PANEL MEMBER NO. 32: The State.

THE COURT: So you found the defendant guilty?

PANEL MEMBER NO. 32: Yes.

THE COURT: And is that the only time you've served as a juror?

PANEL MEMBER NO. 32: Yes.

THE COURT: And you said about 15 years ago?

PANEL MEMBER NO. 32: (Nods head up and down.)

THE COURT: Would anything about that affect your ability to be fair and impartial here?

PANEL MEMBER NO. 32: No.

THE COURT: Thank you very much.

09:32 Anyone else on the last row? All right. Anyone that's since remembered, oh, yeah, I forgot, wait a second. Anyone that I missed? Okay. All right. One second. We'll start on the front row.

09:32 Okay. Juror Number 11. Raise your hand, please, so we can get you the microphone. All right. If you would please rise. Use that mic. All right. Good morning, sir.

09:32 PANEL MEMBER NO. 11: Good morning.

09:32 THE COURT: Would you please tell me about that.

09:32 PANEL MEMBER NO. 11: I was on the grand jury in Gail. I didn't know if that counted or not, but--

09:32 THE COURT: That's fine. How long did that grand jury last?

09:32 PANEL MEMBER NO. 11: Four or five hours. It was just a--just a one-day thing.

09:32 THE COURT: Oh, okay. Interesting. So just one day. You didn't sit as a grand juror over a period of months or 30 days or something deciding whether to indict--

09:33 PANEL MEMBER NO. 11: No. There was-- I did, but there wasn't many cases.

09:33 THE COURT: I understand. Did you return true bills and not true bills?

09:33 PANEL MEMBER NO. 11: Yes, sir.

09:33 THE COURT: Would anything about that affect your ability to be fair and impartial here?

09:33 PANEL MEMBER NO. 11: No, sir.

09:33 THE COURT: All right. Thank you very much. I think there was a hand to your left.

09:33 Yes. We'll hand that to you. Juror Number 14. Correct?

09:33 PANEL MEMBER NO. 14: Yes, sir.

09:33 THE COURT: Good morning.

09:33 PANEL MEMBER NO. 14: It was in Lubbock County. It was a criminal case, and it lasted about a week. At the end of the final day, charges were dismissed.

09:33 THE COURT: Interesting. Okay. So you were not asked to render a verdict one way or the other?

09:33 PANEL MEMBER NO. 14: No.

09:33 THE COURT: Would anything about that affect your ability to be fair and impartial here?

09:33 PANEL MEMBER NO. 14: No.

09:33 THE COURT: Okay. Thank you very much.

09:33 All right. I think I might have seen another-- First row, Juror Number 10. Yes, ma'am?

09:33 PANEL MEMBER NO. 10: I was on the grand jury here in Lubbock for a month probably about ten years ago.

09:34 THE COURT: All right. Did you return both true bills and not true bills?

09:34 PANEL MEMBER NO. 10: Yes, sir.

09:34 THE COURT: Would anything about that affect your

ability to be fair and impartial?

09:34 PANEL MEMBER NO. 10: No, sir.

09:34 THE COURT: Thank you very much.

09:34 All right. Anybody else that I missed? Okay. We have one more from Juror Number 18, our frequent flier. Yes.

09:34 PANEL MEMBER NO. 18: Yes, sir. Sorry about that. Like her, I served on a grand jury when I used to live in Lubbock, probably somewhere between 2007 and 2010, for about two weeks.

09:34 THE COURT: Okay. And would anything about that affect your ability to be fair and impartial?

09:34 PANEL MEMBER NO. 18: No, sir, they would not.

09:34 THE COURT: Thank you. And you now live in Brownfield?

09:34 PANEL MEMBER NO. 18: Yes, sir.

09:34 THE COURT: Okay. Thank you very much, sir.

09:34 PANEL MEMBER NO. 18: You're welcome.

09:34 THE COURT: Okay. The next question is whether anyone--it's about prior involvement in lawsuits. Is there anyone on the jury panel who has ever brought a lawsuit against someone else? So if you were a plaintiff that brought a lawsuit against someone else and that case was brought in state or federal court, would you please raise your hand. And it's not a--it's not a nasty thing. Sometimes people need courts to help them resolve their differences. Anyone ever sued someone

else?

09:35 Seeing no hands, there's no prior plaintiffs.

09:35 Okay. What about the opposite? Is there anyone here who has ever been sued? Ever been served with a lawsuit that resulted in litigation and you were a defendant in the case? If so, if that's true, would you please raise your hand.

09:35 All right. Not many prior jurors. No prior lawsuits. Whatever y'all are doing, you're living clean. Keep it up.

09:35 Is there anyone here who, although never suing or being sued, has served as a witness in a criminal or civil case? If you have ever been a witness in a case, would you please raise your hand. All right. We've got a couple. All right. We'll start in the front row. One second. Let's start over here. All right. That's fine. Go ahead. All right. You are Juror Number 8; is that right?

09:36 PANEL MEMBER NO. 8: Yes, sir.

09:36 THE COURT: All right. Tell us about that.

09:36 PANEL MEMBER NO. 8: My former employer was sued in the State of Ohio, and I testified as a--on behalf of the company regarding the financial condition of the company.

09:36 THE COURT: All right. What was the lawsuit about?

09:36 PANEL MEMBER NO. 8: Simply put, really, wage-and-hour dispute that an attorney tried to turn into something bigger.

09:36 THE COURT: All right. So the allegation against your employer was that you weren't paying overtime or just salaries as required?

09:36 PANEL MEMBER NO. 8: Yes.

09:36 THE COURT: Okay. Would anything about that experience affect your ability to be fair and impartial here?

09:37 PANEL MEMBER NO. 8: No.

09:37 THE COURT: Thank you very much.

09:37 All right. We had one to my left, Juror Number 5, I believe, if you'd raise your hand.

09:37 PANEL MEMBER NO. 5: Yes, sir.

09:37 THE COURT: We'll get you a microphone. One second.

09:37 Okay. Juror Number 5, tell us about that. And if you need to stay seated, that's fine. It just helps the--

09:37 PANEL MEMBER NO. 5: I'm just slow.

09:37 THE COURT: All right. Go ahead.

09:37 PANEL MEMBER NO. 5: I worked as a correctional officer, and in the arena of my job, I had to do that upon occasion.

09:37 THE COURT: I see. So you've testified as a witness multiple times?

09:37 PANEL MEMBER NO. 5: Yes.

09:37 THE COURT: Were any of those cases civil cases that sought damages?

09:37 PANEL MEMBER NO. 5: Two or three of them.

09:37 THE COURT: All right. And some of them were criminal cases?

09:37 PANEL MEMBER NO. 5: Yes.

09:37 THE COURT: Okay. About how long ago was that?

09:37 PANEL MEMBER NO. 5: The last one was probably six years.

09:37 THE COURT: All right. Would anything about being a witness in multiple cases, both civil and criminal, affect your ability to be fair and impartial here in this case?

09:38 PANEL MEMBER NO. 5: I don't think so.

09:38 THE COURT: All right. Well, let me follow up on that, because I'm sure the parties are going to want to. This is obviously a civil case. It is a car accident, and the allegation is that the defendants' negligence caused these injuries, and compensation needs to result. So sounds very different than the cases you were involved in.

09:38 If you were selected as a juror, would you be able to set aside prior experience as a witness and decide this case based only on my instructions and the evidence that's presented? Could do you that?

09:38 PANEL MEMBER NO. 5: Yes, sir.

09:38 THE COURT: Okay. All right. Let me ask you a related question. I see that you're using the services of a cane. Would you be able--do you have any concern about sitting

in the jury box for a few days? Would that cause you distraction or pain or--I don't want to--and I'm sure the parties wouldn't want to do that. Any problem there?

09:38 PANEL MEMBER NO. 5: No, sir.

09:39 THE COURT: Okay. Thank you very much. Great.

09:39 Okay. Anyone else on the first row? Okay. Second row? All right. One second. We'll get you a microphone. You are Juror Number 25; is that correct?

09:39 PANEL MEMBER NO. 25: Yes, sir.

09:39 THE COURT: Good morning. Tell me about that.

09:39 PANEL MEMBER NO. 25: I testified in a custody case in Lamb County.

09:39 THE COURT: About how long ago was that?

09:39 PANEL MEMBER NO. 25: Probably 20 years ago.

09:39 THE COURT: Oh. So-- Okay. So quite a while?

09:39 PANEL MEMBER NO. 25: Yes, sir.

09:39 THE COURT: Did the jury make the decision in that case?

09:39 PANEL MEMBER NO. 25: The judge.

09:39 THE COURT: The judge did. Would anything about that experience affect your ability to be fair and impartial here?

09:39 PANEL MEMBER NO. 25: No, sir.

09:39 THE COURT: Okay. Thank you very much.

09:39 Anyone else, third row or second row? All right.

Anyone that I have missed, prior service as a witness? All right. I see no other hands.

09:39 I just have a few more questions, and then we're going to let the parties ask you a few questions. My next one, is there anyone on the jury panel who has ever been involved in a car crash that resulted in a lawsuit? All right. I see one hand in the front row. Give me one second. Raise it high so they can find you. Thank you.

09:40 Tell us about that.

09:40 UNIDENTIFIED PANEL MEMBER: When I was in high school--when I was in high school, I was rear-ended by a lady in a car accident--

09:40 THE COURT: Okay.

09:40 THE PANEL MEMBER: --and it turned into a lawsuit.

09:40 THE COURT: Say it louder.

09:40 THE PANEL MEMBER: It turned into a lawsuit.

09:40 THE COURT: Okay. And do you remember-- How long ago was it?

09:40 THE PANEL MEMBER: About 15 years ago.

09:40 THE COURT: So about 15 years ago, you were rear-ended, and a lawsuit resulted?

09:40 THE PANEL MEMBER: Yes.

09:40 THE COURT: Did you or your insurance company bring that lawsuit; do you recall? Who started the lawsuit?

09:40 THE PANEL MEMBER: My parents did, against the

lady.

THE COURT: Okay. Understood. What happened? Do you remember how it ended?

THE PANEL MEMBER: I know that-- I'm really not sure what happened.

THE COURT: All right. You didn't go to a trial like this?

THE PANEL MEMBER: No, no.

THE COURT: All right. And you didn't testify at a--

THE PANEL MEMBER: No. I know lawyers were involved, but I don't think it ever went anywhere.

THE COURT: Okay. So the allegations in this case are that the defendant rear-ended the plaintiff and that that was negligent and that damages resulted, and the plaintiff is seeking money damages as a result from the defendant.

This lawsuit, it sounds like you were rear-ended; your parents brought a lawsuit on your behalf. So pretty similar.

THE PANEL MEMBER: Yes.

THE COURT: Would anything about your experience in that process affect your ability to be fair and impartial here?

THE PANEL MEMBER: I don't think so.

THE COURT: All right. So let me follow up, because they're going to want certainty one way or the other.

So it was 15 years ago. Your case didn't go to trial. This one, the parties haven't been able to reach an agreement, so they need the jurors' help. You'll hear evidence. You'll hear opening statement and closing arguments if you're selected. I would give you instructions. And if that happened, could you base your decision solely on my instructions and just the evidence that was presented?

09:42 THE PANEL MEMBER: Yes.

09:42 THE COURT: Okay. All right. Thank you very much.

09:42 Anyone else who has been in a car accident that resulted in a lawsuit? All right. Juror Number 21; is that right?

09:42 PANEL MEMBER NO. 21: Yes, sir.

09:42 THE COURT: Good morning.

09:42 PANEL MEMBER NO. 21: Good morning.

09:42 THE COURT: Okay. Tell us about that.

09:42 PANEL MEMBER NO. 21: I personally have not, but someone close to me has.

09:42 THE COURT: Okay. Let me check the microphone first. You said you have not but someone close to you has; is that right?

09:42 PANEL MEMBER NO. 21: Yes, sir.

09:42 THE COURT: Tell us about that.

09:42 PANEL MEMBER NO. 21: My sister was involved in a car crash two and a half years ago.

THE COURT: And a lawsuit resulted?
PANEL MEMBER NO. 21: Yes, sir.
THE COURT: What happened in the crash; do you know?
PANEL MEMBER NO. 21: A semi pulled out in front of her.
THE COURT: And she hit the semi?
PANEL MEMBER NO. 21: Yes, sir.
THE COURT: Okay. Did she bring a lawsuit?
PANEL MEMBER NO. 21: Yes, sir.
THE COURT: Did they go to a jury trial like this?
PANEL MEMBER NO. 21: I'm not certain. It's been settled.
THE COURT: Oh, it's-- Okay. Understood.
PANEL MEMBER NO. 21: I don't know the details of the actual lawsuit.
THE COURT: Whatever happened, they reached an agreement or found some resolution somehow?
PANEL MEMBER NO. 21: Yes, sir.
THE COURT: Would anything about your sister's experience or your knowledge of it affect your ability to be fair and impartial here?
PANEL MEMBER NO. 21: No, sir.
THE COURT: Okay. Thank you very much.
Anyone else? All right.

09:43 Is there anyone here who has been involved in a car crash that didn't result in a lawsuit but that you believe would affect your ability to be fair and impartial here? So anyone who has been in a car accident--and I'll say close family member, to take account for what Juror Number 21 just said. You or a close family member in a car accident that would affect your ability to be fair and impartial in this case? If so, please raise your hand.

09:44 All right. Seeing no hands, I find that no one does.

09:44 All right. This is my final question. Both the plaintiff and the defendants have the right to a fair trial in this case, and a huge part of that is finding jurors that can be fair and impartial, hear the evidence, and make a nonbiased decision. Is there anything I have missed? Are any of you asking yourself, why hasn't he asked me about this? This is a car crash case; there's no way I could be fair and impartial in this case, but he hasn't asked me the right question.

09:44 So if there's something that I have missed that you think the Court and the parties need to know about that would prevent you from being fair and impartial, would you please raise your hand.

09:44 All right. Seeing no hands, I find that no one does.

09:44 All right. It's the attorneys' time to ask you

questions. They're both on time limits. We're going to be respectful of your time.

Mr. Bechtol, are you doing voir dire?

MR. BECHTOL: Yes, Your Honor.

THE COURT: All right. From the podium, please. Whenever you are ready.

MR. BECHTOL: May it please the Court?

THE COURT: Yes.

MR. BECHTOL: All right. Good morning, everyone. Like I said, I have limited time to ask you questions, so sometimes I might try and move on a little bit, but I'm not trying to cut you off, and it's not that I don't think your answers are important. But both of us have a very limited time to ask actually ask you questions that might be relevant to issues in the case. And the judge has done a great job of asking questions that, normally, we might answer.

So as a follow-up to what he just asked about car crashes, I know you mentioned your sister. Anybody else have a close family member or somebody close that was involved in a crash and they were hurt and they brought some type of lawsuit or claim against someone? Juror Number 7?

PANEL MEMBER NO. 7: It was about a year ago, my parents were involved in a car crash.

MR. BECHTOL: Okay.

PANEL MEMBER NO. 7: And it was a company truck,

just came of nowhere. And I don't know the result of the whole thing; I just know they were involved in the car crash.

09:46 MR. BECHTOL: What type of injuries did they have?

09:46 PANEL MEMBER NO. 7: I know right now, my dad has, like, a bad shoulder, arthritis now. My mom, like, just hurt her wrist. But they were good.

09:46 MR. BECHTOL: Did either of them end up having any type of surgical procedures?

09:46 PANEL MEMBER NO. 7: No, sir.

09:46 MR. BECHTOL: Okay. Anything about that--what happened to your parents and seeing what they went through that would affect your ability to listen to the evidence in this case and make a fair decision based on what you see?

09:46 PANEL MEMBER NO. 7: No, sir.

09:46 MR. BECHTOL: You'd be able to be fair to both sides?

09:47 PANEL MEMBER NO. 7: Yes, sir.

09:47 MR. BECHTOL: Okay. Thank you.

09:47 And as a follow-up, Juror 21, what type of injuries did your sister have, if you know?

09:47 PANEL MEMBER NO. 21: Broken neck, broken back. Several organs were damaged.

09:47 MR. BECHTOL: Based on that, did she have surgical procedures done to repair that?

09:47 PANEL MEMBER NO. 21: Yes. Yes.

09:47 MR. BECHTOL: Anything about the nature of your sister sustaining those types of injuries, which required surgery to her spine, that would affect your ability to weigh the evidence in this case fairly to both sides?

09:47 PANEL MEMBER NO. 21: No, sir.

09:47 MR. BECHTOL: Okay. Thank you.

09:47 Anybody else? Juror Number 9?

09:47 PANEL MEMBER NO. 9: I don't know if this matters, but my uncle was killed by a semi, and his mother, back in 1991.

09:48 MR. BECHTOL: Okay. Anything about that experience that has altered your view on 18-wheelers, commercial vehicles that would prevent you from weighing the evidence fairly for both sides in this case?

09:48 PANEL MEMBER NO. 9: I mean, I'm always afraid of tractor-trailers, but I would be able to weigh the evidence.

09:48 MR. BECHTOL: Okay. In this case, you're just going to hear evidence, really, about the damages. All right?

09:48 PANEL MEMBER NO. 9: Okay.

09:48 MR. BECHTOL: And being asked to award an amount based on that. So if you're just asked to view that evidence, are you able to do that fairly for both sides?

09:48 PANEL MEMBER NO. 9: Yes.

09:48 MR. BECHTOL: All right. Thank you.

09:48 She mentioned that she has a fear of 18-wheelers.

And in this case, it involves an 18-wheeler. Is there anybody coming in today that just has some sort of opinion about 18-wheelers, trucking companies in either direction? They either feel that they're unfairly targeted or they're terrified of them to the point that they are not going to be able to listen to this case and not come in with some type of opinion on 18-wheelers, either direction, that would basically make it a little unfair for either side from the get-go? Juror Number 1?

09:49 PANEL MEMBER NO. 1: I'm a former truck driver.

09:49 MR. BECHTOL: Okay.

09:49 PANEL MEMBER NO. 1: Drove over-the-road for over four and a half years. Was a trainer for a trucking company.

09:49 MR. BECHTOL: Okay. Did you ever--

09:49 THE COURT: And, sir, would you please-- Pardon me, Mr. Bechtol.

09:49 Would you please rise? It will just help my court reporter see you a little bit better. Thank you.

09:49 Go ahead, Mr. Bechtol.

09:49 MR. BECHTOL: During the time that you were a trainer and a truck driver, did you ever--were you ever involved in any crashes?

09:49 PANEL MEMBER NO. 1: No. I have watched an accident happen beside my truck on Interstate 80 in Northern Nevada.

MR. BECHTOL: Okay. Was that a bad accident where somebody was injured or hurt? Killed?

PANEL MEMBER NO. 1: I have no idea if the party who slid into the median was injured or not. They were attempting to pass my truck in ice and snow and wound up spinning out into the median of the interstate. And with road conditions like it was, there was no possibility of slowing down or stopping to check on them.

MR. BECHTOL: Okay. Anything about your experience, because you were in that field, where you're coming in today and you feel trucking companies are unfairly targeted?

PANEL MEMBER NO. 1: No.

MR. BECHTOL: Anything about your experience the opposite direction? Because you were a trainer, that you feel like the opposite, that there's unsafe drivers out there and they--and you have an opinion about people that are unsafe truck drivers?

PANEL MEMBER NO. 1: No less so than people who drive cars.

MR. BECHTOL: Okay. So in this case, based on looking at damages, would you be able to fairly assess--

PANEL MEMBER NO. 1: I believe so.

MR. BECHTOL: Okay. Nothing where either side is going to have an advantage?

PANEL MEMBER NO. 1: No.

09:51 MR. BECHTOL: All right. Thank you, sir.

09:51 Anybody else? I think if I--Juror Number 14, am I--you're a retired--your spouse is a retired truck driver?

09:51 PANEL MEMBER NO. 14: Yes, he is.

09:51 MR. BECHTOL: Could you-- Sorry. I might do that--just because I read this, I might point out stuff that caught my attention.

09:51 PANEL MEMBER NO. 14: He's only retired because he became ill.

09:51 MR. BECHTOL: Okay.

09:51 PANEL MEMBER NO. 14: Yeah, the doctor just said that he should no longer drive. That's the only reason.

09:51 MR. BECHTOL: He couldn't pass the--

09:51 PANEL MEMBER NO. 14: He's disabled. No, he's disabled. He had caught West Nile virus, and that affected his muscle, nervous system, and his memory, so--so a lot of things going on with him right now, medical conditions. But that's the only reason he's no longer a truck driver.

09:52 MR. BECHTOL: As a side note, is there anything about-- Do you have to care for your husband or anything that you need to be home?

09:52 PANEL MEMBER NO. 14: I do, at times, have to take-- Well, Wednesday, he's-- Well, he's been also--doctor suspects he might have cancer, so he's running all these tests. So Wednesday, he's got to go in for one more test, which I have

to be there to drive him home. That would be the only reason.

09:52 MR. BECHTOL: All right.

09:52 PANEL MEMBER NO. 14: But, yes, I do have to take care of him when he can't do things at times.

09:52 MR. BECHTOL: Other than-- And I'm sorry.

09:52 PANEL MEMBER NO. 14: That's fine.

09:52 MR. BECHTOL: But other than that, of coming in here today, because your husband was a truck driver-- How many years was he?

09:52 PANEL MEMBER NO. 14: Oh, about 20-plus.

09:52 MR. BECHTOL: A lot?

09:52 PANEL MEMBER NO. 14: Uh-huh.

09:52 MR. BECHTOL: Anything about the fact that you're married to a truck driver that you might feel either direction coming in, that either truck drivers are unfair targets or, what I said to him, there's good drivers and then there's unsafe drivers and you have bad opinions about those unsafe drivers?

09:53 PANEL MEMBER NO. 14: Well, at times, you know, with--like you said, he is my husband, and hearing his side stories, sometimes he--yeah, I could say there's an unfair side to truck drivers, because drivers--regular car drivers don't know the rules of the road and don't understand that sometimes a semi cannot stop on a dime like a regular vehicle can.

09:53 MR. BECHTOL: Okay. All right. Thank you so much.

09:53 PANEL MEMBER NO. 14: Uh-huh.

09:53 MR. BECHTOL: Juror Number 24, I saw you kind of nodding along with that opinion. Can you tell me what your feeling is that you are in agreement for?

09:53 PANEL MEMBER NO. 24: Yes, sir. I'm in agreement with her. My son drives for Martin Ag. They haul milk. And cars will pull right out in front of them, and when you're hauling that much weight, you cannot get that thing stopped.

09:53 MR. BECHTOL: Okay. I saw--as a follow-up-- I'm going to jump around. Juror Number 5, this is just a quick question. During some of the civil cases that you heard as a correctional officer, were you asked to award money damages to some of the inmates?

09:54 PANEL MEMBER NO. 5: The awarding part was not in my arena.

09:54 MR. BECHTOL: Got it. Okay. And just to make sure, with your cane, are you--did you suffer any type of injury that has resulted in the--that you need to use a cane, or is--

09:54 PANEL MEMBER NO. 5: It's a disease.

09:54 MR. BECHTOL: Okay. And I want to make sure that we're totally fair. You're okay to come in and out and--

09:54 PANEL MEMBER NO. 5: The only questionable thing, sir, is stairs. And, I mean, I--there's only two.

09:54 MR. BECHTOL: Okay. And these chairs are much more

comfortable than the pews, so-- All right. Thank you so much.

I saw-- Juror Number 3, you've been a little too quiet, so I've got to ask you a question. It says you're an administrative officer.

PANEL MEMBER NO. 3: Yes.

MR. BECHTOL: Can you tell me where, what that means.

PANEL MEMBER NO. 3: So I work for Department of Veteran Affairs.

MR. BECHTOL: Okay.

PANEL MEMBER NO. 3: I help manage the medical providers for four clinics.

MR. BECHTOL: All right. Because you're involved with arranging medical providers--and this might be a general question after--is, anything about dealing with doctors and medical care that would kind of give you an opinion, looking at--because some of the evidence you're going to see in this case is going to be medical records, medical bills. You're going to hear from experts in the billing field. Anything about your experience in your job that would--you would come in having an opinion either direction that would give either side an unfair advantage?

PANEL MEMBER NO. 3: I wouldn't say an unfair advantage, but--

MR. BECHTOL: Or disadvantage?

09:55 PANEL MEMBER NO. 3: I wouldn't say either one. I mean, it's definitely something that I would pay close attention to, because that's what I do every day for our veterans, so--but it wouldn't--I wouldn't side one way or the other. I mean, it would be strictly about the facts.

09:56 MR. BECHTOL: Okay. Thank you so much.

09:56 Anybody else in the medical field or medical billing? I'm going to go-- Juror Number 2, I saw you're a medical assistant. I had you on my list too.

09:56 PANEL MEMBER NO. 2: Yes.

09:56 MR. BECHTOL: Where do you work?

09:56 PANEL MEMBER NO. 2: I work for Dr. Fatima Salas. We're a pain clinic.

09:56 MR. BECHTOL: Okay. Do you see people with spine injuries?

09:56 PANEL MEMBER NO. 2: Yes.

09:56 MR. BECHTOL: Do you assist in their care?

09:56 PANEL MEMBER NO. 2: Yes.

09:56 MR. BECHTOL: Do you ever treat people that have been injured in automobile crashes?

09:56 PANEL MEMBER NO. 2: No. We don't take on motor vehicle.

09:56 MR. BECHTOL: Okay. You specifically don't take those types of clients there?

09:56 PANEL MEMBER NO. 2: Correct.

09:56 MR. BECHTOL: All right. Does that sway your opinion because you don't even--y'all choose not to see injured people from car crashes, or--

09:57 PANEL MEMBER NO. 2: No, sir.

09:57 MR. BECHTOL: Do you provide any of the care yourself, which would be shots, any--

09:57 PANEL MEMBER NO. 2: Like regular IM shots, something, just in the buttock. Other than that, I run an x-ray machine. So we help do injections in the spine.

09:57 MR. BECHTOL: Okay. Like ESI--

09:57 PANEL MEMBER NO. 2: Epidurals, yes, sir.

09:57 MR. BECHTOL: Okay. Okay. That's it. Thank you so much.

09:57 PANEL MEMBER NO. 2: Okay.

09:57 MR. BECHTOL: Juror Number 9?

09:57 PANEL MEMBER NO. 9: I've been the executive director of a third-party administrator since 1998. We process health insurance claims for companies that are self-funded, so very familiar with medical billing charges and what's considered reasonable and customary.

09:57 MR. BECHTOL: Okay. So because you are familiar with those specific types of bills, would you agree that you're probably not the best person to be looking at the different medical bills in this case that are going to be disputed, because you're going to come in knowing about things like CPT

codes and reasonable and customary charges and things?

09:58 PANEL MEMBER NO. 9: Potentially, yes.

09:58 MR. BECHTOL: And because you said "potentially," I just want to make sure-- And I want to make sure that neither of us are getting an unfair shake, you know. If you're looking at the bills, are you going to take your experience looking at those bills and say, well, I know that this should be this, regardless of what the evidence is?

09:58 PANEL MEMBER NO. 9: It's going to be hard, because, I mean, I handle No Surprise Act claims, so--those are claims that are for no--like billings that take place for emergency care. So, I mean, that is my expertise.

09:58 MR. BECHTOL: Got it. All right. Thank you so much.

09:58 THE COURT: Let me follow up there, Mr. Bechtol.

09:58 So you mentioned, Juror Number 9, that it would be difficult for you to set aside your expertise. So if there's evidence of medical records that come in, plaintiff asks for X amount of dollars because those demonstrate the costs associated with treating the alleged injuries in this case, could you resolve that dispute just based on my instructions and the evidence, or not?

09:59 PANEL MEMBER NO. 9: Yes. No, I think I would be able to.

09:59 THE COURT: Okay. Do you need to follow up on

that? You're welcome to if you'd like, if you think there's going to be dispute about billing codes or otherwise billing. And if you don't want to follow up, that's perfectly fine. I just wanted some clarity there.

09:59 MR. BECHTOL: Sure. Do you deal with any type of--do you ever deal with billing procedures for orthopedic spine surgeries?

09:59 PANEL MEMBER NO. 9: Yeah. I mean, everything across the board.

09:59 MR. BECHTOL: Everything?

09:59 PANEL MEMBER NO. 9: Absolutely, whether it's motor vehicle, third-party-accident injury, subrogation, medical injuries, diseases. I mean, it's--I mean, after nearly 25 years, I see everything.

09:59 MR. BECHTOL: Based on your knowledge of this, in this case, would you be able to look at the customary charges alone and take out any of your knowledge about subrogations, insurance, anything like that, and keep that completely separate from what you're looking at?

10:00 PANEL MEMBER NO. 9: I would try to. It's just--I mean, it's hard to look at things and not know--I mean, if you were looking at charges for the same procedures in a certain city versus another, that would be what I would look at, if that makes sense. Like--so, I mean, the same spine surgeries in New York City with my East Coast clients would be very

different than the claims here in Lubbock.

10:00 MR. BECHTOL: Okay. In this case-- Are you familiar with surgery costs in the D/FW area?

10:00 PANEL MEMBER NO. 9: Yes.

10:00 MR. BECHTOL: Okay. All right. Thank you so much.

10:00 Was there somebody else? There was a few. I'm going to jump over-- I haven't heard from you, Juror Number 16. You were on my quiet list.

10:00 PANEL MEMBER NO. 16: Hello. Yeah. I'm a registered respiratory therapist. I work at Covenant Children's.

10:00 MR. BECHTOL: You're a what? I'm sorry.

10:00 PANEL MEMBER NO. 16: Registered respiratory therapist. I work at Covenant Children's.

10:01 MR. BECHTOL: Okay. Do you have--do you treat car crash victims or anything?

10:01 PANEL MEMBER NO. 16: All the time, yes.

10:01 MR. BECHTOL: In what capacity?

10:01 PANEL MEMBER NO. 16: Just the kids that come in that were victims of a car crash.

10:01 MR. BECHTOL: Okay. Anything about your experience where you see victims that have been injured in crashes that would maybe give my client an upper hand from the get-go in this case, or the opposite?

10:01 PANEL MEMBER NO. 16: No.

MR. BECHTOL: Okay. You would be able to view the evidence fairly?

PANEL MEMBER NO. 16: Yes.

MR. BECHTOL: Okay. All right. Thank you.

Juror Number 20?

PANEL MEMBER NO. 20: I've been a trauma rep for the last 18 years, so I've seen tons of, like, horrible car accidents, 18-wheelers--

THE COURT: Would you hold the mic closer to you. Thank you. Go ahead.

PANEL MEMBER NO. 20: I've been a trauma rep for 18 years, so I've got a ton of experience in, like, bad car accidents, 18-wheelers, just seeing patients come in. I actually sit in the operating rooms with the doctor, so--

MR. BECHTOL: When you say you're a rep, are you like a med--you--

PANEL MEMBER NO. 20: Like hardware, like fake hips, knees, everything--wound vac's, anything that a patient would need to survive a really bad wreck.

MR. BECHTOL: Okay. Because you've seen-- How long have you been doing that?

PANEL MEMBER NO. 20: Eighteen.

MR. BECHTOL: Because you've been doing that for 18 years and you've seen victims of car crashes and their medical needs and care that's required, do you feel like that

gives you--or are you going to be able to view the medical records in this case without--basically just looking at the records for what they are, without--

10:02 PANEL MEMBER NO. 20: Yeah, yeah, I think I--yeah, I think I'd be able to look at them and see what's--you know, what's legit and what's not.

10:02 MR. BECHTOL: Okay. Do you know about medical billing?

10:02 PANEL MEMBER NO. 20: No. That's not really the world I live in. I let the billers do that.

10:02 MR. BECHTOL: Okay. Your job would be what's needed to actually do stuff?

10:02 PANEL MEMBER NO. 20: Yeah, the actual injuries.

10:02 MR. BECHTOL: Okay. Do you have anything to do with, like, orthopedic spine surgeries?

10:03 PANEL MEMBER NO. 20: In the past, yes. I sold PEEK cages for a long time, which is fusion kits.

10:03 MR. BECHTOL: Okay. Only for neck, or do you do any other--

10:03 PANEL MEMBER NO. 20: I did everything, yeah.

10:03 MR. BECHTOL: Okay. All right. I appreciate it. Thank you.

10:03 THE COURT: Three minutes, Mr. Bechtol.

10:03 MR. BECHTOL: Okay. I think I'll try and finish up with you guys then. Juror 25?

10:03 PANEL MEMBER NO. 25: So I have experience with medical billing, but only in the realm of behavioral health.

10:03 MR. BECHTOL: Of what? I'm sorry.

10:03 PANEL MEMBER NO. 25: Behavioral health, psychology.

10:03 MR. BECHTOL: Okay.

10:03 PANEL MEMBER NO. 25: So I have seen medical records, and I do know what CPT codes are, but only in behavioral health, mental health.

10:03 MR. BECHTOL: In this case, would you be able to look at the bills just for what they are and weigh that evidence without taking your knowledge into account?

10:03 PANEL MEMBER NO. 25: Yes, sir.

10:03 MR. BECHTOL: All right. Thank you.

10:03 And then Juror Number 28?

10:03 PANEL MEMBER NO. 28: I'm an occupational therapist at an inpatient rehab hospital here in Lubbock.

10:03 MR. BECHTOL: Okay. So as part of your job, do you see people that are injured--

10:03 PANEL MEMBER NO. 28: Yes, sir.

10:04 MR. BECHTOL: --have spine injuries, and you have to assist them in getting back to work?

10:04 PANEL MEMBER NO. 28: Yes, sir.

10:04 MR. BECHTOL: So do you have experience in seeing the difficulties that people have?

10:04 PANEL MEMBER NO. 28: Yes, sir.

10:04 MR. BECHTOL: Is there anything about your work coming in that you're going to--either direction? You're going to look at my client and say, "Oh, I deal with people like him, he's fine," or the other way, "I see people"--

10:04 PANEL MEMBER NO. 28: I think I can look at it and make impartial decisions.

10:04 MR. BECHTOL: Okay. Okay. Thank you so much.

10:04 PANEL MEMBER NO. 28: Uh-huh.

10:04 MR. BECHTOL: All right. And a final question. Kids. Is there anybody-- We heard about your husband, but anybody else here that has some unforeseen thing that we haven't brought up-- One time we picked a jury and we got halfway through the first day and one of the jurors said, hey, just so y'all know, I don't know English. And even though the judge has already asked that, I just want to make sure that we don't start getting into this and somebody says, just, by the way, I can't hear, or I--anything like that we haven't discussed that y'all need to tell us? All right.

10:05 And everybody here can give either side a fair shake, depending on what they hear?

10:05 All right. Thank you so much for your time.

10:05 THE COURT: All right. Thank you, Mr. Bechtol.

10:05 Mr. Wise, whenever you're ready.

10:05 MR. WISE: Yes, if it may please the Court.

10:05 Good morning, everybody. Y'all haven't gotten to hear me talk much. My name is Warren Wise. I actually live in Beaumont, Texas, which is, I don't know, nine or ten hours away from here.

10:05 I know--I don't recognize anybody, and I know y'all have said y'all don't recognize me. But has anybody ever heard of the firm Mehaffy Weber? I don't think we do any billboard advertising or anything like that, but just that's the firm that I work for.

10:06 Okay. How about the firm Anderson Alexander? That's who Mr. Bechtol works with. Does anybody know an attorney at Anderson Alexander?

10:06 Judge Hendrix and Mr. Bechtol took a lot of my good questions, so I don't think I'll be that long, but I do have a few things I want to follow up on.

10:06 One of the medical providers who provided some treatment to Mr. Narro is a gentleman named Bryce Olson. Does anybody know Bryce Olson? Yes, ma'am. How do you know Mr. Olson?

10:06 PANEL MEMBER NO. 10: The company I work for does IT support for his company. I've worked with him in that capacity in the past.

10:06 MR. WISE: Okay. And do you know-- He's a physical therapist in town. Right?

10:06 PANEL MEMBER NO. 10: Correct.

MR. WISE: Okay. Have you worked with him personally, or have you just seen his name in paperwork? Do you--

PANEL MEMBER NO. 10: No, I mean, I've worked with him and communicated with him, but about stuff like migrating email or implementing a new server or in that capacity.

MR. WISE: I see.

PANEL MEMBER NO. 10: Not in a physical therapy-type capacity.

MR. WISE: Understood. Okay. Is there anything about your experience or your knowing him that might make you think, "Hey, you know, I know Mr. Olson; he's a real good one; I trust what he has to say," to the point where you couldn't be fair and impartial?

PANEL MEMBER NO. 10: I don't think so, because I don't really know any part of the physical therapy portion, so--and mostly, I deal with the office manager and his wife, who helps manage the office.

MR. WISE: Okay. Thank you, Ms. Cheeke.

I think I saw another hand. Maybe I did. Does anybody else know Mr. Olson? Okay.

Is there anybody here who agrees with the sentiment that if a lawsuit has been filed, it must have some merit? Does anybody think that? No? Okay.

Does anybody think that, just because a case makes

it all the way to trial, that it must have some merit? Okay.

10:08 If y'all have not gathered by now, I represent the trucking company in this case. Okay? And, look, I get it. I drive on interstate highways. I drive on state highways. I know trucks are big, loud, noisy, scary, all those things. Is there somebody--is there anybody here who has any ill will or bad feelings with respect to trucking companies on the road, just generally speaking? No? Nobody dislikes trucking companies? Okay. All right.

10:09 Does everybody--or let me ask Ms. Delacerda. I don't mean to pick on you.

10:09 PANEL MEMBER NO. 2: That's okay.

10:09 MR. WISE: Let me ask just you. Trucking companies. Do you have any feelings towards them one way or the other?

10:09 PANEL MEMBER NO. 2: No, sir.

10:09 MR. WISE: Okay. All right. I guess, do you understand trucking companies have, you know, a place in our society. Right? We need trucks to get food to stores, toys to Target, things like that. Is that fair?

10:09 PANEL MEMBER NO. 2: Yes.

10:09 MR. WISE: Okay. All right. So nothing by the fact that my client is a trucking company is going to make you think, hey, I just don't--I don't know about that side; I favor the plaintiff in this one?

PANEL MEMBER NO. 2: No, sir.

MR. WISE: Okay. Thank you.

Has anybody ever been in a car accident and not been injured? Okay. Got a lot of hands there. I think that happens to--and let me just--does anybody--or is there anybody who agrees if somebody were to say, hey, you know what, if you were in a car accident, you must have been injured? Nobody believes that. Correct? Okay. So there's some car accidents that happen where you're injured; some car accidents happen where you aren't hurt. Fair? Okay.

Is there somebody in the room who deals with back pain, chronic back pain? Okay. A few. Ms. Millis--Ms. Mills. I'm sorry. I'm sorry about your back pain. What's going on?

PANEL MEMBER NO. 3: I am a disabled veteran, and so just hurt my back when I served in the military.

MR. WISE: Thank you for your service. Where did you serve?

PANEL MEMBER NO. 3: I was stationed in Oceana, Virginia.

MR. WISE: Wow. Well, thank you very much for your service.

PANEL MEMBER NO. 3: Yes.

MR. WISE: Does anything about your--I mean, do you deal with back pain daily? Weekly?

PANEL MEMBER NO. 3: Daily.

10:11 MR. WISE: Okay. Does anybody-- One of the allegations in this case has to do with Mr. Narro's back. Does the fact that you deal with back pain daily--do you think that that would affect your ability to determine this case and some of the questions you might be asked about his back fairly and impartially?

10:11 PANEL MEMBER NO. 3: I'll be able to be impartial, because there's a difference between mine and his.

10:12 MR. WISE: Okay.

10:12 PANEL MEMBER NO. 3: You know, how I sustained my injuries versus how he allegedly sustained his is different.

10:12 MR. WISE: Okay. And how did you sustain your injuries?

10:12 PANEL MEMBER NO. 3: Mine was in boot camp. I had a couple of falls in boot camp, and then carrying-- So I worked on F-14's and FA-18's. I could take them apart, fix them, and put them back together.

10:12 MR. WISE: Wow.

10:12 PANEL MEMBER NO. 3: And then--so one of them was climbing out of an aircraft on an aircraft carrier.

10:12 MR. WISE: Well, I'm sorry to hear that. Thank you again for your service, Ms. Mills.

10:12 PANEL MEMBER NO. 3: Yes.

10:12 MR. WISE: I know there were a lot of other hands to that question. Does anybody else deal with-- Yes, sir,

Mr. Lyle?

PANEL MEMBER NO. 1: Much like her, I'm a disabled veteran, served a little over three years. Got out before the very first Desert Storm back in 1989. My--one of my disabilities is my upper back, as well as I have a narrowing of my spinal cord in both my lower back and in my neck and have restrained dorsal spine from carrying one-five-five self-propelled Howitzer rounds on my shoulders.

THE COURT: As one does, you know, just as one does.

PANEL MEMBER NO. 1: Yeah.

MR. WISE: Well, I'm sorry to hear-- That's a back pain you've dealt with, gosh, for twenty--what, 35 years now, I guess?

PANEL MEMBER NO. 1: Close to, yes.

MR. WISE: Yeah. Do you deal with that daily?

PANEL MEMBER NO. 1: Yes.

MR. WISE: Just, I guess--

PANEL MEMBER NO. 1: I have a high threshold for pain.

MR. WISE: I understand. Well, I appreciate your service, as well. Does anything about your--you know, your back pain that you've dealt with--do you think that might affect your ability to--

PANEL MEMBER NO. 1: No.

10:13 MR. WISE: Okay. Thank you.

10:13 PANEL MEMBER NO. 1: You're welcome.

10:13 MR. WISE: I know there were some more hands. Anybody else-- Let's just do the first row to make it easy.

10:14 PANEL MEMBER NO. 5: Mine's from the disease.

10:14 MR. WISE: Okay. Well, I think you've probably talked here more than anybody so far today, so I won't pick on you again.

10:14 THE COURT: Can you repeat what she said, Mr. Wise, just for the record? That was Juror Number 5. What did she say?

10:14 MR. WISE: I think you said that what you've--

10:14 PANEL MEMBER NO. 5: I said it's because of my disease.

10:14 THE COURT: Understood. Okay.

10:14 MR. WISE: How about on the second row? I saw-- yes, sir, Mr. Campbell.

10:14 PANEL MEMBER NO. 16: Yeah, I've been dealing with back pain for about seven years, probably, now. Eight maybe.

10:14 MR. WISE: Okay. How did that come about?

10:14 PANEL MEMBER NO. 16: I can't pinpoint it. Probably just my job or being on a flight medic, stuff like that, so--

10:14 MR. WISE: Okay. So sort of a normal cost of living sometimes?

10:14 PANEL MEMBER NO. 16: Oh, no. I mean, I have three herniated disks, but, yes, they--

10:14 MR. WISE: Oh. I'm sorry to hear that. Okay.

10:14 PANEL MEMBER NO. 16: I just don't know when it happened or why it happened, so--

10:14 MR. WISE: Gotcha. Gotcha. Was it a specific injury that came about that just one day you started hurting, and it started hurting a little bit worse, and then now you've got three herniated disks?

10:15 PANEL MEMBER NO. 16: Yeah, pretty much, yeah.

10:15 MR. WISE: Well, I'm sorry to hear that. Does anything about the back pain you experience affect your ability to weigh the evidence in this case fairly and impartially?

10:15 PANEL MEMBER NO. 16: No.

10:15 MR. WISE: Okay. Do you think maybe because you have back pain, you might sympathize more with Mr. Narro than you might otherwise?

10:15 PANEL MEMBER NO. 16: No.

10:15 MR. WISE: Okay. Thank you. Thank you, Mr. Campbell.

10:15 Yes, sir. Mr. Mwene?

10:15 PANEL MEMBER NO. 20: Mr. Dannenberg.

10:15 MR. WISE: Oh, okay. Okay. I think there was one missing, so I might have missed-- Okay. Yes. Yes, sir.

10:15 PANEL MEMBER NO. 20: I've got three bulging disks

that will probably need surgery by the end of this year.

MR. WISE: Okay. Well, I'm sorry to hear. Is it a normal wear-and-tear thing? Was there an injury that happened?

PANEL MEMBER NO. 20: I was a collegiate boxer, and boxed internationally for a while, and they think that's where most of it came from.

MR. WISE: You look like you could still box.

PANEL MEMBER NO. 20: I can still box.

MR. WISE: Well, I'm sorry about the back pain you're dealing with. I hope you can get that--hope that surgery helps you out there. Do you think anything about the experience you're going through with your back would affect your ability to serve impartially, or maybe you'd sympathize with Mr. Narro more than you might otherwise?

PANEL MEMBER NO. 20: No. No.

MR. WISE: Okay. Thank you. Thank you.

I thought I saw-- Yes, ma'am. Ms. Gentry? And I'm sorry to hear about your uncle, too, by the way. Did you say your--

PANEL MEMBER NO. 12: No. Sorry.

MR. WISE: Oh, I'm sorry. There's a number missing. Might be off.

PANEL MEMBER NO. 12: Yes, we're--

MR. WISE: Okay.

PANEL MEMBER NO. 12: --off somewhere. My--

MR. WISE: Or your sister, I think it was.

PANEL MEMBER NO. 12: --my back pain is just from the car accident that I was in a while back, and I still have issues with it to this day.

MR. WISE: Okay. When were you in that accident again? I'm sorry.

PANEL MEMBER NO. 12: I want to say it was exactly maybe 16 years ago; 15, 16 years ago.

MR. WISE: Okay. Gotcha. And, I guess, did you undergo medical treatment after the accident happened for a period of time?

PANEL MEMBER NO. 12: Yes. And I still get steroid shots regularly.

MR. WISE: Okay. How often do you get those?

PANEL MEMBER NO. 12: Two to three times a year.

MR. WISE: Okay. And that's been true for the last 16 years?

PANEL MEMBER NO. 12: Yes.

MR. WISE: Has anybody recommended a surgery to you?

PANEL MEMBER NO. 12: Yes, but it was just going to be a lot of bed rest, so they said--and it might not work, so it was kind of just a pick and choose what to deal with.

MR. WISE: Okay. Got it. So doctor said, hey, the steroid injections-- When you get a steroid injection, does

that help for, like, a period of time?

10:17 PANEL MEMBER NO. 12: Yes.

10:17 MR. WISE: Does it completely alleviate your pain?

10:17 PANEL MEMBER NO. 12: Not completely, but it's a lot better than dealing with the constant pain.

10:17 MR. WISE: Okay. And so you're able to, I guess, manage through the pain for--I guess it lasts five months or so, and then you--

10:17 PANEL MEMBER NO. 12: Yeah. Sometimes I get it three times a year; sometimes I just need it twice. So it just depends.

10:17 MR. WISE: Okay. And then you get another shot and you feel good for another five or six months and--

10:17 PANEL MEMBER NO. 12: Yes.

10:17 MR. WISE: Okay. Thank you very much.

10:17 Anybody else deals with back pain chronically or because of an injury or has had back pain and they feel better now? Yes. Yes, ma'am.

10:18 PANEL MEMBER NO. 17: I have hypermobility disorder, along the same--in the same family of Ehlers-Danlos Syndrome and POTS Syndrome. A connective tissue disorder at the base, simplest definition of it. So my ligaments and tendons do not support my muscles as much ask they're supposed to, so I have to wear a brace pretty much every day, depending on pain levels, to help support back, hips, joints, muscles.

10:18 So I may potentially sympathize with his back pain little bit, seeing as how I deal with it daily. But seeing as how they are different reasons for back pain, I do not believe it would impact to a substantial degree.

MR. WISE: I understand. And thank you for telling me that. And I'm glad you mentioned "sympathize." One of the instructions you may receive in this case--I might be over--may be wrong--is, you shouldn't let sympathy factor into your decision in this case. In other words, you know, the evidence speaks for itself. Is there anybody here who thinks, you know what, you know, I can't help but let sympathy factor into my decision in who I think wins, loses, or if there's a tie or anything like that? Can everybody sort of set their idea of sympathy aside and just determine the case based on the facts? Okay. Thank you.

10:19 THE COURT: And are you Juror Number 17, madam? Are you Number 17?

10:19 PANEL MEMBER NO. 17: I'm twenty-one.

10:19 THE COURT: No, your juror number.

10:19 PANEL MEMBER NO. 17: Oh. Yes, I'm Juror Number 17. Sorry.

10:19 THE COURT: Okay. I mean, I make a lot of bad decisions, but I would never ask somebody's age.

10:19 Okay. Thank you, Juror Number 17. All right.

10:19 Pardon the interruption, Mr. Wise. Go ahead.

10:19 MR. WISE: Thank you.

10:20 We're going to be calling--we're going to be calling--I think I mentioned two witnesses: a Dr. Chiodo and Ms. Schieber. And they are what we call retained testifying experts. Okay? They don't know any--they weren't involved in the accident; they don't know anything about the accident. They're not parties to the case. They don't really have a stake in the outcome of the litigation. We're calling them here to help explain some aspects of the accident, the injury, and the, I guess, entanglement between the two and help provide sort of their expertise in those areas.

10:20 Now, they are going to be traveling from out of the city, and, as a result, you'll hear evidence that we're having to pay them to be here. Does anybody think, you know what, I'm not going to be able to trust these experts because they are being paid to be here? Does everybody agree that, hey, you know, these experts, their time is valuable. It's like any service we have to pay for. Is that fair? Okay.

10:21 Let me just check my notes. I'm having to hop around, because they asked a lot of the good questions.

10:21 I didn't see anybody here who was a lawyer. Ms. Rodrigues, I saw, I think, you're a paralegal. Correct?

10:21 PANEL MEMBER NO. 27: That's correct, yes.

10:21 Yes, that's correct.

10:21 MR. WISE: Okay. And hello. I don't think I've

heard you speak today.

10:21 PANEL MEMBER NO. 27: Hi. No.

10:21 MR. WISE: What--do you work, I guess, at a law firm?

10:21 PANEL MEMBER NO. 27: I worked for a private law firm for about ten years in Big Spring. And the last three years, I work for a natural gas company as a legal administrator.

10:21 MR. WISE: Got it. Okay. The firm that you worked with, was it, like, a--do they do civil cases like this one, or--

10:21 PANEL MEMBER NO. 27: We did lots of different cases. It was civil litigation, probate, family law. It varied. Oil and gas, real estate. A little bit of everything.

10:22 MR. WISE: Would you say--are you experienced with personal injury lawsuits? Have you worked on personal injury suits before?

10:22 PANEL MEMBER NO. 27: No, I wouldn't say that.

10:22 MR. WISE: Okay. Thank you.

10:22 Does anybody else have any ties to, sort of, the legal industry in terms of, you know, are they a lawyer, a paralegal, an assistant at a law office? Yes, sir?

10:22 UNIDENTIFIED PANEL MEMBER: My wife is a court reporter in Terry County.

10:22 MR. WISE: Okay. Okay. Good. Well, I don't think

that affects too much. Do y'all--

THE PANEL MEMBER: Okay. I just wanted to make sure I was transparent, that's all.

MR. WISE: No, no, I appreciate that. Appreciate that.

THE PANEL MEMBER: Thank you.

MR. WISE: And you're our frequent flier anyway, so I don't want to...

Anybody here that I have not--we have not already heard from--I know we've heard from a few--a doctor, a physician assistant, a physical therapist, anything like that? Anybody who has any sort of educational background in medicine? Yes, sir?

UNIDENTIFIED PANEL MEMBER: [Inaudible.]

THE COURT: Let us get a microphone to you. Just one second.

THE PANEL MEMBER: I was kinesiology and chemistry with premed through college.

MR. WISE: Okay. Cool. Just didn't pursue that field, I guess?

THE PANEL MEMBER: No. I decided to box instead of being a doctor.

MR. WISE: Oh, I see. It's a great career choice, I think.

PANEL MEMBER NO. 18: I'm sorry, it's me again.

Just--I work--I've been in the pharmaceutical industry for about 30 years. I'm currently--I'm [inaudible] manager for a pharmaceutical company. So just to make sure I'm transparent.

10:23 MR. WISE: Okay. So you've got the power to prescribe medication for--

10:23 PANEL MEMBER NO. 18: No.

10:23 MR. WISE: Oh, okay.

10:24 PANEL MEMBER NO. 18: I represent a company with therapies for [inaudible] cancer.

10:24 MR. WISE: I see. Okay. Awesome. Great. Thank you for that.

10:24 All right. The last question I've got. Y'all might have noticed, but at our table, my client, Mr. Singh, is not here today, and I don't expect he's going to be here this week, either today, tomorrow, or Wednesday. Would anybody hold that particularly against him for not being here today? Would anybody-- I mean, everybody would still--hey, we're going to listen to the evidence that we're going to put on-- And me and Mr. Bechtol have worked really hard. We're going to work real hard to make it as concise as possible. But you can hear the evidence and decide this case fairly and impartially. Everybody agree?

10:24 Okay. Last question. Is there anything that you think, you know, I've listened to you ramble on all day and, Warren, I just--I just don't like you, I don't trust you,

anything like that? Because I don't want your-- And you're not going to hurt my feelings. My wife is probably saying that about me right now, so-- All right. I just don't want--if I've said something that might have offended you or anything like that-- I don't think I have. I try not to. But I don't want that to affect my client's ability to have a fair trial. Anything about me that you just maybe don't know about?

10:25 Okay. Thank y'all for your attention this morning, and I'll pass my time.

10:25 THE COURT: Okay. Thank you very much.

10:25 Okay. Ladies and gentlemen, please stay where you are for now. We're almost at a break. I'm going to talk to the attorneys at the bench for one second, and then we'll take a short break. So bear with me one second.

10:25 Can I see the attorneys at the bench.

10:25 ----------------------------------------

10:25 (AT THE BENCH)

10:25 THE COURT: Okay. Thank you both for being efficient and being on time. I only--so I have one strike for cause for sure, subject to your objections. Juror Number 17, the one who spoke near the end. I think you've been informed that she was late for check-in this morning, and somehow, she slipped through our various layers of guiding jurors to the right place, and instead of going to the venire empanelment room, she came to the courtroom. So she was present for the

pretrial conference, heard us talking. I don't see any way that she can sit on this jury. I'm going to find out why she was late. Maybe it's this medical condition. Any objection to excusing Number 17, Mr. Bechtol?

10:26 MR. BECHTOL: No, Your Honor.

10:26 THE COURT: Mr. Wise?

10:26 MR. WISE: No.

10:26 THE COURT: Okay. The only other that I have striking for cause is Juror Number 9. She is Ms. Kelley. She is the 20-year medical biller, deep knowledge of insurance. Kind of went back and forth. I jumped in at one point, but I never heard her--once Mr. Bechtol followed up--say unequivocally that she could set all that aside and just decide the case based only on the facts and the instructions and the evidence.

10:27 I don't think you talked to her.

10:27 Any objection or concern about striking Number 9?

10:27 MR. BECHTOL: No, Your Honor. That would have been mine, as well.

10:27 THE COURT: Mr. Wise?

10:27 MR. WISE: Yeah, my--the only thing I'd say is, a juror can use their experience, you know, in--

10:27 MR. CARPER: I think you've--

10:27 MR. WISE: But--okay. We'll just let it go.

10:27 THE COURT: Okay. All right. Juror Number--

MR. WISE: He's smarter than me.

THE COURT: Juror Number 9 is also stricken for cause.

Mr. Bechtol, any motions to strike for cause from the plaintiff?

MR. BECHTOL: Yes, Your Honor. I wrote down Number 1. He's the truck driver and the trainer.

THE COURT: Okay.

MR. BECHTOL: And based on his direct knowledge of just the trucking industry, I don't know if he could set that aside and be impartial. And then--

THE COURT: Okay. All right. Let me-- We'll take them one at a time. Was there something else about Number 1?

MR. BECHTOL: A high threshold for pain and that he has chronic back pain. I feel like that's an unfair thing coming in to assess my client's injuries.

THE COURT: Mr. Wise?

MR. WISE: I mean, yes, he's a truck driver, but we can't just strike a truck driver because that was his occupation in the past. You know, his threshold for pain is--I didn't hear him say, "I can't be a fair and impartial juror," and I think he actually said several times he could be a fair and impartial juror, despite both truck driving background and his pain.

THE COURT: I agree. He was able to commit to the

10:28 Court that he could be fair and impartial despite those things, so that motion is denied.

10:28 Was there another motion for cause?

10:28 MR. BECHTOL: Number 2. Based on the fact that she works in the pain management clinic and treats people with spinal injuries, and she specifically stated that their practice rejects and refuses to treat people who have been in motor vehicle crashes.

10:28 THE COURT: Okay. Mr. Wise?

10:28 MR. WISE: Yeah, I don't think she said anything about not being able to be fair and impartial because of that.

10:28 THE COURT: I agree. That motion is also denied.

10:29 Any others, Mr. Bechtol?

10:29 MR. BECHTOL: I'm worried about 5, just because the steps, the cane. I don't--I don't want her getting hurt or anything like that.

10:29 THE COURT: Yeah.

10:29 MR. BECHTOL: I just put that out there, just physical, but--

10:29 THE COURT: Okay. All right. And if you could just turn so she can see your face a little bit better. It's okay. You can scoot this way. Just if everybody can see each other, it's a little easier.

10:29 Okay. So there's just concern expressed for Number 5, not necessarily a motion. I share that concern. I

tried to--I tried to give her every option to say, "I don't think I can do it," and she, like, dagnab it, I'm a former prison guard and I'm tough as nails, and if you need me, you can have me.

10:29 We'll have a court security officer or someone help her up and down if she's chosen, but I don't see a reason to strike her for cause.

10:29 Mr. Wise?

10:29 MR. WISE: I don't see that reason either.

10:29 THE COURT: Okay. All right. Any-- So that's motions for the plaintiff. Any motions to strike--

10:30 MR. BECHTOL: I have another one.

10:30 THE COURT: Oh. Yes. Okay.

10:30 MR. BECHTOL: 14, whose husband was the truck driver, and she said she has to take him to the cancer treatment Wednesday morning.

10:30 THE COURT: Yes. Yeah.

10:30 MR. BECHTOL: I think we could get this done tomorrow, but I don't want to prevent her from getting her husband to cancer treatment.

10:30 THE COURT: All right. So that's a good question. So I have her in my column for potential excuse or letting her go for a hardship. This is the first I've heard of this. My jury officers in the clerk's office work extensively with people who have conflicts. We didn't hear about this conflict.

Maybe it's late-breaking.

Any objection to excusing 14 for a hardship?

MR. WISE: For hardship, no. I don't think there's a legal reason, but for hardship, I wouldn't't--

THE COURT: Okay. I agree. 14 is excused for hardship, Ms. Reyes.

Okay. All right. That is the plaintiff's motions. Any motions to strike for cause from the defendant?

MR. WISE: No, Your Honor.

THE COURT: Okay.

MR. WISE: For just--13 and 15 were not present. Correct?

THE COURT: 13 not present, 15 not present.

MR. WISE: Okay.

THE COURT: So we have stricken 9 for cause, 14 for hardship. 13 is not present. 15 is not present. And 17 is stricken for cause.

We're going to sit eight jurors. Each of you have three strikes. So, by my calculation, you can exercise your strikes through Juror Number 19.

MR. WISE: Including Juror Number--

THE COURT: Including. Yeah, through and including Juror Number 19, you can exercise your three strikes.

All right. Anything else that we need to take up from the plaintiff?

10:31 MR. BECHTOL: Not at this time.

10:31 THE COURT: Okay. Anything from the defense?

10:31 MR. WISE: Nothing to take up, but just to clarify. Does that mean 20 through 32 are--we don't need to consider them anymore because of the--

10:32 THE COURT: We won't get to those.

10:32 MR. WISE: Right. Okay.

10:32 THE COURT: You're welcome to--if you want to waste your strikes--

10:32 MR. WISE: No, no, I mean--

10:32 THE COURT: --and strike after that--

10:32 MR. WISE: I just wanted to make sure--

10:32 THE COURT: Use them all.

10:32 MR. WISE: In case there was a--I just didn't know if there was a pending hardship person, if you were going to call-- No. Okay.

10:32 THE COURT: I've taken care of everyone that I think we need to address. I'm not planning to strike anyone else. And I will inform them right now that they're going to be let go, because I don't want people to be confused and someone to leave accidentally. So I'll announce that later.

10:32 Okay. We're going to take a 15-minute recess. I expect--there was very few hands during my voir dire, so I expect we might get to opening, so just prepare. My law clerk will turn the podium during the break so we can be ready for

openings. You're welcome to use the well of the courtroom during openings if you'd like, but you must use a microphone on your lapel.

10:32 I assume the parties want to invoke the rule once we start with evidence. Is that correct, Mr. Bechtol?

10:33 MR. BECHTOL: Yes, Your Honor.

10:33 THE COURT: Is that right?

10:33 MR. WISE: Yes.

10:33 THE COURT: All right. The rule will be invoked.

10:33 Okay. Let's go back.

10:33 ----------------------------------------

10:33 (IN OPEN COURT)

10:33 THE COURT: Okay. Ladies and gentlemen, thank you so much for your patience. Occasionally I have to do some work with the attorneys on the side. What we're going to do now is take a break. So we'll take a 15-minute break. You're welcome to stay where you are if you'd like. If not, I ask you to stay on this floor. There are restrooms on both ends of this floor. Feel free to walk around if you'd like on this floor. Maybe we've lost a juror before, and I don't want that to happen again. I don't want to have to send someone looking for anyone. So stay on this floor.

10:33 In 15 minutes, no later than 15 minutes, please come back into this courtroom and sit exactly where you're sitting now. When we come back, I will announce the eight

members of this panel who have been selected. Those eight members will come forward, sit in this box, and then the rest of you will be excused.

We're in recess for 15 minutes. Let me say one more thing. Don't talk about the case during this break. Talk about how great our football team is despite that loss on Saturday. We're going to recover. Talk about basketball season. Talk about the weather. But don't talk about the case.

We're in recess for 15 minutes.

(RECESS TAKEN)

THE COURT: Be seated.

All right. Welcome back, everyone. Thank you for your patience as the attorneys did some work.

All right. Ms. Flock, if you would please read the jurors who have been selected.

If your number is read, if you'd please come forward and have a seat in the box in any of the chairs with a notepad.

Ms. Flock.

COURTROOM DEPUTY: Number 2, Misty Delacerda. Number 3, Monique Mills. Number 4, James Buchanan. Number 6, Kevin Hodges. Number 7, Marc Wallace. Number 10, Mitzi Cheeke. Number 18, Paul Cardelli. Number 19, Jeffrey Mwene.

(THE JURORS ARE SEATED IN THE JURY BOX)

THE COURT: All right. You can be seated.

All right. Let me just confirm.

Juror Number 2, Ms. Delacerda?

JUROR: Yes.

THE COURT: All right.

Juror Number 3, Ms. Mills?

JUROR: Yes.

THE COURT: Juror Number 4, Mr. Buchanan?

JUROR: (Nods head up and down.)

THE COURT: Thank you, sir.

Juror Number 6, Mr. Hodges?

JUROR: (Indicates.)

THE COURT: All right.

Juror Number 7, Mr. Wallace?

JUROR: Yes, sir.

THE COURT: Juror Number 10, Ms. Cheeke?

JUROR: Yes.

THE COURT: All right. Juror Number 18, the luckiest juror in West Texas, Mr. Cardelli?

JUROR: (Indicates.)

THE COURT: All right. There's something about your face.

JUROR: Present.

THE COURT: Present as always.

And, Juror Number 19, you're going to have to help

me. Is it Mwene? How do I say your last name?

JUROR: Mwene.

THE COURT: Mwene?

JUROR: Yes.

THE COURT: All right. Thank you very much.

All right. Ladies and gentlemen, for the rest of the panel, you were not selected for this particular jury, but I want you to know that we could not have gotten to this net result without your presence. We never know how many people might have prior biases, how many people might not show up. We could not have done this without you. So thank you for your service. You are excused. You may exit through the back of the room.

All rise for the jury.

(THE PANEL MEMBERS EXIT THE COURTROOM)

THE COURT: All right. And before being seated-- everyone else may be seated if you would like. I need to give you another oath. So now that you've been selected as the petit jury, if you would please raise your hand.

(THE JURORS ARE SWORN)

THE COURT: Thank you very much. All right. You have been sworn. You may be seated.

Okay. Welcome. Now that you've been selected, let me tell you what's going to happen next. I'm going to give you some preliminary instructions that will help you as you hear

opening statements and evidence and closing. After my preliminary instructions, we're immediately-- We've made great time this morning. You're going to hear opening statements from both sides.

10:58 There are a few times-- I know it's hard to be read to as an adult. We liked it as kids, but it's really hard to pay attention as an adult when someone is just reading to you. But there are certain times where the words are particularly important. This is one of those times. So if you would please just bear with me, here are the preliminary instructions:

10:58 You have now been sworn as the jury to try this case. As the judge, I will decide all questions of law and procedure. As the jury, you are the judges of the facts. At the end of the trial, I will instruct you on the rules of law that you must apply to the facts as you find them.

10:58 You may take notes during the trial. Do not allow your note-taking to distract you from listening to the testimony. Your notes are an aid to your memory. If your memory should later be different from your notes, you should rely on your memory. Do not be unduly influenced by the notes of other jurors, as jurors' notes are not entitled to any greater weight than each juror's recollection of the testimony.

10:59 Until the trial is over, do not discuss this case with anyone, and do not permit anyone to discuss this case in

your presence. This includes your spouse, children, relatives, friends, coworkers, and people with whom you commute to court each day.

10:59 During your jury service, you must not communicate any information about this case by any means, by conversation or with the tools of technology. For example, do not talk face-to-face or use any electronic device or media, such as the telephone, a cell or smartphone, camera, recording device, PDA, computer, the internet, internet service, text, instant messaging, chat rooms, social media platforms--I think you get it--any platform any way at all, any way to communicate to anyone any information about this case until I accept your verdict and excuse you as a juror.

11:00 So you might hear me during trial at break say, the light is still red; don't talk about this case among yourselves or with anyone. I'll tell you when the light turns green, but the light is red until noted otherwise. Do not even discuss the case with the other jurors until the end of the case when you retire to deliberate. It is unfair to discuss the case before all of the evidence is in, because you may become an advocate for one side or the other.

11:01 The parties, the witnesses, the attorneys and persons associated with the case are not allowed to communicate with you, and you may not speak with anyone else in or around the courthouse, other than your fellow jurors or court

personnel.

11:01 Do not make any independent investigation of the case. You must rely solely on what you see and hear in this courtroom. Do not try to learn anything about the case from any other source. In particular, you may not use any electronic device or media, any that I have mentioned previously, including your smartphone. Do not go online or read any newspaper account of this trial or listen to any radio or television newscast about it. Do not visit or view any place discussed in this case, and do not use the internet or other devices to search for or to view any place discussed in the testimony.

11:02 In sum, you may not research any information about this case, the law, or the people involved, including the parties, the witnesses, the lawyers, or the judge, until after you have been excused as jurors.

11:02 There are some issues of law or procedure that I must decide that the attorneys and I must discuss. These issues are not part of what you must decide, and they are not properly discussed in your presence. So to avoid having you leave the courtroom and to save time, I might discuss these issues with the attorneys at the bench outside of your hearing. When I confer with the attorneys, I'll turn on that white noise machine that you've already heard, but please do not listen to what we are discussing.

11:02 If those discussions with the attorneys take more time, I may ask you to leave the courtroom until the lawyers and I resolve those issues. But I'm going to try to keep those interruptions as few and as brief as possible.

11:03 So the trial is now going to begin. Lawyers for each side will make an opening statement. Opening statements are intended to assist you in understanding the significance of the evidence that both sides expect to be presented. But the opening statements are not evidence.

11:03 After the opening statements, the plaintiff will present his case through witness testimony and documentary or other evidence. Next, the defendants will have an opportunity to present their case. The plaintiff may then present rebuttal 11:03 evidence.

11:03 After all the evidence is introduced, I will instruct you on the law that applies to this case. The lawyers will then make closing arguments. Closing arguments are not evidence; rather, they are the attorneys' interpretation of what the evidence has shown or not shown.

11:04 After that, finally, you will go to the jury room to deliberate and to reach a verdict.

11:04 Keep an open mind during the entire trial. Do not decide the case until you have heard all of the evidence, my instructions, and closing arguments.

11:04 It's now time for opening statements. Let me say a

brief word about our schedule today. Today, we will--it is 11:04 now. We're going to hear opening statements; then we're going to break for lunch. You'll have an hour to an hour and 15 minutes for lunch; you'll come back; and then we will start hearing evidence through witnesses.

11:04 We will finish today--so if you need to tell family, friends or work, you'll be done today at 5:00 this afternoon. That's when we will be excused. I teach at the law school on Mondays. I have a hard stop, because my class is from 5:30 to 8:00 tonight.

11:05 But tomorrow, I want you to talk among yourselves, not about the case, but just about the logistics. We will start--our typical day--our default is no later than 9:00 in the morning to start and to go at least until 5:00 in the afternoon. Some jurors want to start earlier than that to see if they can finish earlier, right? If we get an hour in that we weren't expecting, that will save you an hour on the back end. But sometimes my jurors live, like, an hour and 15 minutes away. The Lubbock Division is huge and includes Muleshoe, for example. And so sometimes it's hard for jurors to get here early. But if you decide as a group that you want to start before 9:00, please just tell my court security officer. He will tell us. I'll inform the parties. You're going to be patient with us, so we're going to be patient with you. If you'd like to start earlier than 9:00, let us know.

If you'd like to work later than 5:00 tomorrow and Wednesday, please let us know that, as well. I ask you to be sensitive if someone has, you know, childcare issues or travel issues. Obviously, no one is obligated. But it's your decision as a group.

11:06 Okay. Time for opening statements. Who will be doing opening statements for the plaintiff?

11:06 MR. BECHTOL: Stephen Bechtol. I will, Your Honor.

11:06 THE COURT: Okay. And, Mr. Bechtol, the rule has been invoked. Are there any witnesses present?

11:06 MR. BECHTOL: Yes, Your Honor. My client's wife.

11:06 THE COURT: Sure. Go ahead.

11:06 MR. BECHTOL: Can she go to the witness room across the hall?

11:06 THE COURT: Yes, she may, of course.

11:06 (PAUSE)

11:06 MR. BECHTOL: Thank you, Your Honor.

11:06 THE COURT: All right. And go ahead and take your time getting set up. Would you like to use the well or the podium?

11:06 MR. BECHTOL: I'll use the...

11:06 THE COURT: You'll use the what?

11:06 MR. BECHTOL: I'll stand at the podium.

11:06 THE COURT: Okay.

11:06 MR. BECHTOL: That way, I can stand in front of the

microphone.

THE COURT: That's fine. Take your time getting set up. Just let me know when you're ready. You will have 25 minutes. I'll give you a five-minute warning.

(PAUSE)

MR. BECHTOL: Okay. Can you hear me okay?

THE COURT: Yes. Everybody on the jury okay? Thumbs up? Thumbs up? Everybody can hear?

MR. BECHTOL: Please let me know anytime y'all can't hear me. Okay?

I'm ready to begin.

THE COURT: Go ahead.

(OPENING STATEMENT BY THE PLAINTIFF)

MR. BECHTOL: May it please the Court.

Thank you everyone. You're the lucky eight. Especially you, Juror 18, you're especially lucky. But I appreciate y'all being here.

There's been some levity throughout this morning as we did jury selection, a few things that are funny, and it's nice to have that. But what we're here to discuss today is a very serious incident where my client is alleging that he sustained severe personal injuries. The case before you is my client, Ruben Narro, versus S. Chahal Trucking, Inc., and Singh Sukhwinder. As you will see, Mr. Sukhwinder has chosen not to be present for this trial.

11:08 You're here for a crash involving an 18-wheeler and my client's Nissan Armada that occurred back on April 12th of 2023, and it occurred at the intersection of Landmark Lane and Clovis in Lubbock here in town. You're going to hear this was a rear-end collision; that Mr. Sukhwinder, in the course and scope of his employment with S. Chahal Trucking, rear-ended my client at the intersection.

11:08 You're going to see in the evidence throughout this case that Mr. Sukhwinder traveled from his home--which he lives in California--in the course and scope of his employment with the trucking company in an 18-wheeler, and he was going to pick up a load in Texas and that he was going to take it to Maryland. And then you're just going to see that he failed to control his speed at the intersection. He rear-ended my client.

11:09 The main thing that you have to understand in this case is--and we kind of touched on this during jury selection--is, this is a case about damages. The defendants have admitted negligence. They've admitted it was their fault. So what we're here to decide in this case is, what are his injuries worth, what are the money damages that you should award for the injuries he is alleging he sustained.

11:09 And, again, you're going to hear from my client. But the defendant, Mr. Sukhwinder, he has chosen that he is not going to come from California and listen to this evidence or

what happened to my client. You're here to assess his damages.

You're going to see photos of the collision scene if you're not familiar with the area. You'll see damages to the vehicle, my client's rear of his vehicle. You're going to see damage to the 18-wheeler and the front of it. And you're going to hear from Mr. Narro, the plaintiff. But again, you won't hear from any of the defendants in this case, except through a small portion of video deposition.

In this case--and this wasn't touched on during jury selection, but sometimes we take depositions and get testimony by video prior to the time of trial. So in this case, we intend to present Dr. Valente, board certified orthopedic surgeon, to discuss his care and treatment for Mr. Narro by video. He's a treating orthopedic surgeon who practices out of the D/FW area. So you're going to see a video of him discussing his care, the procedures he performed, and why.

And throughout this case and what's already in evidence in these binders that you're going to be allowed to take back with you is going to be the medical records and care provided.

As a result of the crash, the day following the crash, Mr. Narro went to the emergency room here in Lubbock. Since that time, he treated with medications, he completed two months of physical therapy at Olson, and he underwent

diagnostic imaging through MRI's for imaging to his lumbar spine. His most significant injuries in this case that he is alleging were injuries to his lower back, his lumbar spine. And you're going to hear that he ended up having a lumbar spine surgery to repair and treat those injuries.

11:11 You're going to see the actual MRI, the records of what was there in his lower back, that he had herniated disks and that they were compressing his nerve roots, and that was the reason he needed surgery.

11:12 You will see Dr. Valente actually discuss the operation that he performed in this case. The evidence is going to show that he underwent a L3 and L4 laminectomy and right discectomy and decompression and foraminotomy, and he's going to explain what that is and why he did it.

11:12 In this case, we've also retained an expert. His name is David Balat. And part of the reason you're going to hear from him in this case is to explain the usual and customary reasonable bills associated with the treatment that Mr. Narro received. Part of the reason we have to do this is to, one, prove they're reasonable, but in anticipation of what the defendant intends to try and disprove.

11:13 You're also going to hear from Emri Narro, who is Ruben's wife, and she's going to discuss what she has seen him go through since the time of the collision and what she has seen as a witness to his injuries and how it's affected him and

his interaction with his family and anything else she has seen.

11:13 And I anticipate what you're going to hear from the defense, which I'm going to call distractions, is two witnesses. They have retained and hired these expert witnesses who I--you know, I deal with these people a lot. Jana Schieber is a former nurse, and she's a billing auditor, and she's going to give opinions on--her opinions of what would be reasonable and customary bills for the treatment Mr. Narro has received. And I anticipate you're going to hear from Ernest Chiodo, who is a biomechanical engineer, among other things.

11:14 But you're going to hear that Jana Schieber--basically she finds bills of treating physicians unreasonable no matter where these doctors are located in Texas. You're going to hear that she determined that the hospital, the physical therapy, the MRI providers in Lubbock were all unreasonable, and then she's going to skip over to D/FW and find that the charges and all of the assistants and anesthesia costs in D/FW were also unreasonable, as well, because that's what she's--that's what she's paid for her opinions to do.

11:14 You're also going to hear in this evidence that she almost exclusively works for defendants.

11:14 I anticipate the evidence from Ernest Chiodo--he's going to come in and give a biomechanical opinion about whether or not Mr. Narro could have even been hurt in this crash. But he didn't examine the vehicles. He didn't go to the scene.

He's paid for his opinions to come and say that people weren't hurt.

11:15 He's going to say that, in this case, that the lumbar disk herniations that were compressing on Mr. Narro's spine that resulted in him having a surgical operation could not have occurred from the crash, and, in fact, these herniated disks cannot occur unless there's associated broken bones with them in the car crash.

11:15 He's going to tell you that Ruben didn't have any injuries whatsoever from this car crash. In fact, what his opinions are is that Ruben actually sustained more force on his body when he sat down to get into his car to start driving that day than when an 18-wheeler hit him from behind. And the defendant is going to ask you to believe that evidence and consider it as well.

11:15 But we also anticipate that they're going to try and bring up evidence in this case that Ruben had a sore back in the months at some point before this crash happened and that he went to go see a chiropractor but then didn't even go to treatment, and then that resolved within a couple of days. And you're going to hear them try and paint him as a liar and that all of this treatment and injuries were actually the result of some sore back he had months and months prior to the crash, and not from the 18-wheeler hitting him.

11:16 You're also going to hear and, I think, probably be

presented with video and pictures in this case of surveillance people that were hired by S. Chahal Trucking to film Ruben and his family outside of his home. And you're going to see that all of these videos took place months and almost a year after Ruben completed spine surgery. And I anticipate that you're going to hear Mr. Narro actually talk about what you see in those pictures and those videos himself.

11:17 But what the evidence is also going to show, what you're really not going to see in any records, is that there's not going to be a single document and a single record that you are presented with in this case, or that even exists, that Ruben had any prior MRI findings showing that he had herniated disks. You're not going to even see that, at any point in his life, that a doctor said, I need you to go get an MRI on your lumbar spine because something might be wrong.

11:17 You're not going to hear that--and there's not going to be any evidence or records presented or it's not going to exist in the records that you do have that are already in evidence that Mr. Narro ever was--received any orthopedic care or that he was even considered to be referred to any type of orthopedic care prior to the April 2023 automobile crash where he was rear-ended by an 18-wheeler.

11:18 But what you're going to hear from Mr. Narro and Emri is that, since the time of the crash--and Dr. Valente--that he has had numbness, tingling, weakness, and pain

radiating down his right leg and his left leg, down into his feet.

11:18 You're going to hear that this isn't just back pain, that he had what's called radiculopathy. He had symptoms running from his lumbar spine at the L3-4 level that traveled down into his legs. You're going to hear that those also resulted in debilitating back spasms that actually caused him to fall onto the ground and collapse. You're going to hear that he had to undergo lumbar spine surgery to actually repair and stop all those symptoms from happening. And you're going to hear that, to this day, that he still continues to live with residual back pain.

11:19 You're also going to hear about how his life has drastically changed, permanently changed as a result of the crash. You're going to hear about his quality of life differences. You're going to hear about the differences in his relationship with his children, his grandchildren, and his wife especially. You're going to hear about his physical ability, what he was able to do before the crash and since the time of the crash, how the crash has affected him.

11:19 And you're going to hear about his lost wages. You're going to hear that he has continued to work how he can since the time of the crash, and--because he has to put food on the table.

11:20 But those are the types of damages you're going to

hear about, because those are what we have claimed in the complaint and lawsuit that's been filed.

11:20 So, in conclusion, as we present the evidence in this case, I want to make sure you hold us accountable. Our burden is to prove these damages that I've just discussed, okay, and that they resulted from the crash. And I think our evidence is strong, and there's not going to be any records or paper that you're going to see, or any testimony, that you're going to see that any of this existed prior to the April of 2023 crash.

11:20 And Mr. Narro is going to ask that you hold S. Chahal Trucking and Mr. Sukhwinder responsible, even if they're not here. Even if they have chosen that they don't want to hear this, he's going to ask you to hold them responsible anyway.

11:20 So what we need you to do is, as you go through this--which, again, with our judge and everybody else, we're going to try and keep this very streamlined and try and get you out of here as quickly as we can. We know that you have families and jobs and everything to go back to as well. So we're going to ask you to judge the credibility of the witnesses that you hear throughout this case. Think about why they are here and what they are here for. Use your common sense. And no matter what happens, Ruben--we're going to trust your verdict and whatever you decide. Thank you.

11:21 THE COURT: Okay. Thank you, Mr. Bechtol.

11:21 Mr. Wise, are you doing opening statements?

11:21 MR. WISE: I'm sorry?

11:21 THE COURT: Are you conducting the opening statements?

11:21 MR. WISE: Yes, Your Honor.

11:21 THE COURT: All right. Go ahead, whenever you're ready.

11:21 (OPENING STATEMENT BY THE DEFENDANTS)

11:21 MR. WISE: May it please the Court.

11:21 Good morning again. This is really a pretty simple case. It involves an automobile accident that my client, Mr. Sukhwinder Singh, caused. We are here to take responsibility for causing the accident. He wants to take responsibility for causing the accident, but he's not here. He doesn't want to be taken advantage of. He wants to do what's right, what's reasonable--

11:22 MR. BECHTOL: Objection, Your Honor.

11:22 MR. WISE: He doesn't believe that--

11:22 THE COURT: Overruled. It's opening statement. The jury knows this is not evidence. Go ahead.

11:22 MR. WISE: He wants to do what's reasonable. But he doesn't believe the plaintiff is entitled to a blank check because of this accident. This case is not about whose fault the accident is. I'm telling you the accident was my client's

fault. Okay? You're not going to be asked that question. Or, if you are, you can say yes, it was our fault.

This case is really about money. What sum of money would fairly and reasonably compensate Mr. Narro for his injuries, if any, that were caused by the accident. That is generally the question that y'all are going to be asked to answer. That's the crux of the case.

After you've heard all of the evidence, we're going to ask you to award the plaintiff money and to pay for the reasonable costs of his medical treatment that was made necessary because of this accident. The great thing about our legal system is, us lawyers don't get to decide what's reasonable. I don't get to decide what's reasonable. Mr. Bechtol doesn't, Mr. Narro doesn't. Even our esteemed Judge Hendrix doesn't. You, the jury, get to decide that. That amount that y'all decide is reasonable, that's the amount that my client wants to take responsibility for.

When we get to the closing argument stage of the trial after you've heard all of the evidence, the plaintiff's attorney, I anticipate, will tell you how much he is going to ask you to award, and we'll do the same thing. You don't have to listen to either of us, or you can choose which one of us. You, ultimately, are the decider of that number. It's not pick my number, pick his number. You get to decide that. That ultimately is how you render your verdict.

I've already introduced myself to you this morning, but just in case you forgot--I won't be offended if you did--my name is Warren Wise. I'm an attorney at the law firm Mehaffy Weber. I have been an attorney for about fifteen years.

Mr. Carper is my associate attorney. I think you'll have an opportunity to hear him speak at some point in this trial. He's a new attorney with our firm, but he has actually been a criminal prosecutor in his, sort of, prior career.

And Michelle Stutes is an executive assistant with Mehaffy Weber. She's essentially the glue that holds the firm together for us. She's been there since the day I joined the firm. Together, the three of us have the honor of representing Mr. Singh and the company he created, S. Chahal Trucking, Inc., in this case.

Mr. Singh, so you know, was born in North India in a state called Punjab. He moved to California in 2015. He's now married to his wife Balminder [phonetic]. Together, they have a five-and-a-half-month-old baby.

Mr. Singh has been a commercial truck driver for five or six years now. At the time of the accident, he would typically deliver, like, frozen foods and stuff across the country. Since having a baby, though, he now delivers food--or delivers household goods closer to his home.

Up to this point, I think the judge has explained

to you, you have not heard any evidence yet. What we did in jury selection wasn't evidence. What Mr. Bechtol just said in his opening statement wasn't evidence, and what I'm telling you right now is not evidence. The only evidence you're going to hear is going to come from that witness stand over there. I think there might be some video testimony, and there will be some documents that are shown and published to you. That's the evidence that you're going to hear.

11:26 Anything Mr. Bechtol and I say, it's basically just arguments. It's our job as lawyers to argue the case the best that we can for our clients. I know Mr. Bechtol is going to do a great job. I'm going to try to do a great job, as well. Ultimately, though, it's not a battle between Mr. Bechtol and I. If you think he's better at doing this than I am, that's fine. You're not going to hurt my feelings. If you think I'm better at it than he is, probably won't hurt his feelings either. This is a case, though, between his client, Mr. Narro, and my client.

11:26 Now, I've mentioned to you before that Mr. Singh accepts responsibility for causing the accident. I do anticipate you're going to hear a video deposition of him. It might be right after lunch or sometime this afternoon. That deposition was taken roughly a year ago or so. And he'll tell you a little bit about how the accident happened in the video. One of the things, though, that you may hear is, he'll

testify--at that time, his belief was that the accident was Mr. Narro's fault, because he thinks Mr. Narro started moving at a green light and then stopped, trying to turn right, and that caused him to hit him.

11:27 He has reflected on that since then and realizes he was wrong in that and that the accident was his fault. So you're going to hear that testimony, but I don't want you to be confused. At the end of the day, we are accepting that the accident was our fault. Okay? And so this question--this case really--as Mr. Bechtol said, it's really about damages.

11:27 And I think you're going to find that, really, the primary point of contention between the parties is the extent to which Mr. Narro actually needed the surgery that he received. We believe the question to that answer is no. We believe the evidence is going to show that Mr. Narro had pain in his lower back for two months prior to the accident and actually sought medical treatment for that pain. We also believe the evidence is going to show that the force of the impact in the collision was not enough to cause Mr. Narro's alleged injuries.

11:28 You've heard me talk a little bit about Dr. Chiodo. He's a biomechanical expert and a medical doctor and a lawyer and a bunch of other things I'm sure he's going to tell you about. But he has reviewed the plaintiff's--Mr. Narro's medical bills, photographs in the case, testimony, the evidence

in this case, and has developed his opinion. Essentially, he's going to explain a few things to you, why he believes that there's no connection between the accident and Mr. Narro's alleged injuries, that the force of the impact in the accident was not significant enough to cause Mr. Narro's injuries, and that the plaintiff didn't need to have the back surgery that he had because of this accident. We also believe the evidence is going to show that the medical bills that Mr. Narro has been charged is not a reasonable amount.

11:29 The plaintiff has what we call the burden of proof in this case, and y'all have probably heard that term before. In criminal cases, you hear, the burden of proof is beyond a reasonable doubt. Right? This is not a criminal case. It's a civil case. So the burden of proof is actually by a preponderance of the evidence. The plaintiff has to prove by a preponderance of the evidence that the medical treatment he received was reasonable and necessary, that it was caused by this accident, and that the cost of that treatment was reasonable. To the extent he's arguing that he's going to need medical treatment in the future--I'm not sure if he is or not--he also has to prove that by a preponderance of the evidence.

11:29 If, at the end of the trial, you don't believe he has met that burden on any of those questions, you should render your verdict--we ask that you render your verdict accordingly to that.

11:30 Now, while the plaintiff has the burden of proof, he does get the advantage of getting to go first and last in this case. There's--that means--so the evidence you're going to hear first, and probably today, is going to be the evidence that they want to present to you. I think most of the evidence that we'd like to present to you will probably be tomorrow, maybe into Wednesday, depending on how long this takes.

11:30 There's theories out there among people who study this kind of thing called the primacy bias and the recency bias. That refers to one's tendency or a juror's tendency to listen to the evidence and put more meaning or stock into the evidence that they hear first and last. When we get to the closing argument stage, you'll find that Mr. Bechtol will have the opportunity to make his argument to you first, then I get to go, and then he gets to go again. The recency bias, by the way, is--that's where you have the tendency to believe--or put more stock in what you hear last.

11:31 All we're asking is that--don't forget about the middle part, okay, where we get to argue. Just--we ask that you pay attention throughout the trial. We've talked about we're going to try and be as efficient as possible in this case, but it's an important case to both parties, to Mr. Narro and to my client. Okay?

11:31 So as I said sort of at the beginning of my opening, again, you'll hear we are taking responsibility for

causing this accident. We just don't want to be taken advantage of simply because the accident happened and was our fault. We want to do what's right. We ask that you listen carefully to the evidence, and what you decide is--you know, we--like they do, we trust and believe in your capabilities of hearing that.

11:32 So on behalf of myself and my client, my colleagues, I thank you for your attention this morning, and I look forward to presenting the case to you.

11:32 THE COURT: Thank you, Mr. Wise.

11:32 Okay. Ladies and gentlemen, it's 11:30. We'll break for lunch a little earlier. I know you've been sitting for a while during selection, and now instructions and opening, so it's a good time for a break.

11:32 So we will take an hour and 15 minutes. So it's a little--we'll call it 11:30 now. So please be back--and we'll show you how to get in and out--no later than 12:45. That will give you time to get your coffee, get your water. You are welcome to bring coffee or water into the courtroom with you, as long as it's in a sealed container. We will have bottles of water for you. We'll have snacks and stuff, as well, but please don't bring any food or anything other than a sealed container with the liquid, water or coffee, in it.

11:32 Think about it over lunch. Let court security know what time you would like to start and end at some point today.

11:33 The light is red. Don't talk about the case. Have a nice lunch.

11:33 All rise for the jury.

11:33 (THE JURORS EXIT THE COURTROOM)

11:33 THE COURT: Be seated.

11:33 All right. We're still on the record. The jury has been excused, and the door is closed.

11:33 Anything from the plaintiff before we take our lunch break, Mr. Bechtol?

11:33 MR. BECHTOL: The only thing that I'll say is, I might swap David Balat and the video for Valente, depending on Mr. Balat's flight this afternoon.

11:33 THE COURT: Okay.

11:33 MR. BECHTOL: So I might switch that order. But otherwise, no, Your Honor.

11:34 THE COURT: All right. And I've asked my IT tech to come to the courtroom now so you can test your video deposition excerpts.

11:34 MR. BECHTOL: Thank you, Your Honor.

11:34 THE COURT: So let's get that done before you exit for lunch.

11:34 Mr. Wise, anything from the defendants before we break.

11:34 MR. WISE: Not at this time, Your Honor.

11:34 THE COURT: All right. We'll be in recess until

12:45.

(LUNCH RECESS TAKEN)

(OUTSIDE THE PRESENCE OF THE JURY)

THE COURT: All right. Anything from the plaintiffs before we bring the jury in?

MR. BECHTOL: I don't think so, Your Honor.

THE COURT: From the defense?

MR. WISE: No, Your Honor.

THE COURT: Who are you calling, Mr. Bechtol?

MR. BECHTOL: I'm going to play the video of Mr. Singh, or Sukhwinder.

THE COURT: All right.

Okay. Let's bring them in.

(THE JURORS ARE SEATED IN THE JURY BOX)

THE COURT: Okay. Be seated.

Welcome back, everyone. Hope you had a nice lunch. Thank you for being on time.

All right. Mr. Bechtol, the plaintiff can call his first witness.

MR. BECHTOL: Your Honor, we're going to call the defendant via video deposition, because he's not here.

THE COURT: All right.

MR. BECHTOL: May I proceed?

THE COURT: Yes, you may.

(VIDEOTAPED DEPOSITION OF SINGH SUKHWINDER PLAYING)

12:53 12:53 12:54 13:12 13:12 13:12 13:12 13:13 13:13 13:14 13:14

THE COURT: Pardon the interruption. Just a quick question. If you move your mouse, will the status bar go away so we can see the subtitles better, or does it stay no matter what?

MR. BECHTOL: Let me see if--

THE COURT: And if you can't move it, it's fine. I just thought I would ask. I'm hearing and understanding fine, but if we're able to get rid of the status bar if you move your mouse, great. If not, no big deal. You can restart whenever you're...

(VIDEO CONTINUES AND PLAYS TO THE END)

MR. BECHTOL: Your Honor, that concludes the plaintiff's offer of testimony for Mr. Sukhwinder.

THE COURT: Okay. Thank you very much. You can call your next witness.

MR. BECHTOL: Would it be okay if I stepped out and made sure that our expert, Mr. Balat, is in the hallway?

THE COURT: Yes, or co-counsel can do that. Either one is fine.

While we're waiting, if you would like to stand up and stretch, feel free to do that, but you don't have to if you don't want to.

(PAUSE)

THE COURT: Mr. Bechtol, who are you calling?

MR. BECHTOL: Your Honor, I'm going to call David

Balat. He's our billing expert.

THE COURT: All right.

Good afternoon, sir.

MR. BALAT: Good afternoon.

THE COURT: Would you please raise your right hand.

(THE OATH IS ADMINISTERED BY THE COURT)

THE COURT: Thank you very much. Have a seat.

MR. BALAT: Thank you.

THE COURT: Mr. Bechtol, your witness.

MR. BECHTOL: All right. Thank you.

DAVID BALAT,

PLAINTIFF'S WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

DIRECT EXAMINATION

BY MR. BECHTOL:

Q. Will you state your full name for the record, sir.

A. My name is David Balat.

Q. And can you tell the jury what your current occupation is.

A. Certainly. I--entrepreneur and businessman. I have a company called Med-X Global that is a litigation service support company. I also have another company called Direct Care Alliance, where I help employers negotiate direct contracts with hospitals.

Q. How long have you been doing that for?

A. Say that again?

13:15 Q. How long have you been operating those companies for?
13:15 A. I've been the CEO of Med-X two and a half years. Direct Care Alliance is about a-year-and-a-half old.
13:16 Q. And you heard me introduce you to the judge. As our expert, can you tell the jury what type of expert you are.
13:16 A. I'm a healthcare finance expert. I've been a hospital CEO and billing expert for well over 20 years, so that's--that's--I lend myself to that kind of work, which is why I'm here today.
13:16 Q. And so in this case, what exactly have we asked you to do?
13:16 A. You sent over the medical records and the billing records and asked me to determine whether the charges that were charged by the providers were--would fall within the usual, customary, and reasonable range in the markets where the services were provided.
13:16 Q. And to be fair and transparent with the jury, have I asked you to do work on other cases in the past?
13:16 A. You haven't, but your firm has.
13:16 Q. Okay. Same difference. All right. Okay. And can you tell the jury, then, a little bit about your educational background.
13:17 A. Certainly. I have an undergraduate degree from the University of Houston. I have a joint master's degree from the University of Houston-Clear Lake, one in business--I have an

MBA--and I have an MHA, which is a master of healthcare administration.

13:17
Q. And can you tell us about any type of special certifications or training that you've received in your field?

13:17
A. Process engineering, a six sigma certification, is the only one that I have on my resume. But nothing more than that.

13:17
Q. And so today, you're here as this expert, but other than appearing like today and giving your opinions about the amounts of bills like we've asked you to do, what else do you do in your line of work?

13:18
A. Currently in my line of work, or what I've done in the past?

13:18
Q. Well, let's start with the past so the jury knows how you got here. In the past, what were your--what was your line of work?

13:18
A. Certainly. I was a--worked in the hospital industry. I was a healthcare executive, chief operating officer, chief executive officer. I did that for nearly 20 years. The last part of my career, I was a turnaround specialist. So if there was a hospital that was in financial straits, I would be asked to come and see if I could get them back on their feet again. I actually did one here in Lubbock over 20 years ago.

13:18
Then I got into the policy world, where I worked with the Governor and the State Speaker of the House here in Texas to work on a number of healthcare-related policy bills.

I was asked to work during the first Trump Administration on the hospital price transparency executive order, so I was invited to the White House to work on that. Also worked with the Biden Administration to make it a little bit stronger with the enforcement, and brought that language back from that executive order to make Texas the first state that required hospital price transparency.

13:19 Q. Can you tell us a little bit more about what your experience is with actually reviewing and determining whether or not particular medical bills are reasonable and customary.

13:19 A. Yeah, I think that goes to the very beginning. It's not just the determination of what is usual, customary, and reasonable. My background in working with the hospitals is that I would set the charges, and we would have to look at the market, we would have to look at the competitors, we would have to look at the services, we would have to look at the education, talent, resources of the physicians that were performing the surgeries, and come up with costs that were consistent with what the market rates were. So that's one of the things, I think, is important in understanding this line of work.

13:20 But I've also owned billing companies. I do audits for organizations. I currently negotiate charges for employers with hospitals. So it's something I'm very much comfortable with and entrenched in.

Q. You mentioned the administrative work with the Biden and Trump administrations. During those times, did you provide any actual testimony in front of any type of legislative body?
A. I did. I was invited to come give testimony before the House Oversight Committee, the House of Representatives. So I did get to testify before Congress.
Q. And--
A. As well as various state legislatures. That was at the federal level. But at the state level, Texas many, many times; Kansas; and Alaska.
Q. And outside of that, have you had opportunities to testify, either in court or through a deposition, in different types of cases like you're here for?
A. I have.
Q. And as we sit here today, do you feel that you're qualified to testify about issues regarding healthcare finance and medical billing?
A. Oh, yeah.
Q. So today, when I ask you about your opinions on Ruben's medical bills associated with his treatment, can you agree to give your testimony today on those subjects based upon a reasonable degree of medical probability in healthcare finance and billing?
A. Yes.
Q. In this case, could you tell the jury what exactly you

reviewed, what actual materials?
A. I couldn't hear what you said.
Q. In this case, what materials did you actually review and look at?
A. I was sent the medical records and the billing records by provider.
Q. Can you tell us what providers you actually looked at?
A. Yes. There were a total of twelve. Would you like me to read through the list of providers?
Q. Yes, sir.
A. There was Bryce Olson Physical Therapy, which I believe is located in Lubbock; Covenant Health; Dallas Radiology, P.A.; Equinox Spine, P.A.; Fairview Monitoring Services; First Baptist Medical Center; Lighthouse Anesthesia; Mark Valente, D.O.; Mission Diagnostics; MRI Centers of Texas; River Oaks Hospital and Clinics; and Synovation.
Q. So once you reviewed those bills and records, can you describe what your methodology is to determine how you assess whether or not something is usual and customary and reasonable?
A. Certainly. When we're talking about usual, customary, and reasonable, we're looking at all of the prices, all the data points in the market, from very low to very high and everything in between. And what's important is that we have to understand that usual, customary, and reasonable is a range. What's important--and there's a resource that I use called

Turquoise Health, and Turquoise Health applies percentile ranges to that data. So it will have 50th, 75th, 90th percentile.

It's customary to use 90th percentile to say anything above that could be considered to be an outlier, something maybe excessive in the market. So we create an artificial ceiling on that range to say, okay, this number to this number is the appropriate range of numbers to choose from.

And so looking at the charges, looking at the different CPT codes that come with the billing records, anything that may have been above that 90th percentile was revised down to the 90th percentile so that we kept it in that range.

Q. You just referenced the words "CPT code."

A. Yes.

Q. Can you tell the jury, what's a CPT code? What does that have to do with--

A. I'm sorry. Yes. CPT code, it--current procedural terminology, is what it stands for. It's developed by the American Medical Association. The American Medical Association creates these codes. Whenever your doctor--you come in with a diagnosis, there's a diagnosis code. That diagnosis code is then paired up with a toolbox of various procedures or therapy codes that would line up with that diagnosis. So if I have a broken arm, there's going to be a category of CPT codes to

choose from for what's going to be used in terms of therapy or surgery or different types of services that would be offered to repair that broken arm.

13:25 So it's often used with payers, with third-party payers. So doctors, facilities, any of these providers that we've mentioned, they submit those codes in order to get paid by whoever is going to pay it.

13:25 Q. And in terms of Mr. Narro's bills, in the past, other than this case, had you had opportunities to review and give opinions on the type of care of physical therapy, imaging, orthopedic care, hospital, at other points in time?

13:26 A. Yes.

13:26 Q. All right. Many times?

13:26 A. Many times.

13:26 Q. Do you have any idea how many reviews and reports you have done like you did in this case?

13:26 A. I don't have an exact number. I'd hate to guess.

13:26 Q. Okay. In this case, did you actually come to any type of conclusions and findings regarding Mr. Narro's medical bills?

13:26 A. Yes.

13:26 Q. Okay. So with Mr. Narro's actual billed charges, can you tell us what the actual billed charges were?

13:26 A. The actual billed charges were $240,136.69.

13:27 Q. And what was your overall opinion about the reasonableness of Plaintiff's charges of his medical treatment?

A. I reduced a number of them. It came down to $222,748.13.
Q. And I brought this over here without plugging it in.
And up on the screen, is this what you're referencing when you just said those numbers from your report?
A. Correct.
Q. So which of the bills did you actually look at and reduce by any means?
A. I looked at all of them, but--
Q. Well--
A. --in terms of reduction--
Q. Correct.
A. --there was--the first one, it appears, is Dallas Radiology, P.A., and that was the--that was the radiologist that read the images. And so their charges were outside of that 90th percentile, and that was revised back to the $750 rate that you see there.
Equinox Spine, P.A., this is--may I explain what this provider was?
Q. Sure. You can explain what--
A. Equinox Spine was the surgical assist. So in a very--in a complicated case like a spine case, there's typically a first assistant surgeon. So this was the assistant surgeon, not a doctor, oftentimes trained in that position, or they are doctors in foreign countries that haven't been able to get licensed here. So their charge was fairly excessive, and I

revised that back down to 3500, based on what was usual and customary in the market.

13:29 Fairview Monitoring Services--and again, I need to explain what they do. When you're dealing with surgeries pertaining to nerves, they want to make sure that there is a monitoring service that is there to make sure that all the nerves are firing and that they are not cutting any nerves or injuring the patient in their nervous system. So one of--and this one was--this was the physician component of the neuro monitoring, and I believe that they were monitoring remotely during the procedure. That was on the higher side. I did revise that down to 6,750 for that portion.

13:29 First Baptist Medical Center was 128,000. No revisions there, based on the CPT codes that were available.

13:30 Lighthouse Anesthesia, that was the anesthesia group.

13:30 Mark Valente, D.O. This was the surgeon. For the surgical procedures, the codes that were offered at the prices that were on the billing records, that was revised as well.

13:30 Let's see. Mission Diagnostics stayed the same. All the rest stayed the same.

13:30 Q. The remaining four providers, you found that their charges were within that 90 percent range?

13:30 A. That's correct.

13:30 Q. Okay.

A. They were within that range.
Q. All right. So as we sit here today, can you tell the jury what you believe, based on your education, training, experience, knowledge, would be for them to submit for Ruben's reasonable past medical expenses?
A. The charge that I have is $222,748.13.
Q. And to be fair, on the other end, do doctors have to follow this type of billing procedure that you have analyzed?
A. I'm not sure I follow.
Q. Are doctors allowed to charge whatever they want?
A. Well, certainly. Anybody can charge whatever it is they want. But if you're consistently on the high end, people are not going to be using you in the long-term. It's like, you know, there's a gas station on one corner, another gas station on another corner, and one has got gas for six dollars. They might get a few customers for the convenience sake--not me--but suddenly you're going to get people going to the other side.
So people can charge what they want, certainly, but competitive forces come into play, and people will do what's best in light of their pocketbook.
Q. The methodology that you've explained to come up with the reasonableness, customary nature of the charges, is that a methodology that other experts in your field would rely upon?
A. Yes, for the most part.
Q. Okay. And in this case, we're in Lubbock. But have you

given opinions on the reasonableness of charges outside of the Lubbock area?

13:32 A. Well, in this case, you know, Covenant and Bryce Olson, P.T. are in Lubbock. But Dallas Radiology, First Baptist Medical Center, those are in Dallas. Synovation, that was a service provided in Dallas, but they're out of New Braunfels. MRI Centers and River Oaks are in Houston. So we had to look at each market individually.

13:32 Q. And other than just this particular case, have you had the opportunity to review bills in other areas of Texas?

13:33 A. Certainly.

13:33 Q. What about the rest of the country?

13:33 A. Certain parts of the country, not--not--not all over. But mainly--mainly the South and Arizona.

13:33 Q. Okay. In this case, did you have the opportunity to review the opinions of the expert, Jana Schieber, that was retained by the defendants?

13:33 A. I did.

13:33 Q. Do you have any agreements or disagreements with Ms. Schieber?

13:33 A. Ms. Schieber is a nurse that did refer to a database, but when talking about pricing, there was--she would talk about a single price. She would say, well, it's higher than this price. Well, that's not how market rates work. Like I said, it's a range. So did it fall within the range or is it outside

of the range? There's no set pricing anywhere, really, but in healthcare specifically.

13:34 So that was confusing in reviewing that, trying to understand what this price was. And at times in her report, she also said that, for certain CPT codes, the codes we talked about earlier, she said--the price that she came up with was the cost plus 150 percent. Well, what does that mean? What hospital cost? Is that based on the Medicare cost report? Is it based on--on what?

13:34 So it was difficult to really make sense of it in terms of what benchmark was used. And then how do you compare with other providers in the market if we're not using a percentile.

13:35 Q. And from her report, do you recollect what she determined a reasonable and customary charge, total, would have been?

13:35 A. Say one more time?

13:35 Q. From reviewing her report, do you recall what she considered a reasonable and customary amount?

13:35 A. I don't recall exactly. I think it was one-fifty-four.

13:35 Q. 154,000?

13:35 A. 154,000, yes.

13:35 Q. So she had--

13:35 A. And some change. I don't recall the exact number.

13:35 Q. Okay. To be transparent with the jury, you're not working for free, are you?

13:35 A. I am not, no.
13:35 Q. Okay. In this case, have you charged and been paid for your services?
13:35 A. The company I work with and for and partially own charged and was paid $7,000 for my time today. I'm paid a salary.
13:35 Q. Okay. In addition to the $7,000 to be here in Lubbock, were you also paid for your report?
13:35 A. Yes.
13:35 Q. Or the company paid for your report?
13:35 A. Yes, the company was paid for the report.
13:36 Q. And do you recollect how much that amount was?
13:36 A. Oh, I don't.
13:36 Q. All right. I show $750. Does that sound right?
13:36 A. Okay.
13:36 Q. Okay.
13:36 A. I believe--I believe that, yes.
13:36 Q. Okay.
13:36 A. That's our document, so I believe it.
13:36 Q. All right.
13:36 All right. Mr. Balat, I certainly appreciate your time and for you coming down here to the courthouse today.
13:36 MR. BECHTOL: I will go ahead and pass the witness.
13:36 THE COURT: Cross-examination?
13:36 MR. CARPER: Please, Your Honor. Thank you. I'll move to the--

13:36 THE COURT: Yes. From the podium, please.

13:36 MR. CARPER: Apologies.

13:36 THE COURT: And, Mr. Balat, while counsel is preparing, do you mind just pulling the microphone a little closer to you? We were--

13:36 THE WITNESS: Will it move? Yes, okay.

13:36 THE COURT: Thank you very much.

13:36 THE WITNESS: I didn't know it could do that.

13:36 THE COURT: Appreciate it.

13:36 THE WITNESS: Thank you.

13:36 THE COURT: All right. Your witness.

13:36 MR. CARPER: Thank you, Your Honor.

13:36 CROSS-EXAMINATION

13:36 BY MR. CARPER:

13:36 Q. Good afternoon, Mr. Balat.

13:36 A. Good afternoon.

13:37 Q. So you're retained by Mr. Narro to serve as a testifying expert. Correct?

13:37 A. I didn't hear what you said.

13:37 Q. You were retained by Mr. Narro or his attorneys to serve as a testifying expert?

13:37 A. Yes.

13:37 Q. And you were paid for your testimony. We already went over this. Correct?

13:37 A. Well, the company has been paid.

Q. Okay. And you're the CEO and part-owner of that company?
A. That's correct.
Q. Okay. And you were also paid to prepare to testify, as well?
A. No.
Q. No? Okay. Just the fee for the appearance?
A. It's a flat rate.
Q. Understood. And that 7,000 and that 750, that's all you've billed in this case to date?
A. That's correct.
Q. Okay. But you've been hired by this law firm in other cases as well?
A. Yes.
Q. Can you recall how many times?
A. No.
Q. Okay.
A. Well, in terms of what? A report? Deposition? Trial?
Q. We'll just say basic, just, report.
A. Report? Less than 20.
Q. Less than 20? And that's just one firm. Correct?
A. Correct.
Q. Does your company work for other firms as well?
A. We work with about 150 firms.
Q. Okay. Would you say you average about 20 case reports per firm?

13:38 A. No. It varies.
13:38 Q. It varies? Okay. But it could be more, could be less?
13:38 A. Could be more, could be less.
13:38 Q. Okay. Could you guess that you've maybe done a thousand reports?
13:38 A. I don't have the exact number. I would be guessing at that point. That may be close to a number; I just don't know.
13:38 Q. Understood. Understood. And by all means, don't guess.
13:38 A. Yeah.
13:38 Q. But you've also--have you testified for other attorneys in Mr. Bechtol's firm?
13:38 A. In Mr. Bechtol's firm?
13:38 Q. Correct.
13:39 A. In deposition. I don't think in trial.
13:39 Q. Okay. Understood. And do you get a fee for deposition testimony, as well?
13:39 A. I do, yeah.
13:39 Q. Have you testified for other attorneys, other defense firms--I'm sorry--other plaintiffs firms like Mr. Bechtol's?
13:39 A. Other plaintiffs firms, yes.
13:39 Q. Okay. And about how many would you say?
13:39 A. What's the question?
13:39 Q. About how many other firms have you testified for?
13:39 A. Oh, I don't know the answer to that either.
13:39 Q. Understood. You said 150, maybe, for reports. Is it

probably less than that?
A. It's less than that, yes. Yeah.
Q. Okay. Would you say it's more than a dozen?
A. More than a dozen? I would say right around 40, less than 40.
Q. Okay. And you received about 7,000, maybe, different fees at different times, so about 7,000 for each of those?
A. At trial-- The company does. For trials, it's 7,000. Depositions are four.
Q. Understood. Thank you.
Do you plan to continue testifying for firms like Mr. Bechtol's in the future?
A. If we're asked to produce a report that results in my needing to come testify, then that's what we'll do.
Q. Understood. Now, before we go on, I do want to see if we can agree on some things.
A. Okay.
Q. You do agree that several of the billers in this case were unreasonably high?
A. Repeat the question, sir?
Q. Several of the billers in this case were unreasonably high?
A. Not the billers. Some of the codes that they billed on, or the corresponding price with the CPT's, were above that 90th percentile. So based on that methodology, it was deemed

13:40 to be outside of the usual, customary, and reasonable and an outlier.

13:40 Q. Okay. And you define that as above 90th percentile; is that correct?

13:40 A. That's correct, yes.

13:40 Q. So to fix that, you reduced it down to 90 percent?

13:41 A. Correct.

13:41 Q. So the new price that you assigned them is more expensive than 90 percent of other billers?

13:41 A. It's certainly a premium on that range, but it's within the usual and customary and reasonable--within that range itself.

13:41 Q. But it is the absolute limit of what you consider UCR?

13:41 A. Say that again?

13:41 Q. It's the absolute limit of what you consider usual--

13:41 A. It is the upper limit. It is that artificial ceiling that I referred to, yes.

13:41 Q. Did you make a report with the average or 50th percentile?

13:41 A. I did not.

13:41 Q. Would that be substantially lower, you think?

13:41 A. Given the way math works, yes.

13:41 Q. Understood.

13:41 A. Yeah.

13:42 Q. Now, for the other ones, you did make a report saying if

13:42 they were above average or below average?

13:42 A. I'm sorry. What's the question?

13:42 Q. You did a report on the other billers, whether or not they were above or below 50 percentile?

13:42 A. What other billers?

13:42 Q. So there was, I believe, four you stated were unreasonable. Correct?

13:42 A. There are four where I revised the rates down to the 90th percentile, yes.

13:42 Q. Understood. And there's, I believe, eight other billers; is that correct?

13:42 A. Yes.

13:42 Q. Okay. Did you do a report on whether or not those are more or less than 50 percentile?

13:42 A. More or less than 50 percent what?

13:42 Q. We've talked about a range this whole time. Right? About the--

13:42 A. Yes. Yeah, they fall within the range, which is why there was no revision. So if they fell within the--between the low and that 90th percentile, then they were deemed usual, customary, and reasonable, and there was no changes or alterations.

13:42 Q. Okay. And to be clear, you didn't come here to provide a specific number for usual, customary, and reasonable. Correct?

13:43 A. Well, no. It's--you don't really provide a number.

You're saying that--is it--does it fall within an acceptable market rate in the region that you're providing for the services that are being offered compared to other providers of the similar type.

13:43 Q. Okay. And--but the jury in this case, they will not be providing a range. Correct? They will have to give a specific number?

13:43 A. I'm sorry. Would you repeat the question?

13:43 Q. The jury. You're here to help the jury. Correct?

13:43 A. Yes.

13:43 Q. They are going to have to provide a specific number?

13:43 A. Correct.

13:43 Q. But you're here to provide a broad range?

13:43 A. Well, no. So the way that usual, customary, and reasonable works is that there is a range. For those numbers that exceeded the 90th percentile, I revised it back to the 90th percentile so that it could be a representative number based on what would be usual, customary, and reasonable, and the number I have offered is $222,748.13.

13:44 Q. Now, you talked about your experience in the past. You worked for hospitals; is that correct?

13:44 A. I have worked for hospitals, yes.

13:44 Q. And you specialized in increasing profits. Correct?

13:44 A. Well, that's--that's your job--

13:44 Q. Understood.

A. --as an executive.
Q. And correct me if I'm wrong, but hospitals are typically the ones sending out the bills to be paid. Correct?
A. Correct, yes.
Q. So part of your job was to always try to get as high as possible in that UCR range?
A. Well, you know, it's--that's a good question. As the leader of any organization, you have a fiduciary duty to not leave any money on the table, that you have to do your best, as long as it's ethical, moral, and legal, to collect as many dollars as you can.
Now, I will also say that it's one of the reasons why I don't do that. I'm not in that business anymore and I do what I do now, in helping to negotiate direct contracts for employers with hospitals, so I get to use my experience to help reduce those costs. But, yes, so that's absolutely true.
Q. Okay. And so--and in this case, whenever the bill was too high, you only put it down to 90th percentile?
A. Say again?
Q. You only put it down to 90th percentile, so only the--I guess the top is what you're saying 90th percentile, is the UCR?
A. I'm not following your question, sir. I'm sorry.
Q. I'll move on.
Now, you're saying that all of these bills were in

the range. Correct?

A. Correct. Well, no, not all of them.

Q. I'm sorry. The ones that--

A. I did revise four of them.

Q. After you've adjusted them--

A. Yes.

Q. --they're all in the range?

A. Correct. Yes.

Q. Okay. If they were lower, would they still be in the range?

A. Yes.

Q. So if the jury gave less than these amounts, they would still be in the usual, customary, and reasonable range?

A. Well, it comes down to what is going to be required by the provider. But yes. The answer is yes.

Q. So down to the 10th percentile would still be the usual, customary, and reasonable range?

A. Well, I don't know. I'd have to look to see what the lower limit is for certain procedures. But, no, to your answer question, yeah, the answer is yes, it falls within usual, customary, and reasonable.

Q. Did you provide a report to provide what the 10th percentile would be for each of these?

A. I did not, nor did your expert.

Q. And you did not provide one for 50th percentile?

A. I did not, and nor did your expert.
Q. So you've only provided the absolute upper limit of what could reasonably possibly be considered for these bills?
A. I--well, again, what I did is create--I created the upper limit by using the 90th percentile from Turquoise Health. So if something is being charged at $100, and the 90th percentile is $90, I changed the charge for that code to be $90 so that it would be within that usual, customary, and reasonable range.
Q. Would you agree that that's arbitrary?
A. Oh, no, not at all. It's much less arbitrary than the report that I read earlier today from your expert.
Q. But could you have selected 70th percentile?
A. Could I have selected what?
Q. 70th percentile.
A. Well, the 70th is already within the range. We're not creating an upper limit. So remember what we're trying to accomplish. We're trying to prevent or exclude outliers. If I chose the 70th, that's--statisticians and actuaries will commonly use 90th percentile to say, okay, that 10 percent, we're going to create that limit there so that we're excluding numbers that might be way too high, and so we're going to use this new range to establish, this is the market rate.
So, yeah, I mean, could I have used the--could I have chosen the 70th or the 50th or the 30th or the 66th? Sure. But what good is that accomplishing?

Q. Would it still provide something in the usual, customary, and reasonable range?
A. Say that again?
Q. Would it still provide something in the usual, customary, and reasonable range?
A. It does fall within the range, as I have explained, yeah.
Q. So--but kind of turning back to your past just very briefly--I'm almost done--
A. Sure.
Q. --it was your job to get bills sent out as close as possible to the 90th percentile?
A. No. I didn't really factor in the 90th percentile when I was running hospitals.
Q. But you were trying to maximize profits?
A. Yes. We hired a company at the time, before hospital prices were transparent now. They would have to go and find the rates, and we'd go through a whole study and determine what the market rates are for this hospital and that hospital and this hospital and fall within a range at a level that was going to get us the most amount of money for any particular service.
Q. Okay. And would you say that you're providing similar expertise today?
A. Say that again?
Q. Are you providing similar expertise today for--
A. No. This is a very different form of expertise. Today--

I'm not developing charges today. Today is not a day where I'm saying--I'm trying to generate dollar amounts for facilities. I have no connection to these facilities. I have no leadership in these facilities. Today, I'm using that experience that I have generated over decades to say, okay, as a third-party objective person, using resources and databases with percentiles of the market rate, what would be usual, customary, and reasonable as per the definition.

13:49 Q. But you do plan to continue testifying in cases like this?

13:49 A. Say that again?

13:49 Q. You plan to continue testifying in cases like this?

13:49 A. I do.

13:50 Q. And part of that is providing testimony at the 90th percentile of the UCR?

13:50 A. Well, you have to establish a range. So that's the upper limit of that range, and I think that that's--what's happening there is, you're protecting against those bigger numbers. And there have been times when the numbers have been excessive and we've had to cut the bills down. This one was about a 9 percent reduction.

13:50 MR. CARPER: No more questions, Your Honor. Pass the witness.

13:50 THE COURT: Redirect?

13:50 /

REDIRECT EXAMINATION

BY MR. BECHTOL:

Q. In this particular case, you're not working for a hospital or anybody else, are you?

A. No, sir. I don't work for any hospitals. I--currently, I negotiate against hospitals.

Q. And in this case, with the payment of these medical charges, you're not getting those charges--the money to pay those doctors, are you?

A. Could you repeat that question?

Q. With these bills, these questions about profitability, are you getting paid a portion of these doctors' bills?

A. No, sir. I don't get anything other than what has been charged and received by your firm.

Q. And with these percentile questions, in this case, you didn't say the--or that the plaintiff's medical bills should be higher than they actually are, did you?

A. Not once.

Q. In fact, in this case, you've actually said they should be a little bit lower?

A. I did.

Q. So you're actually saying the doctors should be paid little bit less than whatever this profit argument might be?

A. That's accurate.

Q. All right.

13:51 MR. BECHTOL: That's it. No further questions. Thank you.

13:51 THE COURT: Any recross limited to that scope?

13:51 MR. CARPER: No, Your Honor. Thank you.

13:51 THE COURT: All right. Thank you very much. You can be here-- Any objection to this witness being excused?

13:51 MR. BECHTOL: No, Your Honor.

13:51 THE COURT: From the defense?

13:51 MR. CARPER: No, Your Honor.

13:51 THE COURT: All right. You are excused. Thank you for being here.

13:51 THE WITNESS: Thank you, Judge.

13:51 THE COURT: And, Mr. Bechtol, you can call your next witness.

13:51 MR. BECHTOL: Your Honor, I'm going to call Dr. Valente by video deposition.

13:52 THE COURT: Okay. While you're setting that up, I'll just encourage the jury, if you want to stand up-- We are going to take a break in about 30 or 45 minutes, but if you'd like to stand and stretch before we start this next witness, you certainly may.

13:52 (PAUSE)

13:52 THE COURT: All right, Mr. Bechtol. Whenever you're ready.

13:53 (VIDEOTAPED DEPOSITION OF MARK VALENTE, D.O., PLAYING)

14:28 THE COURT: Mr. Bechtol, pause it.

14:28 All right. It's about 2:30. It's a good time for our afternoon break. I'll remind you, ladies and gentlemen of the jury, that the light remains red. Please don't talk about the case among yourselves or with anyone else. We'll take 10 minutes, or a little bit more if you need it, for a comfort break. When you're ready, just tell the court security officer, and he will bring you in. And if you are able to talk about your preferred schedule tomorrow and let my CSO know, he will let us know.

14:28 All rise for the jury.

14:28 (THE JURORS EXIT THE COURTROOM)

14:29 THE COURT: Be seated.

14:29 All right. Still on the record. The jury is out of the room and the door the closed.

14:29 Anything from the plaintiffs before we take our afternoon break, Mr. Bechtol?

14:29 MR. BECHTOL: No, Your Honor.

14:29 THE COURT: From the defense?

14:29 MR. WISE: No, Your Honor.

14:29 THE COURT: Okay. The only thing the Court has. Mr. Davidson, are you feeling okay?

14:29 MR. DAVIDSON: It's hard to hear. It's just the echo.

14:29 THE COURT: The echo. Okay. It appears-- I'm

just--I'm trying to keep the jury fully attentive. They have been. It appears just that you have difficulty remaining with the Court. Maybe that's not the case. Maybe that's just how you listen. But just do me a favor and even--if you are attentive, appear attentive. That will help me keep the jury attentive. Understood?

14:30 MR. DAVIDSON: Yes, Judge.

14:30 THE COURT: All right. We are in recess for 10 to 15 minutes.

14:41 (RECESS TAKEN)

14:45 (OUTSIDE THE PRESENCE OF THE JURY)

14:46 THE COURT: All right. Let's bring them in.

14:46 Mr. Bechtol, how much longer do we have, approximately, in the video?

14:46 MR. BECHTOL: Twenty-nine minutes.

14:46 THE COURT: Thank you.

14:46 (THE JURORS ARE SEATED IN THE JURY BOX)

14:47 THE COURT: Be seated.

14:47 All right. Mr. Bechtol, you may continue.

14:47 MR. BECHTOL: Thank you, Your Honor.

14:47 (VIDEO CONTINUES AND PLAYS TO THE END)

15:16 MR. BECHTOL: Your Honor, that concludes both sides' presentation of Dr. Valente.

15:17 THE COURT: All right. Thank you very much. You can call your next witness.

15:17 MR. BECHTOL: Your Honor, we're going to call Emri Narro. She's in the hallway. Can I go get her?

15:17 THE COURT: Yes, you may.

15:17 All right. Ladies and gentlemen, if you'd like to stand and stretch, you may, as we're waiting on the next witness.

15:17 (PAUSE)

15:18 THE COURT: Good afternoon. Before you step up there, would you please raise your right hand.

15:18 (THE OATH IS ADMINISTERED BY THE COURT)

15:18 THE COURT: Thank you very much, madam. Have a seat. Take your time.

15:18 Mr. Bechtol, if you would just click your ClickShare so the screen is black, unless and until you need to present admitted evidence.

15:19 MR. BECHTOL: Don't want to distract us with dolphins. I'm sorry.

15:19 THE COURT: No.

15:19 Oh, interesting. Okay.

15:19 MR. BECHTOL: I'll plug it in when I'm ready.

15:19 THE COURT: Oh, interesting. Sorry. We used to be able to just click the button, but we're having a problem. It's okay.

15:19 MR. BECHTOL: I thought it would, but I guess it's a Mac thing, and so--

THE COURT: Understood. Okay. Your witness.

MR. BECHTOL: Thank you, Your Honor.

EMRI NARRO,

PLAINTIFF'S WITNESS, TESTIFIED ON HER OATH AS FOLLOWS:

DIRECT EXAMINATION

BY MR. BECHTOL:

Q. All right. Can you introduce yourself and state your full name to the jury, please.

A. Yes. My name is Emri Narro. I am the wife of Ruben Narro.

Q. How long have you guys been married?

A. We've been married seven years; together twenty.

Q. Okay. Do y'all have any children together?

A. Yes. We have Ruben Narro, who is a 19-year-old; Raven Narro, who is seventeen years old; and Riley Narro, who is nine years old.

Q. Now, besides those three children, do y'all have any other children?

A. I do. I have Isaiah Flores, who is twenty-five; Felicity Tijerina, twenty-three; and Christopher Tijerina, twenty-two. Ruben has helped me raise them twenty years of our lives.

Q. Okay. And out of all those children, do you have any grandchildren?

A. I do. A lot. I have, altogether, nine.

Q. Which of your children do you guys have grandbabies with?

15:20 A. That's my oldest son, Isaiah Flores. He is twenty-five years old, and Ruben and I have custody of three of them.

15:20 Q. Okay. And the three grandbabies that you have custody of, you and Ruben, do they reside with you in your home?

15:20 A. Yes, they do.

15:20 Q. What are their ages?

15:20 A. Xaven Flores is nine years old; Xavory and Xavorienne [phonetic] are a set of twins. It's a boy and a girl. Birthday, 8-15-2020, and they are five years old.

15:21 Q. Okay. So besides the three grandbabies, which of your--do any of your children--which of your children actually reside in the home with y'all?

15:21 A. With Ruben and I?

15:21 Q. Yes.

15:21 A. All three of our children--Ruben, Raven, and Riley--still reside at home.

15:21 Q. Okay. Do any of your prior children live there?

15:21 A. No, sir.

15:21 Q. All right. So besides the kids--the three children and the grandbabies, does anybody else reside in y'alls home?

15:21 A. Yes. We also care for my uncle, Arnold Flores.

15:21 Q. How old is your Uncle Arnold?

15:21 A. Seventy-three years old.

15:21 Q. And the crash that makes the basis of this lawsuit

occurred in April of 2023. Were the grandbabies living with y'all at that time?

15:22 A. No, sir, they were not.

15:22 Q. When did they move in?

15:22 A. They moved in per CPS removal July the 30th of 2023.

15:22 Q. And when you say the removal, what--how did that take place?

15:22 A. Because the mom had neglected her children at that point and called CPS on herself, and the State emergency removal removed the children and placed them with my husband and I. Since that day, they have been in our custody.

15:22 Q. And what about your Uncle Arnold? How did it come about that he lives with y'all?

15:22 A. Because my grandfather passed away in 2020 of COVID, and his sisters, nor brothers, wanted to be responsible for him. Since I was the one that was caring for him when he was going through his cancer stages, the doctors and the social workers thought that my husband and I would be a good fit for him to move in us and for us to continue to care for him. So we have had my uncle, caring for him, since 2018, but living in our home since 2020.

15:23 Q. And can you explain, why does he need care?

15:23 A. My uncle?

15:23 Q. Yes.

15:23 A. Because he is mentally ill. He is disabled. My uncle

15:23
was born mentally ill. He's other health-impaired.
15:23 Q. Okay. So we know who lives in your house--
15:23 A. Yes, sir.
15:23 Q. --before and after this crash. Where exactly do you guys live?
15:23 A. We live here in Lubbock, Texas, 1602 48th Street.
15:23 Q. And how long have y'all been at that house?
15:23 A. We have been in our home since 2016. April 21st, 2016.
15:23 Q. Can you, in general--we know who lived there and where, but can you, in general, describe what home life was like with you and Ruben and your children and your uncle prior to the April 13th--the April 2023 crash?
15:24 A. Okay. So only my uncle was living with us prior to the crash, not my grandchildren. My grandchildren were given to us after. So before, Ruben was an active father and husband, would go to work, come home, you know, typical husband, typical father, very active in our lives, very family oriented. Very, very close. He, at that point, was the main source of income, as well, before the car accident.
15:24 Q. Before the car crash, did he have any problems maintaining work, completing work, going to work each day?
15:25 A. Absolutely not. He has always been able to maintain his employment.
15:25 Q. And you said he was the primary wage-earner in the house. Do you work?

15:25 A. I do work. So--
15:25 Q. Where do you work?
15:25 A. I work at Grace Funeral Care.
15:25 Q. And what do you do there?
15:25 A. I am the administrator at Grace Funeral Care. I am also the family care specialist, and I'm also the ambassador.
15:25 Q. Can you tell us a little bit about what that means. What is a family care specialist and ambassador?
15:25 A. So the family care specialist--well, I am the first one that connects with the family, the initial call. I am the one that takes the initial call. I am the one that takes what's called a first call when a loved one passes away, so I am the one that contacts the legal next of kin. I, again, contact them, establish the services that they are wanting. I make a connection with the family, and then I set them an appointment. They come in. We then meet again, and then I allow them to meet the funeral home director, and then we go from there.
15:26 Q. Does that--what you described, does that also include the ambassador part of that?
15:26 A. I also serve--so as the ambassador, because I've already developed a relationship with the families, I serve every service and viewing for the family. My husband and I are also in ministry, so because I've already established a relationship with the families, we then--about seven out of ten families, we officiate their services as well, only because, you know, we've

already established that relationship with the families and they are already comfortable with myself, and then that's when my husband comes in and we, more than likely, officiate their services.

15:26 Q. Okay. And that's where I was kind of going.

15:26 A. Okay. I'm sorry if I jumped the gun.

15:26 Q. No, no, no. I was going to ask you, in terms of-- You said Ruben assists you. What exactly does Ruben do with you and Grace Funeral Home?

15:27 A. So my husband and I are ordained ministers, and so, again, once I make contact with the family, get them in, once I establish that relationship with the family-- A lot of families, unfortunately, don't have home churches, and so then I allow them to know that my husband and I are in ministry. I allow them to meet my husband, and once they are comfortable enough, they, you know, want us to serve--service their family, and my husband officiates their services.

15:27 Q. In the form of a minister?

15:27 A. Yes, sir. Correct.

15:27 Q. How long has Ruben been helping you out with the ministry portion of Grace Funeral Home?

15:27 A. At Grace Funeral Care? So I've been at Grace Funeral Care for four years, and the Lord has really moved him these last two years at Grace.

15:28 Q. Now, with your children that actually live in the home,

you described them and their ages. It's a pretty wide gap. So back in 2023, if we subtract two years from everybody, did you have two children in high school?
A. I did.
Q. And then your youngest daughter--
A. Uh-huh, Riley.
Q. --in second grade?
A. She was.
Q. Okay. Before the crash and when the children are younger, did Ruben participate in their school activities or extracurricular activities or anything?
A. Absolutely. So our son wasn't really active, like, in sports or whatnot. His thing was, you know, the game system at home. But we have a daughter who is now a--in college, but last year was her senior year playing varsity baseball. And before--before any of--all of this took place, Ruben was, you know, the active father at every baseball game, encouraging his children. Like I said, he was active in their lives.
After this, these last two years, I was the only one showing up for my daughter and all of her, you know, athletic needs, appointments at school. She graduated early, so this whole last year, I think Ruben was only able to make two of those appointments, and I was the one that was the one that was a face for my daughter.
Q. What about any activities with--I know you said your son

likes to play video games. What about your youngest daughter?
A. Riley?
Q. Is Riley involved with anything yet?
A. So Riley--she's my--she's my typical girl. So she's more into, like, the honor choir. She is Student Council. So she's way different. She's not as active as Raven was, but--so I can't really say that he is absent like the way that he was absent for, you know, Raven's senior year. Riley, like you said, a lot of her things are done during the day at school. She comes home, and it's pretty much the same schedule. She comes home, does her homework, gets on her iPad, go into the garage or to the backyard, you know, to jump on her jumpoline. She has a Doodle, so she loves her dog. So she's not as active as Raven was.
Q. Okay. Or at least yet. She's a little girl. Right?
A. Yeah. Then there's a big age difference.
Q. Besides you two, is there anybody--let's say since your grandbabies moved in, has anybody been there to assist with their care besides you two?
A. No, sir. It's just me and my husband--or my husband and I.
Q. Well, let's-- Prior to the crash, you said your husband--you didn't see him have any issues completing his job or activities. But let's say in just the two years prior to the crash, did you ever have any occasion to see him having any

sort of back pain?
A. No, sir, not that I recall of.
Q. All right. Do you recall him ever getting treatment for any type of back pain?
A. No, sir.
Q. And did you ever see him complain of any type of radiating pain into his legs?
A. Prior to the accident?
Q. Prior to the crash.
A. No, sir, absolutely not.
Q. Did you ever have him--any occasion where you saw him suffer from any type of back spasm?
A. No, sir.
Q. Did you ever hear him complain of any type of numbness or tingling or loss of sensation prior to the crash?
A. No, sir.
Q. Now, because of this particular lawsuit, have you had occasion to hear about--discuss with Ruben a chiropractic visit or anything prior to the crash?
A. So one was brought to my attention that I wasn't aware of that he went to a chiropractor but didn't get treatment. But I wasn't aware that he had went.
Q. Okay. So you didn't have any awareness of that?
A. No, sir, I didn't.
Q. And did you have any awareness, you know, outside of that

occurring, that he was complaining of any type of lower back pain, lumbar spine pain, leading up to the crash?
15:33 A. No, sir.
15:33 Q. Do you see your husband every day?
15:33 A. Yes, sir.
15:33 Q. Do you guys speak about your day and your daily events?
15:33 A. Yes, sir.
15:33 Q. Okay. And during--I don't even know. In, let's say, a month, two months prior to the crash, do you ever recall Ruben coming home and having any complaints about his lower back?
15:33 A. No, sir, I don't.
15:33 Q. Did you ever see any physical signs--
15:33 A. No, sir.
15:33 Q. --when he got home from work or waking up in the morning, that he was having any type of trouble, that you saw, you would attribute to lower back pain?
15:33 A. No, sir.
15:34 Q. Prior to the crash, you said he was physically active?
15:34 A. Yes, sir.
15:34 Q. You know, outside of work and taking care of your full house, prior to the crash, did you and Ruben have any activities that y'all liked to do together?
15:34 A. Yes. So we always had, like, family vacations, family outings, you know. Joyland used to be a thing. We used to take our children to Joyland, to the park. As you know,

baseball is another family function that we like to do. Boating, the lake, the river, those types of things before the car accident took place.

15:34
Q. Did you see him participate in whatever activity the children needed to do?

15:34
A. Before the car accident? Absolutely. He was also a baseball coach. Yes, sir.

15:35
Q. Now, when you say he was a coach, what did he do?

15:35
A. He coached Little League. He coached t-ball. And he's always been proactive in my grandbabies' lives, like, you know, teaching them how to hit the ball and, you know, pitching them the ball and things of that sort.

15:35
Q. And was that taking place even before they came to live with you?

15:35
A. Yes, sir.

15:35
Q. And what about you and him in particular? Did you guys like to do anything together outside of just the children? And you described the vacations and everything.

15:35
A. Yes. So, yeah, there--we used to have, like, night outs, dinner. Well, of course, we don't have too much of alone time now, because our house is very full. But we used to go out. We used to--well, before we started serving the Lord, we used to go dancing a lot and things of that sort. We didn't dance, like, these last couple of years, of course. But dinners. Can't say too much movies. Family cookouts, a lot of vacations

to see his family in the San Marcos area, my sister in San Antonio area.

Q. Would y'all drive to San Marcos?

A. Yes, sir.

Q. How far of a drive is that from here?

A. About five and a half, six hours.

Q. Did he ever have any trouble completing that drive--

A. No, sir.

Q. --complaining that he couldn't sit and make that drive?

A. No, sir.

Q. Has that changed since the crash?

A. Absolutely.

Q. Do y'all take trips like that?

A. No, sir.

Q. Okay. I want to ask about the actual crash. You know, when did you first learn about the crash?

A. So I was at work, and I was in a service, and I get a phone call from Ruben. I just remember it being very brief, and he's allowing me to know that he had been hit from behind. Again, the conversation was very brief. We're not allowed to be on our phones during funeral services. And he said that he was waiting for PD to get to the scene.

Q. Did you complete your service and your day of work?

A. I did.

Q. So when was the first time that you recall seeing Ruben

following the crash?

15:37 A. When I got home that night.

15:37 Q. When you got home that night, can you tell us what his state of mind was or what you physically saw?

15:38 A. Honestly, I feel like it was more of a shock to him. He didn't go into detail over the phone. Like I said, it was very short. So when I got home, he was a little more informative as to what took place. He told me that he had been hit from behind by a semi. We walk out to see the vehicle and we walk back in and just had, like, a little--I don't remember the exact words--I'm going to be honest--the exact words to the conversation that we had that night, but I do remember us going out, looking at the vehicle, then coming back in.

15:38 Q. Do you recall at any point that--if he started to experience any type of pain?

15:38 A. It was the next morning, the next morning when he was at work and he told me that he was having some severe pain.

15:39 Q. Do you know what he did at that point?

15:39 A. I believe that he went to the emergency room.

15:39 Q. Did you accompany him to the emergency room?

15:39 A. I did not.

15:39 Q. Okay. Now, following that and--following the crash, the emergency room, did you begin to notice any changes in him that you saw?

15:39 A. Absolutely. And this is so personal and a little

embarrassing, but I must share it. So the first one that I recall as his wife is going to be the sensation of my husband. When we were--when we would try to be intimate, my husband--there was no sensation. He had lost all sensation. And that was the first--you know, the first time--or when I was aware that something was wrong with my husband, is when I was noticing that he wasn't getting arose, an--you know, or he wasn't getting any sensation. I remember him telling me that--you know, about the numbness and the tingling and all of those things, but I never thought that it was going to affect his, you know, private area. And once he started seeing the doctor, we allowed the doctor to know what was taking place with my husband in that area.

15:40 So the intimacy was not there. I noticed, and he noticed as well, what was going on in that area. Then the back spasms. I fully--well, I walked into two where he's laying already on the floor, but the last--

15:40 Q. Let me try and transition that--

15:40 A. Okay.

15:41 Q. --into that area. So after the crash happens, did you have any occasion where you saw him have any type of back spasm?

15:41 A. After the crash-- Say that again. I'm sorry.

15:41 Q. Did you ever see him have a back spasm?

15:41 A. Prior? Before?

15:41 Q. No. After.
15:41 A. Oh.
15:41 Q. After the crash happens, did you ever see him have a back spasm?
15:41 A. Yes, I did.
15:41 Q. Can you explain what you saw so that the jury can understand what that even means?
15:41 A. So on two of them, when I walk in--like, he would just yell. And when I would come in, he was already, like, laying on the floor with his hand on his back. But the one that I witnessed was August the 17th of 2023, where we are getting ready. It's his birthday, and his family is going to take him out to dinner, and he yells, and I'm, like, what's wrong?
15:41 And, again, his hand is on his back, and we're in--or he's in between the bed and our dresser, and he puts his hand on the bed and he's, like, I need help, I need help.
15:42 And I'm, like, what do you need me to do? And I then, like, help him--or--position himself onto the floor, and then, thankfully, his sister got there in time to where we were able to pull him out from that, you know, narrow spot, out into our floor area. And he's, like, don't move me, don't move me, and he's crying at this time.
15:42 I'm, like, what's wrong? What's wrong?
15:42 And he's, like, just leave me alone, just leave me alone, just let me get through it.

15:42 And at that time, we're all panicking, because we don't know what's going on. Like, the two times before, it wasn't as bad as the one that I witnessed. And, of course, my children are little. We don't understand what's going on. But I can, I mean, say that I witnessed that one in my room on August the 17th.

15:42 Q. And did you say that the children were around and saw this too?

15:42 A. Yes, because we were all going to his birthday dinner. And so he yells, and again, we're in panic mode. My daughter at that time, she's a little younger. She's six or seven at that time. And so she doesn't understand what's going on, and so she's crying because he's crying, and, you know, we just all began to panic. We don't know what's going on. We just, like I said, bring him out from that narrow spot, slowly pushing him out with his legs but trying to be careful, because we don't know what's going on at this point, while he's saying, is, like, don't move me, don't move me. But I also didn't want him to get hurt, because it's, like, a very narrow spot, and he's not that small.

15:43 Q. All right. Did you ever see him experience anything like that at any point that y'all have been together prior to this crash?

15:43 A. No, sir, absolutely not.

15:43 Q. What about--did you ever see, after the crash, any

occasion--I know you discussed the loss of sensation and function of his private area, but what about any other type of--did you ever see him physically suffering from any type of numbness or tingling sensations?

15:44 A. So he would tell me, but, of course, I'm not him, so I don't know. I just would have to hear from him that he would--like, had numbness, and, like, he would tell me that he couldn't feel his toes. I remember, like, he would massage his legs or whatnot. But to say, like, that I actually, like, knew that he couldn't, I can't say that, because I'm not him. Only he would know what he was feeling. I just know that he would tell me, you know, that he had tingling in his legs or numbness in his toes.

15:44 Q. After the crash, just in general, did you see him where he appeared to be--just outside of those specific conditions, but occasions where you saw him visibly in pain?

15:45 A. Yes.

15:45 Q. And so how often was that going on after--say after the emergency--say the emergency room?

15:45 A. It was daily until he started seeing the doctor and they started giving him pain medicines and those types of things. And he started going to, like, physical therapy, I believe that was, and that didn't help, and so it was--it was a drastic change.

15:45 Q. So were you with him on any of the appointments or

occasions where Dr. Valente saw him and said that he would need surgery or something like that?

15:45 A. So I would travel with him to the Dallas/Fort Worth area when he would see the doctor, but I would stay out with the children, and he would go in to see the doctor himself.

15:46 Q. So following the crash, let's just say from--did you-- Well, before I ask that, did he--did you actually go with him when he underwent surgery?

15:46 A. I did.

15:46 Q. Okay. So let's just say in the period April to September, during that time, did you see his activity level around the house change?

15:46 A. Absolutely.

15:46 Q. And I know you described the relationship between you and him at that point. What else did you see with respect to let's just say household duties?

15:46 A. So it was--so that's when the transition took place. So the car accident took place in April, and my grandchildren were moved into our home in July. And so when my husband got into the car accident, again, he was depending on the pain pails and anti-inflammatory pills that they were giving him, right, to help him, you know, ease the pain. So he was asleep a whole lot. Like he was still trying to go to work and still, you know, trying to perform his duties at home. But once he got home, it was, like, pop a pill and he was out. And so I had to

carry on all of the responsibilities as far as my uncle, my grandchildren, household duties alone.
Q. Did that cause any strain between you two?
A. Yes.
Q. How so?
A. Excuse me?
Q. Can you tell me how? In what ways?
A. It was very, very stressful. Very, very stressful. We had just went through a major--major transition within those months, you know, and it was very hard and very, very, very stressful. I don't know how I did it. All I can say is that God just got me through it. He led me through it. Because having my husband, you know, in pain and on pills and always asleep, you know, to having--my--the twins were littler than they are now. They were still in diapers, and then Xaven and my Riley and little Ruben and Raven and my uncle. So it was a whole lot. It was--it was very, very stressful having to carry my family through, you know, the months when the accident took place.
Q. Can you describe to me--I mean, obviously, little kids and babies are babies, but can you describe to me, what type of care does your uncle require?
A. So my uncle is mentally ill, so we have to prepare all of his meals. We have to do everything for my uncle. The only thing that we do not have to do for my uncle, thankfully, is

change his diapers. But anything else, we have to do for my uncle. He is nonverbal. He is mentally ill. We make all of his decisions. We take him to all of his appointments. We prepare all of his meals. We are, you know, the ones who care for him.

15:49 Q. Prior to the crash, did Ruben assist with that?

15:49 A. Yes.

15:49 Q. And let's say that same period, April to September, did that change?

15:49 A. Yes. So I was the only one having to take my uncle to the cancer center and, you know, to internal medicine and all of those appointments by myself. So, before, we would alternate.

15:49 Q. I know you said he slept a lot, but did you see experiences in mood, that he--

15:49 A. He was always very grouchy, very frustrated, very irritated.

15:50 Q. Okay. So when the surgery takes place, you went to Dallas with him?

15:50 A. Yes, sir.

15:50 Q. You weren't--were you in the operating room or anything?

15:50 A. No, sir.

15:50 Q. Okay. So how long were y'all in Dallas?

15:50 A. Two days.

15:50 THE COURT: Mr. Bechtol, could I just ask one

question for clarification. Everything you've described so far occurred before surgery?

THE WITNESS: As far as like--

THE COURT: The events that you described with your husband, the spasms, just--

THE WITNESS: Oh, yes.

THE COURT: Your testimony thus far, everything you've described thus far is presurgery; is that right?

THE WITNESS: Yes, sir.

THE COURT: If it's wrong, that's fine.

THE WITNESS: No. Yes, sir.

THE COURT: I just want to make sure--

THE WITNESS: The spasms and the loss of sensation and all of those were before the surgery.

THE COURT: Okay. Thank you. Sorry. I just wanted to get the chronology clear. Go ahead, Mr. Bechtol.

MR. BECHTOL: Thank you, Your Honor.

Q. (BY MR. BECHTOL) Okay. So you spend two days in Dallas. Were y'all at the hospital?

A. One day.

Q. Okay. And then after that, what do you guys do?

A. So my husband goes into surgery. He's then, you know, put back into the pre-op or recovery area, and then they release us, and I am driving home with my husband. I drive from the Dallas/Fort Worth area back to Lubbock with my

husband.

15:51 Q. How was that drive?

15:51 A. Or, Lord. The worst. So they release my husband from the hospital. It was then and there that I found out that he had this tube coming out his back with, like, a pouch of blood that it was suctioning out.

15:52 So two years ago, the roads from Dallas to Lubbock were very, very, very awful. A lot of construction. And so on our way home, there was a lot of--you know, like a lot of bumps or whatnot to--it was, like, making him cry, to where my anxiety level was very, very, very high. And there's traffic. Traffic is crazy, to where I had to pull over into a convenience store and just get off and just release my emotions. My anxiety level was very high. I had to literally go into a restroom and just cry. Like, I didn't understand why all of this was taking place. I didn't understand why they, you know, released my husband. You know, his padding and his back was bloody. I have this tube coming out his back with a pouch of blood that I'm supposed to be draining, and I just had no understanding for it. But I just prayed my way through it, and thankfully we got home.

15:53 Q. And did you take any pictures of what your husband looked like post-surgery?

15:53 A. Before the surgery?

15:53 Q. Post--like right after the surgery.

A. Oh. Yes, I did.
Q. All right. And did you provide those pictures to me?
A. Yes, sir, I did.
Q. Now, the photo that I have on the screen, do you recognize this photo?
A. Yes, sir, I do.
Q. Did you take it?
A. Yes, sir, I did.
Q. What does this show on here?
A. So this is when the nurse practitioner is giving me instructions to how I am going to be changing out the bedding of the incision and how I'm going to be draining the tube and the suction.
THE COURT: Mr. Bechtol, for the record, you're showing Plaintiff's 7. Correct?
MR. BECHTOL: Yes, Your Honor.
THE COURT: Thank you. Go ahead.
It's the fourth photograph in Plaintiff's 7. Go ahead.
Q. (BY MR. BECHTOL) And this picture also--
A. Yes, sir.
Q. --show the same thing, I guess?
A. Yes, sir. So the bottom is the incision, and the top is where--the hole where the actual tube was in place to where I was going to have to be cleaning it and making sure that it

wouldn't get infected.
15:54 Q. And this hole picture, did you take this one as well?
15:55 A. Yes, sir.
15:55 Q. Now, after you received the instruction on the wound care and y'all make it back to Lubbock, were you actually the one who assisted in that--the blood bag and the wound care?
15:55 A. Yes, sir, I did.
15:55 Q. How long did that go on once he got home where he had that bag and the tube in the wound?
15:55 A. So the tube was in place for seven to ten days. We needed to make sure that no more blood was suctioning out or whatnot. Then they told him that he needed to take an antibiotic that they were going to prescribe him. And then the next step was, is that we were--because the doctor was in Dallas, and not here, that we just follow the instructions of the doctor and pull the tube out of his back. And once we pulled the tube out of his back, we called the doctor just to tell him, like, what it looks like and all of the things, and the doctor said that it looked good.
15:56 Q. I guess the last one, which would have been the first picture, so--did you take this photo?
15:56 A. Yes, sir.
15:56 Q. And when you described that he was at home for seven to ten days, is this what his condition was?
15:56 A. Yes, sir.

15:56
Q. And the padding that we see, is that what you would change out?

15:56
A. Yes, sir. So I would put a whole lot of--as you can see, it wasn't like the hospital gave it, because as you can see, under there, like, it was still, like, really, really bloody. Like, it had a lot of drainage; very, very bloody. So I would, like, try to, like, layer it so I wouldn't have to, like, be changing frequently.

15:56
Q. During that seven to ten days, that healing process before the tube comes out, can you describe how you saw Ruben in that time? Was he in pain? Was he okay?

15:57
A. So he--again, he spent a lot of time just laying down, just keeping calm, laying down. Didn't do too much. All we were worried about was his recovery, and so we kept him, you know, on our recliner with his feet elevated, only because there was still, like, blood coming out and stuff, and I didn't want him to injure himself. My main concern was, is that the doctor was not in the Lubbock County, you know, so if anything went wrong, his doctor was in Dallas. And so we tried our best just to care for him the best way that we could and just have him laying down, taking his medication, and just laying low. We didn't want him really to do anything.

15:58
Q. So after that healing takes place and after the surgery now, did you notice any changes in Ruben post-surgery in terms of how you saw his health?

A. So by the grace of God, a lot of his sensation came back, or, like, his movement and things come back slowly but surely. He started feeling his legs again. I didn't hear anything about, like, the numbness in his toes or anything of those sorts. True enough, the pain in the back was still there, but my main--our main concern was, you know, the feeling in his legs and, you know, in his area and, you know, being able to move the way, you know, he's supposed to be moving. And thankfully that the surgery did take place and that the feeling did come back.
Q. All right. So--
A. And when I say "feeling," like the movements in his legs and all of those things.
Q. And, in particular, I would ask, were you--following surgery, were y'all able to be intimate again?
A. So for those months, we were not intimate because, of course, there was a loss of sensation. After the surgery, when we tried to be intimate, I'm going to be completely honest with you. It's--it's not the same, I mean, as it was before. Obviously, we have children, but the intimacy, it's not the same. And it's a little too personal to get too into detail here with--you know, but--
Q. Right.
A. I just understand. I understand the situation. I understand my husband. I am not with him, you know, for the

intimacy. I am with him because I made an oath to God that this is my husband and that I would be with him until death do us part. So the intimacy, I mean, yes, it's needed in a marriage, but ultimately, it's not why I'm with my husband. I can't say it's the same, because it's not. And it has affected, you know, our marriage. I mean, not being able, you know, just to be intimate, it's not the same.

16:00 Q. Outside of that, you described that the burning sensation, the numbness and tingling stopped. Was there ever any occasion, after the surgery happened, that you saw any of those muscle spasms like you described?

16:00 A. I haven't witnessed any after the surgery, no, sir.

16:01 Q. Okay. In your opinion of just being able to see him day to day, did the surgery help him?

16:01 A. As I mentioned before, like the numbness and the tingleness and the feeling, thankfully, he has got that back. The back pain, it does come and go. The surgery did help him, but not at a hundred percent. He does have frequent back pains, but not the way it was, you know, before the surgery. He's not having the back spasms. He does have, you know, some aches and some pains in his lower spinal area, mainly when there's, like, a change of weather that's fixing to take place or whatnot. But for the most part, the surgery did help him.

16:02 Q. After the surgery, has he been able to assist around the home?

16:02 A. Yes. He--after the surgery--so not right after the surgery, but, you know, months later and things, like, he's able to mow the yard. He's able to interact with my children and my grandchildren. He's able to walk the dogs. He's able to do many things. He can't bend over and put his shoes on, but yes, he's more active than he was in those months that we were going through this.

16:02 Q. It's in that--is it during that time that he begins to assist in the ministry?

16:02 A. Yes. Where he's starting to be used more, yes, sir.

16:02 Q. And has he been able to hold a job and continue working as time has gone on?

16:02 A. So that was a little struggle. So he had been at Xylem for X amount of years, and because he wasn't able to perform the duties of Xylem anymore because of, you know, the back and the spinal issues, he did have to let go of Xylem to where he could get, like, a job where he can try to perform the duties. And I believe it was, like, painting at one point, and now he's--he's had three jobs since then, and he has been with Custom Pipe this whole last year. But he left Xylem, which was our main source of income, because he couldn't perform those duties anymore. It was very, very hard for him to perform at a hundred percent.

16:03 Q. And since the surgery, in these last two years, has he been able to interact with the children more?

16:03

A. Absolutely. I honestly feel-- And this is just me. I honestly feel like my husband just pushes through, because he's the man of our household, and that--you know, God calls the man to be the head of his household. And I believe within my heart that my husband doesn't tell me a lot of the things that he feels and that he just pushes through because he doesn't want to let his family down, although I know that there's days where it's hard on him, that his back is hurting or whatnot. But, like, again, I said, I just try to understand my husband, and I know, like, his role as a husband, father, and grandfather, that he doesn't really say much to me, because he doesn't want to cause, you know, any chaos in the home or, you know, an argument or disagreements or whatnot, because I know that he feels like he has already put me through so much that I feel like he just pushes through each day.

16:04

Q. I know you described the children crying during the spasms or in other situations where he was in pain. But were there any other occasions where you were able to witness, you know, Ruben and your children in distress over something going on around the house?

16:05

A. Yes. And that was when we-- Well, see, my daughter had been allowing us to know-- And if you're from the Lubbock area, you know that 48th and Avenue P is not the most, you know, secure neighborhood or safest neighborhood. So I live on 48th and Avenue P, where there is a lot of activity with so

much--and so we, as a family, were--you know, we already, like, know when something abnormal is happening. Like, we know to find one another or whatnot.

16:05 So my daughter had come in, like, two days in a row telling my husband and myself that she had spotted a man outside, you know, like videotaping her or taking pictures of her. And again, there's so much that happens there, we really didn't--you know, we would go out, look, make sure she's okay; we wouldn't see nothing or whatnot. It wasn't until, you know, I started reviewing my cameras that I saw that there was, in fact, an individual there, you know, taking pictures of my daughter and my uncle, you know. And then I went through and looked at all of my cameras for the last two days, and it was the same individual, same male that was doing this or whatnot.

16:06 So the day that we finally were made aware of who it was, she come running in, and she's, like, Dad, Dad, Dad.

16:06 And we're, like, what's wrong? Like, calm down.

16:06 She's, like, that man is back outside. That man is back outside.

16:06 And so we all go outside, and, you know, that's when we notify the Lubbock Police Department, because again, it was the same individual three days in a row, and he was only, like, taking pictures of when Riley was outside or whatnot. And so she's the one that allowed us to be aware that somebody was videotaping what we thought was her, not necessarily the

house. It was just our opinion. We didn't know what was going on until the pastor from across the street allowed us to know that he had made contact with the individual and that he allowed him to know that he couldn't be doing that on their premises or--because there was other children that were on the church premises. And that's when the individual identified him as a private investigator, and they said that they respected him--

16:07 MR. WISE: Your Honor--

16:07 A. --but they--

16:07 THE COURT: Hold on one second, please.

16:07 Go ahead.

16:07 MR. WISE: Your Honor, objection to relevance--

16:07 THE COURT: Sustained.

16:07 Q. (BY MR. BECHTOL) Thank you. All right. Outside of that, you mentioned that there was--it was your--y'alls daughter's senior year and that you were the person that attended the most of the events. During that time, did Ruben attempt to go to any games or anything with you that you saw--or you recall?

16:08 A. During the time of the accident, as he's recovering?

16:08 Q. Yeah, just out--from the crash, on, through her senior year.

16:08 A. My daughter. Okay. Right. I thought you meant Riley. So you're talking about Raven.

16:08 Q. Raven.

16:08 A. Okay. So Ruben--throughout her whole senior year, you can count on the number--I mean how many times he went to a game. It wasn't very many, because, as you all know, the bleachers are metal, and it wasn't comfortable for him, so he would not, you know, partake in a lot of her games. And again, like I said, it was me, my mother-in-law, my sister-in-law, or her older sister.

16:09 He was there on her senior night, so that one--I mean, that's the main one that mattered was, you know, when she was able to walk the field and, you know--I don't know what it's called, last bat out or something like that, but we--where we were able to walk the field with her one last time. So he did make it to that one.

16:09 Q. Have you ever had occasion-- Well, Mrs. Narro, I think that's all the questions that I have for you at this time.

16:09 A. Yes, sir. Thank you.

16:09 MR. BECHTOL: I will go ahead and pass the witness.

16:09 THE COURT: All right. Thank you very much.

16:09 Cross-examination?

16:10 MR. WISE: No questions, Your Honor.

16:10 THE COURT: Okay. All right. Thank you very much. You can step down.

16:10 And any objection to this witness being excused? Might she be called in rebuttal? Do we need to keep the rule

16:10 invoked for this witness?

16:10 MR. BECHTOL: I don't believe that she will be called in rebuttal.

16:10 THE COURT: Well, it's up to you whether you want to err on the side of caution or not. But I'll leave that to you. You can speak with her about that. I know she's obviously not going to leave, but if she wants to be in the courtroom, that's fine, but then she would not be able to be called.

16:10 You can call your next witness.

16:10 MR. BECHTOL: Okay. Your Honor, the last witness we have is Mr. Narro.

16:10 THE COURT: Okay. Mr. Narro, take your time getting to the stand.

16:10 Ladies and gentlemen, we're going to end at 5:00. It's 4:10. If you'd like to stretch before this next witness, obviously, you may.

16:10 Mr. Narro, go ahead.

16:10 (PAUSE)

16:11 THE COURT: Good afternoon, sir.

16:11 MR. NARRO: Good afternoon.

16:11 THE COURT: Would you please raise your hand.

16:11 (THE OATH IS ADMINISTERED BY THE COURT)

16:11 THE COURT: Thank you very much. Take your time. It's a bit of a tight squeeze.

16:11 Mr. Bechtol, whenever you're ready.
16:11 (PAUSE)
16:12 MR. BECHTOL: Okay. May I proceed, Your Honor?
16:12 THE COURT: Yes.
16:12 MR. BECHTOL: Okay.

RUBEN NARRO,

PLAINTIFF, TESTIFIED ON HIS OATH AS FOLLOWS:

DIRECT EXAMINATION

BY MR. BECHTOL:

16:12 Q. Can you introduce yourself to the jury, please.
16:12 A. Yes. My name is Ruben Ray Narro.
16:12 Q. And what is your date of birth?
16:12 A. August 17th, 1982.
16:12 Q. So how old does that make you today?
16:12 A. Forty-three.
16:12 Q. All right. Can you tell the jury where you currently live.
16:12 A. 1602 48th Street, Lubbock, Texas 79412.
16:12 Q. Are you from Lubbock?
16:12 A. I'm sorry?
16:12 Q. I said are you from Lubbock?
16:12 A. I've been here for the last, shoot, twenty-something years now.
16:12 Q. Obviously you just heard your wife testify.
16:12 A. Yes.

16:12 Q. But--and we heard about your household and who lives with you. So as we sit here today, can you tell us who you help support within your household?
16:13
16:13 A. My wife, our kids, and our grandkids and our--her disabled uncle.
16:13 Q. With regard to her disabled uncle, can you tell me what type of activities you actually participate in?
16:13 A. Helping with his meals basically and sitting outside with him in the front yard sometimes. Depends on the weather. But it's usually just--it's mainly, like, a company deal to making his meal.
16:13 Q. Will you tell the jury a little bit about your education. Where did you go to school?
16:13 A. High school education. I went to school several places. One of the last places was actually Texarkana, Texas. I didn't have a real stable childhood, so I moved around a lot, and-- I don't know how in-depth you want me to get on that.
16:14 Q. That's fine. So let's-- I want to talk a little bit about your employment.
16:14 A. Okay.
16:14 Q. Are you currently employed?
16:14 A. Yes.
16:14 Q. Where do you work?
16:14 A. Custom Pipe and Fabrication.
16:14 Q. How much do you make there?

16:14 A. 17.50 an hour.
16:14 Q. Do you work a full 40-hour week?
16:14 A. Yes.
16:14 Q. Now, the crash that made the basis of this lawsuit, the April 12th, 2023, crash, were you employed back on that date?
16:14 A. Yes.
16:14 Q. Where did you work?
16:14 A. I worked almost literally across the highway at Xylem, which is another pump place. It's called Goulds Pumps.
16:15 Q. Can you tell me--Xylem Pumps, what did you do there?
16:15 A. I would build their--basically they're called skids, but they're like big pallets where they would assemble the pumps and then set them on there and then ship them out.
16:15 Q. Was that a physically demanding job?
16:15 A. Extremely.
16:15 Q. How long did you work there before the crash happened?
16:15 A. Shoot. I think about two years, two and a half years.
16:15 Q. Did you ever have any difficulty or problems completing your work building those pallets?
16:15 A. Not before, no, sir.
16:15 Q. Now, besides-- And after the crash, did you continue to work?
16:15 A. I tried to, but in all honesty, the job was just too physically demanding for my back, and I was in a situation where I didn't want to do more damage to my already weak back

at that moment.

16:16 Q. So before this crash happens-- And let's--again, let's focus--let's just say in the year before. In the year before the crash, did you ever have any issues with your lumbar spine?

16:16 A. No.

16:16 Q. In the year prior to the crash, did you ever experience any type of burning sensations down your legs?

16:16 A. No.

16:16 Q. In the year before the crash, did you ever have any numbness or tingling that radiated down your legs or into your toes?

16:16 A. No.

16:16 Q. And before this crash, in the year before, did you ever experience any type of muscle spasms?

16:16 A. No.

16:16 Q. All right. We heard--and you were sitting right here when the testimony of Dr. Valente was played, and he said that you had reported low back pain prior to the crash. Did you report that you had lower back pain, lumbar spine pain to Dr. Valente?

16:17 A. I was trying to be as honest as possible with him. I did have some, like, soreness in the middle of my back, but never in the lower part of my back. I don't know if he misunderstood that or not. But I was trying to be as accurate as possible, because I knew that it was going to, well, potentially affect

the surgery or not, or whatever was going to go on with my back.
Q. I mean, at the point that you first see Dr. Valente, do you have any idea that you need surgery or anything?
A. Oh, no, no.
Q. And listening to that--the first visit that you saw Dr. Valente after the crash, do you recall how that took place?
A. I'm sorry. Say that again?
Q. The first visit that you had with Dr. Valente, do you recall how that took place?
A. I really don't, honestly. It's been so long. I'll be honest with you. Like, I don't recall the conversation we had.
Q. And I'm just referring more to--he referenced it as a telemedicine versus in-person. Do you recall that?
A. Yes. Yes, I remember that.
Q. That telemedicine, do you know if it was phone or if you guys were on video?
A. I think it was basically the phone. It was just like a question type of deal at that moment.
Q. Okay. So this soreness or incident that you--can you tell me about it? What happened? What does this mean?
A. Do I need to stand, or--
Q. Are you trying to point, like, where--
A. Yeah, I'm just going to--I just had soreness up here, and it--and it was not--I mean, to my understanding, it wasn't that

serious. I did have some soreness, and I was going to go to a chiro--I'm sorry--a chiropractor. When I got there, I just didn't like the vibe, so I ended up leaving.

16:18 Q. So did you even get any treatment for that soreness?

16:18 A. No. No, sir.

16:18 Q. How long did that soreness in the middle of your back last?

16:18 A. Shoot, maybe two days.

16:19 Q. Okay. Do you recall exactly when this was prior to the crash?

16:19 A. Months before.

16:19 Q. And during the phone call with Dr. Valente, did you talk to him about this?

16:19 A. I might have said, like, two months before, just to be honest with him, I mean, but other than that, I didn't have any lower problems with my back. And if he misunderstood that, I'm sorry.

16:19 Q. Well, prior to the crash, did you ever have any type of imaging done to your lower back that you recall?

16:19 A. No, sir.

16:19 Q. Whether it be x-ray, MRI?

16:19 A. No, sir.

16:19 Q. Prior to the crash, did you ever go to an orthopedic doctor for any reason, like Dr. Valente?

16:19 A. No, sir.

16:19 Q. And--or a physical therapist, where you went through procedures to treat your lumbar spine?
16:19 A. No, sir.
16:20 Q. Did any doctor that you saw--did you ever receive any diagnosis for lumbar radiculopathy or anything prior to the crash?
16:20 A. No, sir.
16:20 Q. So you work at Xylem. You have the kids at home. Did you have any issues whatsoever being able to meet the physical demands of either your household chores or work prior to the crash?
16:20 A. No, sir.
16:20 Q. We heard your wife discuss this ministry position. Were you involved with the church or something at the time of the crash or before?
16:20 A. I'd been involved with the church for the last, actually, seven years of my life, thank God.
16:20 Q. And when did you become the ordained minister?
16:20 A. Maybe four years ago.
16:21 Q. Okay. And when the jury hears that you're an ordained minister-- I think they heard from your wife of what you participate in. Is it strictly with the funeral home?
16:21 A. No, sir. I--I serve at a church. I was--we were actually serving across the street from where we live now, but I'm actually at a different church, different denomination

church, and I've actually chosen to start from the bottom and then eventually, God willing, get to preach there as well.
Q. Did you have any trouble performing your ministry services prior to the crash?
A. No, sir.
Q. Now, let's--I want to do the same thing. Between the crash date and when you had surgery, did you have any trouble performing those types of services?
A. I didn't, really. I didn't do that. I didn't, because--it wasn't a chore to move around, but it was not--I wasn't--how can I say? I wasn't in the right state of mind most of the time because I was in pain.
Q. Your wife discussed some of your issues with her. Prior to the crash, you know, outside of standard marital arguments, how would you describe your relationship?
A. Well, it's strained, of course, because--
Q. And I said before this crash happens.
A. Oh, before? I mean, it was fine. I mean, we--typical married couple. We argued, but that was one--let me just specify, that was not an argument that we had.
Q. And prior to the crash, did you have any limitations or issues with being able to be an attentive father or attend whatever your children needed?
A. No, sir.
Q. With the crash itself, do you recall being in the crash?

16:23 A. Yes.
16:23 Q. What type of vehicle were you in?
16:23 A. A 2018 Nissan Armada, I believe.
16:23 Q. Is that your vehicle?
16:23 A. It's more my wife's than mine.
16:23 Q. A family vehicle, I guess?
16:23 A. Yes.
16:23 Q. Okay. Do you recall, I guess, where it happened?
16:23 A. Like geographically speaking, or--
16:23 Q. Like the intersection.
16:23 A. Yes. It's Landmark.
16:23 Q. Is that near your house?
16:24 A. No. It's actually maybe 3 miles from my job, from where I worked at then and where I work at now.
16:24 Q. Do you recall at this time where you were going to when this happens?
16:24 A. Home.
16:24 Q. Had you been at work that day?
16:24 A. Yes.
16:24 Q. So you left work; you were headed home?
16:24 A. Yes, sir.
16:24 Q. Was this your typical route home?
16:24 A. Yes.
16:24 Q. So you're headed home. You come up to the intersection. Can you just walk me through from that point and tell me what

you recall up to, like, the impact.

16:24 A. I'm going to be honest with you. As far as, like, recalling every little moment, I don't. I think I was reaching for my shades and I just felt a smack, and I remember looking--well, of course, I'm looking forward when I grab, and the light was still red, and then I just felt a shove forward.

16:25 Q. So when the impact happens, were you stopped? Is that what you're saying?

16:25 A. Yes.

16:25 Q. And at this red light, were you going straight? Were you turning? What were you doing?

16:25 A. Going straight.

16:25 Q. And the--prior to the impact, if you're grabbing your shades or anything, did you ever see the truck approaching from behind you?

16:25 A. No, sir.

16:25 Q. Prior to the impact, did you ever hear any brakes or anything?

16:25 A. No, sir.

16:25 Q. Were you--when the impact happens, do you have--I know this--if it's a guess, it's a guess, but if--do you have any recollection if you think that--like how long you had been stopped there?

16:26 A. No. I couldn't have been there that long. I don't remember, honestly, but I don't think I was there that long,

because I have a habit of, every time I get in the car, I just kind of look over, and all the cars were still there. It was still red. But, I mean, honestly, I don't recall. It's been so long.

16:26 Q. So the impact happened. Can you describe the force you felt, what it felt like?

16:26 A. Like somebody pushing the crap out of me, pretty much.

16:26 Q. As we sit here today, do you have any-- We know you're stopped, so you're going zero miles an hour?

16:26 A. Yes.

16:26 Q. Do you have any idea how fast the defendant was going?

16:26 A. No, I have no idea.

16:26 Q. When the impact happens, what does your vehicle do; do you recall?

16:27 A. Yeah. It got--like, lurched forward.

16:27 Q. Okay. When the impact happens, what was the very next thing you do?

16:27 A. As far as I remember is pulling over to the side.

16:28 Q. Did-- Okay. I wanted to pull up what's Plaintiff's Exhibit 5. We've seen these pictures of this intersection at Landmark and Clovis. I guess, do you recognize this intersection?

16:28 A. Yes.

16:28 Q. All right. Is this where the crash happened?

16:28 A. Yes, sir.

16:28 Q. Were you traveling this direction?
16:29 A. Yes.
16:29 Q. All right. And so if-- The cross street, the highway in front of you, is--the access road is Landmark?
16:29 A. Yes.
16:29 Q. And you're on Clovis?
16:29 A. Yes.
16:29 Q. And you're saying it was your intention to go straight here?
16:29 A. Yes.
16:29 Q. And I want to bring up Plaintiff's Exhibit 6. Did you take this picture?
16:29 A. Yes, sir.
16:29 Q. Was this picture taken at the scene?
16:29 A. Yes.
16:29 Q. Does that picture show the damage to your Nissan?
16:29 A. Most of it, yes, sir.
16:29 Q. What color is your Nissan?
16:29 A. Silver.
16:29 Q. And in this photo, is this after you described that you pulled over to the side?
16:30 A. Yes.
16:30 Q. So when the impact happens, you're not in this location?
16:30 A. Yes. Actually, I'm knocked in the middle of street, so I pull over to the other side. And it's kind of--if you look at

the sidewalk and then you look at the picture before, you'll see where--that will give you a better description of where I'm at.
Q. Okay. So if we look back at Exhibit 5--or this one? Is that what you're saying?
A. Yes, sir.
Q. Where we see your vehicle parked, are you parked over in this--
A. You're probably right there where that skid mark is at.
Q. Okay. So--
A. Yeah, probably right there.
Q. Are you describing that you push into the intersection, and then afterwards, you move over to the right?
A. Yes, sir, that's all I did.
Q. But as we see it in this picture, it wasn't your intention to be turning that way or something?
A. No, sir.
Q. Did you see what type of vehicle hit you?
A. Yeah. It was a semi.
Q. Did you--after the semi hit you, what did they do? What did you see them do?
A. He got off, and I'm going to be honest with you. Like it scared--it scared the--it scared me, because I--like, I just got hit by a semi, so it was a shock at first. And then he gets off and he's speaking another language, and he's just

saying that he's got to go. So in that moment, I called the cops, because I didn't want him--I didn't know what his thoughts were then.
Q. Did he stay there?
A. Yeah, he stayed there for the--yeah, he did.
Q. And did the police come?
A. Yes, sir.
Q. Were you able to describe to the police what occurred in the crash?
A. Yes, sir.
Q. Did you see--did you see the police speak to Mr. Sukhwinder?
A. Yes, sir.
Q. Were you close enough that you heard anything, or--?
A. No, sir.
Q. All right. Because he was speaking in a different language, did you actually ever have any conversation with him?
A. No.
THE COURT: Mr. Bechtol, I'm sure you're getting there soon, but let's focus on damages.
MR. BECHTOL: Okay.
Q. (BY MR. BECHTOL) So while you're at the scene here, did you notice that you were experiencing any type of pain, no pain, or how were you feeling?
A. At that moment, it was just shock, really. I was still

in shock.

Q. So how long do you end up being at the scene and where do you go next?

A. I'm sorry?

Q. How long did you end up being at the scene and where did you go?

A. As soon as the cop said I could leave, I went home.

Q. What did you do when you went home?

A. I told my wife that I--well, I showed her the vehicle, and then I just kind of went and took a shower, because I was kind of weirded out. I didn't know how to react to it. I hadn't been in a wreck in a long time.

Q. When you get home, when is the first time you recall that you start to experience any pain or anything?

A. It would have had to have been in the morning when I get to work, because again, I build pallets, and I would have to either flip them or push them. And as soon as I go to get my tools, I felt, like, a sharp pain in my back, and I automatically knew that wasn't normal.

Q. What emergency room did you go to?

A. Covenant.

Q. Do you recall what took place at that visit?

A. They did x-rays and they just took a--like an overview. They asked me what happened, and that's pretty much it, I think.

16:33
Q. And at that point, at the emergency room, do you recall, like, what you were reporting that you were saying was wrong?
16:34
A. Just that I got hit by a semi and I was having sharp pains in my back.
16:34
Q. And when you say your back, what areas of your back are you talking about?
16:34
A. Then, it was my lower back.
16:34
Q. Any other parts of your spine that you reported--you recall reporting were hurting?
16:34
A. Not at that moment, no, sir.
16:34
Q. Okay. Your focus was on your lumbar spine?
16:34
A. Yes.
16:34
Q. And at that point, you're released from the emergency room. Can you tell me, in the days that follow, what you started to experience?
16:34
A. A lot of tingling. If I would just add, my legs would go to sleep. Like I would literally--they would fall asleep there. I couldn't--I would feel numbness everywhere from the waist down. My toes. And then it wasn't until maybe a couple of weeks after that that I started to experience the actual back spasms, and that was--that was horrible, because my whole body would just lock up and I would--I couldn't move. There was nothing I could do.
16:35
Q. Had you ever experienced anything like that prior to the crash?

A. No, sir.
Q. Besides the numbness and tingling and the back spasms, did you experience any type of--not just, ow, my back hurts, but any type of radiating pain? Anything like that?
A. Yeah. It was--it was--it's hard to describe, because it was every form, I would have sharp pains, the numbness, the soreness, burning. The only thing that would take it then was I started with Aleve. I would take Aleve. And--but again, I don't like to--I wouldn't like to stay medicated, because eventually, it would just come right back.
Q. Following the emergency room, did you ultimately seek or get treated by any other doctor?
A. Yes. Physical therapy.
Q. All right. The--well, the physical therapy is the treatment. Did you see the doctor before the physical therapy?
A. No. No, actually, I think I did. We talked to Mark Valente, and then he is the one that started the process.
Q. Where did you go to physical therapy?
A. Olson. Olson Physical Therapy, I think it is.
Q. With Olson, what did they do there?
A. Shoot. They did--it was a bunch of stretches, trying to see--they did the nerve-ending thingies where they put--it would shock your back, and it was supposed to make it feel good, and then it did hot and cold treatments. But it was mainly stretches and working out.

16:37 Q. Did that help with what was going on at all?
16:37 A. In all honesty, it just--it seemed like it aggravated it sometimes, and sometimes it would--the only thing that felt good was the electrodes. That's the only thing that felt good.
16:37 Q. At some point, did you undergo an MRI?
16:37 A. I'm sorry?
16:37 Q. At some point, did you undergo a lumbar MRI?
16:37 A. Yes.
16:37 Q. Did anybody--do you have an understanding of what was on your MRI?
16:37 A. I don't know. They just--I think that's when they said I had a herniated disk. But at that point, I think I already--I had already gone through most of the physical therapy, and then I don't know if it was before that--I don't really remember exactly if I had the conversation with--not Bryce. It was not Bryce. It was another physical therapist there, and he was, like, we've already kind of max'd out your treatment here. He said, we can do the shots or we can do the surgery.
16:38 And I was kind of in a position where, if you're going to put a needle in my back, I'm going to--I would rather have the surgery, because I'm still going to have a needle in my back. But I guess the odds are--that it would actually help me are better than me having to get a shot every three months and living with the pain anyway.
16:38 Q. So you made the decision to move forward with the surgery

with Dr. Valente?

A. Yes, sir.

Q. If the Olson therapy didn't end up helping, why did you keep going?

A. Because I wanted to finish the treatment. I wanted to give it a shot, because, if not, I mean, it was not--I was hoping I didn't have to have surgery. I knew the risk. I'm--tons of risks.

Q. So with the surgery--where did that take place?

A. Dallas.

Q. And what is your recollection of the actual surgical procedure and what you had to do once you got to Dallas?

A. Oh, man. It was just a pre-op. Got there at 5:00, and they gave me some kind of morphine or anesthetic to put me to sleep, and then I woke up and they said, it's time to go. And I was in horrible pain. I'm, like, I'm not going to get to stay here? They said no.

Q. And at that point, did you go home?

A. Yes.

Q. Was it like you heard your wife describe?

A. From her side, if it was strain--I mean, if it was stressful for her, it was way worse for me. I mean, but at the end of the day, I kind of--I pushed my way through it because I was hoping it would get better, and that's the truth of the matter. That's the only reason I got the surgery, because

16:40
there was chances that it would fix my back and everything else that was causing the strain on my relationship.
Q. Tell me about that. I mean, you heard your wife describe the loss of sensation. In that period between the crash and the surgery, did you have a problem where you had a loss of function?
16:40
A. Yes.
16:40
MR. WISE: Objection, Your Honor, to relevance.
16:40
THE COURT: One second, please.
16:41
Overruled.
16:41
Q. (BY MR. BECHTOL) You can answer.
16:41
A. Yes-- I'm sorry. Go ahead and ask the question again.
16:41
Q. Following the crash but before your surgery, did you have a loss of function?
16:41
A. Yes. I--it was numb, like--and again, it's not--it's not something a man wants to talk about, but, yes, erectile dysfunction.
16:41
Q. We saw some of the pictures associated with your--once you got home and that recovery process, so I don't want to keep rehashing things. But let's say following that care at home, that initial seven to ten days where you had the tube, did you notice any immediate effects of the surgery?
16:41
A. Yes. Like that was--that was one of the amazing things, and I do thank God for that, that almost immediately, as I-- they laid me out on the bed, rolled me over, I had, like, the

sensation back in my toes. It was just immediate. And from that, it just progressed. But it was almost an immediate sensation back in my feet, because my feet were always going to sleep. If I sat down, they would go to sleep.

16:42 Q. Following the surgery, did you have any more of those back spasms?

16:42 A. No, sir.

16:42 Q. Do you have any idea how many times between the crash and the surgery that you had those back spasms where your body locked up?

16:42 A. Sheesh. Because they would range from light--because if I--it--if--there was light spasms and there was just full lock-up spasms. And a light spasm, I would just kind of stop. And then if I stopped, then it would--it would kind of reduce. But if I moved again, then it was just debilitating and I wouldn't be able to move. And those were the worst ones, because I would be out for about 30 minutes.

16:43 Q. Leading up to the surgery, were you prescribed any medications?

16:43 A. The same thing I'm prescribed now, as a matter of fact. He gave me Methocarbam and Meloxicam. One was an anti-inflammatory, and the other was a muscle relaxer. Directly after the surgery, he did give me some hydrocodone 10, so--

16:43 Q. Following those pain medications after the surgery, did

Dr. Valente continue to prescribe you medications?

16:43 A. Yes, sir, up until, shoot, last month, as a matter of fact.

16:43 Q. Actually seeing Dr. Valente for postoperative care, like when he was still looking at you, treating you for your surgery, do you recall when the last time that was?

16:44 A. Yeah, it's been a while. I don't remember an exact date the last time I've seen him. I have talked to his--what is she called--his medical assistant, something Grifaldo [phonetic], and that's who I usually ask for a refill in my pain--well, not my pain medicines, but my muscle relaxers.

16:44 Q. Okay. So the numbness stops, the tingling stops, the spasms stop. Did you have a restore in function?

16:44 A. It's not the same. I'm just going to say that. It's not the same. I--and I say this with all due respect. Like, I didn't--it wasn't a marathon, but it's not a sprint either. I mean--

16:44 Q. Right. You know--but at least there's some sort of--

16:45 A. Yes. I mean, it's--it's better.

16:45 Q. Okay. Since this crash has happened, are there specific things that you know or you recall missing in your children's lives?

16:45 A. It's probably the worst thing is, is just being able to be there with my daughter, because those benches were steel. And most of the time, I can--I can--like even here, I can sit

for an hour, hour and a half, and my back just starts burning. But there's really nothing else I can do. It's the same thing over there. So I would have to get up and walk around, go behind the bleachers, come back. And it's been an issue. I'm having to live with it every day. But mostly it's the fact that I have to watch myself in everything that I do. I can't--My daughter is eight years old, and that's my baby, and I can't pick her up and throw her, do things like that, because I may throw my back out and then go through the whole process again. So it's a--it's a fear. And I know that the Lord hasn't given me a spirit of fear, but it's--I understand that my body's--there's limitations to my body now.

16:46 Q. With--I know that she's your baby, but has--since the surgery, have you been able to be more active with your family?

16:46 A. Yes. I try to take walks with them. I try to. I don't--I haven't played baseball or football with them, but I try to take walks with them. I'm still--I don't really push myself too hard, because I don't know exactly how much my back can take at that moment. And it's something that lives with me, is the fact that I have to hold back. As much as I want to, I have to, because I don't know--and it's--and it's kind of hard because the things that I would do before, I can't do. I can't go out there running with them, because I don't know if I might run and pull something then and then be in the same situation.

16:47 Q. But in terms of basic--basic life, are you able to go about your business? Go to work?
16:47 A. Yeah. I mean, I have to. I have to work.
16:47 Q. Take out the trash?
16:47 A. Yeah, I mean, I--I try. I try to help out as much, at the house, I mean, as I can. I have to work, because I ain't got no choice. If I don't provide for my family, nobody else is.
16:47 Q. And with--so the surgery solves those issues, the burning issues, tingling, numbness, loss of sensation, the back spasms. Did it get rid of the pain?
16:48 A. The pain is sporadic. Kind of like the weather. As soon as we have a shift in the weather, if it goes cold to hot, or hot to cold, or if it gets cloudy, it literally feels like my back is in a corkscrew. With the cold to hot that we're feeling today, it's pretty bad. But again, I'm not--I can't live on medicine. I'm not going to live on my meds. I'm sorry, I'm not. I can't be reliant solely on that medicine, because then I'm--I'm--I can't afford to become dependent.
16:48 Q. With--you know, we heard the doctor's testimony about what he said, but let's just say-- Now we're two years after your surgery. What percentage do you feel like you've improved since the time of surgery now, as we sit here?
16:49 A. I would say I'm a good 75 percent. 70, 75 percent. And it's progressing. I mean, I don't know if it's--if it's a time

deal or--I'm praying it's all the time. But, yeah, I feel about 75 percent better.
16:49 Q. Do you feel like the surgery benefited you?
16:49 A. Yes, in some areas, tons.
16:49 Q. Okay. With your work, after the crash, how long did you--well, did you end up staying at Xylem?
16:50 A. No. Like I said, I couldn't do the work anymore. It was kind of--it was a humbling situation to say the least, because the same things that I could do without thinking about it, I couldn't do it anymore, and the ones that I could do, I was too afraid to do them. And it was kind of--it was stressful.
16:50 Q. Did you end up leaving Xylem?
16:50 A. Yes. I ended up quitting.
16:50 Q. Okay. Do you recall when that occurred?
16:50 A. No, sir, I don't.
16:50 Q. After Xylem, did you try and find different work?
16:50 A. Yes. I was trying to find something that wouldn't be as much stress where I didn't have to lift anything. I tried driving a forklift, and--
16:50 Q. Where did you do that at?
16:50 A. It was that little company--well, it's not a little company, but it's a steel company, and it's called TrueNorth. So I was a--what they call a material handler, but all that bouncing with big pieces of steel wasn't good on my back either.

16:50 Q. This is after your surgery though?
16:50 A. Yes, sir.
16:50 Q. Okay. And then do you recall, like, how long you lasted there at the--
16:50 A. There, wasn't more than a month.
16:51 Q. And then following TrueNorth, did you try and work somewhere else?
16:51 A. Yes. I ended up at another pump company called SIMFLO, because they were needing a painter and basically a crater, but they didn't--their pumps were not as big as the ones we had at Xylem. But it was the same thing there. I was having to push pumps around, and it was putting a ton of stress on my back, and I didn't want to--in all honesty, I didn't want to push my back to a position where I'd be put in that same situation, because a job is not going to cover me knowing that I just had surgery.
16:51 Q. Do you recall how long you lasted at that job?
16:51 A. I might have been there three months.
16:51 Q. And then after you leave there three months, did you find more work?
16:51 A. Yeah, eventually. I think it might--I might have been gone--I might have been out a month for about--I'm sorry--out of work about a month, and then I ended up coming to where I'm at now, Custom Pipe.
16:52 Q. The TrueNorth and SIMFLO, was that pay comparable to what

you were making at Xylem?
A. Both were pay cuts, and I--just progressively less money.
Q. All right. So tell me about now, where you are now.
A. I'm seventeen-fifty now.
Q. And how much were you making at Xylem?
A. Nineteen-fifty.
Q. And so with the steel fabrication job, what kind of physical requirement does that put on you?
A. The TrueNorth?
Q. No, where you are now.
A. Okay. Well, now, it's not really any at all, because everything--I'm using a crane and hoist and forklift. I don't--there's no--really not any manual physical labor that I have to do, other than pressing buttons and a small amount of pushing and pulling. But it's nothing--there's no physical exertion, as opposed to making skids.
Q. Are you able to go to work each day and complete your job?
A. I have to.
Q. Leading up to your surgery, did you feel like you were going to be able to continue working?
A. I have no choice. There's nothing that--I have to work, because nobody else is going to support my family.
Q. Like immediately following the surgery, was there any time where you were off work? A recovery period?

16:53 A. Yes. I was off for a month and a half, I believe, and I was blessed enough that Xylem gave me--

16:53 Q. I forgot to ask this earlier. During that recovery period, besides what we saw on the pictures of the blood tube and the bandages, was there anything else associated with that recovery that you had to do?

16:54 A. Just be out of work.

16:54 Q. Did you have to wear a brace or anything?

16:54 A. Yes.

16:54 Q. Okay. How long did you have to wear that brace?

16:54 A. The brace, I believe, was, like, a month, month and a half. Or, no, like, I think, three weeks. He didn't want to wear it too long--or for me to wear it too long, because then he said my back would get used to having that brace on and it would--it would do more harm than good.

16:54 Q. As part of this crash and the events that followed, have you had an opportunity to view surveillance videos and photographs taken of you?

16:55 A. Yes.

16:55 Q. Do you have a sense, were those--when those videos and pictures were taken of you?

16:55 A. From my understanding, it was after the surgery.

16:55 Q. Okay. And when you looked at those photos and videos, do you see yourself in them?

16:55 A. Yes.

Q. Okay. And I'd like to show those to you--

THE COURT: No, not yet, not unless they're admitted.

MR. BECHTOL: Your Honor, I'll move to admit them, then, if he's going to be asked about them.

THE COURT: You're moving to admit Plaintiff's, what, 30 is it? 33?

MR. BECHTOL: It would be--it's labeled as Rebuttal Exhibit 2, but it's thirty-- That's what it's labeled as.

THE COURT: All right. It's labeled as Plaintiff's Rebuttal 2. Any objection to Plaintiff's Rebuttal 2 coming into evidence?

MR. WISE: Yes, Your Honor. I mean, I would object. I can't tell which videos he's referring to now.

THE COURT: Okay. All right. Just because you're not certain which one--because I know some of this overlaps with Defendants' 12 through 17, I assume. But you're just not certain what exactly is in Plaintiff's Rebuttal 2?

MR. WISE: Correct.

THE COURT: Have you not been provided a copy of it?

MR. WISE: Is that--

THE COURT: Let's do this. We're almost to 5:00. We'll work this out. So we're going to take our break. I'll talk to the parties about this so you don't have to sit here

16:57 16:57 16:57 16:58 16:58

for it. Thank you for your attention today. We have made a lot of progress. We are way ahead of schedule, so just know that. The attorneys are working hard to be very efficient.

The light is still red. Please do not talk about this case among yourself or with anyone else. I, believe it or not, am a human being, and I can tell you that when you get home, your friends, spouses, neighbors are going to ask you exactly what they asked me when I served as a juror. What's the case about? So just blame mean ugly Judge Hendrix. I'd love to tell you, but that judge is a real jerk and he says I'm going to get in all sorts of trouble if I talk about it.

So just blame me. Tell them you can talk as soon as we're done, but not until then. If you happen to do that, which I know you won't, we have to start all over, and that would waste everyone's time and energy. So please don't put us in that situation.

Tomorrow, I've been informed that you would like to start at 9:00, which is perfectly fine. I know some of you have traveled quite a distance to be here. So please plan to arrive 8:50, 8:55, get your water, get your cup of coffee, and then we will start at 9:00. Have a great night.

All rise for the jury. And please take your notepads, and you can leave them in the room. We will safe-keep them tonight.

(THE JURORS EXIT THE COURTROOM)

THE COURT: All right. Please be seated.

And, Mr. Narro, if you'd like to go back to counsel table, that's fine.

THE WITNESS: Yes, sir.

THE COURT: Okay. I don't believe the Court has received a copy of Plaintiff's Rebuttal 2. Let's do this. At the very least, it's my understanding that these are the surveillance videos that, initially, you objected to; now you're seeking to admit them. At least 12 through 17 are much of the same--or part of the same things. Why don't y'all talk, see if you can come to an agreement as to-- Do you have a copy of Rebuttal 2?

MR. WISE: I do.

THE COURT: Okay. Whether it's overly broad and you have some objection to it, I'll resolve that before we bring the jury in tomorrow. If you can reach an agreement, great, and we'll go from there.

All right. A couple of things from the Court. Tomorrow, in addition to that, we will do our charge conference. You only have two witnesses. Right, Mr. Wise?

MR. WISE: That's right.

THE COURT: Approximately how long do you anticipate their testimony--I won't hold you to it, but--

MR. WISE: One of them is a billing expert similar to Dr. Balat, 30--I mean, I don't know how long you're going to

cross her, but 30 minutes.

THE COURT: Okay.

MR. WISE: Dr. Chiodo could be closer to, like, an hour, hour and a half.

THE COURT: For direct, or direct and cross?

MR. WISE: For direct, probably 45 minutes.

THE COURT: Okay. So we might be done by lunch tomorrow?

MR. WISE: That's feasible.

THE COURT: Okay.

MR. BECHTOL: I think, yeah. I was going to say I think--

MR. WISE: I don't know how much longer Mr. Narro is going to--

MR. BECHTOL: I would say I have maybe 20 minutes to ask him.

THE COURT: All right.

MR. BECHTOL: A couple more areas of damages. Sorry I got off in the weeds asking about the crash during his direct, but--

THE COURT: That's okay. It's all right.

Okay. So let's--we will get together at 8:20 tomorrow morning. We will hopefully resolve, either by agreement or otherwise, this dispute about Defendants' 12 through 17 and your attempt to admit Rebuttal 2. So we'll go

17:00 on the record at 8:20 to do that and the charge conference, so review the jury charge.

17:00 My law clerk, tonight, will make a few additional changes that reflect, for example, the plaintiff's choice not to seek loss of future earning capacity. That's currently in the charge we gave you this morning, because we prepared that over the weekend and last week. That's changed. We'll get that out. We'll do that in tracked changes, so any additional changes, you can identify quickly tomorrow morning. But be prepared to address any potential objections in the morning.

17:00 Mr. Bechtol, for the record, I think we should probably mark for identification purposes the two deposition excerpts that were played. You have not admitted those into evidence. I think that's probably right. But we played the deposition expert--first, the defendant, Mr. Singh, and then second--was it Valente?

17:01 MR. BECHTOL: Yes, Dr. Valente.

17:01 THE COURT: All right. So why don't we mark those, unless there's objection, for identification purposes as Plaintiff's Depo Exhibit 1 for Singh and Depo Exhibit 2 for Dr. Valente. Does that make sense?

17:01 MR. BECHTOL: Does that mean y'all need copies of the video?

17:01 THE COURT: I do not need copies. But my court reporter does not transcribe video that's played in court in

real time. Just as a matter of standard practice, court reporters in federal court don't do that. So when you get your trial record, to the extent you ever need one, it's just going to say "Video plays." So to make sure the record is captured, I would tell you to keep the originals of the excerpts you played today of Singh--that'll be Plaintiff's Depo 1--and Valente. That will be Plaintiff's Depo 2. Make sense?

17:02 MR. BECHTOL: Makes sense.

17:02 THE COURT: Okay. So to the extent they're ever needed, either on appeal or otherwise, you have the originals, and I'm sure Mr. Wise has a copy.

17:02 Any objection to that, Mr. Wise?

17:02 MR. WISE: No objections.

17:02 THE COURT: Okay. All right. Let's see if there was anything else from the Court. Hold on.

17:02 So you only have--we're going to finish Mr. Narro tomorrow, then your two witnesses, and then we're done. What order are you calling those witnesses; do you know?

17:02 MR. WISE: Dr. Chiodo will be first. Jana Schieber will be second.

17:02 THE COURT: Okay. If something changes and you decide to call another witness, I ask you to inform Plaintiff's counsel tonight. Understood?

17:02 MR. WISE: Okay. I don't anticipate that happening, but I will.

17:02 THE COURT: Okay. That's fine.

17:02 MR. WISE: I will inform them if there is.

17:02 THE COURT: Yeah, I'm just trying to avoid any further surprises. That's all.

17:03 MR. WISE: Understood.

17:03 THE COURT: Okay. One more thing from the Court, gentlemen, and then you guys--you can have the room for as long as you need. There was I should have followed up this morning, but another to-do item for the attorneys was to discuss the potential instruction about a non-unanimous verdict. Have you researched that and discussed that and reached an agreement? Are you still seeking an instruction that a non-unanimous verdict is okay, or are you seeking now and demanding a unanimous verdict?

17:03 MR. WISE: We would like a unanimous verdict, Your Honor.

17:03 MR. BECHTOL: That's what the rule is. I'm fine with that, Your Honor.

17:03 THE COURT: Okay. All right. We will do that.

17:03 All right. That's it from the Court. Anything else from the plaintiff for the Court?

17:03 MR. BECHTOL: I was going to say, we also don't have any future medical treat--mut--mut--

17:03 THE COURT: You're doing great.

17:03 MR. BECHTOL: Future medical bills.

17:03 THE COURT: Okay. No--

17:03 MR. BECHTOL: So you can take that out of the charge. We know that.

17:03 THE COURT: All right. Anything else from the defendant?

17:04 MR. WISE: Just one, since you're doing changes on the jury verdict. The Question Number 1 says "S. Chahel Trucking" with an "e." It's spelled C-h-a-h-a-l.

17:04 THE COURT: All right. We will fix that typo. Thank you. Yeah, thank you. And we'll do a universal search for that as well.

17:04 All right. Thank you very much. Have a good evening. We will be in recess until 8:20 tomorrow morning.

17:04 (END OF DAY)

17:04

17:04 I, Mechelle Daniel, Federal Official Court Reporter in and for the United States District Court for the Northern District of Texas, do hereby certify pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

17:04

17:04 *_/s/ Mechelle Daniel_* DATE JANUARY 5, 2026

17:04 MECHELLE DANIEL, CSR #3549
FEDERAL OFFICIAL COURT REPORTER

17:04

17:04

17:04