UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

RUBEN NARRO, Plaintiff,
VS.
SINGH SUKHWINDER, et al., Defendants.

CAUSE NO. 5:24-CV-045-H

---

TRANSCRIPT OF TRIAL
VOLUME 2 OF 2
BEFORE THE HONORABLE JAMES WESLEY HENDRIX,
UNITED STATES DISTRICT JUDGE, and A JURY

OCTOBER 21, 2025
LUBBOCK, TEXAS

---

FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

A P P E A R A N C E S

FOR THE PLAINTIFF:
ANDERSON ALEXANDER
ATTORNEYS AT LAW
101 N SHORELINE BOULEVARD, SUITE 610
CORPUS CHRISTI, TEXAS 78401
BY: STEPHEN F. BECHTOL

BENJAMIN H. DAVIDSON
ATTORNEY AT LAW
5010 UNIVERSITY AVENUE, SUITE 500
LUBBOCK, TEXAS 79413

FOR THE DEFENDANTS:
MEHAFFY WEBER
ATTORNEYS AT LAW
ONE ALLEN CENTER
500 DALLAS STREET, SUITE 2800
HOUSTON, TEXAS 77002
BY: WARREN B. WISE
GRANT CARPER

* * * * *

# INDEX
## VOLUME 2


JURY CHARGE CONFERENCE................................ 9

WITNESSES FOR THE PLAINTIFF:

RUBEN NARRO
DIRECT EXAMINATION CONTINUED BY MR. BECHTOL...... 17
CROSS-EXAMINATION BY MR. WISE.................... 29
REDIRECT EXAMINATION BY MR. BECHTOL.............. 55

WITNESSES FOR THE DEFENDANTS:

ERNEST CHIODO
DIRECT EXAMINATION BY MR. WISE................... 59
CROSS-EXAMINATION BY MR. BECHTOL................. 79
REDIRECT EXAMINATION BY MR. WISE................. 114

JANA SCHIEBER
DIRECT EXAMINATION BY MR. CARPER................. 119
CROSS-EXAMINATION BY MR. BECHTOL................. 156

PLAINTIFF'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| Rebuttal No. 2 | Surveillance video | | 6 |
| 34 | Stipulation | | 8 |

DEFENDANTS' EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 12 - 17 | Surveillance videos | | 6 |


(continued)

INDEX (CONTINUED)
VOLUME 2

PLAINTIFF RESTS........................................ 57
DEFENDANTS RESTS....................................... 173
PLAINTIFF CLOSES....................................... 173
DEFENDANTS CLOSE....................................... 173
COURT'S CHARGE TO THE JURY............................. 174
CLOSING ARGUMENT BY THE PLAINTIFF...................... 184
CLOSING ARGUMENT BY THE DEFENDANTS..................... 201
FINAL CLOSING ARGUMENT BY THE PLAINTIFF................ 209
DELIBERATIONS COMMENCE................................. 216
VERDICT RETURNED....................................... 216
REPORTER'S CERTIFICATE................................. 219

* * * * *

P R O C E E D I N G S

(OUTSIDE THE PRESENCE OF THE JURY)

08:29:02 THE COURT: Good morning, everyone. Sorry we're running a few minutes late. We're waiting on the court security officers. They must have a busy morning. I think everybody will probably stay in line. I'll keep an eye on Mr. Davidson over there.

08:29:19 Okay. A couple of things before we get to the jury charge. What is the status of any agreement on the surveillance evidence, if any?

08:29:29 MR. BECHTOL: I believe that we came to an agreement--

08:29:30 THE COURT: Okay.

08:29:33 MR. BECHTOL: --that all of the exhibits they had intended to offer would be authenticated and admitted.

08:29:37 THE COURT: All right.

08:29:39 MR. BECHTOL: Which was, what, 7 through 12?

08:29:41 THE COURT: 12 through 17?

08:29:43 MR. BECHTOL: 12 through 17.

08:29:48 And then I'm only admitting which is labeled Plaintiff's Rebuttal 2. I won't be trying to--I won't be playing Rebuttal Exhibit 1.

08:29:58 THE COURT: Understood. Okay. So the parties are stipulating to the authenticity and admissibility of Defendants' 12 through 17, and Plaintiff's Rebuttal 2. So

you'll be asking me to preadmit those so you can just refer to them, publish them; is that right?

MR. BECHTOL: Yes, Your Honor.

THE COURT: Mr. Wise, is that correct?

MR. WISE: That's correct.

THE COURT: All right. Then Defendants' 12 through 17 are admitted, as is Plaintiff's Rebuttal 2. Let me make a note of that. One second, please.

So Plaintiff's Rebuttal 2 is admitted. Those are--it's identified in the Plaintiff's exhibit list as surveillance videos taken by Defendant if not excluded by Court. Is it a collection of all the videos?

MR. BECHTOL: It's just--there was a--they had produced several videos. The only one they didn't want to use is one that I want to use--

THE COURT: And that's Plaintiff's Rebuttal 2?

MR. BECHTOL: --and that's--it's just a video of my client's house, him on his porch.

THE COURT: Okay. All right. So 2 is admitted, as are 12 through 17.

All right. So because they're in evidence, I know you were about to go there with your witness. Feel free to publish and ask him whatever you'd like.

MR. BECHTOL: Thank you.

THE COURT: All right. Given that some of that

evidence is now in and some of it is electronic, the parties--I mentioned this at the pretrial conference--will need to be able to provide some clean laptop to go to the jury room, to the extent the jurors want to provide that. If you haven't already discussed that plan, do so among yourselves and let me know when you know how we will deal with that. And if there's a problem, let me know. I don't-- The parties always provide those means, but if there's an emergency, let me know. I'll see what the Court can do.

08:31:49 Is there an agreed stipulation about the citizenship of the various parties?

08:31:53 MR. BECHTOL: Yes, I was about to say, it was just filed as Document 109.

08:31:57 THE COURT: Okay. Is that right, Mr. Wise?

08:31:58 MR. WISE: That's correct.

08:32:00 THE COURT: Okay. Why don't we admit that. Let me pull that up. One second.

08:32:10 (PAUSE)

08:33:23 THE COURT: All right. Thank you very much. Out of an abundance of caution, in light of Fifth Circuit precedent, why don't we admit this stipulation into evidence as well. It can be--any objection to it just becoming Plaintiff's 34?

08:33:43 MR. BECHTOL: No, Your Honor. That works.

08:33:45 MR. WISE: No objection.

08:33:47 THE COURT: All right. The stipulation will also be admitted into evidence as Plaintiff's Exhibit 34, which is Docket Number--help me. What was it? Docket--also Docket Number 109. Thank you, Ms. Flock.

08:34:09 All right. The final question I have is, there was some talk about the possibility of providing the jurors lunch. Is that your preference?

08:34:15 MS. STUTES: I'm going to order Jason's Deli.

08:34:16 THE COURT: Okay.

08:34:17 MS. STUTES: I need to know what time you want it here.

08:34:19 THE COURT: 11:30.

08:34:22 MS. STUTES: And can you ask the jury about allergies when they get here?

08:34:27 THE COURT: Sure. Sure.

08:34:27 (DISCUSSION BETWEEN THE COURT and COURT SECURITY OFFICER)

08:34:42 MR. BECHTOL: Or vegan or preference, I guess.

08:34:46 THE COURT: Yeah. Thank you. All right. We'll let you know as soon as we know. Thank you.

08:34:52 All right. Before we move to the jury instructions, any questions or updates from the parties, Mr. Bechtol?

08:34:58 MR. BECHTOL: No, Your Honor.

08:34:59 THE COURT: Mr. Wise?

08:35:00 MR. WISE: No.

08:35:02 THE COURT: Okay. All right. We've provided an updated tracked change version of the jury instructions. I have a few things to discuss, but I'll just start with the parties.

08:35:16 Mr. Bechtol, any objections to the Court's proposed final jury instructions?

08:35:26 MR. BECHTOL: I think, with Instruction 2, if they are stipulating to liability or stipulating to negligence, that that needs--that needs to be clear, that they caused the collision, that they were the proximate cause of the collision, but they are disputing damages. This is just saying that there was a crash; they ran into us; and that he was in the course and scope.

08:36:02 THE COURT: Mr. Wise?

08:36:07 MR. WISE: I have no objections to that. I was going to just say that, perhaps, the appropriate language--it would be: Defendants admit that the incident made the basis of this lawsuit was proximately caused by the negligence of Sukhwinder Singh.

08:36:23 THE COURT: Adding that as a third stipulation into Questions 2?

08:36:27 MR. WISE: Correct.

08:36:28 THE COURT: Read that language again, please.

08:36:30 MR. WISE: Defendants admit that the incident made the basis of this lawsuit--

THE COURT: One second.

MR. WISE: Sure.

THE COURT: Defendants admit that the--

MR. WISE: Or you can say the collision, to make it consistent.

THE COURT: Okay. Defendants admit that the collision--

MR. WISE: Was proximately caused by the negligence of Sukhwinder Singh.

THE COURT: Does that language do the trick for you? Any objection to that?

MR. BECHTOL: I guess that the next part of that would be, do we need Question 1, or then do we need an instruction that says, "And so you are instructed to answer "yes" to Question 1.

THE COURT: Mr. Wise?

MR. WISE: My initial thought on that is, you know, we're admitting that the collision was our client's fault, but not necessarily that Mr. Narro's injuries were caused by my client's-- Question 1 references proximately caused the injury to Ruben Narro, not the collision.

THE COURT: Yeah, I understand. Okay. I will add the stipulation to Instruction Number 2: The defendants admit that the collision at issue in this lawsuit was proximately caused by the negligence of Sukhwinder Singh.

08:38:11 I will take under advisement this remaining dispute, but I understand your point, Mr. Wise.

08:38:24 All right. Any other objections, Mr. Bechtol?

08:38:36 MR. BECHTOL: The--on Question 2--I'm not looking at the PJC, but Number 3, is that--is that correct how that's written? Because we're saying--we're just claiming loss of earnings, not earning capacity in the past.

08:38:54 THE COURT: So what is your suggested edit?

08:38:57 MR. BECHTOL: Would just be loss of earnings sustained in the past.

08:39:00 THE COURT: Loss of earnings sustained in the past?

08:39:01 Mr. Wise?

08:39:03 MR. WISE: I think he's correct. I'm not sure if it's wages or earnings. I'm--

08:39:06 MR. BECHTOL: Yeah, that's what I was thinking.

08:39:08 MR. WISE: I'm looking it up right now.

08:39:13 THE COURT: Okay. I'll give you a second.

08:39:13 (PAUSE)

08:40:03 MR. BECHTOL: How it's written--

08:40:03 THE COURT: I'm sorry?

08:40:06 MR. BECHTOL: How it's written on here is correct, yes. So there's no change needed to Number 3.

08:40:14 THE COURT: Okay. We will leave that as is.

08:40:30 MR. BECHTOL: Do we need Instructions 8, 9--well, 9 is for injuries. Do we need Instruction 8 or--for negligence?

08:40:49 THE COURT: Given that we're asking whether the negligence here caused the injuries, subject to your objection, I think it will help the jury understand. Even though the negligence of causing the collision is not at issue, negligence causing the injury--

08:41:05 MR. BECHTOL: Okay.

08:41:07 THE COURT: --could be helpful for them to just understand what's before them.

08:41:10 Anything else?

08:41:11 MR. BECHTOL: And then I don't think that we need Number 5 on page 15 for disfigurement in the future.

08:41:18 THE COURT: Question Number 5?

08:41:19 MR. BECHTOL: No--

08:41:21 THE COURT: Category 5?

08:41:24 MR. BECHTOL: --Category 5 on Question 2.

08:41:26 THE COURT: Disfigurement that, in reasonable probability, Ruben Narro will sustain in the future.

08:41:35 So you are agreeing that that potential category of damages should go away?

08:41:37 MR. BECHTOL: Yes, Your Honor.

08:41:39 THE COURT: Mr. Wise, any objection to removing Number 5?

08:41:43 MR. WISE: No, I'm not going to object to that one.

08:41:44 THE COURT: All right. Didn't think so. Okay. We will remove Number 5. So Number 6 currently in the draft

before you will become 5.

08:41:56 All right. Mr. Bechtol, anything else?

08:41:57 MR. BECHTOL: Not that I saw. I think that clears up--

08:42:00 THE COURT: A little louder. I'm sorry.

08:42:01 MR. BECHTOL: Not from the plaintiff, Your Honor.

08:42:03 THE COURT: Okay. Mr. Wise?

08:42:07 MR. WISE: I have no--nothing to add to this jury charge. I think it looks good.

08:42:12 THE COURT: Okay. One, just, question for the Court--I'm sorry--from the Court, and a suggestion. Let me pull it up. Give me one second.

08:42:27 Okay. In my order that denied two of the pretrial motions and granted one of them, the Court noted that I would instruct the jury that a request for a specific amount of noneconomic damages is not evidence; instead, it's argument that the jury is free to agree with or reject.

08:42:43 I just want to follow through on that representation of the parties that I would do that. We need to decide how and where to do that. In the preliminary instructions--and I'm paraphrasing--I said something like, closing arguments are not evidence. So I've told them-- Come on in. Mr. Wise, he is currently on the stand. Do you have any objection to him being present?

08:43:09 MR. WISE: He is, and I have no objection to that.

08:43:13 THE COURT: All right. Just for the record, the plaintiff has just arrived.

08:43:18 All right. So I've told them about closing arguments in the preliminary instructions, so maybe there's nothing else to do. Alternatively, on page 1 of the instructions, Number 2 says: Base your answers only on what was presented in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not presented in the courtroom.

08:43:45 I could add a paragraph from the Fifth Circuit's pattern criminal instructions that says the-- But we do not have to do this. I'm just brainstorming. "The function of the lawyers is to point out those things that are the most significant or most helpful to their side of the case and, in doing so, to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls the case. What the lawyers say is not binding upon you."

08:44:17 That's from the Fifth Circuit's criminal pattern. Again, if--we can leave well enough alone, but I did want to raise it with the parties.

08:44:25 Mr. Bechtol, do you have a position on this?

08:44:27 MR. BECHTOL: I don't think we need it. I would say we don't need that instruction.

08:44:30 THE COURT: Mr. Wise?

08:44:32 MR. WISE: I don't think we need it, but I'm always a fan of educating the jury on the law more than not, so--

08:44:37 THE COURT: All right. Okay. Well, given that neither side believes it's necessary, I am inclined to leave it out, but I will let you know if that changes. But currently, there won't be any change. All right.

08:46:43 All right. The only remaining objection, then, is Mr. Bechtol's request to also instruct the jury that there's a stipulation that the negligence also caused the injury and that they should be instructed to answer "yes" to Question Number 1 on page 13. That remains in dispute, I'm hearing from the defense. Correct, Mr. Wise?

08:47:06 MR. WISE: Yes, Your Honor.

08:47:08 THE COURT: Given that that is in dispute and that is a fact issue for the jury to decide--yes, the Defendant Singh caused this injury through his negligence, but whether that also caused the alleged injuries in this case is for the jury to decide. So that objection is overruled, and I will leave the proposed instruction as is.

08:47:28 All right. We will incorporate all of the tracked changes that you've seen. I have resolved all the objections, so we will get you a clean jury charge. I think that addresses all of them, and there are no other objections to address. Is that correct, Mr. Bechtol?

08:47:37 MR. BECHTOL: Yes, Your Honor.

08:47:38 THE COURT: Mr. Wise?

08:47:38 MR. WISE: Yes, Your Honor.

08:47:40 THE COURT: Okay. All right. We're still waiting on a few jurors. Anything to take up from the parties as we wait, Mr. Bechtol?

08:47:48 MR. BECHTOL: No, Your Honor.

08:47:50 THE COURT: Mr. Wise?

08:47:51 MR. WISE: I don't believe so, Your Honor.

08:47:54 THE COURT: Your witnesses are present and ready to go?

08:47:56 MR. WISE: One of them is, and one of them has probably gotten in in the last 30 minutes, or is ten minutes away--

08:48:03 THE COURT: Okay. Mr. Bechtol, your plan is to continue the direct. You estimated 20 to 30 minutes; then we'll have cross. Approximately how long do you suspect for cross?

08:48:13 MR. WISE: 20 to 30-- 30 minutes, we'll say, something like that.

08:48:15 THE COURT: All right. Then, Mr. Bechtol, you still plan to rest?

08:48:18 MR. BECHTOL: I will plan to rest at that point.

08:48:20 THE COURT: Okay. We'll go straight into the defense case at that point. Probably won't be time for a

break.

All right. Well, we'll be in recess until 9:00, when the jurors are ready. I'll ask my court security officer to inform the parties once we know whether there's any restrictions on diet.

We're in recess.

(RECESS TAKEN)

(OUTSIDE THE PRESENCE OF THE JURY)

THE COURT: All right. Let's bring them in.

(THE JURORS ARE SEATED IN THE JURY BOX)

THE COURT: Be seated.

Good morning, everyone. Welcome back. Hope you had a good night.

Mr. Bechtol, you may proceed.

MR. BECHTOL: Okay. Thank you, Your Honor.

RUBEN NARRO,

PLAINTIFF, CONTINUED TO TESTIFY ON HIS OATH AS FOLLOWS:

DIRECT EXAMINATION (CONTINUED)

BY MR. BECHTOL:

Q. Good morning, Mr. Narro. Are you ready to continue with your testimony?

A. As ready as I'm gonna be.

Q. Okay. After we talked about your injuries and your surgery and your recovery, have you been left with any type of scar as a result?

A. Yes, sir.
Q. And where is that scar?
A. On the low of my back.
Q. These pictures--have you seen these photos before?
A. Yes, sir.
Q. And your wife had testified about these pictures yesterday, which are Plaintiff's Exhibit 7. Where that hole is, is that where the scar is?
A. No. It's under that. It's--well, it's--there's one there and one under there as well.
Q. Like where the bandage is?
A. Yes, sir.
Q. There would be an area where we can't exactly see?
A. Yes.
Q. Is that scar there to this day?
A. Yes.
Q. How long did it take for this to actually heal and scar over?
A. I couldn't tell you exactly. I really--I don't know.
Q. Okay.
A. It took a while.
Q. Now, what we almost started to go into yesterday was whether--or is about some surveillance videos taken. Do you recall where we started to talk about that yesterday?
A. Yes, sir.

Q. Okay. And in this case, have you seen the different photographs taken of you, and videos?
A. Yes, sir.
Q. And are you in those photographs and videos?
A. Yes, sir.
Q. And I believe the question asked yesterday was--before--when we left off, was, do you recall when those photos and videos were taken?
A. Yes. After the surgery.
Q. So the activities shown in the photos or the videos would have all taken place--
A. After, yes, sir.
Q. And that--after--right after your surgery or were they several months after the surgery?
A. I want to say probably about two months after surgery maybe. I know it was after the surgery, from my--from what I could tell, because I wasn't aware that I was being, I guess, surveilled.
Q. Now, this still frame from the surveillance videos, do you recognize where this is?
A. That's my house, yes, sir.
Q. Where the basketball hoop is?
A. Across the street. It's--the basketball is actually in the church parking lot. So it's pretty much where that basketball hoop is, the end of the church parking lot, and then

09:06:33
there's a street, and then it's my house.
Q. And do you see what the time is, and the date, on the bottom?
09:06:36
A. Friday, January 12th, 2024.
09:06:43
Q. And so that would have been approximately three and a half months, four months from your surgery?
09:06:51
A. I wouldn't--I'm going to be honest with you. Like I'm horrible with dates, horrible.
09:06:58
Q. Now, do you recall seeing a video of yourself where you go to a Home Depot?
09:07:03
A. Yes, sir.
09:07:08
Q. And pictures where you were inside of Home Depot. Do you recall seeing these photos?
09:07:11
A. Yes. That's me.
09:07:15
THE COURT: Mr. Bechtol, what exhibit is this?
09:07:21
MR. BECHTOL: This is Defense Exhibit, I believe, 12 or 13.
09:07:28
THE COURT: Mr. Wise, can you help us?
09:07:30
MR. WISE: The video is 12, if he's talking about the photographs-- It would be Exhibit 14. Both of them are Exhibit 14.
09:07:40
THE COURT: All right. We're looking at 14 now.
09:07:40
MR. BECHTOL: Yes, Your Honor.
09:07:43
MR. WISE: That's what he's looking at now, yes, sir.

09:07:44 THE COURT: Go ahead, Mr. Bechtol.
09:07:48 Q. (BY MR. BECHTOL) This trip you made to Home Depot, do you recall what you were doing?
09:07:52 A. I was looking for something in the restroom, I believe.
09:07:55 Q. In this video, what are you doing? Or in this picture. Sorry.
09:07:58 A. He probably took it slow, because I ended up having to crouch very slow.
09:08:07 Q. And so you're crouching down.
09:08:09 And in this photograph, what are you doing?
09:08:12 A. That's probably the later part of that video, because I couldn't stay crouched very long.
09:08:14 Q. Okay.
09:08:15 A. Or that picture.
09:08:19 Q. And so after the surgery, were you able to crouch down?
09:08:19 A. Yes.
09:08:22 Q. After your surgery, were you able to kneel down, like we see in the photograph?
09:08:25 A. Yes, sir. After the surgery, yes, sir.
09:08:28 Q. After the surgery, were you capable of doing something like walking into a store and picking up an item?
09:08:36 A. Yeah. Obviously, I had my work uniform on, so I was working, as well, there.
09:08:48 Q. Okay. Now, prior to your surgery, in that period between the crash and your surgery, were you engaged in activities

09:09:05 where you would have to crouch or kneel on the ground?
A. I wasn't even going to try.
09:09:18 Q. And I'm going to switch over to a video, which is Plaintiff's R-1--or R-2.
09:09:51 All right. Ruben, have you seen this video, where it starts like this, before?
09:09:54 A. Yes, sir.
09:09:55 Q. And do you see the date in this?
09:09:57 A. Yes, sir. June 12th.
09:10:00 Q. So this is approximately nine months after your surgery?
09:10:03 A. Yes, sir.
09:10:05 Q. Nine months after your surgery, were you still experiencing any of the numbness or tingling or burning sensations?
09:10:10 A. No.
09:10:14 Q. All right. So what are we looking at here?
09:10:17 A. This is the front of my house, and that's my disabled uncle--or my wife's disabled uncle.
09:10:23 Q. The gentleman sitting on the porch?
09:10:30 A. Yes. His name is Arnold. That's kind of his spot right there.
09:10:35 Q. Do you know what he's doing out there?
09:10:43 A. He's eating some watermelon.
09:10:45 Q. Are you in this video portion here?
09:10:47 A. Yeah, that's me right there.

Q. And who else is out there with you?
A. That's my baby.
Q. All right. Do you recall the date that this was taken?
A. Yes, sir.
Q. What do you remember about this?
A. This is the day that I actually had to come outside because she ran inside my house freaking out because there was a man that had been recording her. And it was--it was a situation, because we didn't believe her at the time, but-- I don't spend too much time outside, especially in the summertime, and her and my nephew--or my--I'm sorry--my uncle do.

So she runs inside and she said, "Dad, dad, he's back, he's taking pictures of me and Arnold again."

So I come outside and see this man across the street in the church parking lot. I didn't approach him, of course, but that's what he was doing.
Q. Do you remember what you were doing here?
A. Calling the cops.
Q. Did you end up filing a police report?
A. Yes.
Q. How did it make you feel that there was people watching you and your home and your family?
A. I--that they watched me, I have no problem. Them watching my 7-, 8-year-old daughter, that made me extremely

angry and broke my heart, because at the end of the day, she has nothing to do with any of that. I don't know what kind of man that was. I don't know what his intentions were. And there was no way that I could tell, because I didn't know what he was doing there at that time.

09:12:23 Q. Do you have an understanding of what he was doing there now?

09:12:25 A. Yes.

09:12:26 Q. What was he doing?

09:12:31 A. He was surveilling me apparently. He was hired to take pictures of me.

09:12:40 Q. Then the video switches here to around 8:53 at night. What are we looking at in this portion of the video?

09:12:52 A. This is my Yukon. That's my work car.

09:13:02 Q. And then let's look at Defendants' Exhibit 13.

09:13:04 Have you seen this video where it starts in the dark outside your garage?

09:13:07 A. I'm sorry?

09:13:09 Q. Have you seen this video where it starts in the dark outside your garage?

09:13:14 A. Yes, sir.

09:13:20 Q. Is that your vehicle in the driveway that was actually involved in the crash?

09:13:23 A. Yes.

09:13:26 Q. And the date on this, do you see in the bottom?

09:13:29 A. Yes. January 12th.
09:13:32 Q. Is that the same date as the pictures that we looked at from Home Depot?
09:13:36 A. Yes, sir.
09:13:40 Q. So that was early in the morning. Now it's 8:00 in the morning, January. Now it's noon. Now it's 4 p.m. Is that also one of your vehicles?
09:14:01 A. Yes, sir.
09:14:03 Q. All right. Now, is that you in the video?
09:14:04 A. Yes, sir.
09:14:06 Q. So four months after the crash, could you do something like close your garage door by raising your hand?
09:14:13 A. Yes. I had to. Nobody is going to do it for me.
09:14:16 Q. But after your surgery, were you physically capable of an activity like that?
09:14:18 A. Yes, sir.
09:14:20 Q. Were you physically capable of getting in your car and driving to a store and walking inside, like we see in the video?
09:14:27 A. Yes, sir.
09:14:29 Q. Do you have an opinion on whether the surgery allowed you to live your life and be able to do daily activities like this?
09:14:37 A. Yes, the surgery helped a lot. But so does medication.
09:15:10 Q. Yesterday, you testified about your work history, missing work, and your difference in pay?

09:15:14 A. Yes, sir.
09:15:20 Q. Have you been able to arrive at a number that you would say are the amount of loss of earnings you've had since the time of the crash?
09:15:28 A. I want to say about 19,000, loss of earnings.
09:15:33 Q. And did you put a calculation together where--
09:15:34 A. Yes.
09:15:36 Q. --where the numbers are at?
09:15:40 A. Yes.
09:16:06 Q. So right after the crash, you missed a few days, and then a few weeks during the course of doctors' appointments and pain?
09:16:11 A. Yes, sir.
09:16:14 Q. You missed approximately eight weeks after your surgery. And then starting when you were able to get the job at Steel Fabrication, approximately right at a year ago--
09:16:26 A. Yes, sir.
09:16:30 Q. --you have made $40,000 in the last year, which is about 8,000 less than you were making at SIMFLO?
09:16:35 A. Yes, sir.
09:16:37 THE COURT: Mr. Bechtol, would you please take that down until we have testimony about it. I don't believe-- That's not an exhibit, is it?
09:16:44 MR. BECHTOL: It's not.
09:16:47 THE COURT: Okay. All right. Go ahead.

09:16:47 MR. BECHTOL: All right.
09:16:49 THE COURT: If he testifies about it and you want to put it up, that's fine. I haven't heard him testify to those numbers yet. I heard a total.
09:16:58 MR. BECHTOL: Well, that's why I prefaced that with yesterday he talked about the time that he missed from work following the crash and his difference in pay and everything.
09:17:04 THE COURT: Okay.
09:17:07 MR. BECHTOL: So that's why.
09:17:09 THE COURT: And if you would stay close to a microphone, either that one or, if you need your laptop, just pull that one closer to you. Thank you.
09:17:18 MR. BECHTOL: Normally I have a little clicker, but I forgot it.
09:17:20 THE COURT: That's all right.
09:17:22 Q. (BY MR. BECHTOL) Okay. And based on those numbers, is that how you arrived at the--
09:17:25 A. Yes.
09:17:26 Q. --the 19,000 number?
09:17:27 A. (Nods head up and down.)
09:17:36 Q. Okay. And you've seen testimony throughout this case, as well as--do you have copies of and know about the medical bills associated with the treatment for your injuries and your surgery?
09:17:44 A. Yes, sir.

Q. Do you have an idea of whether or not you have remaining unpaid bills?
A. I have a lot of unpaid bills, yes, sir.
Q. Do you know approximately how much those bills are?
A. $231,000 in bills, and change, I believe.
Q. As we sit here today, can you tell us--because you're not seeing the surgeon, as far as that care. How do you cope with the pain that you're still having on a day-to-day basis?
A. I pray as much as possible. And when I get to a situation where I can't take it anymore, then I do take muscle relaxers. The last time I was prescribed another 100 Methocarbam and, I think, 50 Meloxicam was a month ago, and then now that-- That was the last conversation I had with the--the--I guess her--his nurse practitioner or something, I guess whoever was over the office and did the medication. She said I would have to actually have another meeting for another round or refills or anything else. But the only way I cope with it is toughen it out, and medication as little as possible.
Q. Between your surgery, medications, and toughing it out, are you able to at least get through your daily activities?
A. Yes, sir.
Q. In this case, what are you here to ask the jury to do?
A. Just be fair and keep them responsible. That's it.
Q. All right. Thank you, Mr. Narro.

MR. BECHTOL: I'll pass the witness.

THE COURT: All right. Mr. Wise, cross-examination?

MR. WISE: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. WISE:

Q. Good morning, Mr. Narro. How are you?

A. Good morning. How are you?

Q. Good, good. I'm going to hop around a little bit.

A. Okay.

Q. Try to be as brief as possible.

As I understand it, you think my client was going 45 miles per hour when he hit you; is that correct?

A. That was an--that was a guess. There was no way that I could tell.

Q. Okay.

A. I just know I got hit pretty hard.

Q. Do you recall giving your deposition in this case?

A. Yes, I remember my deposition.

Q. And do you recall that I asked you, how fast do you think my client was going when this accident happened?

A. If--it was probably just a guess. I mean, at the end of the day, it was a guess, because there was really no way that I could tell. And I'm pretty sure I said that in the deposition, as well.

09:20:22 Q. Okay. Do you-- You also told your medical providers at the ER, the first ER visit you had, that you were going 45 miles per hour. Correct?
09:20:30 A. I may have said that, yes, sir.
09:20:30 Q. Okay.
09:20:32 A. That they were going-- I'm sorry. Say that again?
09:20:35 Q. That you were going 45 miles per hour--or that-- I'm sorry. That my client was going 45 miles per hour when he hit you.
09:20:40 A. Oh. I mean, I would--I guess it was probably another guess, I guess.
09:20:45 Q. Okay. Well, do you disagree that you said that to your doctors?
09:20:48 A. I don't disagree, but again, I probably made a guess.
09:20:54 Q. Okay. Are you aware of what kind of damage an 18-wheeler can do going 45 miles per hour to a car?
09:21:00 A. No, sir.
09:21:00 MR. BECHTOL: Objection; speculation.
09:21:03 THE COURT: Overruled. You can answer if you know. I think-- What was your answer?
09:21:07 THE WITNESS: I said no, sir, I'm not.
09:21:10 MR. WISE: Okay. Would you pull up Defendants' Exhibit Number 10.
09:21:23 Q. (BY MR. WISE) Okay. I'm showing Defendants' Exhibit 10 on the screen now. This is a photograph of your vehicle

09:21:28 following the accident. Correct?

A. Yes, sir.

09:21:31 Q. Okay. And the full extent of the damage to your vehicle, is that there on the right rear of the car?

09:21:39 A. And also the passenger's side, the whole left quarter panel.

09:21:40 Q. Okay.

09:21:47 A. I'm sorry. Right quarter panel.

09:21:49 Q. Okay. Would you agree that the damage to your SUV doesn't appear to be consistent with an 18-wheeler that was traveling 45 miles per hour?

09:22:00 A. I don't--I'm not a, I guess, body repair person.

09:22:03 Q. Okay. Were you wearing your seat belt when the accident

09:22:03 occurred?

09:22:05 A. Yes.

09:22:12 MR. WISE: Would you pull up Defendants' Exhibit 2. Might make it a little bit bigger.

09:22:25 Q. (BY MR. WISE) I'm showing you Defendants' Exhibit 2, which is a medical record from your hospital visit at the ER at Providence Covenant. You see it's highlighted there. It says: Patient has no seatbelt sign, chest, abdomen, or pelvis pain.

09:22:45 Is that correct?

09:22:46 A. Yes.

09:22:49 Q. Okay. So you didn't have a seat belt mark on your chest after the accident?

09:22:52 A. I was not aware of that. I wasn't really worried about my chest or my shoulder. It was more my back that hurt.
09:22:58 Q. Did an ambulance come out to the scene?
09:22:59 A. I'm sorry?
09:23:01 Q. Did an ambulance come out to the scene?
09:23:01 A. Yes, sir.
09:23:02 Q. Did you take the ambulance?
09:23:03 A. No, sir.
09:23:06 Q. All right. Were you able to drive your vehicle away from the scene?
09:23:07 A. Yes, sir.
09:23:11 Q. Okay. And you didn't seek any medical treatment the day of the accident. Correct?
09:23:12 A. No, sir.
09:23:14 Q. You went the day after to the ER?
09:23:17 A. Yes, sir.
09:23:25 Q. Okay. Would you agree with me now, then, that my client was not going 45 miles per hour, or even close to that, at the time of the accident?
09:23:30 A. I'm sorry. Say that again?
09:23:33 Q. Would you agree with me that my client was not going 45 miles per hour, or even close to that, at the time of the accident?
09:23:38 A. I wouldn't know, because I wasn't driving his vehicle.
09:23:43 Q. Okay. You've treated with Dr. Valente since the

accident. Right?
A. Yes, sir.
Q. Okay. And there's been a lot of talk yesterday about whether you told Dr. Valente that you had lower back pain or not. Fair?
A. Yes.
Q. Okay. You remember that testimony yesterday?
A. Yes, sir.
Q. Okay. And I think you've testified yesterday that you did not tell him you had lower back pain when you first saw him, or first treated with him over the phone?
A. I said that I said that I had back issues, not lower back issues.
Q. Okay.
A. I had some soreness in my back.
Q. I think--did you say--my recollection is you said that you had mid-back pain?
A. Yes.
Q. Okay. And you said something else yesterday I wanted to ask about. I wrote it down. You said: I tried to be as honest as possible to the doctor so I didn't mess up my surgery.
Do you recall saying that?
A. I was--I recall saying that, but I don't remember the question.

Q. Okay. Were you already anticipating having surgery the first time you treated with Dr. Valente on the phone?
A. No, but I did enough research that it was possible.
Q. Okay.
THE COURT: Mr. Wise, pardon the interruption. Would you and Mr. Bechtol just confirm that there aren't any future witnesses in the courtroom? It's not one of your witnesses. Correct, Mr. Wise?
MR. WISE: It is not.
THE COURT: Okay, just making sure. Go ahead. Pardon the interruption.
MR. WISE: No worries.
Q. (BY MR. WISE) Up to the point that you saw Dr. Valente the first time, the only treatment you had was at the ER?
A. Yes, sir, I believe so.
Q. Okay. And the first time you treated with Dr. Valente was by telephone. Right?
A. Yes, sir.
Q. And that's when you told him about your back pain, mid-back pain--
A. Yes, sir.
Q. --whatever it was? Okay.
And the reason you did that is because you wanted to be as honest as possible because you didn't want to mess up your surgery, is what you said. Correct?

09:25:41 A. No. In that case, because I wanted to make sure that I had my back fixed. If--if--if it came out that way, then I didn't understand the question, obviously, and I didn't know the--well, there was no way to determine if I was going to have surgery or not.

09:25:57 Q. Now, you're aware that Dr. Valente testified on the video yesterday that you told him you had low back pain for the two months prior to the accident and had treatment for your lumbar spine prior to the accident. Right?

09:26:06 A. Yes, sir, I am aware of that.

09:26:09 Q. Okay.

09:26:11 MR. WISE: Can you show Defendants' Exhibit 5 real quick.

09:26:17 Q. (BY MR. WISE) And do you agree he wrote that in his notes, in his medical records?

09:26:19 A. Yes.

09:26:23 Q. Okay. We'll just show Defendants' Exhibit 5 real quick.

09:26:24 MR. WISE: Can you make that bigger?

09:26:32 Q. (BY MR. WISE) Okay. See where it's highlighted, it says: The patient did have low back symptoms before the

09:26:36 accident for about two months.

09:26:36 Did I read that--

09:26:39 A. See, that's--when I was listening to that, that was not correct, because it was not for two months. It was two months before. It wasn't two months.

Q. Okay. But you would agree that that's what his medical records say?
A. Yes.
Q. Okay. All right. And you disagree with his--with Dr. Valente in that regard?
A. Well, that's the only thing that there was a miscommunication is where I heard the deposition that he had that I had-- For two months prior to this? No, sir. I had it two months before, and it was soreness in the middle of my back.
Q. Understood. Okay. So Dr. Valente says it was your low back. You've said today and yesterday it was your middle back.
A. Yes, sir.
Q. Do you recall telling me in your deposition that it was actually your upper back?
A. Well, that would be considered anything over my lower back, yes, sir.
Q. Okay.
MR. WISE: Let's pull up Mr. Narro's deposition, page 57, line 9.
Q. (BY MR. WISE) I'm going to read your testimony that you told me back in August of 2024 when we took your deposition.
The question from me was: All right. Did you tell Dr. Valente you had ever experienced any back pain before the accident?

09:27:47 Answer: I believe I did. Soreness, if anything else.

09:27:50 Question: What did you tell him about it?

09:27:53 Answer: That I felt back pain every once in a while.

09:27:54 Question: Did you tell him that it was specifically upper back versus mid or lower back?

09:27:59 Answer: Yes, upper back.

09:28:01 Question: Did you ever tell him you had any lower back pain before the accident?

09:28:04 Answer: No, sir.

09:28:05 Did I read that correctly?

09:28:06 A. Yes, sir.

09:28:08 Q. Okay. So can you tell us once and for all what was going on with your back? Was it your upper back, your middle back, or your lower back?

09:28:16 A. I don't--it's hard for me to specify lower back and anything other than the lower back. So when you say "mid," it's my upper back. I don't--I'm not a--I'm not a surgeon or I'm not a doctor. So obviously either it's the top of my back or the bottom of my back.

09:28:32 Q. Okay. And you told us yesterday that the reason you even told him this in this first visit is because you did not want to mess up your surgery?

09:28:37 A. I'm sorry?

09:28:39 Q. You told us yesterday that the reason you even told him about this back pain was because you wanted to be trust--or honest so that you didn't mess up your surgery. Correct?
09:28:49 A. There was no way that I was going to be aware that I would have a surgery.
09:28:56 Q. Okay. Let's go back for a moment and take a look at-- The first time you sought medical treatment was at the ER the day after the accident. Right?
09:29:01 A. Yes, sir.
09:29:03 Q. Okay. And you're able to drive yourself there. Correct?
09:29:04 A. Yes, sir.
09:29:05 Q. All right. And you didn't seek any further treatment--I think it was for eight days?
09:29:09 A. I don't recall. No, sir, I don't.
09:29:13 Q. Okay. And you talked to Dr. Valente on the telephone eight days after the ER--eight, nine days, something like that. Right?
09:29:18 A. I guess, yes, sir.
09:29:20 Q. Okay. How did you learn about Dr. Valente?
09:29:23 A. I called my lawyer, and he was--he made him aware.
09:29:28 Q. Okay. So Dr. Valente--so your lawyer recommended you see Dr. Valente. Correct?
09:29:31 A. Yes, sir.
09:29:33 Q. Where does Dr. Valente office out of?
09:29:34 A. In D/FW.

09:29:37 Q. Okay. So you wanted to--you treated with a doctor in Dallas even though you live here in Lubbock?
09:29:40 A. Yes, sir.
09:29:43 Q. Okay. Did Dr. Valente--he ultimately recommended you undergo some physical therapy. Correct?
09:29:47 A. Yes, sir.
09:29:49 Q. And you saw Bryce Olson for that. Right?
09:29:49 A. Yes, sir.
09:29:52 Q. Okay. And I think you did that, I don't recall, roughly a month? Two months?
09:29:55 A. I don't recall exactly, no, sir.
09:29:58 Q. Okay. Did the physical therapy help you in any way?
09:29:59 A. Yes.
09:30:01 Q. Okay. How so?
09:30:04 A. Well, it relieved some of the pain, because the electrodes helped a lot. But it seemed to aggravate everything more.
09:30:11 Q. Okay. So it helped in some regards but aggravated your pain in other regards?
09:30:14 A. Yes.
09:30:17 Q. Okay. After you completed physical therapy, you went back to Dr. Valente; I think it was roughly July 2023?
09:30:22 A. Yeah, something like that.
09:30:26 Q. Okay. And did he recommend you try steroid injections to see if those helped you with your pain?

09:30:29 A. Yes, he did.
09:30:32 Q. And you did not have those injections. Correct?
09:30:32 A. No, sir.
09:30:33 Q. Why not?
09:30:39 A. Because I was not going to take a placebo when, at the end of the day, they were going to have to put a needle in my back anyway.
09:30:46 Q. Okay. What do you mean, "placebo"?
09:30:49 A. Because it makes you feel good for a while. I did as much research before I took the last option that I could.
09:30:55 Q. Okay. So you did your own research, but Dr. Valente said a steroid injection could help you?
09:30:58 A. I'm sorry?
09:31:01 Q. But Dr. Valente told you that the steroid injection could help you?
09:31:05 A. He said that they would be--that they would help, but it would not alleviate the pain.
09:31:08 Q. Okay.
09:31:11 A. Well, you know what? Let me rephrase that, because I don't really remember what he said, so you really can't quote me on that. I don't remember what he said. The only thing that he did say was, the next step after injections was surgery, yes, sir.
09:31:25 Q. Okay. All right. And you elected to proceed directly to surgery rather than even trying the steroid injections?

A. Yes, sir.
Q. Okay. There was a lot of talk yesterday also about back spasms. You had back spasms?
A. Yes, sir.
Q. And those were all before the surgery. Fair?
A. Yes.
Q. Okay. You haven't had any back spasms since the surgery?
A. No, sir.
Q. Okay. I haven't seen any reference to back spasms in any of the medical records that you produced in this lawsuit or that's before us today. Why didn't you mention your back spasms to your doctors?
A. I don't understand.
Q. Did you mention that you were having back spasms to your doctors?
A. To Dr. Valente? Yes.
Q. Okay. I haven't seen it in his medical records. That's why I'm asking. But you say you did tell him about it?
A. Yes.
Q. Okay. All right. After the surgery, I think you had a couple of follow-up visits with Dr. Valente. I think I counted two. Does that sound about right?
A. Yes, sir.
Q. Okay. And since those follow up visits-- The last one, I believe, was in January of 2024. Does that sound about

right?
A. Yes, sir.
Q. Okay. You've not seen Dr. Valente since that time. Correct?
A. Yes, sir.
Q. That's a bad question. I am correct in saying that you have not seen him since that time?
A. Yes.
Q. Okay. So to sort up wrap up the medical treatment you received, to make sure I've got it all, you went to the ER the day after the accident. Right?
A. Yes, sir.
Q. Eight days later, you talked to Dr. Valente on the telephone?
A. Yes, sir.
Q. He recommended physical therapy?
A. Yes, sir.
Q. You did that?
A. Yes, sir.
Q. Helped in some regards, made it worse in other regards. Fair?
A. Yes, sir.
Q. Okay. Went back to see Dr. Valente?
A. Yes, sir.
Q. He recommended injections? He recommended you try an

injection?
A. He actually--now that I'm thinking about it, he said it was--that I only had two options left, and that was the injections or the surgery.
Q. Okay. You elected not to try the injections?
A. Yes, sir, I did.
Q. And proceeded immediately to surgery?
A. Not immediately, but I--I--I prayed about it, and that's what I went with, yes, sir.
Q. Okay. That's fair. I said "immediate." You had surgery roughly two months after the first time you saw Valente--
A. Yes, sir.
Q. --after the physical therapy. Is that fair?
A. Yes.
Q. Okay. Shifting bases just to talk about your claim for loss of earning capacity in the past and your employment history. You are asking the jury to award you money for loss of earning capacity in the past. Correct?
A. Yes, sir.
Q. Okay. You were working with a company called Xylem Pumps when the accident occurred; is that right?
A. Yes, sir.
Q. All right. And as I recall, you were a crate builder, or--
A. Yes. Yeah, yeah, that's fine. That's--yeah.

09:34:16 Q. Okay. And we're talking about-- What you did before--or what you did then is, you were essentially building wooden crates. Correct?
09:34:25 A. Yes.
09:34:25 Q. This is-- You tell me if I'm wrong. You're essentially cutting and putting together 2-by-4's in a certain pattern to make a crate. Fair?
09:34:30 A. Yes.
09:34:32 Q. And you would do the measuring, the cutting, the nailing, all that stuff?
09:34:33 A. Yes.
09:34:39 Q. Okay. And I believe-- I was not clear. Do you recall how much you were making with Xylem when the accident occurred? I've heard nineteen and a quarter, nineteen-fifty. Do you remember?
09:34:48 A. Nineteen-fifty.
09:34:49 Q. Nineteen-fifty. Okay.
09:34:50 A. Yes, sir.
09:34:55 Q. The accident happened in April 2023. Right?
09:34:57 A. Yes, as much as I can remember.
09:35:03 Q. That's-- And you continued working with Xylem at least up until about the point of your surgery in September of 2023. Correct?
09:35:08 A. Yes, sir.
09:35:11 Q. I think I heard a moment ago you missed a few days from

work right after the accident?
A. Yes, sir.
Q. And then roughly three weeks of work leading up to the surgery?
A. Yes, sir.
Q. All right. During that time, though, you were employed with Xylem. Correct?
A. Yes, sir.
Q. All right.
A. I'm sorry?
Q. Sure. And then I believe you missed some time from work after the surgery, I think a month and a half, two months? I can't recall.
A. It's whatever time that doctor prescribed, yes.
Q. Okay. Okay. Roughly in that month-and-a-half, two-months time frame?
A. Something like that, yes, sir.
Q. Okay. Were you paid during those two months?
A. Yes. I was blessed enough that that was kind of a deciding factor--
MR. BECHTOL: Objection, Your Honor. May we approach?
THE COURT: Yes.
----------------------------------------
(AT THE BENCH)

09:36:15 THE COURT: Mr. Davidson, if you would just scoot this way so she can see us. Thank you.

09:36:21 Can you just reask your question with a little bit more direction to keep him away from insurance? I assume that's your concern?

09:36:25 MR. BECHTOL: Yeah. I mean, we saw in the testimony--

09:36:27 THE COURT: Louder.

09:36:28 MR. BECHTOL: We saw in the testimony that this is--he knows the answer. It's insurance that paid for this. So with--there's no other way for him to ask about this without bringing up the insurance. That's why you sustained the objection in the deposition cuts to this exact question.

09:36:43 THE COURT: Mr. Wise?

09:36:47 MR. WISE: You allowed me to ask questions, is he allowed to be--or were you paid for that time of the accident, and he answered yes. I'm fine with that answer right there.

09:36:53 THE COURT: Okay.

09:36:55 MR. WISE: And I'm not going to ask anything else about it. He was about to go on beyond that--

09:36:58 THE COURT: Yeah. All right. Well, let's move on then.

09:37:00 MR. WISE: Okay.

09:37:00 THE COURT: Okay.

09:37:00 /

----------------------------------------

(IN OPEN COURT)

Q. (BY MR. WISE) All right. Moving on now. After this surgery, you went back to work for Xylem for a couple of months. Correct?

A. Yes, sir.

Q. And then after that time period, you moved to-- And by the way, you considered your job at Xylem to be a physically demanding job. Is that fair?

A. What is that job?

Q. Your job at Xylem--

A. Yes, sir.

Q. --would you consider it to be physically demanding?

A. Extremely.

Q. Okay. I think I joked with you in your deposition, it's certainly more physical than mine and Mr. Bechtol's job?

A. Yes, sir.

Q. All right. After Xylem Pumps, you went to work for a company called TrueNorth. Correct?

A. Yes, sir.

Q. And you worked there for about two months as a forklift driver; it didn't work out?

A. Yes.

Q. Then you went to work for SIMFLO Pumps?

A. Yes, sir.

09:38:05 Q. Okay. At SIMFLO Pumps, I believe you were making $19 an hour?
09:38:06 A. Yes, sir.
09:38:08 Q. So 50 cents less an hour than Xylem?
09:38:09 A. Yes, sir.
09:38:11 Q. Okay. What was your position at SIMFLO?
09:38:16 A. I was a crater painter, as well.
09:38:20 Q. Okay. What were your general tasks there?
09:38:22 A. Pretty much the same that I had at Xylem.
09:38:24 Q. Okay. Building crates and painting?
09:38:25 A. Yes.
09:38:29 Q. I think I heard you use the term "siphon painting" in your deposition. What is that?
09:38:32 A. It's a form of painting.
09:38:35 Q. Okay. Is it--what do you do? Is it, like, waving your arm around? Is it--
09:38:40 A. No. It's basically--it's the air. I don't know if I said siphon, but it was a--like an air-driven hose.
09:38:48 Q. Okay. Gotcha. So you're pointing a hose and--
09:38:48 A. Yeah.
09:38:55 Q. Okay. Gotcha. And you were working at SIMFLO, I think you said, 40 to 45 hours per week. Right?
09:38:59 A. Something like that, yes, sir.
09:39:02 Q. All right. And from what I understand, what I learned yesterday-- I took your deposition August 22nd, 2024, and you

were working for SIMFLO at that time. It sounds like you stopped working there maybe a couple of days after your deposition; is that--
09:39:16 A. It was--it was just hard on--I'll be honest with you--it was hard on my body. And I--again, I did a lot of pushing, because they would actually set the pumps on big racks and I would have to push them into that paint room. And it got to where I didn't want to tweak my back anymore, given the fact that it was still pretty fresh.
09:39:37 Q. All right. I saw in some of the documents in this lawsuit that you also began working for Girling Personal Care as a home attendant beginning July of 2024. Is that right?
09:39:45 A. Yes, sir.
09:39:48 Q. Okay. And are you still working for Girling?
09:39:51 A. Yes. That's--they ended up paying me for helping my uncle, making his meals.
09:39:55 Q. Okay. That's what I was going to ask.
09:39:55 A. Yes.
09:39:57 Q. I know there's been talk about you taking--helping care for your wife's uncle--
09:40:00 A. Yes, sir.
09:40:03 Q. --which is certainly admirable. But you are actually being paid for that work. Correct?
09:40:06 A. Yes, sir.
09:40:10 Q. I think I've seen--correct me if I'm wrong. Are you

being paid four hours a day for seven days a week at $10 an hour for that?

A. I'm not sure if it's $10 an hour, but it's four hours a day, yes, sir.

Q. Okay. For seven days a week?

A. Yes, sir.

Q. So you actually have income from that position--

A. Yes, sir, we do.

Q. --in addition to the job you're currently working at now?

A. Yes, sir.

Q. Okay. And so in July and August-- Well, do you actually have two jobs?

A. Somewhat, yes.

Q. Okay.

A. I wouldn't really consider the other one a job, but I do get paid for it.

Q. Okay. All right. In September of 2024, which is right after you stopped working for SIMFLO, you painted a friend's house or helped your friend paint a house for four days. Correct?

A. Yes, sir, in Amarillo.

Q. And that included pressure-washing the house?

A. I did some pressure-washing, yes.

Q. Did that include scrape-cleaning the house?

A. Not really scraping. It was a--they--he had a machine

that kind of did it for him.
Q. Okay. And you caulked and painted the house?
A. Yes.
Q. And then you began working with your current job, which is Custom Pipe and Fabrication, I think?
A. Yes, sir.
Q. Okay. And you've been working ever since then?
A. Yes, sir.
Q. Okay. And you make, I think you said, $17.50 an hour?
A. Yes, sir.
Q. So this is $2 an hour--
A. Less.
Q. --less than what you were working for Xylem. Correct?
A. Yes, sir.
Q. All right. But you're also working for Girling. Correct?
A. Yes, sir.
Q. All right. I learned also yesterday that you're a minister?
A. Yes, sir.
Q. Are you being paid for your service with any church?
A. No, sir. I don't get that check until I go home.
Q. Okay. Understand.
Your wife testified-- Do you help officiate funeral services? Is that what I understood?

09:41:59 A. Yes.
09:42:00 Q. Are you paid for that?
09:42:00 A. No, sir.
09:42:07 Q. Okay. So from the date of the accident, through your surgery, and all the way up until today, you've pretty much always been employed. Correct?
09:42:13 A. I'm sorry. Say that again?
09:42:16 Q. From the date of the accident, through your surgery, up until we're here today, you've always been employed, pretty much. Correct?
09:42:23 A. Yeah. I have no choice. Nobody is going to pay my bills.
09:42:25 Q. I understand. None of us have a choice.
09:42:31 And I know you missed a couple of months from work, but you were paid for that time. Right?
09:42:37 A. Through short-term disability, and that was actually a blessing. That was kind of the deciding factor.
09:42:44 Q. Okay. Going back just briefly to your treatment with Dr. Valente. Okay? Your last treatment with him was January 11th, 2024. Right?
09:42:51 A. I'm sorry?
09:42:55 Q. Your last treatment with Dr. Valente was January 11th, 2024?
09:42:58 A. Yes, sir, I believe so.
09:43:04 Q. Do you recall Dr. Valente advising you to use good body

posture and avoid bending at the waist?
A. Yes, I do.
Q. Okay.
MR. WISE: Go ahead and pull up Exhibit 12.
Q. (BY MR. WISE) While Ms. Stutes is pulling that up, you're aware, we've talked--we've already heard we've got-- taken a surveillance video of you shopping at Home Depot. Right?
A. Yes, sir.
Q. Okay. Give me just one moment.
(PAUSE)
Q. (BY MR. WISE) It's not a surprise; the video is about to pop up on the screen.
A. No, I'm not worried about it.
You got me surveilled at a beach obviously.
Q. I bet you wish we surveilled you there. Right?
A. Yeah, that would have been nice.
(PAUSE)
Q. (BY MR. WISE) All right. So we're looking at Exhibit 12. First off, just to remind, the last visit with Dr. Valente was January 11th, 2024. Right?
A. Yes, sir.
Q. This surveillance video just so happens to be January 12th, 2024. Right?
A. Yes, sir.

09:44:39 Q. All right. So this video was taken the day after your last visit with Dr. Valente. Right?
09:44:43 A. Okay. So how much after that?
09:44:44 Q. The day after.
09:44:46 A. The day after the visit?
09:44:49 Q. The day after your visit with Dr. Valente.
09:44:49 A. Okay.
09:44:50 Q. Does that seem correct to you?
09:44:51 A. Yeah, that's fine.
09:44:53 Q. Okay.
09:44:56 MR. WISE: If you'd look just ahead to the one-minute-and-twenty-five-second mark or so.
09:45:02 Q. (BY MR. WISE) Now, Dr. Valente told you no bending at the waist. Right? Is that you bending at the waist?
09:45:08 A. Yeah, but I'm also holding myself up. I'm not totally bent over.
09:45:16 Q. Okay. Is--you know, your listening to Dr. Valente in terms of bending at the waist, is that the way that you listen to your doctor's medical advice?
09:45:25 A. Well, I'm going to honest with you. There's no telling how much meds I was on at that moment, so--
09:45:29 Q. Okay. Nine months after the surgery, I think you testified just a moment ago that you were not still experiencing pain with numbness and tingling. Correct? Or--
09:45:39 A. Yeah, I'm sorry.

09:45:43 Q. Bad question. I'll rephrase that one for you. I think I heard you testify earlier that nine months after the surgery--or maybe it was five months after the surgery, which is when this video was taken, you were not experiencing numbness and tingling anymore in your body?
09:45:54 A. Yes.
09:45:55 Q. That's correct?
09:45:57 A. I believe so, yes, sir.
09:46:00 Q. Okay. How about pain? Were you still experiencing pain in your body?
09:46:01 A. I still have pain. So yeah.
09:46:06 Q. Okay. All right.
09:46:07 MR. WISE: I'll pass the witness, Your Honor.
09:46:10 THE COURT: Redirect?
09:46:10 REDIRECT EXAMINATION
09:46:13 BY MR. BECHTOL:
09:46:20 Q. Mr. Narro, you remember yesterday when you said that thing about the needing surgery, or not messing up your surgery, that I even asked you about that and said that--and you gave the same response, that you didn't even know you needed surgery at that time?
09:46:32 A. Yes, sir.
09:46:35 Q. Did you just misspeak yesterday when you said the surgery thing?
09:46:38 A. Yes, I obviously did.

09:46:41 Q. And for that soreness in the back that you were just asked about, did you ever receive any medical treatment in the months, two months prior to--
09:46:48 A. No, sir.
09:46:51 Q. You didn't have to see any doctors to make that soreness go away?
09:46:54 A. No, sir.
09:46:58 Q. In your deposition, when you--Mr. Wise was asking you about what you said about where that pain was, did he ask you to show him or point to it?
09:47:07 A. No, sir.
09:47:09 Q. Did you do that for the jury yesterday?
09:47:13 A. Yes, sir.
09:47:17 Q. And in terms of surgery or pain management, did Dr. Valente explain to you which of those options was likely to resolve the radiating pain and numbness and back spasms?
09:47:29 A. I believe so, yes, sir.
09:47:32 Q. Which one of those options was going to resolve your symptoms?
09:47:36 A. It's going to be the pain--I'm sorry--the surgery, because pain management was not going to do it.
09:47:41 Q. And is that why you elected to go with the surgery?
09:47:43 A. Yes, sir.
09:47:48 Q. You were asked about your posture just a moment ago. Is there anything with your posture that has been affected or that

you've noticed about your gait or how you hold yourself since the crash?

A. I try not to bend. I try not to do certain things. But I also try to stretch it out as much as possible.

Q. Do you feel like you're able to walk the same?

A. After the--after the accident?

Q. Yes.

A. No.

Q. Can you describe what you mean?

A. I'm more stiff. Everything that I do is more stiff. I try not to bend as much.

Q. Okay.

MR. BECHTOL: I'll pass the witness.

THE COURT: Any recross limited to that scope?

MR. WISE: No recross.

THE COURT: All right. Thank you very much. You can step down, sir.

THE WITNESS: Thank you, Judge.

THE COURT: Mr. Bechtol?

MR. BECHTOL: Your Honor, the plaintiff rests.

THE COURT: All right. The plaintiff has rested its opening case.

Mr. Wise, you can call your first witness.

MR. WISE: Okay. Your Honor, we're going to call Dr. Chiodo. May I--or would you-- Your Honor, just for a

moment, he's just across the hall.

THE COURT: No problem.

Mr. Wise, to help my court reporter, can you spell Chiodo?

MR. WISE: Yes, ma'am. It's C-h-i-o-d-o.

(PAUSE)

MR. WISE: I'm told he's using the restroom.

THE COURT: No problem. We've only been going about 50 minutes, but while we wait for this witness to enter the courtroom, you're welcome to stretch if you'd like.

(PAUSE)

DR. CHIODO: Good morning, Your Honor.

THE COURT: Good morning, Doctor. Far side of that box. Thank you.

Before you step up, if you would please raise your right hand.

DR. CHIODO: Yes, Your Honor.

(THE OATH IS ADMINISTERED BY THE COURT)

THE COURT: Thank you very much. Have a seat.

DR. CHIODO: Thank you.

THE COURT: Mr. Wise, your witness.

/

/

/

/

09:51:30 ERNEST CHIODO,

09:51:30 DEFENSE WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

09:51:30 DIRECT EXAMINATION

09:51:30 BY MR. WISE:

09:51:33 Q. Good morning, Dr. Chiodo. Could you please introduce yourself to the jury.

09:51:38 A. Yes, sir. My name is Dr. Ernest Chiodo. That's C-h-i-o-d-o. Italian last name.

09:51:46 Q. And where did you get your bowtie? I'm kidding.

09:51:48 A. Where did I get my-- You know, it took me to the age of sixty-four to learn how to tie a bowtie. It was the greatest accomplishment of my life.

09:52:01 Q. Dr. Chiodo, the jury has no idea who you are. You're not a part of the case. I've seen your CV. I know I'm risking a potentially long answer here, but could you--I think it's important for the jury to understand who you are, what your qualifications are, what you're doing here. So let me just ask if you'd tell us a little bit about your background that you believe pertains to this case.

09:52:21 A. Yes, sir. By way of background, I'm a physician. I'm a medical doctor. I went to--you can tell by my accent that I'm not from around here. So I'm from a little--beautiful little waterside resort town in the State of Michigan, beautiful old French waterside tourist town called Detroit. So I'm from the Motor City.

09:52:40 So I went to medical school at the large state university in Detroit, Wayne State University School of Medicine. I received my M.D. from there. I--I'm one of these guys that just keeps on going to school, mainly because my wife likes it when I make money. And the more degrees I have, the more money I make, so she keeps me go going to school. So I went to Wayne State also for law school. I am an attorney, and I actually do practice law, although most of my life is medical.

09:53:09 Then I, in addition, have a master of public health from Harvard. Then my next degree was a master of science in biomedical engineering from Wayne State in Detroit. Now, that's significant, because Wayne State is where they did all the original car crash studies, because it's Detroit, so it's been--the biomedical engineering program at Wayne State has been funded by the U.S. auto industry since the 1930's to figure out how people get hurt in car accidents, how to figure out forces in car accidents. So that's where I received my biomedical engineering degree.

09:53:45 And then I have some additional degrees that probably aren't going to be particularly relevant in this case, but I'll go through them quickly. I do have a master of science in threat response management, that is, biological, radiological and chemical defense from the University of Chicago. I have a master of science in occupational and

environmental health sciences with specialization in industrial toxicology from Wayne State. I have an MBA with a concentration in economics from the University of Chicago.

09:54:16 And then I have three degrees from the University of Oxford. By the way, none of these were online. I had to fly back and forth to England to take classes. One is a master of science in evidence-based healthcare. The next degree from Oxford was a master of science in experimental and translational therapeutics, drug vaccine development. And the third one was through the Department of Biomedical Engineering at the University of Oxford in--a master's in nanotechnology for medicine and healthcare.

09:54:47 So that's the educational part of my background. And then I have medical training that we may go into.

09:54:53 Q. Well, let me just reign you in a little bit, then, because I know we've got a lot of degrees to go through. And I think you've covered them all. But we've retained you as a biomedical--biomechanical expert in this case. Correct?

09:55:08 A. Medical and biomechanical. So--because you really do both. The biomedical engineer can figure out the forces in the car crash and can say what it typically can cause, but you have to be a physician in addition to say whether or not the forces in a particular accident cause injury in a particular person. So that's why I was retained.

09:55:27 Q. Absolutely. I agree with you. Focusing just for a

second on the biomechanical aspect, are you part of any societies or have any honors in biomechanical engineering?

09:55:40 A. Yes. I am a member of the Society of Automotive Engineers, which is unusual for a doctor. It's not unusual in Detroit, but there's a lot of--a lot of engineers in Detroit that are members of the Society of Automotive Engineers. You almost have to be a member to vote up there, so--because it's Detroit.

09:55:58 Q. Understood. And shifting focus to talk about your background in medicine a little bit, I've seen in your CV, I think you were the medical director for the City of Detroit. Is that right?

09:56:10 A. Yeah. I was--30 years ago, I had not--no political connection. I just happened to have the right technical background to serve as the medical director and manager of Medical and Public Health Services for the City of Detroit. So I was the chief physician in charge of all medical and public health services provided by the City of Detroit to over a million people then living and working in the City of Detroit. It was a position of high public responsibility. I just happened to have the right technical background to fit into that position.

09:56:44 Q. Understood. And have you received any awards or honors from any societies or anything having to do with your medical background?

09:56:55 A. Okay. So my--so I went to Wayne State for medical school. Wayne State University started as a medical school back in 1868. It's the largest single-campus medical school in the country. More doctors have graduated from Wayne State University School of Medicine than any other medical school in the country. So tens of thousands of doctors have graduated from Wayne State's medical school over the years, but I was the 135th doctor to get the distinguished medical school alum award from Wayne State University, so maybe just--I have all these degrees, so they figured they'd make me the distinguished medical school alum.

09:57:36 And then I also have an award from the College of Engineering at Wayne State University in that I was honored by the Engineering Hall of Fame of Wayne State University College of Engineering as a distinguished biomedical engineer.

09:57:51 So those are my little bits of fame. When I--I'm going to have my wife put that on my tombstone when I go.

09:57:59 Q. Now, I might be wrong about this, but I assume the plaintiff's attorney is going to ask you. Dr. Chiodo, are you an orthopedic person or a neurosurgeon?

09:58:08 A. No, I'm not an orthopedic surgeon or a neurosurgeon.

09:58:10 Q. Okay. Does that mean that you're not qualified to testify as to the extent to which this accident would have caused Mr. Narro's injuries?

09:58:20 A. No. It's the manner of using the right tool for the

right job. You wouldn't use a Phillips screwdriver to unscrew a flathead screw. And, likewise, you probably wouldn't use a flathead screwdriver to unscrew a Phillips screw. So it's having the right technical background.

09:58:37 An orthopedic surgeon and a--or a neurosurgeon, very important skills, but their focus is on doing operations. I don't have that skill, but they do. I have a different skill: figuring out whether or not somebody--there was enough force to cause somebody to get an injury in a car accident. So they went one particular way, and very importantly and very laudable on their part. But I went a different way.

09:59:06 So an orthopedic surgeon or a neurosurgeon would not have the background that I have to figure out whether or not Plaintiff was injured in this matter, because they simply don't have the background to figure out how much force happened in the accident. I do. I can show you a number. They don't. Doesn't mean they're bad doctors, but this--figuring out if somebody got hurt due to the car accident is really not what they do.

09:59:33 Q. All right. Now, let's talk about you being paid today. Because of the amount and the extent of the damages that the plaintiff is seeking, my clients have retained you to testify as an expert today. Correct?

09:59:45 A. Yes, sir.

09:59:47 Q. And you're being paid a lot of money to be here. Fair?

09:59:51 A. Yeah, I--yeah, I mean, a lot for, like, a lot of people. And for an expert in a matter like this, pretty much middle of the range.

09:59:59 Q. Okay. And being paid, that's just the nature of services. Right?

10:00:03 A. Right. I am not nor have I ever been a member of the Communist party, and I don't think anybody expects me to be working for free.

10:00:11 Q. And where did you-- Did you fly in for this--to Lubbock for this testimony?

10:00:17 A. Yeah, I--I flew in from Detroit, and basically, because of how trials happen, you don't--I didn't know when I'm going to be testifying. I thought maybe I might be testifying Wednesday, maybe Thursday. So I had to block out basically an entire week of time to come down here from Detroit. Fortunately, I'm going to be able to go back up and see my wife tonight. It's my birthday, by the way, so I'll be able to see her on my birthday. But, yeah, I had to block out an entire week of time to be down here.

10:00:45 Q. Well, happy birthday.

10:00:48 Let me ask, would you have flown in from Detroit on your birthday to subject yourself from probably intense cross-examination from Mr. Bechtol for free?

10:00:57 A. No, definitely not.

10:01:02 Q. Okay. And you're not being paid to say certain things or

to testify to any opinions that are not your own. Fair?

A. You can buy my time. You cannot buy my opinion. That--if you tried to buy my opinion, you would find--even though I seem like a nice guy, you would hear very sharp words from me and it would not happen.

10:01:20 Q. Okay. Have you and I ever met before today?

10:01:22 A. No. This is the first time I've met you, sir.

10:01:24 Q. Well, I'm happy to meet you.

10:01:27 Go ahead and tell the jury, how much have you been paid in this case from the inception of the case up until today?

10:01:37 A. Well, my original report, the charge was a flat fee to review all the records, do my engineering biomechanical analysis, literature search. It took quite a bit of time. I don't recall, because--how much time, because it was on a flat fee, but that was $12,000. And that's pretty much kind of the going range for this type of analysis. And then--for somebody that's not a physician. You know, the biomedical engineers that are not physicians typically charge that, too.

10:02:06 And then my flat fee to come down--basically to come down here, be available to testify, travel expense, blocking out the entire week was $40,000. And then there was a little bit of additional work that I had to do basically putting together affidavits that show my unavailability last week, because last week, I had to be down in West Palm Beach,

Florida, as a lawyer trying a case. So I couldn't be in both places. So maybe an extra couple thousand dollars or so for those affidavits.

10:02:40 Q. Got it. All right. So we've talked about your qualifications, or some of them at least. Let's just go ahead and shift our focus and talk about this case now. Okay?

10:02:47 A. Okay.

10:02:51 Q. First off, what did you review in evaluating this case and preparing your opinions?

10:02:58 A. Yes, sir. Bear with me. I'll pull up my report. I will go through the records I reviewed, 1 through 17, if you wish.

10:03:04 Q. Just generally tell us what you saw.

10:03:10 A. Well, basically I reviewed medical records, because I'm a doctor doing this. I'm giving a medical opinion, not just a biomedical engineering opinion, including records from Mark Valente, who is an osteopathic physician, ortho--I believe orthopedic surgeon. I--the plaintiff's complaint. I reviewed the vehicle photographs and scenes--scene of the photograph, some interrogatory answers.

10:03:45 What is very important were the photographs of the vehicles, because with the photographs of the vehicles, I can come up with a very strong estimate of the forces on the body of Plaintiff in this motor vehicle accident.

10:03:59 Q. Got it. Is there anything that you would have needed to review to arrive at your opinions that you didn't have an

opportunity to review?
A. No, sir.
Q. Okay. You did not have a chance to examine Mr. Narro. Correct?
A. No, nor did I need to examine to formulate my opinion.
Q. That was going to be my question, if you needed to.
You have not had--
A. No--
Q. I'm sorry.
A. Oh, I spoke over you, sir. Sorry.
Q. No, it's-- You haven't had a chance to examine the vehicles in this accident in person. Fair?
A. That's correct. There's no need for me to actually go get underneath a car, whatever. It's all based upon the apparent damage to the vehicles on the photographs. That's how it's done.
Q. All right. So when you're evaluating a case like this, what's the next thing you do after you've reviewed the medical records, the photographs, and those sorts of things?
A. So this is--again, this is part of the reason why it was $12,000. I mentioned one additional degree, that master of science in evidence-based medicine from the University of Oxford. That's very important in this matter. Now, what is evidence-based medicine, if you don't mind me describing this.
Q. I would have asked you that.

10:05:12 A. So say you're driving to work in the morning and you're drinking your morning coffee. You take a sip of coffee. All of a sudden the radio announcer comes on and says, a new study shows that coffee causes cancer. Well, you spit out all of your coffee. There's coffee all over the dashboard. You are never going to drink coffee again, because that new study that the radio announcer talked--mentioned says that coffee causes cancer.

10:05:40 Well, fast-forward six months. You haven't had any coffee in six months. You're tired, driving to work. All of a sudden, the same radio announcer comes on and says, a new study shows that coffee prevents cancer. Well, you think to yourself, what the heck is the answer? Does coffee cause cancer like the one study says, or does coffee prevent it like the others? Like, they're diametrically opposed studies.

10:06:06 Well, evidence-based medicine is the epidemiology discipline within medicine that looks at the body of the peer-reviewed literature, the quality of the different studies--there's different techniques--to come to the opinion, does coffee cause cancer like the one study says, or does coffee prevent cancer like the other study says.

10:06:28 Well, the leading center in the road for the discipline of evidence-based medicine is the medieval University of Oxford in Oxford, England. So that's where I have my master of science in evidence-based medicine.

10:06:42 So what I do, every time I do one of these reports, I go to look, could this--does evidence-based medicine actually support the assertion that an accident like this actually could cause the injuries claimed by Plaintiff? And although there have been a lot of lawsuits over the years, a lot of claims over the years, actually, evidence-based medicine does not support the assertion that the accident in this matter could cause Plaintiff's injuries. So I did that exercise. And, in fact, evidence-based medicine says definitely it could not have caused his claimed injuries. So that was part of my analysis.

10:07:22 THE COURT: All right. Well, let's have another question. And will you confirm you don't have a future witness in the room.

10:07:27 MR. WISE: I do not.

10:07:29 THE COURT: Okay. Thank you. Next question.

10:07:30 MR. WISE: Okay.

10:07:33 Q. (BY MR. WISE) All right. So just what is your opinion with respect to whether this accident caused Mr. Narro's injuries?

10:07:43 A. It is my opinion to a reasonable degree of medical scientific certainty that the injuries in this matter--not saying he doesn't have problems, but that this motor vehicle accident did not cause or aggravate any health problems, including the claimed disk herniations in Plaintiff.

10:08:05 Q. And how did you arrive at that opinion? Did you look at

10:08:10
forces? Speed to the vehicle? What did you look at?
A. I looked at a number of things. First off, I was able to calculate the force--the maximum amount of forces on Plaintiff in this accident. So I have a number. I can give you a number.
10:08:23
Q. What is the--what is the force--the number force that you found? The maximum force--
10:08:31
A. The maximum force is 2.3 G's. Now, what the heck does that mean?
10:08:32
Q. So what is a G?
10:08:36
A. Okay. One G is the force of gravity on earth. So it's 2.3 times the force of gravity on earth. Still the next question. What the heck does that mean, Doctor?
10:08:46
THE COURT: Doctor, let him ask the questions. Okay?
10:08:46
THE WITNESS: Oh, I'm sorry.
10:08:46
THE COURT: Mr. Wise, go ahead.
10:08:50
Q. (BY MR. WISE) All right. So what does the-- 2.3 G's. Correct? That's the maximum amount of force that Mr. Narro would have felt in the car accident. Is that your testimony?
10:08:59
A. That's true.
10:09:03
Q. What is that telling you? What is 2.3 G's.
10:09:05
THE WITNESS: May I demonstrate, Your Honor?
10:09:07
THE COURT: No. Why don't you just explain it.
10:09:07
THE WITNESS: Okay.

A. So say I stood up out of this chair and I plopped down into my seat. The G-forces horizontally along the top of my-- top of the seat are about five-and-a-half G's. Vertically, up and down, about eight-and-a-half G's. The vector between the horizontal and vertical vector is over 10 G's.

10:09:34 Now, in order to get into most motor vehicles, including Plaintiff's motor vehicle, you have to open the door, you have to rearrange your posterior over the seat, and then you plop down into the seat. That is basically how you get into most motor vehicles.

10:09:57 So Plaintiff had, at most, 2.3 G's of force in this accident. He had over 10 G's of force getting into his motor vehicle. So he had more force getting into his motor vehicle before the accident. He hasn't--didn't claim that he got hurt getting into his motor vehicle. So, therefore, if he had more force getting into the motor vehicle before the accident than he had in the accident, this accident did not cause or aggravate any of his problems.

10:10:25 Q. (BY MR. WISE) How did you determine that the maximum amount of force that he felt in this car accident was 2.3 G's?

10:10:34 A. Okay. Well, how you do it is, you look at the apparent damage to the motor vehicle, the photographs, and you compare that to the type of damage that happens with various metered crashes. So it's very common to have studies looking at where--

Q. Let me briefly-- I'm going to go ahead and pull up Defendants' Exhibit 10, which is a photograph of the plaintiff's vehicle following the collision. This might help you describe how you arrived at the maximum amount of force being 2.3 G's.
A. Yes, sir.
(PAUSE)
A. Okay.
Q. (BY MR. WISE) Okay. This is a photo of Defendants' Exhibit 10. So--
A. Okay. This is the back of Plaintiff's vehicle. And if you look at it, this is the type of damage that you would expect if somebody backed their vehicle into a barrier, maybe like a pole in a parking lot, at 5 miles per hour or less.
Q. All right.
A. And with that, I know that the maximum barrier equivalent collision speed was 5 miles per hour. Not that the semitruck was going 5 miles per hour. The semitruck probably was going much slower than 5 miles per hour. But the apparent damage on Plaintiff's vehicle is the same as if he had backed into a barrier at 5 miles per hour or less. With that number, then I can go ahead, without going through all the mathematics, calculate the maximum G-forces at 2.3 G's.
Q. Okay. Now, you understand that Mr. Narro has claimed that he injured his lower back in this accident. Correct?

10:12:17 A. Yes, sir.
10:12:20 Q. Okay. And he has actually had a surgery in his low back.
10:12:21 A. Yes, sir.
10:12:24 Q. Okay. Have you formed any opinions as to whether Mr. Narro actually needed that surgery, or even injured his back, as a result of this accident?
10:12:35 A. Well, I have formulated an opinion that he did not develop a disk herniation to his lumbar spine, for the reason being that it's well-known within the biomedical engineering--vehicular impact biomedical engineering community that you do not get disk herniations from a single loading event, a single accident, unless you shatter your spine. I'll explain why if you wish.
10:12:58 Q. Sure. Why is that?
10:13:01 A. Because the bones of the spine, the vertebrae of the spine are hard and brittle like a teacup. But the disk spaces between the spine are soft and flexible, like a rubber band. That's why you can bend. If they were--if it was all just one bone, you would not be able to bend. So in order to bend, you have these flexible disks. That flexible disk--one of those disks ruptured in the case of Plaintiff.
10:13:31 Well, the flexible disks are soft and flexible like a rubber band. So in order to get a disk herniation, you have to have shattered your spine. That is, if they have enough force to get a disk herniation, the hard brittle vertebrae

would had to have shattered. They're like a teacup. If you hit a teacup with a hammer, it shatters. But the annulus fibrosus is soft and flexible like a rubber band. If you hit a rubber band with a hammer, it does not shatter.

10:14:07 So you do not get disk herniations from a single accident, a single loading force, unless you shatter your spine. Now, why do you get--why do people get disk
10:14:16 herniations?
10:14:19 Q. Have you seen any evidence that Mr. Narro shattered his spine in this accident?
10:14:21 A. No, I did not.
10:14:25 Q. Has the fact that Mr. Narro has actually had the back surgery--does that change your opinion at all in terms of he needed that surgery because of this accident, or didn't need it because of this accident?
10:14:36 A. Well, two different things. Two different things. The question is, did he need the back surgery. Next thing, but was it due to the accident. I can say emphatically it was not due to the accident.
10:14:46 Q. Okay.
10:14:50 A. Okay? Did he need the surgery? In my humble opinion, no. He would have been better off with medical treatment rather than the surgery. But I'm not arguing that he did not have a disk herniation. You know, that happens a lot of times from physical labor, from work. It's cumulative trauma that

causes that.

THE COURT: All right. Next question.

Q. (BY MR. WISE) Now, Dr. Valente has testified that, in his opinion, Mr. Narro's injuries and his need for back surgery was caused by this accident. That's not your opinion. Correct?

A. That's correct.

Q. You disagree with Dr. Valente?

A. Most emphatically.

Q. Do you have any criticism of Dr. Valente's opinion that the accident caused these injuries?

A. I don't criticize him as a doctor, but it's just not his area. He's--I mean, he--I don't think he has a basis for saying it, other than his patient saying that--that he thought he got hurt in an accident. So he just doesn't have the basis for his opinion. Most doctors are trained to diagnose and treat disease. They are not trained to figure out forces in car accidents and did somebody get hurt in this context. You have to have some different background like I have.

Q. If Mr. Narro told his doctors that the accident--that he was hit by an 18-wheeler that was going 45 miles per hour--Dr. Valente is basing his opinion partially on that--would Dr. Valente be working on bad information?

A. Can you put that picture up again?

MR. WISE: Show Exhibit 10.

10:16:46 A. I've been doing this for years. This is not what a vehicle looks like if it gets hit by a semi going 45 miles per hour. No, so Dr. Valente was given the wrong information by plaintiff.

10:17:06 Q. (BY MR. WISE) Okay. Would you agree that most neurosurgeon and orthopedic surgeons, they are just not trained on how to determine causation in a low-speed accident like this?

10:17:16 A. Yeah. It's just not their area.

10:17:20 Q. Now, in fairness, in high-speed collisions, right, where there's real--a lot of damage, causation really isn't an issue in that point, and neurosurgeon, orthopedic surgeons, anybody could say, hey, that accident clearly caused these injuries. Fair?

10:17:34 A. That's clear. I mean, if you have an accident, a person gets into their car, they're fine; after the accident, they have a bunch of broken bones, lacerated liver and spleen, the janitor at the hospital could tell you it was from the car accident.

10:17:57 Q. As a medical doctor, is it odd to you that Mr. Narro refused to try a steroid injection before moving to surgery?

10:18:02 A. Yes.

10:18:05 Q. Why is that?

10:18:12 A. A steroid injection is basically a shot, and most people, from my experience, would rather have a shot than have an

10:18:29
10:18:34
10:18:52
10:19:03
10:19:03
10:19:34
10:19:36
10:19:38
10:19:40
10:19:40
10:19:43

operation on their spine. So to be afraid to have a shot but then want to have an operation on the spine, that is unusual to me.

MR. WISE: Your Honor, I'll pass the witness.

THE COURT: All right. Before your cross-- It's a good time for a break anyway. So it's 10:15. We'll take our morning break. The light is still red. Please don't talk about the case with anyone. We'll take 10 to 15 minutes, depending on how long you need; then we'll bring you back.

One word about lunch. The parties have agreed collectively to bring lunch in for you to try to make your days as easily and as efficient as possible, so that will be coming and will be ready when we're at lunch.

All rise for the jury.

(THE JURORS EXIT THE COURTROOM)

THE COURT: Okay. Be seated.

Mr. Bechtol, anything from the plaintiff before we take our break?

MR. BECHTOL: Not at this time, Your Honor.

THE COURT: From the defense?

MR. WISE: No, Your Honor.

THE COURT: All right. Doctor, I want to-- I know you've done this many times, so you probably already know. You're on the stand. We've taken a break. You're about to be cross-examined. So please do not talk about the substance of

your testimony with defense counsel, or with plaintiff's counsel for that matter. If you have logistical questions for them, where can you go to get X, Y, or Z over the next 10 or 15 minutes, that's obviously fine, but nothing about the substance. Does that make sense?

10:20:09 THE WITNESS: In fact, I won't talk to anybody at all.

10:20:11 THE COURT: Perfect. Even better.

10:20:11 THE WITNESS: Thank you, Your Honor.

10:20:12 THE COURT: Talk to no one.

10:20:13 We're in recess.

10:20:13 THE WITNESS: Thank you, Your Honor.

10:26:59 (RECESS TAKEN)

10:34:35 THE COURT: Let's bring them in.

10:34:36 (THE JURORS ARE SEATED IN THE JURY BOX)

10:34:37 THE COURT: Be seated.

10:34:44 All right. Mr. Bechtol.

10:34:45 MR. BECHTOL: Thank you, Your Honor.

10:34:45 CROSS-EXAMINATION

10:34:46 BY MR. BECHTOL:

10:34:58 Q. Mr. Chiodo--

10:34:59 A. It's actually "Dr.," but...

10:35:05 Q. Dr. Chiodo, Dr. Lawyer Chiodo, my name is Stephen Bechtol. We haven't ever met, have we?

10:35:08 A. No, sir.

Q. In this case, you've been retained as an expert by the defendants?
A. Yes, sir.
Q. And as part of what you did in this case and what you just described is, you looked at the pictures of the vehicle when Ruben was hit by the 18-wheeler on April 12th, 2023. Correct?
A. That's part of what I did, yes, sir.
Q. All right. So you looked at the damage to both vehicles?
A. I don't have--I haven't looked at the photographs for some times, but it says "vehicle photographs." I presume both vehicles.
Q. Do you know whose vehicle that is?
A. Pardon me, sir?
Q. Do you know whose vehicle this is in the picture?
A. Again, it's been--it's been--it's a year since I looked at the actual photographs. So I presume that is the semitruck that was involved in the motor vehicle accident in this matter. If I'm wrong, you can correct my understanding.
Q. You're the expert. But the semitruck involved, do you know how much that semitruck weighed?
A. No, because it's not important for the analysis.
Q. You don't know what was in it, if it was loaded, unloaded, anything like that. Correct?
A. I'm having a hard time hearing you, sir.

Q. You don't know if it was loaded or unloaded, anything like that. Right?
A. Yeah, because it's just not relevant to the analysis.
Q. It doesn't matter. Right?
A. That doesn't matter.
Q. In this case, did you request to actually inspect the vehicles or request a download of the ECM, anything like that?
A. No, for the reason being it doesn't affect the analysis.
Q. Doesn't matter. Right?
A. Does not.
THE COURT: Mr. Bechtol, if you have an exhibit you'd like to show him, that's fine. But otherwise, let's remove that.
MR. BECHTOL: Okay.
THE COURT: Thank you. If you get to an exhibit, obviously, that's fine, but-- If you need those notes up for yourself privately, that's also fine.
MR. BECHTOL: I'll just delete those.
(PAUSE)
Q. (BY MR. BECHTOL) Okay. In this case, you're here as a retained defense expert who has been paid to present legal opinions in this case. Correct?
A. Pardon me? Again, you're--I'm having a hard time hearing.
Q. In this case, you're here as a retained defense expert,

being paid to give legal opinions in this case. Correct?

A. No, I'm not--I'm not here as a lawyer. I am a lawyer, but I'm not here to give legal opinions. I am here to give my medical and biomechanical engineering opinions.

Q. Well, you're not a--

THE COURT: Mr. Bechtol, what exhibit is this?

MR. BECHTOL: This is in the defense--the defendant's vehicle photos.

THE COURT: Which exhibit number? I'm just--just need to make a record. You said it's a defense exhibit?

Mr. Wise, are you aware?

MR. WISE: I don't...

THE COURT: Okay. Mr. Bechtol, what exhibit is it?

MR. BECHTOL: It's in Plaintiff's exhibits. It's the--4 or 5. That defendant's vehicle--

MR. DAVIDSON: Is that 4?

THE COURT: 4 is vehicle damage estimate; 5 is photographs of collision scene.

MR. BECHTOL: 7? It would be in Exhibit 6.

THE COURT: 6? 6 is the close-up of the bumper.

MR. BECHTOL: Well, here. I'll take the--

THE COURT: Thank you.

MR. BECHTOL: Until I get to the next one.

Q. (BY MR. BECHTOL) All right. You're not here as a treating physician. Correct?

10:39:55 A. That is correct.

10:39:57 Q. What does it mean to be a treating physician?

10:40:02 A. Treating physician means that you have a--you have a physician/patient relationship where you're rendering care to the individual.

10:40:10 Q. And having a physician/client--treating physician/client relationship means you have legal obligations, meaning if you mess up, you could be sued for malpractice. Correct?

10:40:21 A. Yeah, and you can also have to try to testify for your patient because you're afraid you'll get sued for malpractice. Yeah, it goes both ways. If you're the treating doctor, if you mess up, you can get sued for illegal malpractice. But if you're a treating doctor and your patient wants you to help them with their lawsuit and you don't want to, you can get sued for malpractice. It cuts both ways.

10:40:44 Q. I don't know what that means. You can't be sued for malpractice in this case by Ruben, could you?

10:40:50 A. That's--that's true. And I can't be sued for malpractice by Defense if I say something they don't like.

10:40:57 Q. And you're not a practicing surgeon. Correct?

10:41:01 A. I'm not a--I'm not a--I don't practice orthopedic surgery, although physicians--we're all licensed as physicians and surgeons. But I--my practice is internal medicine and occupational medicine.

10:41:15 Q. Right. It's either like a primary care physician or you

try and help people get back to work?

A. Well, it's both. Actually I'm--you know, I'm board certified, three specialties. So internal medicine, that is the adult medicine doctor. They oftentimes act as a primary care doctor for adults. Occupational medicine is a medical specialty that figures out if somebody got hurt by a particular type of work. And then public health and general preventive medicine is the epidemiology and biostatistical specialty in medicine. Those are the CDC hot-zone doctors or the medical directors of a big city or state health department. That's why I was the medical director and manager of Medical and Public Health Services for the City of Detroit.

10:42:01 Q. You don't perform lumbar spine surgery. Correct?

10:42:05 A. That's dicey. I don't do that type of surgery. As an internal medicine doctor, you do something that--you do some surgical procedures on the lumbar spine, i.e., spinal taps, where you'll sit down there and get cerebral spinal fluid. So that is technically a surgical and operative procedure. But I don't do the type of surgery that was done in this matter and don't pretend to--and don't pretend to do that type of surgery.

10:42:29 Q. Have you ever performed that surgery?

10:42:32 A. No. No, I--to my recollection, no.

10:42:35 Q. Would it be malpractice if you tried to perform that surgery on Ruben?

10:42:37 A. Probably would be.

Q. All right. And you're not here to practice law. Correct?
A. That is correct.
Q. You don't represent anybody in this courtroom. Right?
A. That is correct.
Q. And you're not here practicing medicine. Fair?
A. That is correct.
Q. You're not doing anything, providing any care that would have made Ruben better at any point. Correct?
A. That is correct.
Q. You're here through a company, which I pulled from your report, called MedEx Reviews?
A. Yes, sir.
Q. All right. So you're not--

THE COURT: What exhibit is this?

MR. BECHTOL: This isn't an exhibit. This would be a demonstrative. This is from his documents that he brought.

THE COURT: Well, if he has a hard time answering, you can put it up, but otherwise, let's take it down.

MR. BECHTOL: Okay.

THE COURT: It's not a demonstrative that summarizes testimony, so-- Go ahead.

Q. (BY MR. BECHTOL) You're here through a company called MedEx reviews. Right?
A. That is correct.

10:43:38 Q. All right. And that's a company that hires experts like yourself to come and testify and give legal opinions. Right?
10:43:44 A. I presume so, but I don't really know. I'm not part of MedEx. I'm not an employee of theirs, so--but I presume that's probably what they do.
10:43:51 Q. So you're not-- That's what I want to be clear to the jury, is, you're not here as Ernest Chiodo, the doctor or the lawyer. You're here as a retained expert through some company called MedEx?
10:44:04 A. I'm here as a medical doctor and as a biomedical engineer to render my truthful opinions using my range of expertise. So, no, I mean--no, just because I'm a retained expert doesn't make me any less of a doctor.
10:44:22 Q. In this case, when you gave your opinions originally, your understanding of the facts were that Plaintiff claims that, due to the motor accident, he suffered injury to his spine in the form of disk herniations. Is that correct?
10:44:35 A. Yeah, that's generally my understanding of what the claim is.
10:44:38 Q. That's what you put as the basis of why you were making this report. Fair?
10:44:43 A. That's--that's--yeah. That's the general understanding of what I believe the claim is.
10:44:47 Q. Today, you came in and you talked about that it didn't-- you said that, but it also didn't aggravate any injuries or

cause any injuries?
A. Well, that's the under-- In my report--you know, it's like a--I don't know how many pages long it is; 15 pages. I believe that I detailed that in extent in my 15-page report. I didn't put that in my understanding of facts. Understanding of facts, that's not where you put my opinion. That's what I understand the claim is. So, yeah, it wouldn't be here in the understanding of facts, but I believe that I covered the issue of cause or aggravate any of his injuries--claimed injuries in this matter in my 15-page report.
10:45:32 Q. So you're saying your opinions go beyond just saying that all this is because he got--he's saying he got a disk herniation in the crash?
10:45:42 A. Yeah, I agree with you. My opinions go beyond the two sentences on page 3 in my 15-page report. I agree with you on that.
10:45:51 Q. So we're clear, it's not just that the disk herniations didn't occur in the crash. It's no injuries occurred in the crash. Fair?
10:45:57 A. Pardon me, sir. Again, I'm--
10:46:00 Q. You're saying not only did the disk herniations not occur, but, also, no injuries occurred in the crash?
10:46:07 A. Yeah. Yeah, as I--as I testified on direct, if he didn't get hurt getting into the motor vehicle with much greater force on his body, then he did not get hurt in the motor vehicle

accident with much less force than getting into the motor vehicle.

10:46:24 Q. And you also listed all the documents you reviewed to come up with your 15-page report?

10:46:27 A. Yes, sir.

10:46:31 Q. And it looked like you looked at his medical bills, some medical records, and the plaintiff's complaint. Did you ever review any depositions or anything else?

10:46:50 A. I'm not seeing them in the 17 pages--I mean 17 items that I reviewed. I'm not seeing, in my quick look, deposition transcripts.

10:47:03 Q. And then the basis, other than looking at the photographs of your report, is that you also rely on this Estimate of Speed article from the European Spine Journal that was from 1997?

10:47:18 A. No, I don't--I don't rely upon these articles. They corroborate my opinion. So the articles corroborate my opinion, that opinion that one can estimate the G-forces based upon photographs of a vehicle with a rear-end collision. So that article corroborates my opinion. My opinion is based upon my knowledge, training, and experience. But if somebody came in here and said, "Well, Doctor, do you have any peer-reviewed literature that would allow you to say that in federal court," yeah, I believe that this article corroborates my opinion.

10:47:50 Q. You specifically reference it.

10:47:53 A. Yeah, because it--because--what I'm saying is, I, given

my training and experience, can look at photographs of vehicles and then calculate what the G-forces are. Okay. And I can say I have a lot of education and you should listen to me. Well, somebody could say, well, do you have any peer-reviewed literature--

10:48:10 MR. BECHTOL: Your Honor, I'm going to object to the narrative.

10:48:12 A. --that supports that? That's what--that's--

10:48:14 THE COURT: Sir, sir, one second. One second, please.

10:48:16 You can try again.

10:48:17 MR. BECHTOL: Objection to the narrative.

10:48:19 THE COURT: That's sustained. You can reask your question.

10:48:25 Q. (BY MR. BECHTOL) The European Spine article that you reference, it's from 1997. Right?

10:48:29 A. 1997, correct.

10:48:34 Q. And that particular study was done in Europe. Right?

10:48:37 A. I don't know if it was done in Europe, but it was published in the European Spine Journal.

10:48:44 Q. In that particular study, do you know how many people were involved?

10:48:51 A. No, I don't recall offhand, for the reason being that the reason why I cite the study is because it specifically says the way to determine accelerations, i.e., G-forces in a car

accident, is based upon photographs. That's what I cited it for. There may be other things in the article that have nothing to do with that. The reason why I cited it is for the sole reason that it is a peer-reviewed medical literature that says that I can look at photographs of vehicles and calculate G-forces. That's all I cited it for. They may talk about a lot of other things in that article other than that. That's not why I cited it.

10:49:30 Q. The basis of why you're saying that you can look at a photograph, though, is based on a study that had only 14 males, 5 females that were screened people and they knew they were going to be in a crash. Right?

10:49:45 A. No. The basis for my knowing this is that this is what they taught me at Wayne State University's master of science program in biomedical engineering, that how you figure out G-forces is you look at the photographs of the vehicles. That's the basis of my opinion that I can do it.

10:50:08 The corroboration is this article that just says-- There's just a few words. It has nothing to do with how many people were in their study, whatever. They just happen to say, yes, this corroborates that Dr.--they don't say "Dr. Chiodo"-- that an expert can look at photographs of vehicles after an accident and figure out what the G-forces are. That's all-- that's the only reason why I cited it. There may be some other things in there that may be interesting, may deal with European

people, whatever. It's just to corroborate the opinion in case you brought what's called a *Daubert* challenge to my opinion in court.

10:50:50 Q. Do you--in that European Spine Journal, do you know if they followed any of those 19 people that study is based on to see if they actually had any long-term chronic changes, any chronic pain afterwards?

10:51:03 A. I--I--I don't know, don't recall, because frankly, the only reason why I cited that article is, it has to say that what I do, looking at photographs of vehicles after a collision, an expert can calculate the G-forces. That's the only reason why I cited it. The rest of the article, frankly, I don't--I think they talked about forces in whiplash, whatever. Has nothing to do with my opinion in this matter.

10:51:30 Q. All right. You mentioned Wayne State, so let's talk about that. Biomechanics and why it's in Detroit is because that's where they do a lot of the crash tests and everything when they build cars. Correct?

10:51:45 A. Well, yeah. I mean, Detroit is known as the Motor City. It is still--despite the City of Detroit having gone in bankruptcy, Detroit--metro Detroit is still the center of the worldwide auto industry.

10:52:00 Q. And part of biomechanics and why it's up there is because the real use of it is actually to test cars and try and make them safer in the event that you're in a crash?

10:52:11 A. Yeah. That's a big part of it, yes.
10:52:13 Q. That's nothing like what you're doing here, where you're being retained by a defendant. Correct?
10:52:17 A. No, no. I'll agree to disagree with you.
10:52:22 Q. Okay. It's your choice to actually be here, being retained by Mr. Sukhwinder. Fair?
10:52:29 A. Yeah, it's--yeah, it's my--I mean, if I had a choice to be here or be back home on my birthday-- And I may--I'm getting to be an older guy. I may not have that many more birthdays. Yeah, I'd rather be at home. But when I--it was my choice to become an expert in this a year ago. The exact date, hey, if it's this date, I've got to juggle things around and be available.
10:52:54 Q. Other than it's your birthday, you could choose to be back in Detroit, seeing patients and actually helping people. Right?
10:53:04 A. I think I'm helping society right now by being here. I think I'm doing a very important service to society, like you, like defense counsel, and like the judge. Yeah, I think I am helping society.
10:53:17 Q. Where are you licensed to practice and see patients?
10:53:21 A. Michigan, Illinois, New York, and Florida.
10:53:24 Q. And I was looking at that, because you said you live by the beach in Detroit. On your website, it also lists that you have offices in Illinois and West Palm Beach. Right?

10:53:35 A. I do. I have--my main home and main office is in suburban Detroit. I do have a residential condominium in Chicago, but I do own an office space in Chicago. And I do have a residential condominium in West Palm Beach, Florida, and I do have an office space that I own in West Palm Beach, Florida. So I have three offices, correct.

10:53:56 Q. And you mentioned New York. Do you have anything there too?

10:53:59 A. No, I do not--I have a license in New York, but I do not own real estate there or have a residence there, or an office.

10:54:05 Q. So instead of choosing to be here for Mr. Sukhwinder, you could have been choosing to practice medicine and help people in any of those four states?

10:54:17 A. You know--you know, I think I have a responsibility to the court to be here, and I think I'm helping people. I'm helping people in a very serious matter in the administration of justice. So, yeah, I mean, helping people by taking care of their medical conditions is helping people as a doctor. And helping society as an expert witness in this matter is also helping society.

10:54:48 Q. Plaintiff's Exhibit 3, the police report, did you review this document?

10:54:55 A. I-- Let me take a look here.

10:54:58 I don't see it specifically listed, but, many times, police reports are included in other records. So I

don't recall offhand. I wrote my report on October the 22nd, 2024, so 364 days ago. So I haven't gone back and looked at the original record since then, so I don't have a present recollection.

10:55:20 Q. Is it listed as something that you looked at?

10:55:24 A. I have 17 items. It's not specifically listed, but that doesn't mean I did not see it, because, many times, records like the police report are included in other records. I don't know if that's the case. I don't know that that's not the case. I don't have a present recollection.

10:55:43 Q. Is a police report a typical document that you look at when you're working on cases like these?

10:55:48 A. Yeah, many times, it's nice. It's helpful. What's most important are the photographs.

10:55:55 Q. And so, like we see on the diagram of how the impact occurs, and you looked at the pictures and you could see where the impact to each vehicle is, do you take that into consideration when you assess the biomechanics of how somebody's body reacted inside the car?

10:56:11 A. Yeah. I mean, this photograph is consistent with the damages we saw on--this diagram on the police report is completely consistent with the damages that we saw on the photograph, which are consistent with somebody having backed into a pole at 5 miles per hour or less.

10:56:30 Q. You agree my client didn't back into a pole; he was hit

from behind by an 18-wheeler?

A. That's true. But it's the type of damage that you would get if you would back into a pole at 5 miles per hour or less that gives me, then, the barrier equivalent collision speed that allows me to calculate the numbers, the G-forces of 2.3 G's or less.

Q. All right. Yesterday, the jury was presented with this testimony from Mr. Sukhwinder in which he actually said that he struck the back of Mr. Narro's Armada straight-on. Did you ever review any of that testimony?

A. Again, I don't see deposition transcripts in the records I reviewed. I don't have-- All I could tell you is that this looks like somebody--a truck hit the very back corner, passenger's-side back corner of Plaintiff's vehicle, which is what the photographs look like.

Q. When you're trying to do an analysis, does it matter where the vehicles strike each other?

A. It depends. It all depends upon the accident. In this particular case, this--the photograph is consistent with--with this diagram. If the driver said that he struck the passenger rear of the plaintiff's vehicle-- And then it says, actually, truck had hit them head-on straight. No, it didn't hit it head-on straight. It hit the corner.

Q. The guy in the corner, have you ever met him?

A. No, I have never met him.

Q. Did you ever call him at any point in the entire case that you've been involved and ask him, how fast were you going?
A. For--for--no, for--because the photographs will tell me the barrier equivalent collision speed. What this man says, whatever, would not base my opinion upon that. Base my opinion upon the photographs. That's the evidence, to me, to be able to--for me to formulate an opinion as to the barrier equivalent collision speed and, therefore, the G-forces. What this man may say, what he might get confused about, whatever, really-- This is a barrier equivalent collision of 5 miles per hour or less, and it happened to be on the passenger's-side rear corner of the--
MR. BECHTOL: Objection to the--
THE COURT: Sustained.
Q. (BY MR. BECHTOL) The jury also heard in evidence yesterday where Sukhwinder talked about that he had a GPS tracking telematic system in that truck through a Smart ELDS.
A. Uh-huh.
Q. And in other cases you've worked on, have they involved semitrucks?
A. I've been an expert in hundreds of cases, including cases involving semitrucks.
Q. In the past, have you had an opportunity to review things like telematics records?
A. Yes, I have.

10:59:34 Q. And in those types of records, they often tell you exactly where somebody is and how fast they were going when a collision occurs. Correct?
10:59:40 A. They could. They could.
10:59:45 Q. At any time when you were retained by Sukhwinder to give opinions on the forces and speeds involved in this crash, did you ever ask him to produce Smart ELDS records?
10:59:58 A. No, for the reason being it would not add to my analysis.
11:00:01 Q. It wouldn't add to your analysis to see the speed he was going when he hit my client from behind?
11:00:06 A. No, it wouldn't, because this is--this is a barrier--the photograph is consistent with a barrier equivalent collision speed of 5 miles per hour, period.
11:00:17 Q. And this is also from the police report, the Exhibit 3. Did you pull any specific crash data on either the Nissan Armada or the 2019 white Freightliner vehicle?
11:00:30 A. Please define what you mean by "specific crash data."
11:00:34 Q. I mean, did you pull any type of, you know, crash test reports, anything like that that were specific to the vehicles involved in this crash?
11:00:42 A. For the reason, no, that this is a-- I have viewed many, many, many, many images, thousands of images of vehicles in barrier equivalent collision speeds. I can tell you, as an expert with a learned eye, this looks like a 5-mile-per-hour-or-less barrier equivalent collision.

11:01:03 Q. The jury also heard from Dr. Valente yesterday, and his testimony was played to them. And his specific opinions were that the lumbar spine injuries and surgery were the result of the April 12th crash. You're here to tell the jury you disagree with that?
11:01:17 A. Yes, definitely.
11:01:19 Q. You disagree with the treating surgeon?
11:01:23 A. And he--if--he disagrees with the former medical director of the City of Detroit and the physician/biomedical engineer. Okay. So we both disagree. He has his expertise; I have my expertise.
11:01:35 Q. When you give opinions in this case or other cases as an expert, do you have to abide by any type of, like, AALS standards?
11:01:41 A. Pardon me, sir? I'm--
11:01:44 Q. Do you have to abide by any type of standards when you give opinions with regard to other doctors'--like treating doctors' medical opinions?
11:01:52 A. I'm sorry. Could you repeat the question again?
11:01:56 Q. If you give opinions on the type of treatment provided by treating providers in cases like you are here for today, do you have to abide by any type of standards?
11:02:07 A. To give my truthful opinion so help me God.
11:02:14 Q. And if a doctor's conduct or treatment falls within the standard of care, you're not supposed to criticize or condemn

that. Fair?

A. You know, I haven't criticized his care. I've testified I think he would have been better off if he had medical treatment rather than surgery. But the real issue is whether the surgery was indicated by any injury from the accident, and my opinion is, it was not indicated by any injury from the accident.

So whether or not it was medically indicated, I, as an internal medicine doctor, would never have referred him to a surgeon. Internal medicine doctor is supposed to figure out if you go--if you should see the surgeon, and I would never have referred him to the surgeon. Now, whether or not the surgeon does the operation and, if he does an operation, it's an unnecessary operation, that's their call.

Q. Are you telling the jury that Dr. Valente committed malpractice by performing that surgery?

A. I'm not using the word "malpractice," but I think it was an unnecessary operation.

Q. Are you telling the jury that he mutilated him?

A. Pardon me, sir?

Q. Are you telling them that they--that Dr. Valente mutilated his back?

A. You know, I'm not God. I can't look into his soul.

Q. When you become a doctor--let's put your doctor hat on--you take a Hippocratic Oath. Correct?

11:03:43 A. Yes, sir.
11:03:44 Q. What is that?
11:03:48 A. Well, the central portion is, do no harm.
11:03:50 Q. That would be the same oath that Dr. Valente and all of his other treating providers would have to take. Correct?
11:03:55 A. I don't know. Actually, Dr. Valente is not an M.D. He's an osteopathic physician. So whether or not the osteopathic physicians take the same oath as an M.D., I can't say with certainty.
11:04:08 But, you know, again, it's just my opinion. I would not have referred--if Mr. Narro was my patient, I would not have referred him to a orthopedic surgeon. And, in fact, I believe he was never referred by a doctor to the orthopedic surgeon. I think the referral was taken somewhere else, from the lawyer, that the lawyer referred--
11:04:31 MR. BECHTOL: Objection to the narrative. I mean--
11:04:33 THE COURT: Sustained. You can ask your question again if you'd like.
11:04:39 Q. (BY MR. BECHTOL) How about--do you ever refer-- Put on your doctor hat again. Do you ever refer patients to orthopedic surgeons?
11:04:46 A. Yeah. Depending upon the condition, yes.
11:04:50 Q. All right. If somebody has a lumbar spine injury that has nerve compression, what type of symptoms could they have?
11:04:57 A. Well, they have radiculopathy. They'll have pain that

will radiate to various--depending where the disk is. And the proper treatment is with steroids and physical therapy. You only do surgery unless they have progressive neurologic symptoms, like losing control of their bowel and bladder. That's when-- If I have a patient that's losing control of their bowel and bladder, yes, I would refer them to a neurosurgeon or an orthopedic surgeon. If that's not the case, I would prescribe them steroids to take down the swelling and send them to physical therapy. That's what I do, and, in fact, that is the recommended evidence-based standard of care.

11:05:45 Q. So if he was losing the use of his private areas, genitals--

11:05:49 A. If you lose control of your bowel or bladder.

11:05:50 Q. Okay.

11:05:53 A. Bowel or bladder. If you get those type of problems, then get to an orthopedic surgeon, neurosurgeon, right away, because then you have cauda equina syndrome. But if that's not the case, the proper treatment is medical, and you don't jump to do surgery.

11:06:12 Q. ESI's do not fix a herniated disk. Correct?

11:06:13 A. Pardon me, sir?

11:06:16 Q. An ESI does not fix a herniated disk. Correct?

11:06:19 A. Well, yeah. You wouldn't do an epidural steroid injection either. You would do physical therapy, because what happens is--I won't go on a narrative, but that's--that's not

the treatment. The treatment is--because epidural steroid injection is still doing some type of intervention. The proper treatment, if you ever have a back problem, is, you get--you go to see your internal medicine doctor, who then prescribes some steroids for a short period of time to take down the swelling, and physical therapy. And then the disk material resolves, and then you're fine. You don't need any surgery. It's--in most cases, it completely resolves. Some cases, you get progressive neurologic symptoms. You lose control of your bowel and bladder. Then you need surgery. But if you didn't have that problem, you really should not go to see an orthopedic surgeon.

11:07:14 Q. So before he got surgery, he should have taken different types of medication and gone through a course of physical therapy?

11:07:21 A. Yes.

11:07:23 Q. You reviewed his medical records. Right?

11:07:24 A. Yes, I have.

11:07:27 Q. You saw his Covenant Medical-- He went to the emergency room the day after the crash?

11:07:32 A. Again, I don't have present recollection. I won't differ with your assertion.

11:07:37 Q. All right. This would be Exhibit 1-a. You see that--in the records that you said you reviewed, that he went and reported back pain the day after the crash. Right?

11:07:48 A. Didn't say I-- I did review, not just say I said I

reviewed. But, yeah. And it's the day after. It wasn't-- That's an important factor. Didn't go the day of the accident. He went the day after the accident. If somebody really gets hurt in a car accident, they go to the emergency room the same day. They don't go the next day.

11:08:08 Q. A herniated disk and nerve compression isn't exactly like you had a compound fracture and a bone sticking out of your arm or something. Right?

11:08:17 A. If you got-- First off, you do not get disk herniations from a single loading event. Now, he may have disk herniations. Fine. It did not happen from this accident for the reasons I've stated. You don't get disk herniations unless you've shattered your spine, because the bones of the vertebrae are hard like a teacup, brittle like a teacup. The annulus fibrosus of the disk, soft and flexible like a rubber band.

11:08:42 So he did not get a disk herniation from the accident that day. He may have had it beforehand, okay, from his work. He's a--seems like a nice man, but, you know, like a lot of us, Mr. Narro is a little on the heavy side. Being obese, you end up having disk herniations. So preexisting condition, not discovered until we started having imaging studies.

11:09:14 Q. In the actual records from Olson Physical Therapy--you reviewed those too. Right?

11:09:19 A. Again, if it's in the medical records I was sent, then I

reviewed-- I reviewed everything I was--that is listed, 1 through 17. I wrote the report almost a year ago. I don't have a present recollection, but I presume, if it's in these records--and you've been married to the records--then I reviewed them.

11:09:43 Q. So on Plaintiff's Exhibit 1-b, Ruben went through an eight-week course of physical therapy with Olson P.T. Do you recall that?

11:09:50 A. I don't have a present recollection, but I won't differ with your assertion.

11:09:57 Q. And if Ruben said, at the end of this course of physical therapy, that the physical therapy didn't fix the problem, what should he do then?

11:10:14 A. What he should do then is lose weight. That's the best important treatment. Listen, I'm not criticizing. I'm trying to lose weight myself, too. Lose weight, and--you lose weight, you'll start to feel better. Disk herniation, that physical therapy, medical treatment should have taken care of it. And if it didn't take care of it, you still don't do surgery, because you get--you-- The reason why you take care of it medically instead of surgery is, all sorts of bad things can happen to you if you've had surgery. All sorts of complications can happen.

11:10:48 So he should have lost weight. He should have-- That's the--that, really, is the main treatment. I hate to

tell you. You know, in this modern age, with all the technology we have, the best treatment he could have had was to lose weight. Nice man, but I can tell, Mr. Narro is--is--is significantly obese. He's not just overweight. He's obese just by looking at him.

Q. Okay. So you see in the highlighted portion of Exhibit 1-b that, when he went to the physical therapy, the doctor reported that he was complaining of a sharp, stabbing pain, thoracic and lumbar spine. He has numbness, tingling, burning, and radiating pain down the right leg to the knee.

Do you see that?

A. I'm not differing with your assertion.

Q. All right. Those are signs of radiculopathy. Correct?

A. Yeah, those can be signs of radiculopathy, which is a subjective opinion. There's not objective-- I mean, that's what Mr. Narro is saying. I mean, we don't know that that's actually the case, but that's--that apparently is what he was saying were his symptoms.

Q. You see that in the Objective section?

A. Well, objective. Symptoms are not objective. They're simply not. Imaging studies--if I could do an MRI, that's objective. What the patient says, that's subjective. You don't know if that's actually the case or not, because patients can say things for a number of reasons where they may not actually have the problem. Now, again, I'm not God. I can't

look into Mr. Narro's soul to say whether or not that's the case or if he just wanted to exaggerate his issues, because my understanding is he has also said that he was hit by a semitruck going 45 miles an hour--

11:12:41 MR. BECHTOL: Objection to the narrative, Your Honor.

11:12:42 A. --and that's not the case.

11:12:45 THE COURT: Sustained.

11:12:54 Q. (BY MR. BECHTOL) Disk herniations. They can be caused by trauma. Right?

11:12:58 A. Only if you have enough force to have shattered your spine.

11:13:05 Q. And the study that that comes from, what is that?

11:13:09 A. Well, what I--that's--when I say that, that's based upon my knowledge, training, and experience, including specifically my education in the master of science and biomedical engineering at Wayne State in Detroit.

11:13:26 To corroborate that statement, I cited a section in a book called Accidental Injury Biomechanics and Prevention, Second Edition, the chapter written by Albert King, who was the chairman of the Biomedical Engineering Program at Wayne State when I received my degree. And he said in that book: With regard to the relationship between disk rupture and impact loading on the spine, it can be safely said that disk ruptures do not occur as a result of a single loading event, i.e., a

single accident, unless there are associated massive bony injuries to the spine.

11:14:10 So that corroborates what I'm saying. And, yes, where did I learn that? In medical school? No. I learned that in the master of science in biomedical engineering at Wayne State in Detroit.

11:14:23 Q. Isn't it true that that line of study actually says the only way that you can definitively say the herniation occurred from a specific type of trauma, if it has associated bony rupture or edema?

11:14:37 A. No. What it says-- This is what it says: With regard to the relation-- I'm quoting it: With regard to the relationship between disk rupture and impact loading on the spine, it can be safely said that disk ruptures do not occur as a result of a single loading event unless there are associated massive bony injuries to the spine.

11:14:59 And that's--that's consistent with what Dr. Albert King taught me when I was his student. So if you think that that's not what he meant, you have something that you think says otherwise, well, that's fine, but it's news to me, and maybe you misread or misunderstood what you're--what you were--claim to have been reading.

11:15:17 THE COURT: Doctor, I know you've testified many times before, so I know you know that when cross-examination is done, the defense counsel will be able to get up--

11:15:25 THE WITNESS: Oh, Your Honor.

11:15:26 THE COURT: --and ask--

11:15:27 THE WITNESS: Yes, Your Honor.

11:15:30 THE COURT: --and ask you follow-up questions. And I'm certain, if there's anything that defense counsel thinks you need to explain further, defense counsel will ask you about it. At this point, if you would just try to answer the questions that are asked, give your answer to those, and then we'll let defense counsel follow up.

11:15:49 THE WITNESS: I will endeavor to keep it short, Your Honor.

11:15:51 THE COURT: It's not a matter of short or long. It's a matter of just trying to listen to the question that's asked, answer that question. And I know that, you know, there's so much in there that you want to explain, but if it's not in response to the question, just save it for later, and I'm certain, if it's important, defense counsel will follow up.

11:16:06 All right. Mr. Bechtol--

11:16:07 THE WITNESS: And I will be--try to be directly responsive as much as possible.

11:16:10 THE COURT: Thank you.

11:16:12 Mr. Bechtol, pardon the interruption. Go ahead.

11:16:12 MR. BECHTOL: Thank you, Judge.

11:16:17 Q. (BY MR. BECHTOL) Plaintiff's Exhibit 1-1 is the records from A.D. Surgeons and Physicians, and, in your list, it said

that you looked at these, too. Did you see the list of diagnosed and reported injuries from his June 5th, 2023, appointment?
A. I mean, that's--whoever put this together, that's their--that's their opinion.
Q. Another treating doctor reports two months after the crash: Lumbar spine injury. He reports 7 to 10 dull pain across his lower back that radiates down into his hip and right leg. Bending and twisting makes his pain worse. He feels 10 of 10 pain when first getting up in the morning.
Did I read that correctly?
A. Yeah. I'm not differing that he had symptoms. I'm not saying--I never said he didn't have problems. I'm saying it wasn't caused by the motor vehicle accident in this matter.
Q. And you are aware that he--in Plaintiff's Exhibit 28, he did get the lumbar spine surgery at L3-4 because of lumbar radiculopathy and spinal stenosis--
A. Again, I won't differ that that's what happened. I would not have recommended that he have the surgery, but he did.
Q. It doesn't specifically say, on the operative report, because of herniated disk only. Correct?
A. Again, you know, this is a long report. Do you want me to just go through and list through it? I mean, it says what it says.
Q. All right. It noticed the right L3-4 herniated nucleus

pulposus, but then it also says spinal stenosis, lumbar radiculopathy?

11:17:51 A. Well, lumber stenosis is what you get from cumulative trauma over time, so you would not get that from a car accident.

11:18:03 Q. You reviewed both the MRI's-- There was a T-spine MRI. Correct?

11:18:05 A. Again, I won't differ--it's a year since I've looked at all the records, so I won't differ from your assertion.

11:18:10 Q. T-spine is middle of your back?

11:18:11 A. T-spine is the middle of your back, correct.

11:18:16 Q. If you have injuries in the middle of your back, and it's compressing nerve roots in your T-spine and you have radicular symptoms, where does that go?

11:18:27 A. Well, it goes to the dermatome of wherever that nerve root is. So it would probably go, in that case, around your-- around your chest, low--you know, depends upon--there's-- there's--you know, there's twelve thoracic vertebrae, so it depends on which thoracic vertebrae you're talking about.

11:18:47 Q. But in general, those twelve thoracic vertebrae--if you have nerve compression, it's going to be something in your trunk?

11:18:52 A. It could--yeah, I mean, that's--but they--but they--they go down. They sit down there and tend to-- The nerve--the nerve roots cause a--supply dermatomes that are typically below

the level of that thoracic vertebra. So it kind of goes down.
11:19:15 Q. When you have-- Obviously if you snap a vertebra and it cuts your spinal cord, that could affect everything below you. But, in general, T-spine radiculopathy is going to be localized in your trunk, your chest, stomach?
11:19:28 A. Yeah, I mean, I say as general. I wouldn't differ with that general assertion. You know, I won't--to put--not to put too fine a point on it, yeah, I would say in general, yes.
11:19:39 Q. If you have lumbar disk herniations, the dermatomes are located basically from your lower back, all the way to your toes?
11:19:47 A. Well, now you start talking about the nerve roots going down into your leg, what have you. So that's different than the thoracic spine. Those are basically--
11:20:00 Q. I switched over to Exhibit 1-j, the L-spine MRI, and that's why I said that.
11:20:01 A. Okay. Oh, okay.
11:20:04 Q. Lumbar disk herniations, associated radiculopathy, depending on where it is, would be from the base of your lower back down to your toes?
11:20:13 A. Yeah. Yeah, basically.
11:20:17 Q. In this case, you haven't seen a single medical record, prior to the April 12th, 2023, crash, showing any type of disk herniation, did you?
11:20:30 A. No, because my understanding that he didn't seek medical

attention before that time. Doesn't mean he didn't have a problem. You know, he was--then--so the answer, no, I did not.

11:20:45 Q. All right. There is not a single medical document that you have ever looked at associated with this case that would indicate that Ruben had any type of radicular symptoms prior to the April 12th, 2023, collision?

11:20:58 A. Right. That doesn't mean he didn't have it; just didn't seek medical attention until after he had an accident.

11:21:05 Q. All right. And to kind of put a button on that, somebody can have disk herniations and be asymptomatic. Fair?

11:21:15 A. Yeah, you can have disk--in fact, 25 percent of people, in general, with no back problems, have lumbar disk herniations. 25--so one-quarter of us in this room with--if we have no complaint of any back problems, will have lumbar disk herniations. That's why you don't operate just based upon there being findings on an MRI.

11:21:42 Q. Right. You have to then take the findings, and, when you're treating a patient, you actually do tests, examinations, you prescribe medicine, physical therapy, and you try and treat those injuries first. Right?

11:21:53 A. Right. And you want to see if there's any secondary gain or any reason why somebody might want to have an operation if, in fact, they don't really need one.

11:22:00 MR. BECHTOL: Objection to the narrative.

11:22:02 Q. (BY MR. BECHTOL) Did you hear my question?

A. Well, I just answered the question.
Q. People only get-- How was what you said related--
A. Well, I mean, you--
Q. --to what I asked you--
A. Oh, I'm sorry.
THE COURT: Hold on. One at a time. Go ahead, Mr. Bechtol.
Q. (BY MR. BECHTOL) I don't understand how, possibly, what you said was in answer to what I was asking you.
MR. WISE: Objection; argumentative.
THE COURT: Sustained. Ask a question if you'd like.
Q. (BY MR. BECHTOL) And it is correct to say, as of today, you're getting paid $54,000 to give your opinions in this case?
A. For my time? I'm not getting paid one penny for my opinions. I'm getting paid for my time, yes, and that's probably about it. That's about right.
Q. And because you said that term, "secondary gain," that would be correct to say that you're giving these opinions here--legal opinions for your secondary gain. Correct?
A. No, sir. That's insulting.
MR. BECHTOL: I'll pass the witness.
A. I thought people in Texas were more polite than that.
THE COURT: Redirect?
MR. WISE: Brief, Your Honor.

REDIRECT EXAMINATION

BY MR. WISE:

Q. Dr. Chiodo, do you recall seeing MRI reports of Mr. Narro's thoracic spine and lumbar spine?

A. I mean, I--I don't have a present recollection, but I believe those are the records I reviewed.

Q. Do you recall seeing that those MRI results showed that Mr. Narro has stenosis and spondylosis at various parts of his back?

A. Right.

Q. Okay. Are those--stenosis and spondylosis, are those typically considered degenerative conditions?

A. They're degenerative conditions that happen due to aging, due to obesity--because that puts stress on your spine--and your work. If you do heavy labor, you're going to tend to wear out your spine faster than if you're not--if you're doing something that isn't putting that type of stress on your spine.

Q. Okay. And when we use the term "degenerative," that means essentially wear and tear, not something caused by a traumatic accident, for instance?

A. Right. Yeah, you don't--you don't get those injuries, in this context, from a car accident. You get it from doing--being overweight; a little, you know, aging; and having done heavy labor.

Q. Okay. What is stenosis?

11:24:38 A. Stenosis is where you have-- Okay. The--you have your brain. It's in your skull. The brain is connected to the spinal cord. The spinal cord comes down from your skull, in through the bone--through an opening in the bones of your spine, and there's a canal. It's called the spinal canal. And if you get older, you have degenerative changes, you have--due to work, obesity--then what happens is you can start to get arthritic changes that happen over time, where you start to get narrowing of that canal by buildup of bone due to spurs from, basically, arthritis of the spine.
11:25:19 Q. Okay. And so can the narrowing of a canal that you might get when you have stenosis--or that is stenosis. Can that cause pressure on the nerves?
11:25:26 A. Yes.
11:25:28 Q. What is spondylosis?
11:25:36 A. Spondylosis is where you have--there's a--there's a--bones that bridge between the vertebrae for joints, and you can get--over time, you can--typically happens when you're--due to physical labor or a congenital defect, you end up having those bones not be there. They not so much break, but they end up sort of disappearing, best way to put it.
11:26:08 Q. Now, Mr. Narro has stenosis at L3-L4. Right?
11:26:10 A. Yeah, I won't differ with that.
11:26:11 Q. And that is where he had his surgery?
11:26:13 A. Yeah, I won't differ with that.

11:26:17 Q. Okay. Can stenosis cause back pain?
11:26:17 A. Definitely.
11:26:21 Q. Can it cause numbness and tingling in your lower extremities?
11:26:26 A. Yes, it can.
11:26:30 Q. The mere fact that somebody has an MRI with herniations, that does not necessarily mean somebody is in a car accident. Correct?
11:26:36 A. That's correct. As I just told you, it's--many people can get disk herniations. 25 percent of people have disk herniations that have no problem, but then other people do have disk herniations and they do have pain. But, in general, the disk herniations, unless it's a real big crack-up, don't happen due to--due to a car accident like this, because you have to--you literally have to shatter your spine to get the disk herniations from the force.
11:27:14 Q. Okay. I think I have three more questions for you. I need to show you Defendants' Exhibit 13.
11:27:17 MR. WISE: Can you--
11:27:19 Q. (BY MR. WISE) I'm going to show you Defendants' Exhibit 13. This is a surveillance video that we--of Mr. Narro.
11:27:26 MR. WISE: Go ahead and play the video.
11:27:30 (VIDEO PLAYING)
11:27:32 Q. (BY MR. WISE) All right. Do you see--

MR. WISE: You can stop it there.

Q. (BY MR. WISE) Do you see where Mr. Narro plops into his car and--

A. Yes.

Q. Okay. Would he have felt more than 2.3 G's when he did that?

A. Yes, sir. When he plopped down in the car--and you can see he had a significant plop--the G-forces would, on average, be about five-and-a-half G's along the top of the seat. That's more than 2.3 G's. Up and down, it would be over eight-and-a-half G's. By the way, he would not have, in the car accident, any up and down. It would only be horizontal G-forces. And then the combination of the vector between horizontal and vertical would be over 10 G's.

So that activity and that activity, he had at least four or five times as many G-forces on his body just getting into the car there than he experienced in this motor vehicle accident.

MR. WISE: No further questions, Your Honor.

THE COURT: Any recross limited to that scope?

MR. BECHTOL: No, Your Honor.

THE COURT: Okay. All right. Any objection to this witness being excused?

MR. BECHTOL: Absolutely not.

MR. WISE: No, Your Honor.

THE COURT: All right. Thank you, Doctor, for being here. You are excused.

THE WITNESS: Thank you, Your Honor, for allowing me to be in your courtroom.

THE COURT: Mr. Wise, you can call your next witness.

MR. WISE: I'm going to let Mr. Carper call our next witness.

THE COURT: Mr. Carper?

MR. CARPER: Ms. Schieber, Your Honor.

THE COURT: All right.

It's 11:30. If you would like to stand and stretch while we wait, obviously, you may.

(PAUSE)

THE COURT: Good morning.

MS. SCHIEBER: Good morning.

THE COURT: Before you have a seat, would you please raise your right hand.

(THE OATH IS ADMINISTERED BY THE COURT)

THE COURT: Thank you. Please have a seat.

Mr. Carper, your witness.

MR. CARPER: Thank you, Your Honor.

/

/

/

JANA SCHIEBER,

DEFENSE WITNESS, TESTIFIED ON HER OATH AS FOLLOWS:

DIRECT EXAMINATION

BY MR. CARPER:

Q. Good afternoon. Could you please introduce yourself to the jury.

A. Jana Schieber.

Q. Thank you. And what do you do for a living?

A. I am a nurse auditor, litigation specialist.

Q. And are you technically anything else, as well?

A. Pardon me? I didn't hear your question.

Q. Do you concurrently hold any other certifications or anything like that?

A. Well, I am a registered nurse in the State of Texas, licensed. And I'm also a certified professional coder.

Q. Okay. How long have you been a registered nurse?

A. Since 1996.

Q. Understood. What was your first nursing job?

A. It was at a hospital in Waco, Texas.

Q. What was it called?

A. Providence Medical Center.

Q. And you were a clinical nurse at that time?

A. Yes. I was a staff nurse.

Q. And how long did you remain a staff nurse or clinical nurse?

11:32:00 A. Until 1998.
11:32:02 Q. And what did you become after that?
11:32:06 A. Well, after that, my husband got a job up here in the D/FW area, and so I--we had a small child at the time, and I wanted to move into a more Monday-through-Friday type role, and so I started working in the--in a medical payor type of entity.
11:32:31 Q. Okay. And just very vaguely, what were you doing there?
11:32:35 A. Well, what I did there--my responsibility was to make sure that people that were--that they utilized their benefits appropriately.
11:32:47 Q. Okay. Did you ever interact with any medical codes while doing that work?
11:32:56 A. Not so much. I mean, I've always known, you know, what procedures are, but I didn't--as far as, like, when I charted or did anything, I didn't utilize the actual code.
11:33:08 Q. Okay. And what was your next position and when did that start?
11:33:14 A. Well, after that, I went to another type of company as a medical payor entity. I did the same thing, and also case-managed patients, which I would have several patients that I would oversee their care.
11:33:28 Q. Okay. And after that?
11:33:34 A. Let's see. After that, I started working at HCC Life Insurance Company, and they are a stop-loss company, and it's for employer groups that self-fund their medical benefit plan.

11:33:52 Q. And what did you do there?

11:34:01 A. My sole job there, as a medical underwriter nurse, was, I made cost projections on individuals from those companies that were considered high-risk claimants. I'll give an example, such as somebody that had congestive heart failure, maybe somebody that was just diagnosed with cancer, and I would predict, over a 12-month period, what--their costs they were going to incur for that particular medical issue that they had.

11:34:34 Q. Understood.

11:34:38 A. And so they would--they would have that and utilize that in the underwriting process of those type of contracts.

11:34:45 Q. Understood. And so did you start interacting with medical codes around that time?

11:34:50 A. I did. And I also, at that time, started utilizing databases. Particularly, the company that I worked for, we had six regions throughout the United States, and so all the nurses in each of those six regions, we created, maintained a database that would help us more efficiently to predict these costs for when we, you know, provided these to an underwriter.

11:35:24 Q. Understood. And how long did you do that work there?

11:35:30 A. I did that from 2002 to 2008.

11:35:33 Q. And what was the shift there?

11:35:35 A. The shift there--well, I actually had a little shift there where I went to another medical payor entity, and they were starting up a specialized program of rare diseases, and I

was a case manager. But I didn't stay there very long. I went back to HCC Life Insurance.

11:35:57 After I left there in 2008, from 2015 to-- Well, I take that back. From 2008 to 2015, I was able to be a full-time mom for my high school senior--or my high school child, and--but during that time, I did maintain my nursing license to be active in the State of Texas. And so in doing that, every two years, you have to renew your license, and you have to obtain continuing education units, so--and I did that mainly if I ever decided to go back into the work force, whether it be in a clinical setting or in a position that I'm in right now.

11:36:41 Q. Okay. So you did rejoin the work force?

11:36:42 A. Pardon me?

11:36:44 Q. You did rejoin the workforce?

11:36:47 A. I did rejoin the workforce in 2015 at where I'm at now in ExamWorks Review Services, in the same position that I am in now.

11:36:52 Q. Okay. What is that position?

11:36:53 A. Nurse auditor, litigation specialist.

11:36:58 Q. Okay. And you began dealing with, I think, medical codes, you said, in 2002?

11:37:01 A. Yes.

11:37:04 Q. Okay. And I suppose there was a break there, about 15 years of working with medical codes and billing?

A. Correct.
Q. Okay. That has been your primary role for about 15 years?
A. Correct.
Q. Understood. Can you kind of explain to the jury what a billing review specialist is and what they do.
A. Sure. What I do is, I review medical bills and medical records for individuals that are a product of an accident, regardless of the accident, and I determine whether or not those medical bills they incurred for that treatment are reasonable or not. And I do that day in, day out. I'm a Texas nurse. I only look at cases throughout Texas. And--yeah.
Q. You referenced another, I think, certification regarding coding and--
A. Yes.
Q. Could you talk about that a little bit more.
A. In 2021, I obtained a Certified Professional Coder license. And that's through the American Academy of Professional Coders. And I have to maintain that certification every two years, as well. And that just allows me to have a license and being able to code--
Q. Understand.
A. --understand code for medical procedures.
Q. Understood. And to back up a little bit, how did you obtain that certification in the first place?

11:38:50 A. It was an online procedure--or not an online procedure. It was an online course, and it was a 90-hour course, so it's very--it was a very extensive course, considering I work full-time and this is what I do, and so--but I did obtain that, finished it in 2021, October, and then I took the board--or the certification exam for it in November 2021 and I passed the first time.

11:39:21 Q. Understood. What kind of stuff is on that exam, other than just plain knowing the codes?

11:39:33 A. Well, it is--basically you have real-life scenarios of billing procedures, surgical reports, and you've got to be able to, based upon the description, code it with the proper codes, utilizing American Medical Association's, or AMA's, guidelines that they have set up for billing codes and the conventions that are set out for that. And it's in person. I think it's a three--three-, four-hour course, and it's, I don't know, maybe a-hundred-and-fifty-something questions.

11:40:17 Q. So the guidelines go beyond just assigning certain prices to certain medical codes?

11:40:20 A. Yes.

11:40:21 Q. How so?

11:40:27 A. Well, guidelines--the great thing about the American Medical Association guidelines is, they are national. So they're universal. So if you have a chest x-ray here in Lubbock and you have the same chest x-ray in Dallas or you have

the same chest x-ray in, we'll say, New York City, it's standard. It's a uniform code as to what all explains that x-ray procedure.

11:40:59 And so that really does allow, I think, for continuity of care when--you know, when you're looking at--as a coder, when you're looking at those codes. But, you know, being able to decipher out of the code what all that code entails, all the services that are part of a code are just as beneficial in regards to how a provider will bill those and then how a payor entity will view those as well.

11:41:40 And so, you know, there's some things we may discuss details, but there's some things that should be part of a procedure that's billed and not billed separately. And so by applying the American Medical Association's billing codes and guideline conventions to those standards of the bills does affect, in the long run, what is--what would be considered a reasonable billed charge.

11:42:20 Q. Understood. Now, you work at ExamWorks at this time?
11:42:21 A. Yes.
11:42:25 Q. And you review medical records and billing and litigation scenarios in particular?
11:42:27 A. Yes.
11:42:33 Q. Okay. And just backing up very briefly, you did receive an education before you became a nurse?
11:42:35 A. I did.

11:42:36 Q. Where at?
11:42:42 A. I received an associate's degree in nursing, applied science, at McLennan Community College in 1996.
11:42:52 Q. Understood. And the registration process required some other tests with the State of Texas; is that right?
11:42:59 A. Well, of course, you know, once you sit for the Texas boards and you pass, every two years, you're required, if you're still working, to maintain that, keep it active, and you have to do continuing education units for that. And the same applies also to my Certified Professional Coder. Every two years, I have to maintain a certain amount of continuing education units in order to renew my license.
11:43:28 Q. Understood. Now, based on your knowledge and your experience, your training and education, in addition with your certification and the work you have done in this case in particular, are you aware and familiar with what medical providers charge for services in Texas?
11:43:40 A. I'm sorry. Could you speak up?
11:43:44 Q. Understood. So knowledge, training, experience, in light of all that, your certification and the work you did in this case, are you familiar with what medical providers charge for services in Texas?
11:43:53 A. Yes.
11:43:55 Q. Okay. And, again, you specialize in the Texas area?
11:43:56 A. Correct.

Q. Are you, with more peculiarity, aware and familiar with what medical providers charge for services in the Lubbock area?
A. I do all of Texas, so yes.
Q. And that would include the Dallas area as well?
A. Correct.
Q. And the Fort Worth area?
A. Correct.
Q. Now, you were retained by my clients as a testifying expert in this case. Correct?
A. Yes.
Q. Are you paid per case?
A. I am not.
Q. Have you received any payments directly for your work on this specific case?
A. I have not.
Q. Are you a salaried employee?
A. I am.
Q. What is your salary?
A. Eighty-six, eighty-seven thousand a year.
Q. Understood. Do you receive any bonuses or any commissions or anything?
A. I am exempt from bonuses.
Q. Okay. Is your salary dependent in any way on how many cases you work on, how many cases you bring in, or on what your reports say?

A. No.
Q. Are you ever paid to give a specific opinion or provide a certain answer in any case?
A. No.
Q. And with respect to this lawsuit, you don't really have a dog in this fight or, like, a vested interest in either side; is that right?
A. Correct. I don't.
Q. So you don't gain or lose anything from the outcome of this trial?
A. I don't.
Q. Okay. Now, you're working as a billing review expert and offering your opinion on the reasonableness of the charges that the plaintiff, Mr. Narro, received in this case from his medical providers for his medical services. Correct?
A. Correct.
Q. And I think you and I met for the first time yesterday; is that correct?
A. Yes.
Q. That's long after you made your report?
A. Yes.
Q. And have you spoken with anyone at Mehaffy Weber about this case or about your opinions in this case before making your report?
A. No.

Q. Now, were you asked to review the reasonableness of charges for the medical services Mr. Ruben Narro received as it pertains to this litigation?
A. Yes.
Q. Did you prepare opinions on the reasonableness of the charges Mr. Narro received for his medical treatment?
A. I did.
Q. And we'll get into the details of your opinions in a bit, but, broadly speaking, did you reach a conclusion and an opinion with respect to the reasonableness of the charges that Mr. Narro received?
A. I did.
Q. What was that conclusion?
A. That they were not reasonable.
Q. What documentation did you review in arriving at your opinions?
A. I reviewed eleven medical providers--I believe it's eleven. All of their bills and the billing affidavits, if there were one, and then any type of medical records associated with that provider, if they were available. In this case, I looked at all the medical records.
Q. Did you also review the billing records?
A. Yes.
Q. Did you review the billing codes?
A. Yes.

Q. Did you review the billing codes line by line?
A. Yes.
Q. Okay. Did you ensure that the billing codes matched the services actually provided?
A. Yes.
Q. And how many lines of medical code do you think you've looked through in this case?
A. Maybe, I don't know, five, six hundred.
Q. Okay. And the medical codes in this case from the billing records, did they actually line up with the services provided?
A. Yes.
Q. Okay. Did you review any other materials specific to this case?
A. No.
Q. Okay. And in formulating your opinion, you have determined that the charges by, I believe, eleven of the plaintiff's medical providers were not reasonable, or were excessive. Is that right?
A. Correct.
Q. And that, I believe, charges from one of the providers were a double-charge?
A. I'm sorry, I didn't hear what you said.
Q. One of the providers violated guidelines by being included in another charge, or a double-charge?

11:48:10 A. Yes.
11:48:21 Q. Understood. Now I want to talk about your methodology a little bit. How do you determine what a reasonable charge is for a medical service?
11:48:30 A. Well, first of all, it depends on the type of medical bill that I'm reviewing. My company--I have access to three particular medical databases that I utilize. In this case, I utilized all three of those, which one of them is Context 4 Healthcare. I will spell that for you. It's C-o-n-t-e-x-t, the number 4, and then Healthcare, capitalized, new word. And then American Hospital Directory, and Red Book. Those are two separate words. And those are the databases I utilized.
11:49:07 Q. Are those prominent databases?
11:49:08 A. They are.
11:49:10 Q. Are they widely used in the medical field?
11:49:14 A. They are used throughout the medical entities, yes.
11:49:20 Q. How do you find a reasonable price from those databases?
11:49:29 A. Well, in particular, for Context 4 Healthcare, there's a couple data points that I utilize for that, and that is the actual brick-and-mortar address of where the service was rendered. So zip code is important. The billing codes or procedure codes, the date of service, and then the type of provider that provided the service.
11:50:00 And what all of that does is it allows me to-- Initially when I reviewed this case, I reviewed it in October

of 2024, and, of course, you know, treatment was done in 2022, '23--excuse me--2024. So when I utilize that database, I want to make sure that I'm utilizing the database according to the date of service, not from the time that I look at it, so that I can capture realtime claims from that time period.

11:50:40 And then--so it allows me to look from other like providers--like if it was a chiropractor bill or it's an ambulatory surgical center, hospital, I would view other providers in that area that provided the exact same service on the exact same day, and that would--that's what it pulls the data from and allows me to determine a cost that's considered reasonable for that service.

11:51:16 Q. Understood. And would it refresh your recollection in this case to review your report?

11:51:19 A. Pardon me?

11:51:21 Q. Would it refresh your recollection of the case to review your report?

11:51:23 A. Yes, it would.

11:51:27 Q. Several of the, I think, billers in this case, you believed were unreasonable only by less than a hundred dollars; is that fair?

11:51:32 A. Correct.

11:51:34 Q. While other ones had more substantial amounts?

11:51:37 A. That's correct.

11:51:39 Q. In your experience and opinion, do medical providers

11:51:46
typically accept less than the charge as payment in full for a certain medical charge?

A. Yes.

11:51:47 MR. BECHTOL: Objection, Your Honor. May we approach?

11:51:49 THE COURT: Yes.

11:51:49 ---------------------------------------

11:51:49 (AT THE BENCH)

11:52:09 THE COURT: Yes, sir.

11:52:10 MR. BECHTOL: Any questioning about what medical providers actually accept, whether it's--by anybody, this is going to be specific to reimbursements, all a violation of collateral source. The standard is going to be what are the reasonable and customary charges. She has given her report and testimony on that. But any questions about what doctors are going to actually accept and what they're going to be paid and what they're typically paid, that's all reimbursement, all collateral source, and I would--

11:52:39 THE COURT: Mr. Davidson?

11:52:41 MR. CARPER: I would argue--

11:52:42 THE COURT: I'm sorry. Mr. Carper. Pardon me.

11:52:42 MR. CARPER: Yes, Your Honor.

11:52:42 THE COURT: I'm great with names. I'm fantastic with names. It's my strength. Yes. Go ahead, Mr. Carper.

11:52:47 MR. CARPER: Thank you, Your Honor. That has

11:52:59 nothing to do--this testimony has nothing to do with collateral source. She's going to talk about what people get paid for the services they provide, which goes directly to their actual value. She isn't going to talk about who's paying or how they are paying or--

11:52:59 THE COURT: All right. I find that to be irrelevant to the jury's question, and it definitely gets close to collateral source. So let's move on from this subject. Okay? Anything else, Mr. Bechtol?

11:53:07 MR. BECHTOL: No. That was it.

11:53:08 THE COURT: Okay. Let's go back.

11:53:08 ----------------------------------------

11:53:12 (IN OPEN COURT)

11:53:33 Q. (BY MR. CARPER) All right. And you are often retained to review medical records for defendants. Correct?

11:53:36 A. That's correct.

11:53:40 Q. Okay. Are you familiar with many of the billers in this case?

11:53:41 A. Pardon me?

11:53:44 Q. Are you familiar with some of the billers in this case?

11:53:45 A. Yes, I am.

11:53:46 Q. And you see them frequently?

11:53:50 A. Yes, I do.

11:53:56 Q. Now, turning back to finding the charge in the database, once you've accumulated comparative and nearby other medical

codes and their bills, how do you find a reasonable charge from those?

11:54:18 A. Well, the--it's based upon a percentile. And my company utilizes the 80th percentile, which means 80 percent of the other providers in that same geographic area will charge that much or less.

11:54:33 Q. Understood.

11:54:35 A. And so that's the basis.

11:54:37 Q. Okay. And 20 percent would charge more?

11:54:38 A. Yes.

11:54:43 Q. If someone were to, for some reason, select 90th percent, could that be substantially higher?

11:54:46 A. Yes.

11:54:49 Q. Okay. Do you do any other-- And, also, is that a--is what you just defined an industry standard approach for defining reasonable charges?

11:55:00 A. Anywhere from 75 to 80. The 80th percentile is typically standard. It really depends on who is utilizing the database and what they're utilizing it for.

11:55:12 Q. Understood. Do you or your company utilize any other methods sometimes for finding a reasonable charge?

11:55:15 A. I'm sorry. Did you-- Say it again?

11:55:21 Q. Do you or your company ever utilize any other methods when finding a reasonable charge for something?

11:55:26 A. Well, I mean, the--it would be the other databases that I

mentioned, American Hospital Directory, which is particularly just for a hospital, and to determine a cost-per-charge ratio to determine if what was billed, is in, fact reasonable. And then the Red Book database that I mentioned, that is specifically for medications.

11:55:50 Q. Understood. When dealing with those databases, do you utilize something other than the 80th percentile method?

11:55:58 A. With either of those databases, the 80th percentile--there's not a percentile.

11:56:04 Q. Okay. So what is the method you use with those databases?

11:56:12 A. Well, the method is--particularly for American Hospital Directory, one of the providers for Mr. Narro, I utilized that, and it's--it's the level of emergency room. So the process is based upon the amount that was billed for that. I will look at that particular hospital and on their American Hospital Directory, which are costs that they report to the State, I look and determine what the overall cost per ratio for a visit to the emergency room and take that amount. And then also, the other part of that is, I add a 1.5 percent, or 150 percent, to that to allow for that particular medical entity so they can still make a profit.

11:57:25 Q. Understood. So to just try to simplify that a little bit, for some of these charges, you find the cost that they report to the State?

11:57:30 A. Yes.
11:57:33 Q. And then you multiple that by 1.5?
11:57:34 A. Yes.
11:57:36 Q. So there's a 50 percent profit margin?
11:57:37 A. Yes.
11:57:52 Q. Understood. And we talked about medical codes for a while now. Is there a more specific term for those typically?
11:58:01 A. CPT codes, which are current procedural terminology.
11:58:12 Q. Okay. So let's talk about your opinions that you developed with respect to this case, the reasonableness in this case.
11:58:15 A. Okay.
11:58:15 Q. So, first--
11:58:18 THE COURT: Mr. Carper, before you start on a new topic, I just want to alert you we're two minutes to noon. Is this a good time to break for lunch, or are you within five minutes of--
11:58:28 MR. CARPER: Absolutely, Your Honor, this is a good time.
11:58:30 THE COURT: Okay. All right. We're two minutes to noon. Before we start down that new road, let's take a break. We'll break for lunch. Same instructions as I've given many times. The light is red. Please don't talk about the case. We will just take one hour for lunch, given that lunch has been delivered here. If you're ready before that and you're ready

to go, please just let us you know, and we'll be ready for you.

All rise for the jury. Would you take your notepads with you, do you mind. Thank you.

(THE JURORS EXIT THE COURTROOM)

THE COURT: Okay be seated.

All right. Mr. Bechtol, anything from the plaintiff before we take our lunch break?

MR. BECHTOL: No, Your Honor.

THE COURT: Anything from the defense?

MR. WISE: No, Your Honor. One question that I've got. Same with Dr. Chiodo, Ms. Schieber is on the stand. Are we instructed not to speak with her--

THE COURT: You are.

MR. WISE: --about testimony? Okay.

THE COURT: Yeah.

So very typical, and you've probably heard this before. Because we're taking a break in the middle of your testimony, I'm going to ask that you not talk to either side's attorneys about the substance of your testimony. Obviously, hey, where can I grab a quick bite, where is the restroom, logistical things, no problem. You can ask those questions. But otherwise, just stay away from the substance. Does that make sense?

THE WITNESS: Yes, it does, and I will do that.

THE COURT: I'm sure you will.

12:00:16 The instructions are finalized. Mr. Buell, did you provide updated copies to the attorneys yet?

12:00:19 LAW CLERK: Yes.

12:00:20 THE COURT: Okay. All right. You should have the updated clean copies that reflect all the changes we discussed previously. So we'll be ready to go-- This is your last witness. Correct?

12:00:29 MR. WISE: That's correct. We'll rest after her.

12:00:31 THE COURT: So we'll rest. Mr. Bechtol, do you plan to call anyone in rebuttal?

12:00:33 MR. BECHTOL: I do not, Your Honor.

12:00:35 THE COURT: All right. So you'll rest, and then Plaintiff will close, Defense will close. I'll tell the jury, "Congratulations, you're done," read the instructions, and then we'll do closing arguments.

12:00:53 For closing arguments, the parties requested 30 minutes during our pretrial conference last Friday. I told you I wouldn't hold you to that, given what--we needed to see how the case unfolded. Are you still seeking 30 minutes? Do you need more? Do you expect less? We're ahead of schedule, so I just want to know.

12:01:10 MR. BECHTOL: I think I could do it right at 30 minutes. I mean--

12:01:15 THE COURT: Okay. If you need more time, let me know. I just am trying to plan the schedule.

12:01:21 MR. BECHTOL: Well, if I said 35 just to be--

12:01:25 THE COURT: Sounds good. Yeah. Under-promise and over-deliver.

12:01:27 Is 35 sufficient for the defense?

12:01:28 MR. WISE: I think it's more than we need.

12:01:28 MR. BECHTOL: I think--

12:01:30 THE COURT: All right. So we'll--I'll give you five extra, so we'll have 35 each.

12:01:35 How long do you want to save for your rebuttal argument?

12:01:36 MR. BECHTOL: Five.

12:01:39 THE COURT: Okay. So we'll do 30 and 5 for the plaintiff, and 35 total for the defense.

12:01:45 All right. I will make sure the charge is ready to go. We're in recess until-- Anything from the jury?

12:01:50 COURT SECURITY OFFICER: No.

12:01:51 THE COURT: Okay. We're in recess until 1:00. We'll let you know if they're done early. They never are.

12:11:29 (LUNCH RECESS TAKEN)

13:12:09 (OUTSIDE THE PRESENCE OF THE JURY)

13:12:13 THE COURT: All right. Welcome back.

13:12:16 Just briefly before we bring them in, my law clerk has provided a draft of the final jury instructions. There were a few minor changes, at least what I view as minor changes, but I'm happy to hear objections, if there are any.

First, we've updated the header on page 1 to just Final Jury Instructions.

We have added, on page 3, a new Number 12. We noticed that there was no instruction to the jury, or explanation, to elect a foreperson who will speak for the jury in the courtroom. So new Number 12 comes from the Fifth Circuit's Pattern Criminal Charge. It says: When you go to the jury room, the first thing that you should do is select one of your number as your foreperson who will help to guide your deliberations and will speak for you here in the courtroom.

Any concern or objection to that, Mr. Bechtol?

MR. BECHTOL: No, Your Honor. That's fine.

THE COURT: From the defense?

MR. WISE: No, Your Honor.

THE COURT: Okay. One second.

And then I've added the Court's date and signature line on page 15, because this will go on--this will be filed on the record. Any objection?

MR. WISE: No, Your Honor. Just out of an abundance of caution, I just realized our witness is in the courtroom. Does that matter for purposes of this?

THE COURT: No. I don't plan to discuss the substance. Just going through the changes.

Any concern in the date and signature line on page 15, Mr. Bechtol?

13:13:47 MR. BECHTOL: No, Your Honor.

13:13:55 THE COURT: Okay. All right. Mr. Bechtol, anything from the plaintiff before we bring the jurors in?

13:14:00 MR. BECHTOL: Your Honor, we were just discussing the certification of the trial exhibits. Do we need to fill that out before closing, or before close of evidence, or when should we--

13:14:10 THE COURT: Just as soon as possible. It doesn't need to be done right now. Before--the true drop-dead date is--and the deadline--is, before we send any binders back, that needs to be agreed upon and signed. So you both agree, yes, these binders are complete and accurate, only include admitted evidence, before we send things back, which will need to happen within 10 minutes after I excuse them for deliberations. Make sense?

13:14:35 MR. BECHTOL: Makes sense.

13:14:37 THE COURT: Okay. Let's bring them in-- I'm sorry. Anything from the defense before we bring the jurors in?

13:14:43 MR. WISE: No, Your Honor.

13:14:44 MR. CARPER: Do you want the witness on the stand?

13:14:47 THE COURT: Yeah, if you're ready. And if there's something we need to discuss outside of the witness's presence, that's fine too.

13:14:54 MR. WISE: Me and Stephen just talked about the

issue about the clean laptop, and frankly, it escaped my purview during lunch. We kind of discussed maybe, when they're doing deliberations, I can run up to Wal-Mart or somewhere close to here, get a cheap laptop, and bring it back for the videos.

13:15:15 THE COURT: Do we have 12 through 17 and Rebuttal Number 2, I think it was, on a flash drive?

13:15:21 MR. WISE: We do. I--

13:15:23 MR. BECHTOL: I can put them on a flash drive right now, a clean one that just has those on it.

13:15:28 THE COURT: Let me see if we have a clean laptop. I'm not sure that the Court does. But if that's necessary then, yeah, you can send someone to grab one. If not, I'll let you know. I'll ask right now. But otherwise, you do not have the technology available for the jurors?

13:15:43 MR. WISE: Not with the--I mean, I'm also happy to--

13:15:45 MR. BECHTOL: Both of our computers have lots of client files on them and everything, so it would be difficult to just hand them one of ours and not jeopardize--

13:15:54 THE COURT: Okay. The Court will see if we can help you. If not, I'll let you know.

13:16:01 All right. Go ahead.

13:16:04 (PAUSE)

13:16:30 THE COURT: I've been told we do have one.

MR. WISE: Okay. I think we've got a flash drive. We can take care of that during--

MR. BECHTOL: Okay.

THE COURT: Just make sure you agree upon--open it up, it works, there's nothing else on it.

All rise for the jury.

(THE JURORS ARE SEATED IN THE JURY BOX)

THE COURT: All right. Be seated.

Okay. Mr. Carper, you may proceed.

MR. CARPER: Thank you, Your Honor.

Q. (BY MR. CARPER) At this time, I'd like to publish Plaintiff's Exhibit 2-d.

MR. CARPER: Your Honor, do I have permission to move around the courtroom, just to walk up to screens and such?

THE COURT: To call the witness's attention to something?

MR. CARPER: Yes, and the jury.

THE COURT: Yes. Get a lapel microphone. We need to just keep you on mic. So I would just ask, if you need to do it, that's fine. Do it and then return to the podium when you're done.

MR. CARPER: Understood.

THE COURT: Okay.

Q. (BY MR. CARPER) So, Ms. Schieber, we talked about your expertise in guidelines. Correct?

A. Yes.

Q. This is one of the billing records that was provided you. Correct?

A. Yes.

Q. Did you observe any issues with these two charges for $6,000?

A. Yes.

Q. Can you explain what those are?

A. It's--well, it's-- I'm going to refer to my report, if that's okay.

Q. If it refreshes your recollection.

A. Yes. This is the bill for the assistant surgeon on the surgical procedure Mr. Narro had, and it will follow suit with what Dr. Valente also billed for his service in the respect that the very first procedure, 63030, according to what I had mentioned before, American Medical Guidelines for 2003, how--billing those guidelines, with 63047 and 63048--I'll try not to be very technical, but the 63047 is considered the primary service. Therefore, it will hold all the weighted value of the bill, the charge for that.

As a part of the 6307, 6304 is actually part of that procedure. Therefore, it doesn't need to be billed separately. So there--you know, we--it comes up with a flag that indicates the service billed not typically performed with other procedures on the same date.

13:20:18 The only way where that would be an adequate--the 63030 code specifically, for that to be adequate, is if there was a modifier applied to indicate that there is a distinctive and significant area that surgical intervention was done. There was not. So that is also why the 6300 is not considered to be--it's not considered to be payable.

13:20:50 Q. So what was the code of the primary one?

13:20:52 A. 63047 is the primary.

13:20:58 Q. So that's this $6,000 charge here, the laminectomy?

13:20:59 A. That's correct.

13:21:03 Q. Okay. And which other ones--and if you could read the Description column, which ones ought to have been included in the $6,000 charge?

13:21:12 A. The 63030.

13:21:16 Q. So the top one, the discectomy?

13:21:19 A. Well, and also, 77003.

13:21:23 Q. Okay. But the one ending 048 should have maintained status as a separate charge?

13:21:30 A. Hold on. Let me--can I go back to my report?

13:21:31 Q. If it refreshes your recollection.

13:21:36 A. Yes, it will refresh.

13:21:48 Yes, that's correct. 63030 and 7703, because of the procedure that was done, utilizing 63047, 63048, 63047 being the primary surgical intervention done, those other two, the 63030 and the 7003, are part of the 63047.

Q. So by billing these separately, they are essentially double-charging him?
A. Correct.
Q. Understood.
MR. CARPER: Now I'd like to publish Plaintiff's 2-h. Yes, at page 6.
Q. (BY MR. CARPER) Again, this is-- I'm sorry. One moment.
MR. CARPER: Page 6. If you could zoom in, as well, please. Apologize. Probably should skip to page 5.
Q. (BY MR. CARPER) Now, this is one of the billing records you reviewed. Correct?
A. Yes. This is Dr. Valente's services for the surgery that he performed.
Q. Now, the codes we just talked about on the other bill, 63030, 63047, they are present on this bill as well?
A. That's correct.
Q. Okay. Does that create the same issue you described on the other bill?
A. Yes, it does.
Q. Okay. So which ones needed to have been included in the primary for this one?
A. The same procedure code. 63030 and 77003.
Q. And that was a $12,000 charge and a $1,000 and $80 charge?

13:24:07 A. Yes.
13:24:10 Q. Okay. And those had the same issue of being double bills as well?
13:24:11 A. Correct.
13:24:16 Q. Okay. And I won't be publishing at this time, but you also reviewed a bill from Synovation as well?
13:24:22 A. Synovation? Yes, correct.
13:24:24 Q. Okay. What was that bill for?
13:24:31 A. This bill is a bill for the type of minimally invasive tube system that was utilized as part of the operation. So basically it's part of--it's a surgical tool used in the intermittent surgery that Dr. Narro--I mean Mr. Narro had. And this charge is--it's not normally charged to an individual. It's normally charged to the actual facility of where the system was utilized at. Typically this is part--it would be part of the facility.
13:25:19 Q. Understood. Did Mr. Narro receive a bill for the facility for his surgery?
13:25:22 A. Yes.
13:25:24 Q. Would that have been the First Baptist Medical Center bill?
13:25:26 A. Yes.
13:25:29 Q. What was the gross charge of that bill?
13:25:37 A. The gross charge of the First Baptist Medical Center bill was $128,613.99.

13:25:48 Q. So under the guidelines, typically, the $6,000 charge for the tube would be included in that $128,000 charge?

13:25:54 A. Yes.

13:26:00 Q. So under the guidelines, it's another double-charge?

13:26:05 A. Not necessarily an--I wouldn't say it's necessarily a double-charge. It's just the provider billed it wrong.

13:26:11 Q. Understood.

13:26:16 A. So I think it's an error in billing on his part, whether it was, you know--

13:26:24 Q. Understood. Okay. Now, who makes the guidelines we've been talking about? Who promulgated those?

13:26:27 A. Pardon me?

13:26:29 Q. Who made the guidelines you've been discussing?

13:26:34 A. The American Medical Association. They are the entity--medical entity that is--has--they created the--what's called ICD-9, or a diagnosis code; the computer--or the current procedural terminology, the CPT codes; and then also HCPCS, capital H, capital C, capital P, capital S. And those are secondary codes, billing codes, much to, like, the CPT codes.

13:27:15 So they indicate a type of service that was rendered.

13:27:23 And they update all of these--the whole entire code system every year, and so new codes come in for new year, new guidelines. You know, new codes come in, or there's maybe old codes deleted, or they combine some. So it's just a continual way that they review the value that can be placed on a

particular procedure.
Q. Understood. Now, all of that is before we start talking about the reasonableness of the charges themselves. Correct?
A. That is correct.
Q. Those were just double-charges and something that was perhaps an error?
A. Right.
Q. Okay. Now let's turn to reasonableness of charges. You reviewed the charges from Covenant Health. Correct?
A. I did.
Q. How much was he charged for that visit?
A. For Covenant Health, he was charged $13,188.30.
Q. Okay. And you did a determination of the reasonableness of those charges?
A. Yes.
Q. Okay. What did that turn--what did that turn out?
A. It turned out that the amount of the billed charges that was considered reasonable is $1,443.38.
Q. So he was overcharged by about $11,744?
A. That would be correct.
Q. Okay. So the usual, customary, and reasonable charge for the services was $1,443.38?
A. That's correct.
Q. Okay. Now, turning to Mark Valente--
A. Yes.

13:29:09 Q. --that charge. You reviewed that bill, as well. Correct?
13:29:10 A. I did.
13:29:11 Q. What was the gross charge for that?
13:29:17 A. The total billed charges for him is $36,572 even.
13:29:21 Q. Okay. After removing the double charge and adjusting for reasonable charges, what did you determine the reasonable charge to be?
13:29:33 A. The reasonable amount is $15,123.94.
13:29:35 Q. So it's your opinion that Mr. Narro was overcharged by about $21,448.06 by Mr. Valente?
13:29:40 A. That's correct.
13:29:43 Q. Sorry. Dr. Valente.
13:29:46 So the usual, customary, and reasonable charges for the services were 15,123.94?
13:29:50 A. That's correct.
13:29:55 Q. Okay. Now, you also reviewed the billing records from River Oaks Hospital?
13:29:58 A. I did.
13:30:01 Q. What were the gross charges from that place?
13:30:04 A. $3,550 even.
13:30:08 Q. Okay. And what did you determine the reasonable charges for that location to be?
13:30:14 A. $1,100.17.
13:30:17 Q. Okay. So it's your opinion that Mr. Narro was

overcharged by about $2,449.83?
A. Yes.
Q. Okay. And the usual, customary, and reasonable charge was $1,100.17?
A. Correct.
Q. Now looking at First Baptist Medical Center.
A. Yes.
Q. You reviewed the billing records from that location, as well?
A. I did.
Q. What was the gross charge from there?
A. $128,613.99. I will repeat that. $128,613.99.
Q. Okay. And what did you determine the reasonable charge for those services to be?
A. $102,824.95.
Q. Understood. So it's your opinion that Mr. Narro was overcharged by $25,789.04?
A. Correct.
Q. So the usual, customary, and reasonable charge for those services was $102,824.95?
A. That's correct.
Q. He also received the charge from Equinox Spine, P.A., which I--you reviewed that billing charge, as well?
A. I did.
Q. That's the one we just--that was the first one we talked

about?
A. That's correct.
Q. Okay. How much was the gross charge from that location?
A. $14,040 even.
Q. Okay. And how much did you determine was the reasonable charge after adjusting for reasonableness and removing the double-charges?
A. $1,662.16.
Q. So it's your opinion that Mr. Narro was overcharged by $12,377.84?
A. That's correct.
Q. So the usual, customary, and reasonable charge for the services is $1,660.16?
A. Correct.
Q. All right. Finally, you also reviewed a bill from Lighthouse Anesthesia?
A. Yes.
Q. How much was Mr. Narro charged for those services?
A. $10,500 even.
Q. And how much did you determine the reasonable charge was?
A. $7,002.48.
Q. And that's the usual, customary, and reasonable charge?
A. Correct.
Q. So he's overcharged by $3,497.52?
A. That's correct.

13:32:55 Q. And we talked about it recently, but the $6,000 bill from Synovation, you determined to be unreasonable?
13:33:00 A. Correct.
13:33:03 Q. Okay. You reviewed bills from, I believe, twelve locations. Is that correct?
13:33:05 A. Yes.
13:33:08 Q. We did not go through all of those. Correct?
13:33:10 A. Correct. I think we missed two.
13:33:17 Q. I think three were, perhaps, under $200 in your changes. Is that correct?
13:33:21 A. Yes. Correct.
13:33:23 Q. So if those weren't reasonable in your opinion, they were pretty close?
13:33:25 A. Yes.
13:33:30 Q. Okay. Now, what was the total of all the bills Mr. Narro received?
13:33:35 A. Total for all twelve providers that we've previously mentioned is $240,136.69.
13:33:46 Q. Okay. And what did you determine to be the usual, customary, and reasonable charge for all of those services that were billed?
13:33:55 A. $154,357.18.
13:33:58 Q. So you determined that Mr. Narro was overbilled by about $85,000, roughly?
13:34:01 A. Correct.

13:34:16 Q. Okay. Now, concluding, your opinions with respect to the case are limited strictly to the reasonableness of the charges themselves for the medical services provided to Mr. Narro?

13:34:24 A. Correct.

13:34:26 Q. You're not offering an opinion as to whether or not the medical services provided were necessary?

13:34:30 A. I am not able to do that, correct.

13:34:32 Q. You're not offering an opinion as to whether or not the medical services provided were caused by the accident at all?

13:34:39 A. I am not able to, that's correct.

13:34:43 Q. And you are not offering any opinion as a billing specialist that the charges for the services provided to Mr. Narro were not-- Sorry. One second.

13:35:00 So summarily, you are not here to testify that any of the charges we've discussed can be attributed to the defendants in this case?

13:35:05 A. I'm sorry. Could you repeat that?

13:35:09 Q. Of course. You're not here to testify to whether any of the charges can be attributed to the defendant in this case?

13:35:14 A. Can be contributed?

13:35:14 Q. Attributed.

13:35:18 A. Attributed. Meaning caused by the accident?

13:35:20 Q. Yes.

13:35:25 A. I'm not a physician, so I'm not able to make that--I'm not able to opine, much as what you asked before regarding

medical necessity or causation.

Q. Understood. You're only here to talk about the reasonableness of the bills themselves?

A. That's correct?

Q. Thank you.

MR. CARPER: Pass the witness, Your Honor.

THE COURT: All right. Cross-examination?

CROSS-EXAMINATION

BY MR. BECHTOL:

Q. All right. Hi, Ms. Schieber. It's good to see you again. I'm Stephen Bechtol. I've taken your deposition before in a similar--outside of trial, but in different cases. Correct?

A. You have taken my deposition before?

Q. Yes.

A. I'm sorry, I don't remember. I apologize.

Q. I understand. And I used to work with Thomas J. Henry's office, and you've been deposed--

A. Yes.

Q. --by other attorneys multiple times from that office. Correct?

A. That is correct.

Q. All right. And then every time that's occurred, it's been in a context like this where you've been retained by a defendant like S. Chahal Trucking?

A. Correct.
Q. In fact, almost all of your work is exclusively done for defendants. Fair?
A. One-hundred percent.
Q. You talked a little bit about your qualifications and job history. And, here, what you're doing, it has nothing to do with actual nursing. Right?
A. Other than understanding disease processes and what treatment is being done and all the experience and knowledge that I have from being a nurse, yes, that is a part of it. But am I actually practicing the nursing act? I am not.
Q. Based on your history, you were looking at a few of the bills a moment ago from Equinox and Dr. Valente. Just with your general knowledge, there's--you understand what the laminectomy portion of a surgery is?
A. Yes.
Q. And that portion is when they actually go in, they do the incision, and then the doctor uses a saw and actually cuts out a portion of the bone in the spine, like they did with Mr. Narro?
A. Correct.
Q. And then the discectomy portion is also--it's different than a laminectomy. Right?
A. Correct.
Q. The discectomy is when, after the spine is removed, the

doctor goes in and actually cuts with the tool and the tube and everything and actually cuts the actual portion of the disk out that would be compressing a nerve root?
A. Correct. That's the minimally invasive aspect of it.
Q. And I wanted to make sure I understand before I forgot. The Synovation billing, you were essentially saying just--it should have been included on the First Baptist charges?
A. That's correct. If you actually look at the bill, it was Synovation to First Baptist Medical Center.
Q. I understand. Okay.
One question you get asked a lot is, doctors can charge whatever they want. Right?
A. Absolutely.
Q. If a doctor thinks that they are the best doctor in the world, there's nothing stopping them from charging honestly whatever they want. Fair?
A. That's fair.
Q. And they are not required to actually follow any of the guidelines and databases that you mentioned, just as they aren't for Plaintiff's billing expert, David Balat, and what he relied upon. Correct?
A. Could you speak up and repeat your question? I apologize.
Q. Sure. The--like the plaintiff's providers in this case, they are not required to follow and bill according to any of

13:39:59 13:40:00 13:40:01 13:40:02 13:40:07 13:40:15 13:40:17 13:40:18 13:40:20 13:40:22 13:40:25 13:40:41 13:40:44 13:40:47 13:40:50 13:40:55

the databases that you have mentioned. Right?
A. Who? The physicians--
Q. Yes.
A. --that provided the care--
Q. Right.
A. --and their billing? Well, actually, if you're a medical entity in the United States and you are submitting any portion of--
Q. I want to stop you just in case--
A. Okay. Got it.
THE COURT: Go ahead and refocus your question. Go ahead.
MR. BECHTOL: Okay.
A. Okay.
Q. (BY MR. BECHTOL) Based on any of their bills that you particularly reviewed for Mr. Narro, were any of those providers bound to charge based on the databases that you mentioned?
A. Bases that I mentioned? Could you please specify?
Q. In your--when you were being asked about how you came up with the reasonable and customary amounts before--
A. Okay.
Q. --that you pulled-- You pulled those amounts through entering the information into those databases. Right?
A. Correct.

13:40:58 Q. All right. That's what I'm referring to.
13:40:59 A. That is what you're referring to.
13:41:13 Q. Okay. Okay. And you're here--you talked about your charges and that you're salaried, but you're here through a company called ExamWorks. Right?
13:41:21 A. ExamWorks Review Services, yes.
13:41:26 Q. And while you're paid salary, you don't have any ownership in ExamWorks, do you?
13:41:28 A. I do not.
13:41:31 Q. Okay. They just send you around and they ask you to do reports and everything. Fair?
13:41:35 A. I wouldn't say it like that. I'm a full-time salaried employee, and I'm the only nurse for the State of Texas.
13:41:42 Q. Okay. I mean, versus, like, some experts, they get paid by the hour, and that's--they're getting paid that amount?
13:41:47 A. Correct, because they're considered a freelance.
13:41:51 Q. But you're an employee of ExamWorks?
13:41:53 A. That's exact.
13:41:56 Q. All right. And so in this case, while you might get paid salary, ExamWorks is charging for specific services and by the hour for you to appear here at trial. Right?
13:42:08 A. Correct.
13:42:11 Q. And do you have those amounts of what ExamWorks has been either charged or paid in this case?
13:42:19 A. I am aware of them. I'm not--I'm not part of setting the

fee schedule that the company bills for my services or the marketing aspect of that, but I am aware of what has been invoiced and what the fee schedule is.

13:42:32 Q. And that's what I'm--that's what I'm saying. That's what I understand. So in this case, what has ExamWorks actually invoiced to S. Chahal Trucking?

13:42:53 A. To my knowledge, $3,402.50 has been invoiced, and that is for the review that I completed utilizing the databases to review the hospital bills, provider bills, completing a counter-affidavit.

13:43:08 Q. And then will they also be invoicing for your time to travel here from-- You're in Dallas. Right?

13:43:13 A. Uh-huh. Yes. I'm sorry.

13:43:16 Q. When we do lots of depositions and testimony, we know to correct ourselves.

13:43:21 There's also going to be charges for your travel and your time to appear today in court. Fair?

13:43:25 A. That is correct.

13:43:28 Q. Do you know what that is?

13:43:35 A. Well, I know that the fee schedule indicates it's $1,100 for half a day, or $2,200 for a full day. So depending on that, that would make a difference. I know that I've spent two hours--two-and-a-half hours on trial prep on my own, just to prepare, and then whatever travel expenses I have. At this point, I think it's, like, $7800--or $7,800, not 7,700.

13:44:08 Q. $7,800?
13:44:10 A. Yeah, for my travel.
13:44:12 Q. All right. And then does that include the--when I looked at the fee schedule, the, like, 2200 for a full day is to appear here?
13:44:18 A. Yes.
13:44:19 Q. That's in addition to the 7800?
13:44:20 A. Yes.
13:44:25 Q. Okay. And then two-and-a-half hours to prep for today, would that be charged at that 275 rate?
13:44:29 A. Yes.
13:44:37 Q. Okay. And obviously, I know you're salary, but ExamWorks expects to be paid completely in full for those services. Fair?
13:44:45 A. I would imagine, yes.
13:44:58 Q. And in some of the documents that we received, and of the-- When you were designated, it was a while back. Correct?
13:45:03 A. Correct.
13:45:07 Q. So the document that I have, it shows your bill reviews, counter-affidavits, depositions, and court hearings, but it's for a period of August 2015 to March 2024.
13:45:15 A. Correct.
13:45:20 Q. All right. So it's been a little bit since March 2024. Right?
13:45:25 A. Correct.

Q. So the list that I have is outdated. Have you been working since March of 2024?
A. Yes.
Q. All right. And in that list, it says that, since 2015, you completed 6,970 bill reviews?
A. Correct.
Q. And then 5,333 counter-affidavits?
A. Correct.
Q. What is a counter-affidavit?
A. A counter-affidavit is my report. It's my opinions. It's filed with the court in response to the billing affidavit that was done by that medical entity on behalf of the plaintiff, I believe.
Q. And when you do a counter-affidavit to an affidavit, you do the same. You sign in front of a notary and swear under the penalty of perjury that your report that's attached is true and correct to the best of your knowledge?
A. That's correct, I do.
Q. All right. And then at that time, it listed 107 depositions that had been completed.
A. Yes. I can tell you the new numbers if you'd like.
Q. Okay.
A. Okay. Through, we'll say--what are we--in October? Through September of 2005, I am at 8,925. So 8,925 total cases, I've reviewed for the ten-year span. In regards to

affidavits completed out of those cases, it's 6,875. And I believe now my depositions are at 135, and this would be my sixth court hearing. Actually, this would be my first court trial, so--but I have five court hearings.

13:47:33 Q. Okay. Well, it had to happen sometime. Right?

13:47:37 All right. So, you know, before those updated numbers, like, my average on that is, like, around 812 bill reviews per year?

13:47:47 A. I'm sorry. Repeat that?

13:47:50 Q. I said before you just gave me those updated numbers, when I was doing the math, it looked like that averages out to over 800 bill reviews per year.

13:48:01 A. Correct. I--my average per month is 100 to 125 cases.

13:48:05 Q. Okay. And so is it going to be slightly lower for counter-affidavits? Because not everybody asks for a counter-affidavit. Right?

13:48:11 A. That is correct.

13:48:15 Q. So would that be probably around 100 or something?

13:48:16 A. That would be correct.

13:48:19 Q. And all of these, again, these are all at the request of defendants?

13:48:24 A. That's correct.

13:48:28 Q. And throughout that testimony list that I reviewed, I saw, just in the 107 depositions, 25 different counties in which you have testified into and produced either bill reviews

or counter-affidavits where you were designated as an expert by a defendant.

13:48:44 A. Correct.

13:48:48 Q. And so I read Bell County, Bexar County, Brazos County, Cameron County, Collin County, Dallas, Denton, El Paso, Fort Bend. I mean, would it be fair to say that basically, at this point, you've given opinions on the reasonableness of charges all over the state, from El Paso, to Orange County, up to north of where we are now, down to Brownsville?

13:49:19 A. I think that would be accurate, yes.

13:49:22 Q. And it would also be fair to say that, in almost every case, you tend to find that the bills are unreasonable?

13:49:29 A. Correct.

13:49:33 Q. And just as you did here, some of them are less than others, but you found that every single one of Mr. Narro's bills was unreasonable?

13:49:43 A. That's correct.

13:49:46 Q. And you would agree that, in general, that that's usually the case?

13:49:53 A. That is the case, yes.

13:50:00 Q. Did you review David Balat's report in this case?

13:50:03 A. That does not sound familiar to me at all.

13:50:04 Q. Do you know David Balat?

13:50:05 A. I don't.

13:50:21 Q. Okay. The jury heard his testimony already--

THE COURT: Mr.-- Will you please take this down.

MR. BECHTOL: Okay.

THE COURT: This has not been admitted into evidence. Correct? That's not an exhibit?

MR. BECHTOL: No, I guess it wasn't. He testified--

THE COURT: Okay. Why don't you just ask her about it.

MR. BECHTOL: Sure.

Q. (BY MR. BECHTOL) David Balat reviewed all the bills, just as you did, and in his report on the same bills, he indicated that he believed that the usual and customary charges would have been $222,748.13. As we sit here today, you would disagree with that?

A. I don't--I can't see it on the screen. If I could see it on the screen, I'd be able to kind of visualize-- I'm a visual person. Sorry.

Q. In the-- Let's just put it this way. In the most basic sense, you said that the bills were, like, 150?

A. That were considered reasonable out of the 240, that's correct.

Q. You put 154,357.18. If David Balat says they should be 222,748.13, obviously your number is significantly lower than his. Right?

A. Again, I can't visually see. I would imagine that that's

a truthful amount that you're talking about.

THE COURT: Why don't you turn your screen on for one second.

A. There it is.

THE COURT: Hold on.

A. Okay. Well, there it goes.

THE COURT: Trying to see if I can just turn her monitor on.

MR. BECHTOL: Oh, okay.

THE COURT: Turn your screen on but just put it on your--let's go back to the dolphins or something, not the not-admitted report.

MR. BECHTOL: Okay. Everybody loves dolphins.

(PAUSE)

THE COURT: Good try.

MR. BECHTOL: Okay.

THE COURT: Okay. All right.

MR. BECHTOL: It was off.

THE COURT: One second.

Well, I've been able to do it in the past, but not today. So I tried.

A. I did briefly see it, so--

THE COURT: Yeah, just listen to the amounts that he's asking.

Q. (BY MR. BECHTOL) I mean, in general, I'm asking about

which number is higher or lower. Right?
A. Well, I would attest--what I briefly saw, what you had stated, his are higher in regards to what's considered to be reasonable.
Q. But that amount, even at two-twenty-two, is still lower than what the total of the bills were. Right?
A. Yes, it is. Correct.
Q. All right. Now, up on the screen--
MR. BECHTOL: I swear everything else is already in evidence, if--
THE COURT: All right. Okay. I will unmute it.
Q. (BY MR. BECHTOL) So in this case, the jury heard the testimony of Dr. Valente where he was sworn in under oath, just like you today, and he went through the different surgery charges, and he opined that the reasonable cost associated with the spine surgery he performed was $209,388.39, and--but you're saying you disagree with what he testified was reasonable?
A. Correct.
Q. And you reviewed all the actual bills on that list?
A. Correct.
Q. And these are all going to go back to the jury. They're in evidence. You looked at 2-a, which is the billing affidavit. This is Covenant Hospital, and you've seen this form before?
A. Yes.

13:55:09 Q. And this actual--this is an affidavit, and it's signed by the medical records custodian at Covenant Medical Center where they have testified as to what the actual bills and paid and incurred amount are. Do you see that?

13:55:27 A. Yes.

13:55:31 Q. They listed $5,011.55. You only allowed, like, one-thousand-and-something. Right?

13:55:38 A. Correct.

13:55:43 Q. The physical therapy place where Ruben went, they signed a similar affidavit, sworn--subject to perjury, that the services were reasonable and necessary and that the amounts charged were necessary at $6,735. You also determined that that was unreasonable as well. Right?

13:56:05 A. Correct.

13:56:11 Q. And that goes on through each and every bill that you looked at. Each of these all had--Dallas Radiology for the 1,390, they asserted, again, under penalty of perjury, that these services were reasonable and necessary, and the amounts charged were 1,390. Right?

13:56:30 A. Correct.

13:56:32 Q. And, I mean, I don't want to go through every single one, but Equinox did the same for their $14,000 bill. Right?

13:56:39 A. Correct.

13:56:43 Q. The neuro monitoring at Fairview, they have a similar affidavit signed in front of a notary?

13:56:47 A. Correct.
13:56:51 Q. $8,386.56?
13:56:51 A. That's correct.
13:56:56 Q. First Baptist, 128,613.99?
13:56:59 A. Correct.
13:57:03 Q. Lighthouse, the anesthesia people that put him to sleep during the surgery, 10,500?
13:57:07 A. Correct.
13:57:10 Q. And then Dr. Valente, who actually performed the surgery to help Mr. Narro, $36,572?
13:57:16 A. Correct.
13:57:21 Q. There's two different parts of neuro monitoring. Right?
13:57:21 A. Yes, there is.
13:57:25 Q. And the Mission Diagnostics portion of neuro monitoring--
13:57:26 A. Yes.
13:57:28 Q. --to make sure his brain is still working while he's under anesthesia, their charges were 5275.84?
13:57:36 A. That's correct.
13:57:40 Q. And then the MRI Centers of Texas, in their subpoenaed records, they showed a bill of 5,885. Right?
13:57:48 A. Yes.
13:57:57 Q. There's-- All right. So the issue, then, became this bill for Synovation, and that's the tube system that we've seen in Exhibit 7?
13:58:03 A. Yes.

13:58:06 Q. All right. So you're just saying that Synovation bill for 6,000 that's separated out should have been on the--incorporated somehow into the First Baptist bill?
13:58:18 A. Correct, because they are the ones that--it was placed in their operating room.
13:58:28 Q. Got it. So in this context, if we add up all those bills of what the actual providers signed, swore under oath that those bills were reasonable and necessary, if those total actually $231,959.94, you would tell the jury, no, that's not reasonable?
13:58:53 A. Well, number--first of all, mine was 240, and you said 231, so there might be--something might be--
13:58:59 Q. I think it's the Covenant bill that we looked at first.
13:58:59 A. Gotcha.
13:59:02 Q. Okay? There's a difference of what I showed you, that bill, and what the jury has is 5,000--
13:59:06 A. Okay.
13:59:08 Q. --versus what you have in your report.
13:59:10 A. Okay. That's the difference.
13:59:12 Yes, to your answer.
13:59:17 Q. Regardless, even with Covenant, 5,000 would still be unreasonable. Correct?
13:59:21 A. Correct.
13:59:23 Q. It should be a thousand or something?
13:59:24 A. Correct.

13:59:41 Q. Okay. If the jury listens to what you said--which, you're not saying in this case what should or should not be paid. Fair?
13:59:49 A. Correct. I'm not opining on whatever type of reimbursement these providers are expecting.
13:59:57 Q. My question is different. My question is, you're not telling the jury to give a certain amount or not. You're just saying, I plugged these bills into my system; here's the numbers it told me?
14:00:09 A. That's correct.
14:00:12 Q. The jury is free to review the evidence and decide on their own what they believe are fair and reasonable charges for these medical bills that Ruben owes?
14:00:21 A. Absolutely.
14:00:27 Q. And if the jury looks at your report and believes one-fifty-four is the number, that's less than what the actual charges are for the doctors. Fair?
14:00:34 A. Yes.
14:00:38 Q. Which means, if the doctors' charges are that much, one-fifty-four isn't enough to pay those charges?
14:00:42 A. Understand.
14:00:43 MR. CARPER: Objection; speculation.
14:00:45 THE COURT: Overruled. You can answer if you know the answer.
14:00:48 A. Understand.

Q. (BY MR. BECHTOL) Okay. That's all I have. Thank you for your time.

MR. BECHTOL: I'll pass the witness.

THE COURT: Okay. All right. Redirect?

MR. CARPER: No, Your Honor.

THE COURT: All right. Thank you very much for being here.

Any objection to this witness being excused?

MR. BECHTOL: No, Your Honor.

MR. CARPER: Nothing from defense.

THE COURT: All right. You can be excused.

All right. The defense can call its next witness.

MR. WISE: Defendant rests, Your Honor.

THE COURT: All right. Mr. Bechtol?

MR. BECHTOL: Nothing further. No rebuttal.

THE COURT: All right. The plaintiff closes?

MR. BECHTOL: Plaintiff closes.

THE COURT: All right. The defense closes?

MR. WISE: Defendants close.

THE COURT: All right. Ladies and gentlemen, you are done with evidence in this case. We have made incredible progress.

So the next step is for me to give you the Court's instructions that will guide your deliberations in this case. After I give you the Court's instructions--which I'm going to

send back a hard copy, as well--then each side will have an opportunity to give you their closing arguments.

14:01:53 So you will begin deliberations today, most likely within the next hour, hour and a half. Both sides are on a time limit for closing arguments. They have been very respectful of those limits. I'm sure they will continue to be so.

14:02:09 This is another one of those times when I do need to read to you. We have worked hard on these instructions together, and so the language is important. So if you'll just bear with me as I read these to you, knowing that--listen closely, because they're relevant to the closing argument, but also know, if you want to take a closer look at a certain instruction, what exactly did he say about this or that, I'll send it back.

14:02:31 One second, please.

14:02:34 (PAUSE)

14:02:43 THE COURT: All right. Final Jury Instructions. Instruction Number 1. Members of the jury-- Pardon me one second. I'm going to ask both sides at the end whether they confirm that I have read the instructions accurately, so if someone at each table would please follow along.

14:03:00 Instruction Number 1. Members of the jury, after closing arguments, you will go to the jury room to decide the case. Answer the questions that are attached and reach a

verdict. You may discuss the case with the other jurors only when you are all together in the jury room.

14:03:20 Remember my previous instructions. Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the internet. Do not post information about the case on the internet. Do not share any special knowledge or experiences with other jurors. Do not use your cell phone or any other electronic device during your deliberations for any reason.

14:03:50 Here are the instructions for answering the questions:

14:03:57 1. Do not let bias, prejudice, or sympathy play any part in your deliberations.

14:04:03 2. Base your answers only on what was presented in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not presented in the courtroom.

14:04:21 3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

14:04:35 4. If my instructions use a word in any way that is different from its ordinary meaning, use the meaning I give

to you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any questions or answers are not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence. Whatever a question--pardon me--whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence.

Ruben Narro bears the burden of proving each element of his claim by a preponderance of the evidence. The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or the number of documents admitted into evidence. For a fact to be proved by a preponderance of evidence, you must find that the fact is more likely than not true.

A fact may be established by direct evidence or by circumstantial evidence, or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be

fairly and reasonably inferred from other facts proved.

14:06:31 7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

14:06:52 8. Do not answer questions by drawing straws or by any method of chance.

14:06:59 9. Some questions ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each jurors' amount and figuring the average.

14:07:12 10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

14:07:23 11. The answers to the questions must be unanimous.

14:07:28 12. When you go to the jury room, the first thing that you should do is select one of your number as your foreperson who will help to guide your deliberations and will speak for you here in the courtroom.

14:07:44 As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers to pay for another trial. If a

juror breaks any of these rules, tell that person to stop and report it to me immediately.

14:08:08 Instruction Number 2. A "stipulation" is an agreement. When there is no dispute about certain facts, the attorneys may agree or stipulate to those facts. You must accept a stipulated fact as evidence and treat that fact as having been proven here in court.

14:08:27 The parties have agreed or stipulated to the following facts:

14:08:34 1. The parties stipulate that on April 12, 2023, a collision occurred between Defendant Sukhwinder Singh and Plaintiff Ruben Narro wherein the front of defendant's vehicle struck the rear of plaintiff's vehicle.

14:08:53 2. The parties further stipulate that, at the time, Defendant Sukhwinder Singh was in the course and scope of his employment with Defendant S. Chahal Trucking, Inc.

14:09:07 And 3. Defendants admit that the collision at issue in this lawsuit was proximately caused by the negligence of Sukhwinder Singh.

14:09:20 Instruction Number 3. You alone are to determine the questions of credibility or truthfulness of the witnesses. In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case that he or she may have, and the consistency or

inconsistency of his or her testimony considered in light of the circumstances. Has the witness been contradicted by other credible evidence? Has he or she made statements at other times and places contrary to those made here on the witness stand? You must give the testimony of each witness the credibility that you think it deserves.

14:10:11 Even though a witness may be a party to the action and therefore interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence, if you believe the testimony.

14:10:30 You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed; witnesses are not counted. The test is not the relative number of witnesses, but the relative convincing force of the evidence. The testimony of a single witness is sufficient to prove any fact, even if the greater number of witnesses testified to the contrary, if, after considering all the other evidence, you believe that witness.

14:11:04 Instruction Number 4. When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to

rely on it.

Instruction Number 5. In determining the weight to give to the testimony of a witness, consider whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony given at the trial.

A simple mistake by a witness does not necessarily mean that the witness did not tell the truth as he or she remembers it. People may forget some things or remember other things inaccurately. If a witness made a statement--pardon me--if a witness made a misstatement, consider whether that misstatement was an intentional falsehood or simply an innocent mistake. The significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

Instruction Number 6. Certain testimony has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions a witness was asked in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness's testimony may be presented, under oath, in the form of a deposition. Sometime before this trial, attorneys representing the parties in this case questioned the witnesses under oath. A court reporter was present and recorded the testimony. The questions and answers have been played for you

during trial. This deposition testimony is entered to the same--pardon me--it's entitled to the same consideration and is to be judged by you as to the credibility and weighed and otherwise considered by you in the same way as if the witness had been present and had testified from the witness stand in court.

Instruction Number 7. The fact that a person brought a lawsuit and is in court seeking damages creates no inference that the person is entitled to a judgment. Anyone may make a claim and file a lawsuit. The act of making a claim in a lawsuit, by itself, does not in any way tend to establish that claim and is not evidence.

Instruction Number 8. "Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

Instruction Number 9. "Proximate cause" means a cause that was a substantial factor in bringing about an injury, and without which cause such injury would not have occurred. In order to be a proximate cause, the act or

omission complained of must be such that a person using ordinary care would have foreseen that the injury, or some similar injury, might reasonably result therefrom. There may be more than one proximate cause of an injury.

14:15:02 Instruction Number 10. An employer is liable for the negligence of its employee acting in the course and scope of his employment. An employee is acting in the course and scope of his employment if he is performing the tasks assigned to him by his employer or is engaged in an activity that is in furtherance of the employer's business.

14:15:31 Question Number 1. Did the negligence of Sukhwinder Singh and S. Chahal Trucking, Inc., proximately cause the injury to Ruben Narro? Answer "yes" or "no." And there's a blank on this page where you will write either "yes" or "no."

14:15:55 Question Number 2. Answer Question 2 if you answered "yes" to Question Number 1. Otherwise, do not answer Question Number 2.

14:16:07 What sum of money, if paid now in cash, would fairly and reasonably compensate Ruben Narro for his injuries, if any, that resulted from the occurrence in question?

14:16:18 Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss.

That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any. Do not reduce the amounts, if any, in your answers because of the negligence, if any, of Ruben Narro. Any recovery will be determined by the Court when it applies the law to your answers at the time of judgment.

1. Physical pain and mental anguish sustained in the past. Answer, blank. And you will complete that answer, if necessary.

2. Physical pain and mental anguish that, in reasonable probability, Ruben Narro will sustain in the future. Answer, and there's a blank.

3. Loss of earning capacity sustained in the past. Answer, and there is a blank.

4. Disfigurement sustained in the past. Answer, and there is a blank.

5. Medical care expenses incurred in the past. Answer, and there is a blank.

You are now finished. Sign the verdict form and give it to the court security officer. So entered on October 21, 2025. And I am signing the original instructions.

Mr. Bechtol-- And then let me say one more thing. The last page is the verdict certificate, and it says, "We, the jury, certify that the answers to the above questions

constitute our unanimous verdict in this case." There's a blank for a signature of the foreperson, a blank for the printed name of foreperson, and a blank for date signed.

14:18:41 Mr. Bechtol, do you agree that I read the instructions and verdict certificate accurately? Or Mr. Davidson?

14:18:46 MR. DAVIDSON: Judge, you did read them correctly.

14:18:47 THE COURT: Thank you.

14:18:48 Mr. Carper?

14:18:49 MR. CARPER: Yes, Your Honor.

14:18:51 THE COURT: All right. Okay. Those are your instructions. I'll send these back after closing argument.

14:18:59 It's 2:15, so why don't we just stretch. Does anyone need a comfort break? It's fine if you do. Just raise your hand if so. All right. Well, why don't we just stand up and stretch. Mr. Bechtol, why don't you get ready for closing arguments.

14:19:11 (PAUSE)

14:19:51 THE COURT: All right. Let's be seated.

14:19:57 All right. Mr. Bechtol, whenever you're ready. You will have no more than 30 minutes for the opening portion of your closing argument.

14:20:05 (CLOSING ARGUMENT BY THE PLAINTIFF)

14:20:24 MR. BECHTOL: Okay. May it please the Court.

14:20:27 I want to thank everybody for listening to this.

Today is Mr. Narro's one and only shot, and he has been waiting a while to get here and have you hear his case. And this case is very important to him and his family. Throughout this trial, there's been different times where everybody has laughed at certain things. But this is the time where Mr. Narro is going to ask you to be very serious and look at this evidence and weigh it and hold them responsible for what the defendants have done to him.

14:21:04 We have tried to streamline this case as fast as we can for you. I assure you that I have been in here for some that last two weeks. So we thank you for your time. Even though it's been two days, I know it's a lot to be here, be away from your families and your jobs.

14:21:23 At the beginning, during opening, I told you to make sure to hold us accountable. I told you it's our burden to prove the damages and that they resulted from the crash.

14:21:32 And what you have seen and what you heard from the defendant at the beginning was that they were here to take responsibility, but they didn't want to be taken advantage of. 14:21:43 But all you heard in this entire trial is just one more action after the other where they have done everything they can to avoid responsibility. And they have done this through basically what I call a run-and-hide defense. S. Chahal Trucking and Mr. Sukhwinder have done everything they can to hide from taking responsibility, and they have done it through

a different--a few different ways that I'm going to go through.

But this is a very simple case. It really comes down to something that everybody knows. You break it, you buy it. If you break your neighbor's window, you don't go over and say, hey, I'll just tape up the crack. You fix the window. Same thing with a car crash. You're responsible for all the harm and all the damages that you cause, not just what you want, not just what you think. What the actual damages are.

In this case, you have to weigh everything by the preponderance of the evidence. And this was spoken about earlier in the case, that this is a civil case. And what that means is, every piece of evidence regarding damages, you have to weigh it basically more likely than not.

So when you heard our evidence and you heard their evidence, if you think that it's just slightly more towards the plaintiff, that's more likely than not. If you believe our doctors, you believe the evidence and the bills more likely than not is proximately caused by the defendants, that's what you base your decisions on in this case. It's different than a criminal case or anything else. But that's the law. That's what's been instructed to follow.

And when we look at all the evidence, we believe that our evidence has been overwhelming. You have it. You will be able to take it back. You have seen it. And we believe that it's far more likely than not on our evidence of

what we've proven.

14:23:37 So when you go back, you're going to have two jobs. You're going to answer all the questions that the judge gave you, and he was very thorough in reading all those instructions. But the main thing is to go back and the eight of you talk and explain to each other what you think about the case and why you think you should decide things a certain way, because what this is really about and what final closing arguments are, for any attorneys like us who have actually gone to trial and tried cases-- You heard the evidence. There's not some big movie moment in final closing arguments where you hear something and something changes.

14:24:20 What I need to do is explain to you what this document is that you're going to have when you go back there and how we're going to ask you to fill it out, because it's very long. There's a ton of instructions. And it's not the easiest thing to read.

14:24:35 But the important thing is that you try and follow these instructions in here the best that you can and you just look at the evidence that's being--either--that was either played during trial or that you're taking back in the exhibits. Nothing else. Not some sort of insider expertise. That's why, when jury selection happened, you were asked certain questions about whether you could take stuff and just view the evidence fairly. And you're not supposed to let bias or prejudice or

sympathy play any role. So that doesn't mean you decide this case just because you have sympathy for Mr. Narro or you have sympathy for the trucking company. That's not what this is.

14:25:18 You heard evidence in this case of damages and how it affected his life, because those are recoverable damages under the law. The law allows plaintiffs to recover for pain and suffering and mental anguish. It allows them to recover medical expenses, both in the past and the future. It allows him to recover amounts of money that he lost when he was unable to work because of his injuries.

14:25:42 I told you in opening that, during the course of this case, you would see evidence of the property damage to the vehicles. You saw that multiple times. I told you you would see where this crash happened here in Lubbock. But one thing you haven't seen at all is Mr. Sukhwinder or anybody from Chahal. They chose not to be here. They chose not to participate in this. The past two days, y'all have woken up, y'all have come here and done your duty. Mr. Sukhwinder decided that he's going to stay in California and that he's not going to participate. But, instead, what he's going to do is hide behind all these different defenses.

14:26:25 During opening, his attorney made some promises, or at least some statements about what he was going to tell you, one of them being that he didn't want to be taken advantage of; that's why he's not here. That's simply not true.

14:26:40 He also said that they were going to say to pay Mr. Narro some money. But let's look at what they did. You heard his deposition from Mr. Sukhwinder. In that deposition, he tried to say that it was Ruben's fault that he rear-ended him. Rear-end collisions, very common sense, are the person who did the rear-ending, and that's very plain and simple here.

14:27:08 And then S. Chahal Trucking went and hired experts to say that his medical bills are wrong, they're too high. Then he went and hired an expert to say Ruben just could not have been hurt in this crash. Those are all things that are inconsistent with saying you're here to take responsibility. Those are things inconsistent with saying that you're going to somehow offer to pay Mr. Narro some type of money to take care of him.

14:27:37 We are two and a half years down the road from when this crash happened, and it wasn't until recently, right before trial, that S. Chahal Trucking had this change of heart and said it's our fault--

14:27:50 MR. WISE: Objection, Your Honor.

14:27:53 THE COURT: Sustained. Stick to the evidence that was presented and reasonable inferences from that evidence.

14:27:59 MR. BECHTOL: The evidence they presented, then, was to say, "It's our fault the crash happened, but we didn't hurt him"--that's what you heard from their experts--"and we shouldn't have to pay their bills." But Mr. Sukhwinder, nor

anybody from that trucking company, are here to tell you anything about their side of the story or how the crash happened. And that's why I had to play you the video, because he wasn't here. He chose not to be here. And in that video, what he said was contradictory. It was confusing and inconsistent.

14:28:36 You heard from Jana Schieber, and what I told you in opening held true. She consistently finds that all medical providers across the State of Texas are all charging unreasonable amounts, and she does this because she's paid for her opinions. And I see her all the time. Deposed her. Defendants love to hire her, because she comes in and says exactly what they want: their bills are all unreasonable. She said every single one of Ruben's bills, from Lubbock all the way over to Dallas, were all too high, because that's what she always does. And she was paid $13,730 to come here and tell you that. All over the State of Texas, top to bottom, she has come in and told people who have gone to see doctors--their own doctors across the State of Texas, "They charge too much, they're unreasonable," over and over and over.

14:29:37 Now, Dr. Chiodo, he came in to tell you that Ruben suffered more of an injury anytime that he gets in and out of his car than he did when the 18-wheeler hit him. I want you to completely, completely throw his testimony out the window. It's nonsense. He didn't examine the vehicles. He didn't do

anything. He didn't take any steps, other than to come in here and tell you that he stared at the pictures, and therefore, you should decide he couldn't have been hurt. That's it. That's what he kept coming back to over and over. He had so much other evidence he could have looked at and utilized, and he said, "I don't need to do that." He could have looked at GPS speeds. He could have talked to the person and company that paid him $54,000 to come in here, but he chose not to do that.

14:30:29 These experts haven't met Mr. Sukhwinder. They don't know who he is. Chiodo couldn't even identify the vehicle that he said he was relying on the picture to say that you should say he's not hurt. He didn't even know that that was Chahal's truck, yet he wants you to come in and completely take faith that you should rely on his opinion that the pictures mean that he is not hurt. All right? It's nonsense.

14:31:02 What you do see and what you're going to take back into evidence is all the different treatment. Ruben went to the emergency room. He had physical therapy. He had MRI's. He had pain management. He went to the orthopedic surgeon. He had surgery. These records are all in evidence. You can see that.

14:31:22 And what he testified was, the morning when he woke up and he was hurting, he did what any reasonable person would do. He went to the emergency room, where it was reported that he had neck pain, and also lower back pain. They did x-rays,

made sure he wasn't dying, no broken bones, gave him some medicine and released him.

14:31:43 Very soon after, within a couple of weeks, he has already seen the doctor, and, just like any other reasonable person, he is referred to go get physical therapy. Dr. Chiodo said what he should do is take medications and go get physical therapy, and that's exactly what Ruben did. Ruben tried a course of physical therapy for two months. He took medications for two months, and, when presented with the option from Dr. Valente of, do you want to take a shot or I can do surgery that will hopefully take away and resolve these burning sensations, tingling and numbness going down your feet, and muscle spasms; you would need surgery, because ultimately, that's what it's going to take to try and repair what's been done to you.

14:32:32 You saw the T-spine MRI's, as well as the L-spine MRI's. The L-spine MRI showed the herniated disk at L3-4. There is no evidence that you were presented with, there's not a single piece of paper, there is not a medical care record anywhere that says anything different or that that existed prior to the April 12th, 2023, crash. There is not a single document that is in existence of where Mr. Narro went into a doctor's office and said I'm experiencing any of these symptoms that resulted in him needing surgery.

14:33:09 You're going to have the A.D. Surgeons bill, the

pain management consultant that he went to that also gave him prescriptions in June, two months after the crash. And all of these complaints and systems are all consistent across multiple doctors. Multiple doctors, all who have medical licenses, all who are saying the same thing and have to put their medical license on the line, are subject to malpractice. They are treating physicians. They are all repeating the same thing over and over, which is radiculopathy, pain, numbness, tingling, burning sensations going down his legs. None of that existed prior to the crash. All of them say over and over, every single different doctor from Lubbock to D/FW, these symptoms are a result of the April 12th, 2023, crash when he was rear-ended by an 18-wheeler. There is not a single doctor that treated him or you will see treated him prior to the crash that says anything different.

14:34:09 You heard the live testimony of the treating physician. The treating physician's deposition is played because he's in Dallas and he actually sees patients and helps people and treats them. So we take his deposition ahead of time, because he can't just leave his practice and his patients to fly out to Dallas and block off an entire week of time like Mr.--Dr. Chiodo did. That's not what a real doctor does. All right?

14:34:36 So you heard from Dr. Valente in his sworn testimony, just like every other witness by video, of him come

in and explain the procedures he did, why he did them, why they were needed and necessary, and what the result of that was. And he said it over and over. "The reason that I did surgery was radiculopathy." He didn't specifically just say, oh, he has a herniated disk; we have to cut that out.

14:35:01 What he said and what he testified about were consistent complaints across multiple doctors and a failure of conservative treatment, and that failure of conservative treatment, along with an analysis of the MRI's, is where you see that radiculopathy. And the radiculopathy resulting in the muscle spasms and the burning sensation and the pain radiating down the legs, that's why he needed surgery, not some just one-off statement about, well, it's a herniated disk, and maybe that existed before, because even if there was a herniated disk, he was able to go to work each day. It wasn't causing any of these symptoms. And then it would be the most amazing coincidence in the world if suddenly, immediately after April 12th, 2023, when he's hit by that 18-wheeler, that suddenly all of these symptoms occur.

14:35:57 Either that crash caused the herniated disk and those resulting radiculopathy or it caused that nerve compression where that herniated disk was, and now he's in a position that he has never been in in his life and experiencing something he has never experienced in his life.

14:36:19 Dr. Valente performed a surgical procedure. He cut

open his spine. He removed bone in his spine. He testified--and you heard it in the video--that when he opened up his spine, he saw the herniated disk. The actual herniated disk on the MRI, he saw it with his own eyes, and he cut it out. And you heard that the surgery was successful and that it stopped all those sensations that were causing his life to be upended.

14:36:47 Lower back pain is one thing. Having soreness is one thing. Radiculopathy that upends your quality of life to the point that everything is turned upside down is totally different, and that's what the defendant did to him. That's what the case is about and why he needed surgery.

14:37:08 This is a serious procedure, and it was necessary to restore his quality of life. When they sent all these people to sit outside his house and film his daughter, film him doing mundane tasks, they were all after the surgery, and I want you to keep that in mind and keep talking about that. Because of Dr. Valente, he can do this. Okay? He could go to the store and pick up a bathroom fixture without collapsing on the ground and having his wife and aunt having to drag him out, or his daughter or his wife or his mom seeing him in agony and pain, laying on the ground, unable to move. Because, again, you will not see any evidence and not a single document and you didn't hear any evidence from the defendants in this case that any of that ever occurred prior to April 12th, 2023, not a single time. It just didn't happen. Every single one of these

injuries and what you see in the medical records and what happened to him is easily, and common sense, a proximate cause of this crash. There's no other explanation, no other argument that the defendant can try and make, for one, because he's not here.

14:38:38 But these doctors. You heard lots of different testimony about the bills. You heard from the expert that Plaintiff retained, David Balat. You heard that he had to be paid. David Balat had to be paid and come in here and testify about the reasonableness, because we knew the defendants had hired Jana Schieber to come in here and tell you not to give him money for his medical bills. And so we had to have somebody come in and review these bills and look at them.

14:39:07 And he didn't come in and just immediately give a yes, sir opinion and say, sure, every single bill is completely right. He did his evaluation, and he came in and he actually said, I looked at the bills and I think they should be $228,748.13, slightly less than what the providers show. All right?

14:39:29 And then the evidence that you have and that you're going to take back, under all those sworn affidavits that I showed Jana Schieber with all those different experts, those bills--and I want you to write this down, because it's not going to be on, like, an exact total. But those bills, when you total those up under the subpoenaed, sworn affidavit

records, those bills are all total $231,959.94.

14:40:05 You heard Ruben talk about his lost time from work. Time when money that should have gone into the family bank account to pay the bills, take care of the kids, didn't go there. He had work right after the actual crash where he was out, just in pain. And then over the course of the time, Ruben is asserting that he was out approximately three weeks, total, until the time he had surgery for various doctors' appointments or out for pain, for 2,806.26. After the surgery, he was out for eight weeks, in which he lost $7,483.36.

14:40:50 And ever since October of last year, he finally got a job that is really accommodating to what his physical limitations are, because he's not the strong man that can go to work each day and physically do his job like when he worked for SIMFLO or anywhere else, which the defendants tried to blame his job. But they didn't show you a single record where he came in and got hurt at work, he made a complaint at work saying that he was injured, pulled--anything. There's no--there's nothing there that says he got hurt at work. He was able to do his jobs. But now he's not, and he has taken a job where he's being paid less. And over the course of the last year, he has lost approximately $8,336.

14:41:36 So we're going to ask that you consider giving him $19,027.41 to make up for the time and the money that he missed out on that should have gone into the bank account and provided

for the family.

14:41:54 But what I just told you, lost wages, that's what he missed from work and the medical bills, that's money to pay other people. Money to pay medical bills goes to the doctors. Lost wages is stuff that was taken away from him. But what the case is really about and what the most important thing in this case is, is about the pain and suffering, the mental anguish, the impairment issues that he suffered.

14:42:20 And that's why you heard from Ruben, and that's why you heard from Emri. You heard what they have gone through. Severe lumbar spine pain starting from the day of the wreck through today, and he's likely going to have residual spine pain for the rest of his life.

14:42:37 He had severe emotional distress from the day of the crash to today, when S. Chahal Trucking is still trying to avoid taking responsibility for what they did to him. He has trouble with all daily activities. It's better now since he had surgery, but he still has trouble. And in between that time of the crash and when he had the surgery, the actual injuries were debilitating, and they were extremely serious and extremely severe. They limited his family life, especially during that time, and especially now. You heard about the different things that he missed out on since this crash has happened, and you saw that in some of the surveillance video.

14:43:22 So Mr. Narro is a family man. And not just Emri

and him and his daughter. They have a house full of people. They take in everybody. They have their twin grandkids, plus another one, that they have--you know, graciously take care of in their own home. They have a disabled, nonverbal 73-year-old uncle that they take care of, that they feed. They have a little girl. They have a daughter that's about to go to college. They have a son who's in high school.

14:43:54 Mr. Narro, before this, was their Superman. I mean, he took care of everybody. He had the breadwinning job. S. Chahal Trucking took that away and put that at risk. And you heard the different ways, and it wasn't just, ow, my back. You heard that he wasn't able to attend and participate in his daughter's school. He's not able to play with his children. He's not able to make love to his wife. For, you know, six months, it was impossible, and only thanks to Dr. Valente and the surgery and his recovery since can he actually care for and be there for the person that he loves most in this world, who his partner is, even though his mom is here, and I don't want to be unfair, but--but he's a husband, he's a father, he's a grandfather, he's a son. He's a person who lives here in Lubbock and works a job just like anybody else.

14:44:56 And S. Chahal Trucking needs to be held responsible for what they did to him and his family, because for 923 days, they have avoided responsibility, and they continue to--

14:45:09 MR. WISE: Objection--

14:45:12 THE COURT: Five minutes left in the opening portion.

14:45:16 MR. BECHTOL: The last thing that you're going to have on that jury charge is--one of the questions will be about disfigurement. You did see the different pictures of what he had to endure afterwards with the blood bag and the incision and the hole in his back from the spine surgery that's left a scar. That's a permanent injury that the law allows recovery for, and he went through a lot because of it.

14:45:45 So what this case comes down to is these questions. And Question 1-- They have already admitted they caused the crash. But this question is saying, did they proximately cause the injuries, and the answer to that is affirmatively yes. This crash on April 12th, 2023, led to the injuries and the need for surgery. This man was not like this and didn't require surgery or anything else before this happened.

14:46:16 Question 2 is where we're going to ask you to write the amounts, and what I'm going to ask you to do is consider ranges. You are welcome to award however much or however less you want. If you feel like you want to write more than I'm about to ask you, you can. If you don't, you can award less.

14:46:35 But for physical pain and mental anguish sustained in the past, I'm going to ask that you consider giving Ruben $1 million to $2 million in that box.

14:46:47 For disfigurement in the past, I'm going to ask

that you consider giving 50,000 to 100,000.

For his loss of earning capacity, you saw that number, $19,027.41.

For his medical expenses, if you go with David Balat's report, it was 222,748.13. If you go with the sworn affidavits from the medical providers, it's 231,959.94.

And then for the continued physical pain and mental anguish that he'll likely sustain and have for the rest of his life, I'd like you to consider giving 750,000 to $1 million.

Some might say it's a lot. I think, for what he has gone through, I don't think it's enough. But I want you to think about it and look at the evidence and take it accordingly and hold them responsible. Thank you.

THE COURT: All right. From the defense?

(CLOSING ARGUMENT BY THE DEFENDANTS)

MR. WISE: Yes, Your Honor. May it please the Court.

First off, I want to thank y'all for your attention this week. Y'all really have been one of the more attentive jurors I have ever tried a case in front of, so I really do appreciate that.

The second thing I wanted to mention briefly before I start my closing is, y'all should be very proud of your federal district court judge and his staff. I know y'all have heard about the government shutdown going on. That affects

them greatly. Rather than complaining about it, I can tell you, behind the scenes, they have been working overtime, including over the weekend, to make this trial as efficient as possible. So y'all really should be proud of them.

14:48:36 Talking about this case. We have told you from the beginning, this case is not about who caused the accident. We know who caused the accident. It was my client and his company.

14:48:50 The jury charge. Y'all have seen the two questions that have come up. The first question is, did the negligence of Sukhwinder Singh and S. Chahal Trucking proximately cause the injury to Ruben Narro. You heard Dr. Chiodo's testimony this morning. He opined that Mr. Narro was not injured and could not have been injured in this accident because the force of the impact was too low and the force that Mr. Narro felt was too low to cause an injury. If you believe him, if you believe his testimony to be credible, the answer to Question Number 1 is no, the accident did not cause his injuries.

14:49:30 You have heard Dr. Chiodo's credentials. This is a smart, smart guy. Maybe annoyingly so; I don't know. He collects degrees the way I collect baseball cards. He could barely contain himself from wanting to teach and tell you why he thinks-- The judge even had to kind of reign him in a couple of times. But even if you found him to be a little overbearing or so many degrees or education, that doesn't mean

his opinion is wrong. This is a smart person.

14:50:01 Consider the evidence that we heard that support his opinions. First, we've seen the photographs of the damage to the vehicles. Frankly, the damage to the vehicles was not very significant. This was a low-impact collision. It's certainly not consistent with an 18-wheeler that hit Mr. Narro's vehicle going 45 miles per hour, the way he told his doctors, and which is what Dr. Valente believed when he said, "I believe the injuries were caused by this accident."

14:50:39 And, of course, we know about the inconsistent stories he has told about his back injury in the two months before the accident. Dr. Valente testified he told him that his lower back was hurting for two months prior to the accident and he got chiropractic treatment.

14:50:53 Mr. Narro said in his deposition, no, it was my upper back. Today, he said it was his middle back.

14:51:04 Mr. Narro is asking you, we just learned, to award him as much as over $3.3 million, I think is what I calculated. He wants you to believe that his back was not injured or not hurt before the accident and has now became hurt because of the accident, and now we know why.

14:51:27 We also know from both Dr. Valente and Dr. Chiodo's testimony that Mr. Narro had stenosis and spondylosis in his back prior to the accident. These were degenerative issues, not caused by an accident. Stenosis is the narrowing of the

spine. Spondylosis is essentially normal wear and tear. Both Dr. Valente and Dr. Chiodo testified that if you have stenosis and you have spondylosis, you can have pain in your back, and numbness and tingling in your lower legs. This are the exact conditions that Mr. Narro said he had because of the accident.

14:52:10 But consider also this. Mr. Narro did not find Dr. Valente by himself. Dr. Valente is over in the Dallas area. He was referred to Dr. Valente by his attorneys in this case. Okay? Meaning he's already thinking about litigation before he's even seeing a doctor or a surgeon. Right? And remember what Mr. Narro said yesterday that I thought was really the moment of the trial. He said--when he was talking about his first telephone visit with Dr. Valente--"I tried to be as honest as possible to the doctor so I didn't mess up my surgery." He's already thinking about surgery before he's even seen a doctor. And he said, "Well, you know, I misspoke about that." Right? Maybe he misspoke, or maybe that was the most truthful thing he said during this entire trial.

14:53:03 These are all things that support Dr. Chiodo's opinion that this accident did not cause Mr. Narro's injuries. So if you believe Dr. Chiodo and you believe that evidence supports his opinion, then the answer to Question 1 is "no." And if you answer "no" to Question 1, at that point, you're done. You don't answer Question 2.

14:53:28 But if you do answer "yes" to Question 1, then you

do have to answer Question 2, and that question is, what sum of money, if paid now in cash, would fairly and reasonably compensate Ruben Narro for his injuries, if any, that resulted from the occurrence in question?

14:53:47 And the first element of that question is physical pain and mental anguish sustained in the past. This is inherently a difficult number to come up with. Right? It's because it's not something that is subject to a mathematical calculation. You can't look at a piece of paper and say, oh, that's the answer. You can't do math and decide and say, oh, that's the answer.

14:54:13 If you remember, during the opening statement--and Mr. Bechtol said it here today--you don't have to listen to what Mr. Bechtol says. I think he asked for one million or two million dollars. You don't have to listen to what I'm going to tell you. You can write down any number you want. You can write down a dollar, $1,000, $2500, any number you want. We're not going to ask you to write down a number that low, but we're certainly not anywhere near a million dollars. Okay? We're asking you, if you get to Question 2, if you write "yes" to Question Number 1, to put $20,000 for past pain and mental anguish.

14:54:55 For the second element of the question, physical pain and mental anguish that, in reasonable probability, Ruben Narro will sustain in the future. Based on the evidence you

have had heard, Mr. Narro has not treated with Dr. Valente since January 2024. That's almost two years ago now. No evidence he has gotten any physical therapy since January 2024. He has maintained a full-time job ever since the day of the accident. He's now working two jobs where he's working for his company, and he's also working for Girling, taking care of his uncle-in-law.

14:55:34 He testified yesterday that he is 75 percent improved since the accident and progressively getting better. Frankly, we don't believe he's experiencing any pain and mental anguish as a result of this accident going forward into the future, so we're asking that you write down "zero" for that number.

14:55:54 Loss of earning capacity in the past. We just talked about Mr. Narro has maintained employment since the day of the accident until today. He actually has two sources of wages at this point, and he's--because of the--being paid to watch his uncle-in-law.

14:56:12 Frankly, there's unclarity about how many days of work he missed because of this accident. We have not seen any evidence as to what are his earnings in 2022? What are his earnings in 2023? What about 2024? There's no evidence presented before you. It could be tax returns. But what are--what is this guy making each year, and why is he making less now, or is he making less now? We don't know.

14:56:36 But despite all this, we're asking that you offer him $10,000 for lost past earning capacity. That number accounts for three days that he missed, apparently, from work after the accident, the three weeks leading up to the surgery, and the two months that he missed after the surgery, even though he said he was paid for that time.

14:57:02 Question Number 4, disfigurement sustained in the past. Disfigurement is essentially a physical change in a person's appearance that makes them unsightly or deforms them or something to that effect. This is--again, is another one of those numbers that's difficult to come up with, because you can't look at a piece of paper and make that determination. Right?

14:57:29 In this case, I think the element of disfigurement he's complaining about, I think, is a scarring--or a scar or something on his back. We haven't seen that. Frankly, I have not heard any evidence that suggests that he is embarrassed about that. You know, I don't mean to be insensitive, but this is a scar on a gentleman's back that nobody is probably ever going to see, or at least not that often. Not that many people are going to see it. We are asking that you write down "zero dollars" for past disfigurement.

14:58:03 And finally, medical care and expenses incurred in the past. I talked about this a moment ago. We talked about all the issues. Talked about Dr. Chiodo's testimony, where he

says the force of the impact was low and wouldn't have caused these injuries. We talked about the minor damage to Mr. Narro's vehicle. You've seen a picture of that a moment ago. Talked about him having stenosis and spondylosis for--not because of this accident, but because that's everyday life. Some people have it. And they talked about the extent to which Mr. Narro seemed, frankly, overly eager to have surgery, before he ever even saw Dr. Valente in person.

14:58:50 Ultimately if you get to this question, if you get past Question 1, we're asking that you award the plaintiff the reasonable cost of his ER bill, his physical therapy, and his MRI. Essentially, we're asking you offer him everything--the reasonable cost of all of his medical treatment except for the surgery. I've done the math for you, and that's per Ms. Schieber's testimony this morning. That number is $16,272.34.

14:59:22 And that's it. Once you have answered those questions, you have rendered your verdict. At that point, the judge is going to apply the law to your verdict and come up with what we call a final judgment, and that's it. That's the case.

14:59:42 This is my last chance to speak with you before--during this trial. On behalf of my clients and myself, I appreciate y'alls service on this jury and your attention in this case. The plaintiff's attorney is going to have one more

chance to speak with you. I have no idea what he's going to say. He might come up with this amazing argument I've never even thought of and he's been holding to the end, which is fine. He's allowed to do that.

15:00:09 So in case he does that, I just want you to remember one thing. Okay? While you have to base your verdict on the evidence before you, you do not have to check your common sense at the door. Okay? Using your common sense, frankly, I could have made the case that you don't even need Dr. Chiodo's testimony to know that this accident was not a heavy-impact. This is not the kind of accident that warrants a $3.3 million verdict. So we ask that you use your common sense, apply that to the credible evidence that you've heard, and render your verdict accordingly. Thank you.

15:00:52 THE COURT: All right. Thank you very much.

15:00:58 Mr. Bechtol, you have seven minutes remaining.

15:00:58 (FINAL CLOSING ARGUMENT BY THE PLAINTIFF)

15:01:30 MR. BECHTOL: To address what he just went through, who on earth would want to get parts of their spine removed and go through surgery? To say that him accidentally or misspeaking about needing surgery and thinking that's the moment of the trial is nonsense. There wasn't even surgery mentioned. There's never been a doctor that said he needed surgery prior to this crash. Surgery wasn't even spoken about until he failed conservative treatment.

15:02:02 What they are asking you to do is put Ruben in between a rock and a hard place, because they're asking you to give him very little money that won't even cover his medical expenses. They're asking you to give him very little money that won't even cover the amount that he lost from work, and they're asking you to give him very little money for the pain and suffering he has endured since the time this crash has happened. Don't do that. That's not fair to him. It's not fair to his family.

15:02:33 Dr. Valente's records from this first appointment back in April, within a week of the crash, they don't mention anything about Ruben saying that he got hit 45 miles an hour. That's just not true. It's not in the record. There is nothing in this record from that first visit that says anything about surgery, that says that Ruben was experiencing any type of radiculopathy or symptoms prior to this crash. It's not there. He just made that up and argued it to you. It's not in the record. It doesn't exist, just like the injuries before this don't exist.

15:03:11 And you know what else doesn't exist? Any stenosis or nerve compression or anything prior to the crash. They very carefully selected--showing you that T-spine MRI when they talked about this spondylosis because that's in the middle of his back. And you heard Dr. Chiodo talk about, if you have any type of nerve root compression in your T-spine, if it's going

to do anything, it affects your trunk, your chest, this middle part of your body. It does not affect your lower back, down to your legs or your feet, like what Ruben experienced immediately after the crash. His own expert said that.

15:03:54 So don't be tricked into falling for an MRI result of a different part of his body saying something completely different. Spondylosis in his middle back has nothing to do with why he needed surgery or what was going on, and there is no evidence that you heard in this case that he had any symptoms, that that spondylosis in his middle back was causing any symptoms prior to the crash either.

15:04:20 You have to take the person that you harm as they are. He hit Ruben. And it could have been anybody, but that's who he's--the person that was harmed in this case is. And so you have to take him in his condition when he was hurt, and the result of hitting him with that 18-wheeler caused those injuries. They caused those injuries that resulted in the need for surgery and everything else with it.

15:04:45 And what are they doing? You just heard him get up here and try and avoid responsibility by hiding behind all these different excuses. He works in construction. Again, there is nothing that happened in his past or they can point to that he was having any type of issues going to work and putting food on the plate for his family. Mr. Chiodo sat here for, I don't know, five minutes and just called Ruben fat and all of

his problems are just because he's fat, and not because he was hit by an 18-wheeler. I was offended by that. And, again, Dr. Chiodo said that this was like sitting in a comfy chair. That's complete nonsense.

15:05:33 When you go back, I want you to think about this. We're asking you to compensate Ruben. We're asking you to get him what was taken away. Sometimes juries and people in lawsuits think that this is some sort of reward game, and that's not what it is. Compensate doesn't mean reward. Compensate means balance. Because of S. Chahal Trucking's actions and what their driver did, these scales are tipped, and they're tipped against Ruben. Your job is to go back, look at the evidence, and balance that.

15:06:09 And when you look at that, all you can view in the evidence is the harms, and what our system does is allow you to balance the harms with money. You can't go back to April and make the S. Chahal trucker not hit him and not be hurt anymore. Our system and what the jury trial system does in our country, which is protected by the Federal Constitution, the Texas Constitution--it's a constitutional right that Ruben has to come and ask you to do this--and you-all have it, too--is to ask you to balance, which means to do what you can to restore him back to what he was before this ever happened, before he had daily pain, before he needed portions of his spine cut out.

15:06:58 Nothing else is allowed. Okay?

15:07:00 So when you go back and review the evidence, I want to you think of that. And again, like I said, you have two jobs. Go back and look at the evidence and talk to each other. If you have certain opinions about certain things and why you think a medical bill, or whatever it may be, should be a certain amount or taken into consideration a certain way, talk to each other and let each other know, the same as when we did jury selection. Usually, the more you talk, the more people understand your point of view and why you feel a certain way.

15:07:31 And I said at the beginning of this trial, too, that we'll trust your verdict. Obviously, it means a lot to Ruben and his family to ask you to do this. He doesn't want to go through this process, just like he didn't want to go through the surgery. But this is his only option. His only avenue is to come here and do this. All right? Because they are not here, again, and trying everything they can to avoid balancing and avoid responsibility. Do not let them do it anymore. All right?

15:08:12 I thank you for your time, and again, we'll trust your judgment. Thank you.

15:08:16 THE COURT: All right. Thank you very much, Mr. Bechtol.

15:08:21 All right. Ladies and gentlemen, your work is--in this courtroom anyway, is done. A couple of final notes from the Court.

15:08:31 The light is finally green. Man, that red light was the longest red light of your life, I'm sure. We've all sat at some long ones. The light is green, so when you go back there, you can absolutely start talking amongst yourselves, just amongst yourselves. Not with my court security officer present, not with my law clerk present. Just amongst yourselves, you can start deliberating.

15:08:51 I need to tell you, you need to deliberate as a body. So if you need ten minutes for a comfort break--I'm sure everybody's going to need a break for a second--wait until you're all together to start talking.

15:09:00 We will send the exhibits back. It will take us a few minutes to get them together, make sure only the admitted exhibits are back. But those will be brought to you as soon as we can. It won't take more than ten minutes or so.

15:09:11 We're also going to send back a laptop--that's actually already in the room--a laptop. To the extent you want to watch the exhibits or look at the exhibits that were electronic, like the video and the electronic pictures, if you want to look at that, there's a laptop. There is a USB--a flash drive that's been inserted. Open that flash drive. They are all right there. If you need assistance with that, if the laptop stops working or whatever, it's punky, tell the court security officer. I will send the court's IT person back there and help you get across that barrier.

15:09:46 Finally, your schedule. You've been very patient with us. We are going to be patient with you. So do your work. Take your time. I just ask, if you decide that you're going to work past 5:00 today--if that becomes necessary and you want to stay late, we will accommodate you. Just let us know so we can plan accordingly.

15:10:05 All rise for the jury.

15:10:08 (THE JURORS EXIT THE COURTROOM)

15:10:33 THE COURT: All right. Be seated, please.

15:10:35 The form. Please fill out that form as soon as you can once we take our recess.

15:10:39 Mr. Bechtol, do you plan to stay in the courtroom during deliberations?

15:10:40 MR. BECHTOL: Yes, Your Honor.

15:10:42 THE COURT: Okay. All right. Does the defense plan to stay in the courtroom?

15:10:43 MR. WISE: Yes, Your Honor.

15:10:44 THE COURT: All right. That's fine. If that changes, please just inform my courtroom deputy the best number to reach you, and we'll get in touch as soon as we know whether there's a verdict or a note.

15:10:57 Anything from the plaintiff before we take our recess?

15:10:59 MR. BECHTOL: No, Your Honor.

15:11:00 THE COURT: From the defense?

15:11:00 MR. WISE: No, Your Honor.

15:11:01 THE COURT: All right. We're in recess.

(DELIBERATIONS COMMENCE AT 3:15 P.M.)

15:11:26 ---------------------------------------------

17:03:14 (VERDICT RETURNED AT 5:00 P.M.)

17:07:50 (THE JURORS ARE SEATED IN THE JURY BOX)

17:08:40 THE COURT: Be seated.

17:08:44 All right. We're back on the record in the trial of Narro vs. Singh, 5:24-CV-045. The jury is back.

17:08:51 Ladies and gentlemen, I understand we have a verdict. Who is the foreperson?

17:08:54 JUROR: (Indicates.)

17:08:56 THE COURT: Is your verdict unanimous?

17:08:57 THE JUROR: Yes.

17:08:59 THE COURT: All right. Would you please hand the form to my court security officer.

17:09:51 All right. If the parties would please rise, I will read the answers to the questions.

17:10:02 Question Number 1. Did the negligence of Sukhwinder Singh and S. Chahal Trucking, Inc., proximately cause the injury to Ruben Narro? Answer "yes" or "no." And the Court [sic] has answered "Yes."

17:10:19 Question 2-- I will skip to the questions that were asked.

17:10:24 Number 1. Physical pain and mental anguish

17:10:36 sustained in the past. Answer, $200,000.

Question 2. Physical pain and mental anguish that, in reasonable probability, Ruben Narro will sustain in the future. Answer, $750,000.

17:10:54 3. Loss of earning capacity sustained in the past. Answer, $14,500.

17:11:05 4. Disfigurement sustained in the past. Answer, zero dollars.

17:11:11 5. Medical care expenses incurred in the past. Answer, $232,000.

17:11:20 The verdict certificate is signed by the foreperson. She has printed her name, and it is dated today, October 21st, 2025.

17:11:29 Would either side like to poll the jury? Mr. Bechtol?

17:11:31 MR. BECHTOL: No, Your Honor.

17:11:32 THE COURT: Mr. Wise?

17:11:33 MR. WISE: No, Your Honor.

17:11:34 THE COURT: Okay.

17:11:37 All right. Ladies and gentlemen, this verdict is filled out completely. It is signed, so the Court will accept this verdict. Your work is done-- You may be seated.

17:11:49 Thank you so much for your time, your attention, and for filling this out. The parties appreciate your service. I appreciate your service. What I said during voir dire is

absolutely true. I can do a lot of things, and every day, I have to make many, many decisions. But there are certain things that, very rightfully so, we reserve for the people. This is one of them. So you should be proud of your service. I hope it was a positive experience.

17:12:20 I know it's the end of the day, and I know it's been a long two days for you. If you're willing to stick around for a few minutes just to give me feedback about how the process went, what we can do better, if anything, I would welcome that. I talk to the jurors afterwards. If you need to rush home or get back or pick somebody up, I certainly will not be offended. Know that I'm not one of those judges that has to run for election, so I'm not trying to get your vote. I'm not trying to suck up to you. It genuinely--I do this for public service. So if there's something we can do better, I'd just like to talk. And if you have questions for the Court, I would be glad to answer them.

17:12:55 All rise for the jury. You are excused.

17:12:58 (THE JURORS EXIT THE COURTROOM)

17:13:18 THE COURT: All right. Be seated.

17:13:20 Okay. Mr. Bechtol, anything else from the plaintiff today?

17:13:22 MR. BECHTOL: No, Your Honor.

17:13:24 THE COURT: From the defense?

17:13:24 MR. WISE: No, Your Honor.

THE COURT: Okay. All right. The Court will prepare a judgment that reflects the jury's verdict.

I want to thank both sides for the efficient presentation of evidence.

Court is adjourned.

(END OF TRIAL)

I, Mechelle Daniel, Federal Official Court Reporter in and for the United States District Court for the Northern District of Texas, do hereby certify pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*/s/ Mechelle Daniel* **DATE** JANUARY 5, 2026

MECHELLE DANIEL, CSR #3549
FEDERAL OFFICIAL COURT REPORTER